IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

CASE NO. 20-695

|  |  |
|---|---|
| DALLAS R. MCCLAIN, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) |
| | ) |
| JOHN MICHAEL "MIKE" CAUSEY, | ) |
| Commissioner of Insurance for the State of | ) |
| North Carolina in His Official Capacity and | ) |
| In His Individual Capacity; THE NORTH | ) |
| CAROLINA DEPARTMENT OF | ) |
| INSURANCE, By and Through the Actions | ) |
| Of Its Commissioner and the Individual | ) |
| Defendants Named Herein; JACQUELINE | ) |
| "JACKIE" OBUSEK, In Her Individual | ) |
| Capacity; JEFFREY A. TRENDEL, In His | ) |
| Individual Capacity; JOHN CABLE, In His | ) |
| Individual Capacity; STEVE BRYANT, In | ) |
| His Individual Capacity; DANIEL S. | ) |
| JOHNSON, In His Individual Capacity; | ) |
| M. DENISE STANFORD, In Her | ) |
| Individual Capacity; HEATHER | ) |
| FREEMAN, In Her Individual Capacity; | ) |
| MARTY SUMNER, In His Individual | ) |
| Capacity; And, All Other Persons Involved | ) |
| Causing the Harm and Damage to Plaintiff | ) |
| as Alleged Herein and Being Identified and | ) |
| Referred to as JOHN DOES 1-10; And, | ) |
| JANE DOES 1-10, | ) |
| | ) |
| Defendants. | ) |

CIVIL COMPLAINT
JURY TRIAL DEMANDED

NOW COMES Plaintiff, Dallas R. McClain ("Mr. McClain"), by and through his

undersigned attorneys, and in support of claims for compensatory damages, punitive damages,

1

and attorneys' fees against each and every above-captioned Defendant, jointly and severally, does hereby state and allege as follows:

*****

## I.    INTRODUCTION

1.    This is a lawsuit based on the Defendants' unconstitutional seizure and abrupt shut down of Mr. McClain's bail surety business because of a conspiracy among elected officials, government employees, and their lawyers all working in concert to favor and support their campaign contributors, influential legislators, and Mr. McClain's competitors.

2.    Defendants colluded to fabricate false charges and make salaciously false and misleading statements to the Courts to portray a false narrative of a public emergency.  In doing so, Defendants were effective in convincing a Court in this State to forcibly take and shut down Mr. McClain's company and livelihood, as well as the livelihoods of over 200 bail agents writing bonds for Mr. McClain's surety company.

3.    This lawsuit exposes corruption at its worst, of conduct unbecoming of an elected official and officers of the Court, and violations of the law coupled with a total obliteration of any code of ethics or morality.

*****

## II.    PERTINENT OVERVIEW

### A.    Forecast of what Mr. McClain will Prove to the Court

4.    On 28 September 2017, Defendant North Carolina Department of Insurance ("DOI") seized Mr. McClain's privately held surety company known as Cannon Surety, LLC (hereinafter, "Cannon").

5.     The Department's "emergency" seizure was based entirely on a false narrative, and was, in reality, simply a corrupt, political favor to third-parties. The blatant misrepresentations proffered by the Defendants to the Court in furtherance of the "emergency" seizure of Cannon were an attempt to justify their unlawful actions and hide their abusive, illegal and repugnant seizure of Mr. McClain's private business and rights therein.

6.     Mr. McClain will prove Defendant Causey admitted to multiple individuals that he shut down Mr. McClain's private Cannon business as a political favor to State Senator Phillip Berger and ex-State Senator Tom Apodaca.

7.     Internal DOI documents reveal the Defendants plotted to shut down Mr. McClain's company astonishingly in order to cut off his funds so he could not protect and/or defend himself and Cannon in a lawsuit he was then pursuing against a third-party surety competitor and others who were friends and supporters of Defendants.

8.     Mr. McClain will prove Defendants regulated Mr. McClain's Cannon business in an arbitrary, capricious and discriminatory manner, while allowing other similar surety companies to blatantly break the law with impunity.

9.     Mr. McClain will prove his Cannon business, which did not owe a penny in unpaid bail bond forfeitures when it was seized by Defendants, currently owes the State over two million dollars in unpaid bail forfeitures that have all occurred *after* Defendants' seizure of Cannon.

*****

B.      Some Examples of Defendants' Deception of the State Court to Justify
         Their Improper Acts and Omissions

10.      As more fully discussed below, on 27 September 2017, Defendants filed a sealed, confidential, and unnoticed "verified" emergency petition in Wake County Civil Superior Court to take over control of Mr. McClain's Cannon business.

11.      In a hearing on 12 October 2017 in State Court concerning Defendants' petition, certain statements were made by Defendant Daniel S. Johnson with the full support of and/or instructions by all Defendants.  Set out below are non-exhaustive examples of Defendants' intentional, willful, wanton, reckless, deliberately indifferent, and/or bad faith statements, acts, and omissions that were false and/or misleading (at best) that have directly injured and damaged Mr. McClain:

> THE COURT: What about the *[sic]* being treated differently than all the other sureties who have been prohibited from writing bonds in various counties?
>
> [DEFENDANT JOHNSON]: No one is in the same condition as Cannon.  They are a one-off.  They don't file reports.  They don't have record *[sic]*.  They have 79 million outstanding.  There is no one that's the same as Cannon.  He [referring to Cannon's then-attorney] cannot say truthfully anything about those other things that – he can't say that AAI is doing those wrong that Cannon is doing.
>
> * * *
>
> THE COURT: What is meant by this litigation?  What is owed?
>
> [DEFENDANT JOHNSON]: What's owed?  Well, Your Honor, the records of the company [presumably referring to Cannon] – what's owed is certainly – as of June 30 [2017] by the company's own submission -- $79 million.

4

See, Plaintiff's Exhibit 1 (Excerpts from the 10-12-2017 Seizure Petition Hearing T. pp 77-78, 83) attached to this Verified Complaint.[1]

12.     During this hearing, Defendant Johnson stated on more than one occasion that Cannon owed 79 million dollars in unpaid bond forfeitures to the State.  The truth – as Defendants all knew at the time of their seizure of Cannon - was that Cannon owed exactly zero dollars in unpaid bond forfeitures.

13.     Since stealing Mr. McClain's Cannon business, however, and while Cannon has been exclusively under the Defendants' control, Cannon now currently owes the State over two million dollars ($2,000,000.00 USD) in unpaid bond forfeitures.  A true copy of the State's June 2020 quarterly "rehabilitation" report is attached as Exhibit 2.

14.     In yet another instance of Defendants' misrepresentations to the State Court, the following exchange occurred:

> THE COURT: Are they [Cannon] being treated differently [than sureties such as AAI, North River, and 1st Atlantic]?
>
> [DEFENDANT JOHNSON]: They are not.

See, Plaintiff's Exhibit 1 (10-12-2017 Seizure Petition Hearing T. pp 77-78) attached to this Verified Complaint.[2]

15.     However, *at the time of Cannon's seizure*, North River Insurance Company ("North River") – another surety company - had approximately 33 unpaid bond forfeiture

---

[1]     Pursuant to M.D.N.C. Local Rule 7.1(c), the entirety of this hearing transcript is not being attached but it is available for production in its entirety.

[2]     See, *supra*, footnote 1.

judgments in the State totaling approximately $122,000.00, with some unpaid writs dating back to 2009.

16.     North River is still operating and issuing bonds in the State despite being prohibited for many years in several counties throughout the State.

17.     At the time of Defendant Johnson's foregoing statement, the information on North River's unpaid judgments and prohibition in several counties was known by all Defendants.

18.     Additionally, at the time of Cannon's seizure, 1st Atlantic Surety Company (hereinafter, "1st Atlantic") – another surety company - was prohibited from writing bonds for unpaid bond forfeitures in various counties throughout the State.

19.     And, within a year of Cannon's seizure by Defendants, 1st Atlantic had approximately 18 unpaid bond forfeiture judgments totaling over $220,000.00.

20.     By the Fall of 2019, 1st Atlantic's unpaid bond forfeiture judgments numbered 19 and totaled the unpaid sum of over $580,000.00.

21.     Despite the foregoing, 1st Atlantic has never been seized by Defendants, has operated continuously, and is still actively writing bonds as of the filing date of this action.

22.     And, finally, still yet another surety company, Agent Associates Insurance, LLC (hereinafter, "AAI"), was allowed by Defendants to voluntarily wind its business down and close out with a consensual agreement between the owners and Defendants.

23.     To date, and as of the filing of this action, AAI has never been seized by Defendants despite being grossly undercapitalized compared to Mr. McClain's Cannon business and despite the Defendants having to pay some of AAI's bond forfeitures from the minimal capital reserves that AAI actually managed to have.

6

24.     *Again, at the time of its seizure by Defendants, Mr. McClain's Cannon business had no unpaid bond forfeitures and was not prohibited from writing bonds in any county in the State.*

25.     *In fact, no other bail surety company in the State has ever been seized as was done with Mr. McClain's Cannon business.*

26.     In addition to the above-quoted statements by Defendant Johnson, with the full support and knowledge of and/or instructions by the other Defendants to this action, the following exchange occurred between the Court and Defendant Johnson:

> THE COURT: What about the *[sic]* being treated differently than all the other sureties who have been prohibited from writing bonds in various counties?
>
> [DEFENDANT JOHNSON]: No one is in the same condition as Cannon. They are a one-off. They don't file reports. They don't have record *[sic]*. They have 79 million outstanding. There is no one that's the same as Cannon. He [referring to Cannon's then-attorney] cannot say truthfully anything about those other things that – he can't say that AAI is doing those wrong that Cannon is doing.

See, Plaintiff's <u>Exhibit 1</u> (10-12-2017 Seizure Petition Hearing T. p 78) attached to this Verified Complaint.[3]

27.     Defendants' foregoing representations to the Court through Defendant Johnson are and were belied by the North River and 1st Atlantic examples, as well as AAI.

28.     Further, and contrary to Defendant Johnson's statement to the Court, Mr. McClain's Cannon business underwent two extensive financial examinations that lasted for weeks and which were billed to Cannon by Defendants – one in 2016 and another in 2017.

---

[3]     See, *supra*, footnote 1.

29.    To this very day, and despite the provisions in N.C. Gen. Stat. §§ 58-2-131 and 58-2-132, the financial examiners have never provided any report to Mr. McClain – oral or written - of any alleged deficiencies with Cannon's financials, nor that he needed to take any corrective actions or measures.

30.    And, contrary to Defendants' statements to the contrary, every record that was ever requested by the examiners of Mr. McClain and his Cannon business prior to Defendants' seizure were provided.

31.    As of the filing of this action, the only thing Mr. McClain ever heard from the examiners was that they "did not find any glaring issues" and "everything looked good."

32.    The first time Mr. McClain was ever made aware of any alleged deficiency or alleged problems (all of which are vehemently denied by Mr. McClain) was the day Cannon was seized – approximately four (4) months after Cannon's annual financial examination for 2017.

33.    In stark contrast to Mr. Johnson's appallingly false and prejudicial statements regarding Mr. McClain's Cannon business, the objectively demonstrable truth is this:   Mr. McClain's Cannon business did not owe one penny in unpaid bond forfeitures to the State nor was Cannon prohibited from writing bonds in any county of the State.

*****

C.    Some Examples of Defendants' Internal Documents that Reveal the Calculated and Premeditated Plot Against Mr. McClain and His Cannon Business

34.    A public records request to the DOI involving an individual named Mark Cartret (who, as will be shown in detail below, is a primary figure in this action), produced additional damning evidence that unequivocally shows how unfairly, abusively, and unlawfully the

8

Defendants have intentionally acted to the substantial harm and detriment of Mr. McClain and his Cannon business.

35.     The documents uncovered from the public records request are collectively attached hereto as Exhibit 3 and will be referred to as the "Obusek Documents."  In sum, the Obusek Documents show, *inter alia*, the following:

(i).     On 21 September 2017 (only 7 days before Mr. McClain's Cannon business was seized by the DOI on 28 September 2017 and approximately 3 weeks *before* the return hearing on the seizure of Mr. McClain's Cannon business), the Defendants entered into an agreement with Mr. Cartret's AAI business.  This 21 September 2017 agreement between Mr. Cartret, AAI and the Defendants *increased* the AAI's bond exposure limit to serve as a surety from $500,000 to $550,000 per bond.  Mr. McClain's Cannon business had only been allowed a maximum of $500,000 per bond.

(ii).     The 21 September 2017 agreement between Mr. Cartret, AAI and the Defendants required the DOI to release all real and personal property pledged as security to the DOI by AAI and its officers.

(iii).     The 21 September 2017 agreement between Mr. Cartret, AAI and the Defendants noted that AAI was far below the minimum cash reserve requirements of $1,250,000 required by the DOI with an astonishing deficit of **$686,577.00**.  (Notably, and what should not be lost on this Court is that at the time Cannon was seized by Defendants on 28 September 2017, Cannon was only

9

allegedly[4] "short" the total sum of $265,424.00 from its minimum cash reserve requirements. In other words, of the required $1,250,000.00, Cannon had $984,576.00 on deposit with the DOI, while AAI only had the sum of $563,423.00.).

(iv).    Despite owing the DOI three times more than Mr. McClain's Cannon business to satisfy the DOI's minimum cash reserve requirements, and despite shutting Mr. McClain's Cannon business down in large part because of its alleged deficit of satisfying the DOI's cash reserve requirement, the agreement between Mr. Cartret, AAI and the Defendants inexplicably allowed Mr. Cartret and AAI until 31 October 2017 to satisfy its cash reserve requirements. AAI and Mr. Cartret never came close to satisfying the cash reserve requirement of the DOI by the date of 31 October 2017 or at any time up through the filing of this action. But, yet, AAI was never seized by the Defendants.

(v).    Finally, the Obusek Documents then reveal the alarming, premeditated calculation by the Defendants to shut down Cannon (not Mr. Cartret's AAI business or 1st Atlantic or North River) and put Cannon in supervision in hopes that doing so would, "put an end to the lawsuit [then pending between Cannon and McClain against Mr. Cartret and AAI and others] *since the source of [Cannon's and Mr. McClain's] funds may be interrupted*." (Emphasis added). The Obusek Documents then further reveal how the Defendants acted at

---

[4]    For the reasons explained herein, Mr. McClain denies that his Cannon business had not satisfied the DOI's minimum cash reserve requirements. Regardless, Mr. McClain's Cannon business was in far better financial condition than AAI and AAI's deficit on satisfying the DOI's cash reserve requirements was three times worse than Cannon.

Case 1:20-cv-00695-CCE-LPA   Document 1   Filed 07/30/20   Page 10 of 273

Mr. Cartret's behest to become "an integral part of [the] litigation" as the regulator of Mr. McClain's Cannon business. Ultimately, seven (7) days after the Obusek Documents, the Defendants seized Cannon.

36. After seizing Cannon, the Defendants – now the supposed "rehabilitator" of Cannon – quickly dismissed Cannon's claims and involvement in the lawsuit against Mr. Cartret and AAI and others.

37. The Defendants did so over Mr. McClain's undersigned counsel's objections and warnings that the Defendants were ignoring a fiduciary responsibility to Cannon and deliberately harming Cannon, while obviously helping Mr. Cartret and his AAI company by releasing them from a lawsuit that could have resulted in a judgment against Mr. Cartret and AAI for hundreds of thousands of dollars, if not millions – which would have been to the benefit of Mr. McClain and Cannon.

38. Mr. McClain's counsel also informed the Defendants they were in an inappropriate conflict of interest and could not properly make such a decision.

*****

D.      The Present-Day Results of the Defendants' Actions

39. Mr. McClain has been divested of his property, rights and interests in his private Cannon company in egregious violation of the United States Constitution, North Carolina Constitution, and federal and state common law.

40. Mr. McClain's reputation and goodwill with hundreds of bail bondsmen and agents throughout the State and other surety companies inside and out of the State have been destroyed.

11

41.     Defendant Mike Causey, the DOI's current Commissioner, has stated to at least one person after the Defendants' actions that are the subject of this action –

> We've got 15 attorneys at our disposal.  And the state can spend $10 million dollars defending itself.  And all it's going to do is cost somebody a pile of money.  And, you, know, sure, there's a chance that somebody might win, but the chance is slim.

42.     Unless Defendants are held accountable under the law by this Court, Defendants will only be further emboldened and will continue their pattern and practice of violating the rights of other persons and the laws of the State and the United States of America.

43.     The entire guise behind which the Defendants acted, *to wit* - to protect the public – was false when initiated and has remained so to the present day.  The public's protection and best interests, in fact, have not been served at all.

44.     The public's interests have been substantially damaged by Defendants' illegal actions to the current monetary sum of over 2 million dollars in unpaid bond forfeiture judgments Defendants caused, and this amount will likely only increase.

45.     The public's interests have been substantially damaged by Defendants' illegal actions to the point that this Court should intervene to appoint an independent monitor to oversee the activities of the North Carolina Department of Insurance and all of its subparts.

*****

III.     NATURE OF ACTION; JURISDICTION; AND, VENUE

46.     This is a civil action for damages brought under, *inter alia*, 28 U.S.C. §§ 1331, 1343, 1367 and 1391; 42 U.S.C. §§ 1983, 1985, 1986 and 1988(b); and, North Carolina law.

12

47.     This Court has federal question jurisdiction over Mr. McClain's claims pursuant to 28 U.S.C. § 1331 and supplemental jurisdiction over his state law claims pursuant to 28 U.S.C. § 1367.

48.     Mr. McClain's claims are substantially related, legally and factually, to his federal constitutional claims upon which original jurisdiction is premised.

49.     This Court has personal jurisdiction over each of the Defendants because Defendant DOI is an agency and department of the State and each of the individual Defendants are citizens of North Carolina.

50.     Venue is proper under 28 U.S.C. § 1391(b) because the Defendants reside in this district and a substantial part of the events or omissions giving rise to the claims occurred within this district.

51.     Mr. McClain brings this lawsuit to hold each of the Defendants accountable for their dishonesty, abuse of office, and breach of the public's trust.

52.     Defendants were acting under color of State law at all times relevant to this Complaint.

*****

IV.     FACTS AND PARTIES

53.      Mr. McClain is a citizen and resident of Rockingham County, North Carolina.

54.     At all times pertinent to this action, Premier Judicial Consultants, LLC ("Premier") was a North Carolina limited liability company duly incorporated and validly existing under the laws of the State of North Carolina (hereinafter, "State") and had its principal office located in Greensboro, Guilford County, North Carolina.

13

55.     At all times pertinent to this action, Premier was the 100% owner of the wholly owned subsidiary known and referred to herein as the aforementioned Cannon entity.

56.     At all times pertinent to this action, Cannon had been engaged in the business of providing surety bail bonding services and bail surety as a special purpose captive entity wholly owned by Premier and approved and duly licensed by Defendant North Carolina Department of Insurance (hereinafter, "DOI").

57.     Upon information and belief, the DOI has purchased liability insurance sufficient to waive its immunity against civil liability.

58.     Continuously since 2008, Mr. McClain has been a licensed bail bondsman in the State of North Carolina (hereinafter, "State").

59.     Defendant DOI is an agency of the State and charged with supervising and overseeing bail bondsmen, insurance companies and surety companies, including closely-held, special purpose captive surety companies such as Cannon.

60.     Defendant John Michael "Mike" Causey is the current Commissioner of Insurance for the North Carolina Department of Insurance and, as such, sits as a member of North Carolina's Council of State, responsible for not only his own agency's policies and compliance but also for other State decisions on various important issues.  For purposes of this action, references to Mr. Causey shall be as "Defendant Causey" or "Defendant Commissioner."

61.     On information and belief, Defendant Causey is a citizen and resident of Guilford County, North Carolina.

62.     Defendant Causey is named and being sued in his official capacity with the DOI and in his individual capacity for acts taken under color of law at all times relevant to this Complaint.

14

63.     The DOI is a state agency and department of the State and, as pertains to this action, it is the State agency that has regulatory and supervisory authority over bail bondsmen and surety companies in the State, specifically including special purpose captive surety companies such as Mr. McClain's Cannon business.

64.     On information and belief, Defendant Jacqueline "Jackie" Obusek (hereinafter, "Obusek") is a citizen and resident of Wake County, North Carolina.

65.     At all times pertinent to this action and on information and belief, Obusek was in the position of Senior Deputy Commissioner at the DOI.  Defendant Obusek is named in her official capacity with the DOI and in her individual capacity for acts taken under color of law within the scope of her employment.

66.     On information and belief, Defendant Jeffrey A. Trendel (hereinafter, "Trendel") is a citizen and resident of Wake County, North Carolina.

67.     At all times pertinent to this action and on information and belief, Trendel was in the position of Deputy Commissioner at the DOI.  Defendant Trendel is named in his official capacity with the DOI and in his individual capacity for acts taken under color of law within the scope of his employment.

68.     On information and belief, Defendant John Cable (hereinafter, "Cable") is a citizen and resident of Randolph County, North Carolina.

69.     At all times pertinent to this action and on information and belief, Cable was in the position of Deputy Commissioner at the DOI.  Defendant Cable is named in his official capacity with the DOI and in his individual capacity for acts taken under color of law within the scope of his employment

70.     On information and belief, Defendant Steve Bryant (hereinafter, "Bryant") is a citizen and resident of Wake County, North Carolina.

71.     At all times pertinent to this action and on information and belief, Bryant was in the position of Senior Complaint Analyst at the DOI.  Defendant Bryant is named in his official capacity with the DOI and in his individual capacity for acts taken under color of law within the scope of his employment

72.     On information and belief, the aforementioned Defendant Daniel S. Johnson is a citizen and resident of Durham County, North Carolina.

73.     At all times pertinent to this action and on information and belief, Johnson was in the position of Senior Deputy Attorney General at the North Carolina Department of Justice (hereinafter, "DOJ") and assigned to the Insurance Section.

74.     Defendant Johnson is named in his official capacities with the DOI and DOJ and in his individual capacity for acts taken under color of law within the scope of his employment.

75.     On information and belief, Defendant Denise Stanford (hereinafter, "Stanford") is a citizen and resident of Wake County, North Carolina.

76.     At all times pertinent to this action and on information and belief, Stanford was in the position of Special Deputy Attorney General at the DOJ and assigned to the Insurance Section.  Defendant Stanford is named in her official capacities with the DOI and DOJ and in her individual capacity for acts taken under color of law within the scope of her employment.

77.     On information and belief, Defendant Heather Freeman (hereinafter, "Freeman") is a citizen and resident of Wake County, North Carolina.

78.     At all times pertinent to this action and on information and belief, Freeman was in the position of Assistant Attorney General at the DOJ and assigned to the Insurance Section.

16

Defendant Freeman is named in her official capacities with the DOI and DOJ and in her individual capacity for acts taken under color of law within the scope of her employment.

79.    On information and belief, Defendant Marty Sumner (hereinafter, "Sumner") is a citizen and resident of Randolph County, North Carolina.

80.    At all times pertinent to this action and on information and belief, Sumner was in the position of Senior Deputy Commissioner at the DOI. Defendant Sumner is named in his official capacity with the DOI and in his individual capacity for acts taken under color of law within the scope of his employment.

81.    Defendants John and Jane Does 1 through 10, respectively, are as-yet unidentified individuals and supervisors who, in their official and individual capacities, were personally involved in the improper, abusive, intentional, arbitrary and discriminatory acts and omissions committed against Mr. McClain and his Cannon business.

82.    At all times herein, in committing the acts and omissions herein alleged, each of the individual Defendants was acting within the scope of his or her employment and and under color of law.

*****

V.    PERTINENT HISTORY UP TO AND SURROUNDING 2014

A.    The DOI's 8 December 2003 Memorandum

83.    On or about 8 December 2003, the DOI issued a Memorandum to all surety companies engaged in bail bond business in the State titled, "Important Notice Regarding Unpaid Suety Bail Bond Judgments in North Carolina" (hereinafter, "2003 DOI Memorandum").[5]

_____

[5]    Pursuant to M.D.N.C. Local Rule 7.1(c), the 2003 DOI Memorandum is not being attached as an exhibit but it is available for production in its entirety.

17

84.     The 2003 DOI Memorandum established that all surety companies had to maintain a 1-million-dollar special deposit account with the DOI and further noted that the DOI would suspend or revoke a surety's business for any bond forfeiture judgments that went unpaid or were not timely paid.

*****

B.      Lynette Thompson; the Bail Academy; and, the North Carolina Bail Agents Association

85.     As of February 2011, Mr. McClain was and remains a friend and colleague to Lynette Thompson.

86.     Beginning in February of 2011, Ms. Thompson and her company, Rockford-Cohen Group, LLC, operating under the name of NC Bail Academy (collectively, "Bail Academy") began the continuing education provider approval process with the DOI to become an approved creditable educational provider in bail bondsmen training in the State and to receive remuneration for providing such educational services.

87.     In or about October 2011, after numerous delays and the DOI's purported loss of the Bail Academy's submissions to the DOI, the Bail Academy received approval by the DOI.

88.     Prior to the Bail Academy's approval, the only other approved creditable educational provider in bail bondsmen training in the State was the North Carolina Bail Agents Association (hereinafter, "NCBAA").

89.     Thus, as of the Bail Academy's approval by the DOI, the Bail Academy became a direct competitor to the NCBAA and a large number of bondsmen began attending the Bail Academy when it began being offered as an alternative to the NCBAA.

18

90. From the time the Bail Academy became an approved provider by the DOI, Mr. McClain (who was and remains a bail bondsman) has served as a consultant and advisor to the Bail Academy.

91. Shortly after the Bail Academy's approval by the DOI, Mr. McClain also became a senior instructor for the Bail Academy, and he provides educational licensure training and education to bail bondsmen attending the Bail Academy's classes.

92. Immediately after Bail Academy's approval, Ms. Thompson began receiving death threats and threats that her house would be burned down if she did not shut down the Bail Academy. Ms. Thompson's cat was killed and hung with a sign on it that said "SHUT IT DOWN." Ms. Thompson was forced off the road on two separate occasions.

93. At a January 2012 meeting at DOI, Ms. Thompson brought these incidents to the attention of several DOI officials in attendance, including Defendant Johnson named in this action.

94. On or about 21 December 2011, Ms. Thompson filed a complaint with the DOI that alleged (1) the NCBAA had not received approval from DOI to teach any of the classes it taught the previous year and (2) none of NCBAA's instructors had been approved.

95. As such, and pursuant to 11 NCAC 13.0528, Ms. Thompson alleged that the penalty for the NCBAA teaching while not being an approved provider was sanctions on the provider and instructor including summary suspension or termination as provided below - none of which were taken by DOI.

96. Section 11 NCAC 13.0528 provides -

11 NCAC 13 .0528 SANCTIONS FOR BCEC NONCOMPLIANCE BY LICENSEES, COURSE PROVIDERS AND INSTRUCTORS

(a) The Commissioner shall proceed with administrative action under G.S. 58-71-80 against a professional bail bondsman, surety bail bondsman or runner licensee for any of the following causes:

(1) Failing to respond to Department inquiries, including continuing education audit requests, within seven calendar days after the receipt of the inquiry or request;

(2) Requesting an extension of time to complete BCEC under false pretenses; or

(3) Refusing to cooperate with Department employees in an investigation or inquiry.

*(b) The Commissioner shall summarily suspend or terminate the provider or instructor's certificate of authority to provide or instruct a course for any of the following causes:*

*(1) Advertising that a course is approved before the Commissioner has granted such approval in writing;*

(2) Submitting a course outline with material inaccuracies, either in length, presentation time, or topic content;

(3) Presenting or using materials in a course that were not previously filed with the Commissioner pursuant to 11 NCAC 13 .0526(a);

(4) Failing to conduct a course for the full time specified in the approval request submitted to the Commissioner;

*(5) Preparing and distributing certificates of attendance or completion before the course has been approved;*

(6) Issuing certificates of attendance or completion before the completion of the course;

(7) Failing to issue certificates of attendance or completion to any licensee who satisfactorily completes a course;

(8) Failing to notify the Commissioner in writing of suspected or known violations of the North Carolina General Statutes or Administrative Code within 30 days after becoming aware of the violations;

(9) Failing to comply with the rules in this Section or violating G.S. 58-71-80 and G.S. 58-71-95;

(10) Failing to monitor attendance and ensure that licensees complete the course hours approved by the Commissioner; or

(11) Preparing and distributing fraudulent certificates of attendance or completion.

(c) Course providers and instructors are responsible for the activities of persons conducting, supervising, instructing, proctoring, monitoring, moderating, facilitating, or in any way responsible for the conduct of any of the activities associated with the course.

(d) Upon a finding of a violation of this rule the Commissioner *shall* require the violator to:

        *(1)       Refund all course tuition and fees to licensees;*
        *(2)       Provide licensees with a course to replace the course that was found in violation; or*
        *(3)       Cease all courses offered by the provider or instructor.*

        *History Note:     Authority G.S. 58-2-40; 58-71-71; 58-71-72;*
        *Eff. November 1, 2010;*
        *Pursuant to G.S. 150B-21.3A, rule is necessary without substantive public interest Eff. June 25, 2016.*

(Emphasis added).

97.    Additionally, Section 11 NCAC 13.0539, revised in 2010, requires the Commissioner to deny, revoke, suspend or terminate any provider who has not submitted proper forms and documentation for approval and actually received approval. The provision below governed the circumstances of NCBAA's lack of proper approval and authority and Ms. Thompson's allegations against the NCBAA regarding the same:

        11 NCAC 13 .0539 BAIL BOND PRELICENSING EDUCATION PROVIDER
        *(a) This Rule applies to all bail bond prelicensing providers offering a prelicensing course prescribed by G.S. 58-71-71. All providers desiring to conduct a prelicensing course shall be approved and issued a certificate of authority by the Commissioner before commencement of the courses.*
        *(b) A provider seeking approval to conduct a prelicensing course shall make written application to the Commissioner for a certificate of authority.*
        (c) The Division shall approve a provider when:
        (1) the provider has submitted all information required by the rules in this Section;
        (2) the course to be conducted complies with Rule 11 NCAC 13 .0541 of this Section; and
        (3) the provider has a qualified instructor to teach bail bonding for which it is seeking approval.
        *(d) The Commissioner shall deny, revoke, suspend, or terminate approval of any provider upon finding that:*
        *(1) the provider has failed to comply with any of the provisions of this Section;*
        (2) any provider official or instructor has obtained or used, or attempted to obtain or use, in any manner or form, licensing examination questions for the state exam;

(3) the provider has not conducted at least one prelicensing course during any 12-month period; or

*(4) the provider has refused or failed to submit information or forms prescribed by the rules in this Section.*

(Emphasis added).

98.     Thus, as alleged by Ms. Thompson, every bondsman who attended NCBAA's classes from October of 2010 to November of 2011 were, through no fault of their own, non-compliant with N.C. Gen. Stat.§ 58-71-71, which required licensed bail bondsmen to take their continuing education and pre-licensing classes from a DOI-approved provider.    Stated differently, Ms. Thompson's allegations meant that the people who attended NCBAA's classes during this time period and who bonded defendants out of our State's jails were not properly licensed bail bondsmen.

99.     In or about January 2012, apparently in retaliation, the NCBAA filed a false complaint against the Bail Academy with the DOI (hereinafter, "NCBAA False Complaint").

100.    Ultimately, on or about 2 April 2012 in response to the NCBAA's False Complaint, the DOI concluded it would not take any action against either provider at that time, despite the statute's mandatory and non-discretionary provisions as to the NCBAA's violations.[6]

*****

C.     The Passage of and Litigation Involving North Carolina Session Law 2012-183

101.     On or about 12 July 2012, the DOI and NCBAA succeeded – through the efforts of, among others, NCBAA's then-President, Melissa Seiler; NCBAA's Instructor, Doug Cozart; NCBAA board member, Phillip Bradshaw; Past President of NCBAA, Mark Cartret; and, then

---

[6]     Pursuant to M.D.N.C. Local Rule 7.1(c), the DOI's 2 April 2012 decision is not being attached as an exhibit but it is available for production in its entirety.

Senate Rules Chairman, Tom Apodaca (who was also a bail bondsman and ardent supporter of the NCBAA) – in getting North Carolina Session Law 2012-183 passed into law and which would go into effect 1 October 2012 (hereinafter, "Session Law").

102. The effect of the Session Law was to create a monopoly in favor of the NCBAA by making it the sole provider of bail bondsmen education and training in the State; and to prevent, prohibit, and shut down other persons and businesses in the State – specifically including the Bail Academy - from performing and providing approved creditable educational bail bondsmen training in the State.

103. The Session Law is one of at least two instances in which ex-Senator Apodaca exerted influence and/or intervened with decisions intended to damage and detrimentally impact Mr. McClain's business interests related to bail bonding and surety.

104. There were numerous problems with the disputed Session Law, including the manner in which it was passed and the deception and misrepresentation by the DOI and the NCBAA as to the intent behind the Session Law by legislators and NCBAA supporters, as highlighted in the 16 September 2012 Affidavit of Representative W.A. Wilkins.[7]

105. As the Session Law was deliberated in the Senate Chamber, Senator Josh Stein (now the State's Attorney General) questioned the legality of the Session Law and whether it created an unlawful monopoly.

106. Among other things, as set out in Representative Wilkins' Affidavit, the misrepresentations by the DOI and the legislators advancing the Session Law included that (i) the NCBAA was the "exclusive" provider of bail bondsmen education and pre-licensing (which

---

[7] Pursuant to M.D.N.C. Local Rule 7.1(c), the 16 September 2012 Affidavit of Representative W.A. Wilkins is not being attached as an exhibit but it is available for production in its entirety.

Case 1:20-cv-00695-CCE-LPA   Document 1   Filed 07/30/20   Page 23 of 273

was not true given the fact the Bail Academy was also providing said services); and, (ii) "all bondsmen in the state were 'on board' and in favor of the [Session Law].

107.    Mr. Wilkins' Affidavit further stated that the legislators were "not told the [Session Law's] passage would bring an end to another education company [the Bail Academy] here in North Carolina that had been doing business for months successfully."

108.    As a result of the DOI's and NCBAA's actions and efforts that led to the passage of the Session Law, the Bail Academy was forced to file its "Complaint, Motion for Temporary Restraining Order and Preliminary Injunction" against the DOI and the NCBAA bearing Wake County File No. 12-CVS-12379 (hereinafter, collectively, "Bail Academy Complaint").[8]

109.    The Bail Academy Complaint asserted that the Session Law violated, *inter alia*, N.C. Constitution Article I, Section 34.

110.    Notably, in opposition to the Bail Academy Complaint, the DOI was represented by Deputy Attorney General, David Boone, and Special Deputy Attorney General and a Defendant named herein, Defendant Johnson.

111.    At all times pertinent to this action, Defendant Johnson has been primary counsel for the DOI in its unlawful and unconstitutional seizure of Mr. McClain's Cannon business and made the certain key, intentional misrepresentations in the DOI's Petition and during key oral arguments in open Court highlighted herein (*see*, Section II.B. above).

112.    Up to and as of this filing by Mr. McClain, Defendants have not corrected the record and their material misrepresentations to and deception of the Court.

---

[8]    Pursuant to M.D.N.C. Local Rule 7.1(c), the Bail Academy Complaint is not being attached as an exhibit but it is available for production in its entirety.

113.    Notably as well, in opposition to the Bail Academy Complaint, the NCBAA was represented by attorney, Steve McCloskey (hereinafter, "Attorney McCloskey").

114.    As will be further discussed below, at all times pertinent to this action, Mr. McCloskey has represented Clyde Robert Brawley, Jr., the aforementioned Mr. Cartret, North State Holding Group, LLC and Agent Associates Insurance, LLC.

115.    As will also be further discussed below, Mr. Brawley was and remains the other 25% owner in Premier and thus indirectly, Cannon, with Mr. McClain.

116.    Ultimately, on 1 October 2012, The Honorable Donald W. Stephens, Wake County's then Senior Resident Superior Court Judge, granted the Bail Academy's request for a preliminary injunction in the Bail Academy's Complaint against the DOI and NCBAA; and, enjoined the operation of the Session Law by finding, *inter alia*, it violated the North Carolina Constitution.  Judge Stephens further ruled that there was no factual, logical or reasonable basis to support any lawful purpose of the Session Law.[9]

117.    As can be seen from his Order, Judge Stephens found the DOI and the NCBAA conspired to create, and in fact did create, an illegal and unconstitutional monopoly through its Session Law.

118.    Among other news stories and articles on the subject, an article published by Dan Way of the Carolina Journal on 7 January 2013 entitled, "Lead Story:  Lawmakers Wrangle Over Training for Bail Agents [,] Law Granting Monopoly for Training Leads to Legal Tussle," highlighted the details of the particular persons and motivations involved in the formation and

---

[9]     Pursuant to M.D.N.C. Local Rule 7.1(c), Judge Stephens' Order is not being attached as an exhibit but it is available for production in its entirety.

passage of the Session Law and the opposition to it by the Bail Academy. A true copy of this article is attached hereto as Exhibit 4 (hereinafter, "Way Article").

119. The Way Article contained quotations by the Bail Academy's lead instructor at the time, Tim Mathis, and noted the involvement of then-Senator, Tom Apodaca, and the NCBAA's financial contributions of $19,000.00 to Senator Apodaca as well as $2,100.00 to then-Commissioner Goodwin, and others. *Id*.

120. The Way Article further highlighted Senator Apodaca's ownership of a bail bonding company with his son, and that Senator Apodaca was a founder and past president of the NCBAA. *Id*.

121. The Way Article also documented Senator Apodaca's stock ownership in Accredited Surety and Casualty and, notably, that "[t]en of the 17 members of the N.C. Bail Agents Association's board of directors work for Accredited." *Id*.

122. The NCBAA appealed Judge Stephens' Order to the North Carolina Court of Appeals.

123. By Opinion filed 5 November 2013, Judge Stephens' ruling was affirmed by the North Carolina Court of Appeals.

124. On or about 19 August 2014, Judge Stephens' ruling was also affirmed by the North Carolina Supreme Court.[10]

125. Upon information and belief, various members of the NCBAA's Board of Directors lied to then-Commissioner Goodwin and other DOI personnel stating that Mr. McClain and Ms. Thompson had criminal backgrounds, had started bail schools in other states, and had

---

[10] Pursuant to M.D.N.C. Local Rule 7.1(c), the decisions of the North Carolina Court of Appeals and North Carolina Supreme Court are not being attached as exhibits but they are available for production in their entirety.

"skipped out" of those other states prior to starting the Bail Academy in this State - all of which were false statements and known to be false when made.

126.    At all times pertinent to this action, the NCBAA supported the defeated Session Law.

127.    In or about October 2015, the litigation between the Bail Academy, DOI and the NCBAA concerning the Session Law was settled (hereinafter, "Bail Academy Settlement").[11]

128.    Prior to the Bail Academy Settlement, Ms. Thompson went to the legislature to speak to then-Senator Apodaca to seek his support of a bill that would return the law to the way it was prior to adoption of the unconstitutional Session Law.

129.    When Ms. Thompson approached Mr. Apodaca, he was already in a meeting with another unknown person.  Nevertheless, Mr. Apodaca acknowledged Ms. Thompson and while the other person was still in the room and listening, Mr. Apodaca replied that he really did not know anything about the Session Law; he always recuses himself from all bail-related votes; and, that if she needed anything else she should not hesitate to call upon him.

130.    Despite his statement to Ms. Thompson, Mr. Apodaca is shown in emails acting and participating to the contrary in not taking any role with bail-related votes.[12]

131.    Later in the afternoon of Ms. Thompson's and Mr. Apodaca's conversation, they saw each other again.  Mr. Apodaca approached Ms. Thompson in the hallway of the legislature and told Ms. Thompson that if she did not shut the Bail Academy down and walk away, he was

---

[11]    Pursuant to M.D.N.C. Local Rule 7.1(c), the Bail Academy Settlement is not being attached as an exhibit but it is available for production in its entirety.

[12]    Pursuant to M.D.N.C. Local Rule 7.1(c), the referenced emails involving Mr. Apodaca are not being attached as an exhibit but they are available for production in their entirety.

going to use his considerable influence "to ruin [her] and every single person that [she] care[d] about for as long as [he was] living."

132.    Following the defeat of the Session Law, and as of the Defendants' seizure of Mr. McClain's Cannon business on 28 September 2017, the Bail Academy consistently retained a majority of the attendees for bail bonding licensure and continuing education classes. This fact depleted and adversely affected the NCBAA's finances.

133.    Ever since its inception, the Bail Academy has received positive reviews and accolades with very high pass rates for its students taking the State bail bondsmen licensure exams.

134.    As soon as the Bail Academy Settlement had been verbally agreed upon, the Bail Academy's head instructor at the time – Tim Mathis – was indicted, arrested and placed under a $30,000.00 secured bond.

135.    At the time of the arrest of Mr. Mathis, four television news crews were on the scene of his arrest even though the indictment documents were supposedly "secret" and had yet to be reduced to writing.

136.    In sum, Mr. Mathis was charged with three (3) violations of bail bond law.

137.    On information and belief, and at the time of Mr. Mathis' arrest, no other bondsman licensed in the State had ever been charged with any such purported crimes despite the fact there have been hundreds of identical violations by other bondsmen throughout the history of the State.

138.    At all times pertinent to this action, the aforementioned Mark Cartret had a business partner with him in AAI and North State named, Roland Loftin, Jr. Mr. Loftin was also an instructor in Mr. Cartret's bail school.

28

139. At all times pertinent to this action, including surrounding the arrest and indictment of Mr. Mathis, the DOI had alleged that Mr. Loftin had approximately 1,600 violations and infractions of the bail bonding laws and statutes in the State. A compilation of some collective, illustrative examples outlining the DOI's charges against Mr. Loftin is attached hereto as <u>Exhibit 5</u> (hereinafter, collectively, "Loftin Charges").

140. Mr. Loftin, despite evidence of over one-thousand instances of the same and/or similar violations for which Mr. Mathis had been indicted, arrested and prosecuted, was never indicted, arrested nor prosecuted or otherwise pursued by the DOI and the Defendants named herein for anything pertaining to Loftin's Charges other than merely being fined.

141. On information and belief, Mr. Loftin's fine was paid by AAI.

142. Mr. Loftin was allowed by the Defendants to keep his license and continue writing bonds in the State through his and Mr. Cartret's AAI and North State and other surety companies.

143. At all times pertinent to this action, and during the time of the Loftin Charges and resulting fine against him, Mr. Loftin has been an owner with Mr. Cartret in AAI and North State, an instructor in Mr. Cartret's bail education school, and a bail bondsman who wrote bonds for AAI and North State.

144. On or about 23 August 2018 – almost a year after the Defendants' seizure of Mr. McClain's Cannon business on 28 September 2017 – Mr. Loftin's license was finally revoked by the DOI for other unrelated reasons.

*****

## VI.    PERTINENT HISTORY, FROM LATE 2013 UNTIL 28 SEPTEMBER 2017

### A.    Clyde Robert Brawley, Jr.; and, the Formation of Premier and Cannon

145.    Beginning in or about September of 2013, Mr. McClain and Ms. Thompson first met Clyde Robert Brawley, Jr.

146.    At all times pertinent to this action, the aforementioned Premier was a North Carolina limited liability company duly incorporated and validly existing under the laws of the State and had its principal office located in Greensboro, Guilford County, North Carolina.

147.    At all times pertinent to this action, Premier was the 100% owner and "parent" company of its wholly owned subsidiary known as the aforementioned Cannon.

148.    At all times pertinent to this action and continuing to the present day, Mr. McClain has been and is the 75% owner of Premier (and, thus, 75% indirect owner in Cannon) while Mr. Brawley has been and is the 25% owner of Premier (and, thus, 25% indirect owner in Cannon).

149.    Premier was duly incorporated with the State on or about 4 November 2014 with Secretary of State Identification No. 1410520.[13]

150.    Cannon was duly incorporated with the State immediately after Premier on 4 November 2014 with Secretary of State Identification No. 1410521.[14]

151.    On or about 1 November 2014, Premier and Cannon submitted their Captive Insurance Company License Application to the DOI (hereinafter, "Cannon Application").[15]

---

[13]    Pursuant to M.D.N.C. Local Rule 7.1(c), Premier's incorporation documentation, which is publicly available on the North Carolina Secretary of State's website, is not being attached as an exhibit but it is available for production in its entirety.

[14]    Pursuant to M.D.N.C. Local Rule 7.1(c), Cannon's incorporation documentation, which is publicly available on the North Carolina Secretary of State's website, is not being attached as an exhibit but it is available for production in its entirety.

152.    Among other things, the proposed "Initial Capital and Surplus" identified on the Premier Application was "LOC," which stood for "letter of credit" in the initial proposed amount of $250,000.00.

153.    The two "Officers, Directors, Managers and Members" were identified on the Cannon Application as Mr. McClain and Mr. Brawley.

154.    On Section 7, "Certification," of the Cannon Application, Mr. McClain certified to the DOI that he would notify the DOI of any "material change in the information filed with [the Cannon Application]" within 30 days of such change.

155.    On or about 24 November 2014, in furtherance of the Cannon Application and so as to make certain there were no questions, confusion or misunderstandings as to who the owners of Premier and Cannon were, Ms. Thompson and Carl Valentine (hereinafter, "Mr. Valentine") signed, executed and conveyed their respective "Purchase Agreements" to Mr. McClain of "whatever interest" they had in Premier and Cannon, "if any."[16]

156.    Ms. Thompson and Mr. Valentine both remained as unpaid consultants and advisors to Premier and Cannon.

157.    On or about 22 December 2014, the DOI approved and authorized Premier and Cannon (through Premier as its parent company) to operate and provide surety bail bonding services and bail surety as a special purpose captive entity and corporate structure in the State

---

[15]    Pursuant to M.D.N.C. Local Rule 7.1(c), the Cannon Application is not being attached as an exhibit but it is available for production in its entirety.

[16]    Pursuant to M.D.N.C. Local Rule 7.1(c), the Purchase Agreements are not being attached as exhibits but they are available for production in their entirety.

(hereinafter, collectively, "Surety Services").  See the DOI's approval attached hereto as <u>Exhibit</u> <u>6</u> (hereinafter, "Cannon Approval").

158.   The Cannon Approval contained certain conditions imposed by the DOI.   The DOI's conditions were:

- Maintaining a minimum capital and surplus of $250,000 unless otherwise determined by the DOI;

- Maintaining deposits of $1,000,000;

- Two years allowed for Cannon to attain the above-referenced 1.25 million dollars "by meeting benchmarks" acceptable to the DOI;

- Cannon will not expose itself to any one risk greater than $500,000.  "However, on a case-by-case basis, if Cannon believe it is prudent to issue a bond with exposure greater than $500,000, Cannon may provide the Department with a written request to issue that bond."

- "In the format as directed by the Department, Cannon will provide a projected quarterly bond exposure distribution report for 2015 by January 1, 2014 *[sic]*, and on a quarterly basis, an actual bond exposure distribution report will be submitted 30 days following each quarter-end."

- Cannon will provide the DOI with an "executed copy of all of its *material* agency contracts with the direct or indirect owners of Cannon within 5 days of execution of those contracts.  All agency contracts must be reduced to written agreements."

The foregoing substantive conditions imposed by the DOI on Cannon's approval shall be collectively referred to herein as "Cannon Conditions."

159.   Despite the blatant misrepresentations made by the Defendants to the State Court to the contrary (*see*, *inter alia*, Section II.B. above), at the time of the Defendants' seizure of Mr. McClain's Cannon business on 28 September 2017, Cannon was not in violation of the Cannon Conditions and Mr. McClain was certainly never (1) told or notified by the Defendants of any

32

purported or perceived deficiency in satisfying the Cannon Conditions; nor (2) afforded any opportunity to address and/or remedy any actual, legitimate deficit with the Cannon Conditions.

*****

B.     Agent Associates Insurance, LLC; North State Holding Group, LLC; and, Mark Cartret

160.    Mr. McClain's Premier and Cannon entities were not the first North Carolina special purpose captive entities authorized by the Defendants to provide surety bail bonding services and bail surety.  Premier and Cannon were the second to be so authorized.

161.    On or about 17 October 2013, entities then-known as "Judicial Associates, LLC" (hereinafter, "JA") and "Cattlemen's Surety, LLC" (hereinafter, "Cattlemen's") were both incorporated in the State.[17]

162.    By Amendment dated 23 October 2014 and filed 28 October 2014 with the Secretary of State's Office, which is available to any member of the public by virtue of an online search on the Secretary of State's website, Mr. Cartret changed the corporate name of Cattlemen's to "Agent Associates Insurance, LLC."[18]

163.    Agent Associates Insurance, LLC is commonly referred to by Mr. Cartret and DOI personnel and other persons and parties involved in this action as "AAI."

164.    All references in this Complaint to "AAI" shall mean and include its previous name of "Cattlemen's Surety, LLC" unless expressly stated otherwise.

165.    By Amendment dated 20 May 2016 and filed 2 June 2016 with the Secretary of State's Office, which is available to any member of the public by virtue of an online search on

---

[17]     Pursuant to M.D.N.C. Local Rule 7.1(c), JA's and Cattlemen's respective incorporation documentation, which is publicly available on the North Carolina Secretary of State's website, is not being attached as exhibits but it is available for production in its entirety.
[18]     *Id.*

33

the Secretary of State's website, Mr. Cartret changed the corporate name of JA to "North State Holding Group, LLC."[19]

166. All references in this Complaint to "North State" shall mean and include its previous name of "Judicial Associates, LLC" unless expressly stated otherwise.

167. North State and AAI were the first North Carolina entities created and authorized by the State and DOI under the captive surety laws in the State to serve as special purpose captive entities to provide surety bail bonding services and bail surety.

168. Prior to North State and AAI and Premier and Cannon, there had only been one other North Carolina bail surety company that has been and remains known as the aforementioned 1st Atlantic (*see, inter alia*, Section II.B. above).

169. 1st Atlantic was and remains a traditionally structured insurer as opposed to a special purpose captive surety, such as North State/AAI and Premier/Cannon.

170. 1st Atlantic was incorporated on or about 19 April 2013 – about a year or so before North State/AAI and then Premier/Cannon.[20]

171. Prior to 1st Atlantic and its formation, the DOI had never regulated any domestic bail surety company.

172. 1st Atlantic, North State/AAI, and Premier/Cannon were and are all governed by Chapter 58 of the North Carolina General Statutes.

---

[19] *Id*.
[20] Pursuant to M.D.N.C. Local Rule 7.1(c), 1st Atlantic's incorporation documentation, which is publicly available on the North Carolina Secretary of State's website, is not being attached as an exhibit but it is available for production in its entirety.

34

173. On or about 29 July 2014, North State and AAI were approved by the DOI as the State's first ever "special purpose captive insurance company" for bail bonding and surety services in the State.

174. As with the corporate and ownership structure outlined above between Premier and Cannon, North State was the sole, 100% owner and parent holding company of AAI.

175. The DOI's approval of North State/AAI imposed the same conditions as those that were imposed upon Mr. McClain's Cannon/Premier businesses.

176. At the time North State and AAI were formed and incorporated in October 2013, Mr. McClain was one of six owners in North State and, thus, indirectly, AAI.

177. At the time North State and AAI were formed and incorporated in October of 2013, the other five owners in North State and thus, indirectly in AAI, were the aforementioned Ms. Thompson, Mr. Valentine, Mr. Loftin, Mr. Cartret, and also, Larry A. Powell (hereinafter, "Mr. Powell").

178. At the time North State and AAI were formed and incorporated in October of 2013, Mr. McClain, Mr. Loftin, Mr. Powell, and Mr. Cartret were all active licensed bail bondsmen engaging in bail bonding activities and services in the State.

*****

C.     Closely Held, Special Purpose Captive Sureties and the Surety Bail
       Process

179. At all times pertinent to this action, prior to the passage of the laws in the State allowing for the creation of special purpose captive entities to provide surety bail bonding services and bail surety, bail bondsmen in the State (who were not professional bondsmen) would have to secure a surety to underwrite the bonds they wrote. These surety companies were

all comprised of companies located outside of the State, with the exception of 1ˢᵗ Atlantic. The bondsmen would have to pay a premium to these surety companies based on the face amount of the bond, which would be generally between 1%-3%.

180. Thus, for example, in the case of a $10,000 bond written by a bail agent where the agent could legally charge up to 15%, the agent might receive a 10% payment of $1,000 from the criminal defendant to post his/her bond. Then, the bail agent might typically have to pay a certain percentage to the bail bonding agency with whom he/she is affiliated (usually somewhere around 1%) to be deposited into their "Build Up Fund" or "BUF" account, and then also pay a percentage to the surety company of for the surety company's premium, which was typically around 0.8%-3%).

181. Thus, using 1.0% for the BUF account payment and another 1.5% for the surety premium, the bail agent would "net" $750 for services rendered, while $100 would typically be deposited into the bail agent's BUF account and another $150 would typically be paid to the surety for its premium.

182. BUF account payments and insurance company premiums are typically based on the full bond amount and not the percentage the agent charges. This example will be referred to herein as "Bail Surety Example."

183. The passage of the statutes authorizing the creation of special purpose captive entities to provide surety bail bonding services and bail surety was intended to, *inter alia*, facilitate the creation of bail surety and other companies in the State for jobs and revenue to be created and to remain in the State.

184.     Thus, applying the Bail Surety Example to the facts of North State and AAI, and then later, Premier and Cannon, North State/AAI and Premier/Cannon would receive the surety premium paid by the bail agent on the bond written.

185.     And, furthermore, applying the Bail Surety Example to the facts of North State and AAI, the owners – most of which were bail bondsmen with bail bonding companies – could write bonds, receive their bail agent commission, *less* the BUF account payment they made to their individual BUF account and *less* the surety premium they would pay *to their surety company*.

186.     In effect, the owners of North State and AAI (as well as Premier and Cannon) were able to pay themselves, or at least their own company, to serve as the surety on the bonds they or their bail agents had written.

*****

D.     Mr. McClain Sells His Interest in AAI/North State; and, Mr. Brawley's Knowledge of His and Mr. McClain's Ownership in Premier/Cannon

187.     Shortly after the DOI approved North State and AAI in July of 2014, Mr. McClain and Ms. Thompson began having disagreements about the companies' operations, specifically with and involving Mr. Cartret.

188.     In or about October of 2014, as a result of their disagreements namely with Mr. Cartret, Mr. McClain and Ms. Thompson sold all of their respective ownership rights and interests in North State and, thus, AAI, for the total monetary consideration amount of $75,000.00 ($37,500.00 being paid to Mr. McClain; and, $37,500.00 being paid to Ms. Thompson).

37

189. As previously noted above, there were two owners in Premier and Cannon at all times pertinent hereto, *to wit*: Mr. McClain (75%) and Mr. Brawley (25%).

190. In emails exchanged between Mr. McClain and Mr. Brawley on 3 December 2014, Mr. Brawley acknowledged and confirmed to Mr. McClain his understanding of the ownership in Premier and Cannon and in a later email acknowledged the transfer documents between McClain and Valentine and McClain and Thompson.[21]

*****

E.    Carl Valentine; All American Bail Bonds, LLC; and, Piedmont Bail Services, LLC

191.  As noted above, Carl Valentine remains an owner, along with Mr. Cartret, in North State and AAI (indirectly through North State).

192. Mr. Valentine's interests in North State and AAI were not and never have been purchased, waived, conveyed or otherwise terminated in North State and AAI.

193. On numerous occasions, in writings and formal complaints submitted to the DOI, Mr. Valentine submitted documentation, including emails and corporate documentation, in support of his position that his interests were not and never have been purchased, waived, conveyed or otherwise terminated in North State and AAI (collectively, "Valentine Submittals").[22]

---

[21]    Pursuant to M.D.N.C. Local Rule 7.1(c), copies of these emails are not being attached as exhibits but they are available for production in their entirety.

[22]    Pursuant to M.D.N.C. Local Rule 7.1(c), the Valentine Submittals are not being attached as exhibits but they are available for production in their entirety.

194. Mr. Valentine believed his interests in North State and AAI were in jeopardy due to management by Mr. Cartret and the volume of bond forfeitures being paid as well as Mr. Cartret's obsession with securing the failure of Mr. McClain's Cannon/Premier business.

195. Mr. Valentine sought the help of the DOI – to no avail - in protecting his significant interests in North State and AAI.

196. Ultimately, AAI and North State, by and through Mr. Cartret, entered into a voluntary "run off" agreement with the Defendants to wind down and close its operations, including being prohibited from issuing further bonds (hereinafter, "Run-Off Agreement").

197. On information and belief, the Run-Off Agreement was entered into between Defendants and AAI/North State and Mr. Cartret at the end of 2017 or beginning of 2018.

198. Mr. Valentine was not notified or otherwise invited to be involved in the Run-Off Agreement or anything leading up to or after it, and Mr. Valentine has been shut out from any involvement by Mr. Cartret based on Mr. Cartret's naked contentions and submissions to the Defendants that Mr. Valentine does not own any interest in AAI/North State.

199. The Valentine Submittals were all proffered to the Defendants in the instant case prior to the Run-Off Agreement being entered.

200. The Defendants had actual and constructive notice and knowledge of the Valentine Submittals prior to entering into the Run-Off Agreement.

201. The Valentine Submittals were also tendered to the DOI (i) in opposition to the unfounded and untrue claims that Mr. Valentine was somehow an owner in Premier and Cannon; and, (ii) in opposition to unfounded and untrue complaints and claims that had been communicated to the Defendants in the instant action (and possibly others) by Mr. Cartret and/or Mr. Brawley.

202. Additionally, Attorney R. Gene Davis, Jr., Esquire (hereinafter, "Attorney Davis") was the attorney used by AAI and North State to draft and create North State's Operating Agreement, which was executed by all of the owners in North State on or about 19 August 2014.[23]

203. On 19 August 2014, Attorney Davis provided the executed North State Operating Agreement to Mr. McClain when Mr. McClain was an owner in North State.[24]

204. Mr. Valentine was listed as a 16.33% owner in North State as of Attorney Davis' 19 August 2014 email, and Mr. Valentine's signature – along with the other owners – appears on the executed North State Operating Agreement.

205. On information and belief, other Operating Agreements were signed by Mr. Cartret, Mr. Loftin and others, but without Mr. Valentine's required signature(s) and without any acknowledgement of Mr. Valentine's ownership.

206. Mr. Valentine never authorized nor approved of any version of any Operating Agreement for either North State or AAI that purported in any way to release or convey away his ownership interests therein.

207. At all times pertinent to this action, Defendants have alleged and accused Mr. McClain of having Mr. Valentine as an owner in Cannon and Premier, which is not true, and has never been true.

---

[23] As noted previously, North State's former corporate name was "Judicial Associates, LLC." North State is the 100% parent company of AAI.

[24] Pursuant to M.D.N.C. Local Rule 7.1(c), copies of Attorney Davis' transmittal email of 19 August 2014 and the referenced Operating Agreement of North State are not being attached as exhibits but they are available for production in their entirety.

208. The only owner of the original six (6) owners in North State and AAI that contends Mr. Valentine is not an owner in North State and AAI is Mr. Cartret. The other five (5) owners have already testified under oath and/or will testify that Mr. Valentine was an owner in North State and AAI from the beginning and that fact has never changed.

209. The Operating Agreement for Premier specifically prohibits Mr. Valentine (or any member) from being an owner in Premier and Cannon as long as Mr. Valentine holds ownership in another surety company which, in this case, is AAI/North State.

210. On information and belief, the Defendants have not – at any time whatsoever during all times pertinent to this action – fairly, fully, and objectively reviewed any of the Valentine Submittals.

211. Instead, the Defendants have refused to follow through on any investigation into or take any action regarding Mr. Valentine's information out of a desire and clear pattern of unlawful conduct by Defendants to cover, protect, and/or otherwise shield and immunize Mr. Cartret, AAI and North State from any investigatory and/or regulatory actions whatsoever.

212. Until 2012, on information and belief, Mr. Valentine owned, in whole and/or in part, a bail bonding business known and referred to as "All American Bail Bonds, LLC" (hereinafter, "AABB").

213. AABB was incorporated on 27 April 2009.[25]

---

[25] Pursuant to M.D.N.C. Local Rule 7.1(c), AABB's incorporation documentation, which is publicly available on the North Carolina Secretary of State's website, is not being attached as an exhibit but it is available for production in its entirety.

214. AABB's corporate documentation is, and has always been, readily ascertainable and available to any person in the world by accessing the Secretary of State's online website via an internet search.

215. At all times pertinent to this action, and prior to the unlawful and unconstitutional events of 28 September 2017 at the hands of Defendants and the Defendants' continued unlawful and unconstitutional actions ever since, Mr. McClain's office address for Premier was 2303 W. Meadowview Road, Suite 200 #3, Greensboro, North Carolina 27407-3703.

216. At all times pertinent to this action, and prior to the unlawful and unconstitutional events of 28 September 2017 at the hands of Defendants and the Defendants' continued unlawful and unconstitutional actions ever since, Mr. McClain's office address for Cannon was 2303 W. Meadowview Road, Suite 200 #3, Greensboro, North Carolina 27407-3703.

217. Premier's and Cannon's business premises of 2303 W. Meadowview Road, Suite 200 #3, Greensboro, North Carolina 27407-3703 shall be collectively referred to herein as "Business Premises."

218. Beginning in or about February 2015, after Premier and Cannon were approved and authorized to do business by the DOI, AABB located its bail bonding office at the same general location as Premier's and Cannon's Business Premises.

219. By February of 2015, the approximate time that AABB set up its bail bonding business location at the Business Premises, Mr. Valentine was no longer an owner in AABB. Mr. Valentine had sold his interest in AABB years earlier in 2012.

220. At all times pertinent to this action and up until approximately the Spring of 2017, AABB's offices at the Business Premises were located on the same second floor of the building where Premier and Cannon were located.

42

221.    At the Business Premises, AABB and Premier/Cannon had separate exterior entrances and one shared interior door.

222.    This same two-story building comprising the Business Premises also housed several other businesses including a call center, attorney office, sales organizations, and an Equal Employment Opportunity Commission ("EEOC") office.

223.    In addition to the AABB and EEOC businesses or offices located at the Business Premises, there also was the business known as Piedmont Bail Services, LLC ("Piedmont") located at the Business Premises beginning by on or about 21 December 2015.[26]

224.    Piedmont's corporate documentation is, and has always been, readily ascertainable and available to any person in the world by accessing the Secretary of State's online website via an internet search.

225.    At all times pertinent to this action, AABB, EEOC, and Piedmont were completely separate businesses and enterprises from Mr. McClain's Premier and Cannon businesses.

226.    At all times pertinent to this action, the fact that AABB (which executed a significant number of bonds) and Piedmont were in close proximity to Premier and Cannon was an obvious, mutual benefit to the businesses of AABB, Piedmont and Premier/Cannon.

227.    At no time whatsoever have Mr. McClain or Ms. Thompson ever had any ownership in AABB or Piedmont.

---

[26]    Pursuant to M.D.N.C. Local Rule 7.1(c), Piedmont's incorporation documentation, which is publicly available on the North Carolina Secretary of State's website, is not being attached as an exhibit but it is available for production in its entirety.

228. There is nothing unlawful or improper, nor has there ever been anything unlawful or improper, either in fact or in law, that two or more businesses – regardless of whether related or unrelated - cannot operate out of the same address or premises, as was the case with Premier and Cannon, AABB, the EEOC, and Piedmont on the date of the unlawful and unconstitutional events of 28 September 2017 at the hands of Defendants with the Business Premises.

229. The Defendants' Cannon Conditions do not and did not prohibit Mr. McClain and his Cannon business from being in the Business Premises with any other business whatsoever, specifically and notably including bail bonding businesses such as Piedmont and AABB.

230. At all times pertinent to this action, there is not and there never has been any law that prohibited a bail bonding business – such as AABB or Piedmont - from operating out of the same location as other businesses – whether surety companies or otherwise - specifically and particularly including Premier and Cannon.

231. The Defendants' Cannon Conditions do not and did not prohibit Mr. McClain and his Cannon business from being in the Business Premises with any other business whatsoever, specifically and notably including bail bonding businesses such as Piedmont and AABB.

232. At all times pertinent to this action, and prior to the DOI's approval of Premier and Cannon, AABB's surety for its bail agents' bonds was Bankers Insurance Company (hereinafter, "Bankers").

233. At all times pertinent to this action, Bankers was and remains a Florida corporation.

234. Thus, turning back to the aforementioned Bail Surety Example (*see*, Section VI.C. above), any bonds written by AABB prior to the DOI's approval of Premier and Cannon would

44

have likely had Bankers as the surety company on said bonds and the revenues generated from bonds written in the State would have been paid to Bankers, a Florida enterprise.

235. As a result of the DOI's approval of Premier and Cannon, AABB was able to write bonds – through AABB's bail bondsmen – for which Premier and Cannon served as the surety, which was exactly and precisely how Premier and Cannon were authorized to operate by the DOI.

236. As a result of the approval and creation of Premier and Cannon, AABB had a second surety source which is very common and began having some of its bail bondsmen write bonds for which Premier and Cannon served as the surety, which generated revenue for Premier and Cannon – two State businesses and companies.

237. In addition to AABB sending some of its business to Premier and Cannon, Premier and Cannon also began receiving additional business from other bail bondsmen throughout the State who wanted Premier and Cannon to serve as the surety for their bonds they had written.

238. Upon approval of Mr. McClain's Cannon business as a new special purpose captive, then-Commissioner Goodwin traveled to Greensboro, North Carolina to formally welcome Mr. McClain's Cannon business at a reception celebrating its grand opening.

239. At this reception, Commissioner Goodwin made a brief speech and presented Mr. McClain and Mr. Brawley with Cannon's license.

240. Later during the reception, Commissioner Goodwin spoke privately with Mr. McClain explaining his belief that the DOI's captive insurance program would be very beneficial to the State and wished him the best of luck.

*****

45

241.    On 11 June 2015, and unbeknownst to Mr. McClain, Premier or Cannon until only very recently, then-DOI Commissioner Goodwin entered the DOI's "Commissioner's Summary Order" against AAI, a true and correct copy of which is attached hereto as Exhibit 7 (hereinafter, "Goodwin AAI Order").

242.    At the time of the Goodwin AAI Order, AAI and North State (as well as its principal, Mr. Cartret) were direct competitors of Premier and Cannon.

243.    At the time of the Goodwin AAI Order, Mr. Cartret and the NCBAA were direct competitors of the Bail Academy.

244.    Among other things, the Goodwin AAI Order recites the following pertinent provisions:

- Opening Preamble:    ". . . the Commissioner has reasonable cause to believe that AAI is in such condition as to render the continuation of its business hazardous to the public or to holders of its policies or certificates of insurance."

- (1):    AAI was "$3,572 below AAI's required minimum capital and surplus of $250,000;"

- (2):    "AAI has not filed an acceptable plan with the Commissioner to place an additional $1 million on deposit with the Commissioner in accordance with the stipulations placed on AAI at the time of licensing;"

- (5):    "AAI did not follow its written procedures and practices for issuing bonds in excess of $500,000;"

- (7):    "AAI did not notify the Commissioner of AAI's ownership change;"

46

- **(8)**: "AAI did not maintain proper segregation of duties over the collection of premium payments, bank deposits, cash disbursements, record keeping and bank reconciliations;" and,

- **(10)**: "AAI did not maintain proper documentation supporting cash disbursements."

*Id.*

245. The Goodwin AAI Order then ordered that AAI be placed under DOI supervision.

246. The Goodwin AAI Order then ordered that AAI was expressly prohibited from doing various acts without the prior written approval of Commissioner Goodwin or his representative.

247. The Goodwin AAI Order then issued twelve (12) enumerated conditions on AAI that were required to be satisfied to "abate the determination as set forth in [the] Order." *Id.*

248. The Goodwin AAI Order's conditions of abatement included, without limitation, that AAI (i) increase its capital and surplus to at least $250,000; (ii) "make substantial progress in meeting the additional $1 million deposit requirement in accordance with a plan acceptable to the Commissioner" within 180 days of 11 June 2015 – the date of the Goodwin AAI Order; (iii) submit an updated operating agreement; (iv) provide documentation detailing internal controls for the segregation of duties over the collection of premium payments, bank deposits, cash disbursements, record keeping and bank reconciliations; and, (v) provide documentation of Board of Directors resolutions and meeting minutes reflecting proper corporate governance.

249. Importantly, Commissioner Goodwin concluded his AAI Order by appointing Defendant Trendel as the direct "supervisor of AAI to carry out the provisions of this Order." *Id.*

250. The final provision of the Goodwin AAI Order then provided, "[i]n the event of AAI's failure to comply within 180 days, the Commissioner may institute proceedings under

47

Article 30 of Chapter 58 of the North Carolina General Statutes to have a rehabilitator or liquidator appointed, or extend the period of supervision." *Id*.

251.    On information and belief, at the time of the entry of the Goodwin AAI Order, Mr. Cartret was the Chief Executive Officer and/or President of AAI.

252.    On information and belief, the deadline for AAI's compliance with the Goodwin AAI Order was on or about the middle of December 2015.

253.    At the time of the entry of the Goodwin AAI Order and at all times continuously ever since through the present and continuing, Defendant Trendel has been a Deputy Commissioner at the DOI.

254.    On information and belief, AAI never fully complied with the conditions of abatement and compliance requirements in the Goodwin AAI Order.

255.    Indeed, on further information and belief, AAI did not come close to complying with and satisfying the conditions of abatement and compliance requirements in the Goodwin AAI Order.

256.    On information and belief, the *most* that AAI ever gathered up and accumulated in cash or "other highly liquid assets on deposit" with the DOI in attempting to meet 1.25 million deposit and cash reserves requirement was approximately $563,323.00 – well below – by approximately $686,677.00 - the required total amount (see also, the Obusek Documents referenced above in Section II.C. above and attached as Exhibit 3 reflecting said deficit as of 21 September 2017 in the amount of $686,677.00).

257.    Despite the blatant misrepresentations made by the Defendants to the State Court to the contrary (*see*, Section II.B. above), at the time of the Defendants' seizure of Mr.

48

McClain's Cannon business on 28 September 2017, Mr. Cartret's AAI business *was* in material and egregious violations of, *inter alia*, its similar conditions imposed by the DOI.

258.    However, the Defendants did not do anything to punish, rehabilitate, seize, or take over anything with AAI/North State as was unlawfully and unconstitutionally done to Mr McClain and his Cannon business.

259.    To this very day, neither AAI nor North River were ever seized by the Defendants as part of any rehabilitation or liquidation.

260.    To this very day, 1st Atlantic has never been seized by the Defendants as part of any rehabilitation or liquidation.

261.    At the time of the seizure of Cannon on 28 September 2017, North River had been prohibited from serving as a surety in multiple counties across the State of North Carolina for failure to satisfy multiple bond forfeiture judgments that had been entered and this had been ongoing for years.

262.    Since Cannon's seizure on 28 September 2017, 1st Atlantic has been prohibited from serving as a surety in multiple counties across the State for failure to satisfy multiple bond forfeiture judgments that had been entered.

263.    Attached hereto as Plaintiff's Exhibit 8 is a summary composite listing the known, unpaid bond forfeiture judgments of North River and 1st Atlantic, respectively, and the various counties in which they were prohibited from serving as surety until such time as the judgments were fully paid (hereinafter, "North River/1st Atlantic Bond Forfeitures").

264.    N.C. Gen. Stat. § 58-73-25 specifically provides, in total, the following:

§ 58-73-25. Failure to pay judgment is forfeiture. If a surety company against which a judgment is recovered fails to discharge the same within 60 days from the time such final judgment is rendered, it shall forfeit its right to do business in this State, and the Insurance Commissioner shall cancel its license. (1901, c. 706, s. 1, subsec. 5; Rev., s. 275; C.S., s. 343.).

265.     *Ironically, in its unlawful seizure of Mr. McClain's Cannon business, the DOI referred to N.C. Gen. Stat. § 58-73-25 in an attempt to support the Defendants' seizure of Cannon, while ignoring every other similar surety company that had, for years, been in violation of said statute and should have had its license revoked.  And, again, the DOI did so when Cannon had* <u>never</u> *been in violation of this statute as of the Defendants' seizure of Cannon on 28 September 2017.*

266.     At all times pertinent to this action, specifically and expressly including the DOI's seizure of Cannon on 28 September 2017 and Defendant Johnson's exchange with the judge presiding in open court on 12 October 2017, the Defendants had actual knowledge of the Goodwin AAI Order.

267.     At all times pertinent to this action, specifically and expressly including the DOI's seizure of Cannon on 28 September 2017 and Defendant Johnson's exchange with the judge presiding in open court on 12 October 2017, the Defendants had actual knowledge of AAI's non-compliance with the Goodwin AAI Order.

268.     At all times pertinent to this action, specifically and expressly including the DOI's seizure of Cannon on 28 September 2017 and Defendant Johnson's exchange with the judge presiding in open court on 12 October 2017, the Defendants had actual knowledge of the numerous outstanding and unpaid bond forfeitures by several companies.

269. At all times up to and including the seizure of Cannon on 28 September 2017, Cannon and Premier did not have any unpaid bond forfeiture judgments, nor were Cannon and Premier prohibited in any of the counties of this State from serving as surety.

*****

G.    The Improper and Damaging Relationship, Acts and Omissions of Mr. Brawley and Mr. Cartret, of Which, All Defendants Were All Made Well Aware

270. On 8 July 2016, Ms. Thompson sent an email on behalf of Mr. McClain to Ms. Xu Ke of the DOI that provided Ms. Ke and the Defendants with a pertinent Timeline and Notes regarding Mr. McClain's Cannon/Premier businesses and the damaging efforts and actions of Mr. Brawley and Mr. Cartret. A true copy of this communication is attached as Exhibit 9.

271. On or about 5 August 2016, Mr. McClain also exchanged emails and correspondence with Defendant Trendel and ownership information of Premier/Cannon, copies of which are collectively attached as Exhibit 10.

272. As reflected in Mr. McClain's 5 August 2016 correspondence with Defendant Trendel, Mr. McClain was always open, communicative, and prompt in his communications with Defendants concerning his Premier/Cannon businesses and operations – even though it was during a time in which Premier/Cannon's other owner – Mr. Brawley – was actively engaged in destructive and subversive conduct with Premier/Cannon's competitors, North State/AAI and Mr. Cartret – all of which was communicated by Mr. McClain to the Defendants. *Id.*

51

273. On 24 February 2020, Mr. Brawley (who, again, was a 25% owner in Premier and, thus, indirectly, Cannon) was deposed in other litigation pending in Wake County File No. 17-CVS-3831 (hereinafter, "Brawley Deposition").[27]

274. During the Brawley Deposition, Mr. Brawley was represented by the aforementioned Attorney McCloskey – who had also been *and still was* the attorney for Mr. Cartret, North State/AAI, and the NCBAA.

275. Notably, in the Brawley Deposition, Mr. Brawley testified that beginning in December 2015, he started communicating with Mr. Cartret to supposedly learn about the bail bonding industry.

276. Mr. Brawley's first communication with Mr. Cartret at the beginning of December 2015 was while Mr. Cartret's AAI was still under and still subject to the mandates of the aforementioned Goodwin AAI Order (see, Section VI.F. above).

277. At the time Mr. Brawley started communicating with Mr. Cartret, he did not discuss doing so with Mr. McClain and Mr. McClain did not know about Mr. Brawley's communications with Mr. Cartret.

278. At the time Mr. Brawley started communicating with Mr. Cartret in December 2015, Mr. Brawley was a 25% owner in Premier and Cannon (through Premier) and, as such, had access to all of Cannon's confidential documents and contracts.

279. At the time Mr. Brawley began communicating with Mr. Cartret in December 2015, Mr. Cartret was the principal or primary owner in North State and AAI (through North State), which were both competitors with Premier and Cannon.

---

[27] Pursuant to M.D.N.C. Local Rule 7.1(c), the 24 February 2020 Brawley Deposition transcript is not being attached as an exhibit but it is available for production in its entirety.

280. Mr. Brawley pursuing this improper relationship with Mr. Cartret is akin to an executive of Coca-Cola having secret meetings with an executive of Pepsi Cola in order to share Coca-Cola's secret recipe for making the famous soft drink, which would clearly be against the best interests of the company.

281. At the time Mr. Brawley began communicating with Mr. Cartret in December 2015, Mr. Cartret had also become an approved bail education provider in competition with the Bail Academy and remains so to the present day.

282. At the time Mr. Brawley began communicating with Mr. Cartret in December 2015, Mr. McClain was managing Premier and Cannon (through Premier) and was also one of the primary instructors for the Bail Academy.

283. At the time Mr. Brawley began communicating with Mr. Cartret in December 2015, the Bail Academy had overtaken NCBAA as the State's lead education and licensure provider for bail bonding, and Premier and Cannon (through Premier) had over 200 bail agents writing bonds for which Premier and Cannon served as the surety.

284. In other words, the success of Premier and Cannon, as well as the Bail Academy, made Mr. McClain and Ms. Thompson and their business interests prime targets by their competitors, rivals and detractors, including Attorney McCloskey – *all* of whom were also involved in the aforementioned Bail Academy Complaint, Bail Academy Settlement, defeated Session Law, and the Way Article.

285. Mr. Brawley then testified he first met Mr. Cartret, in person, at a meeting scheduled and held at Mr. Cartret's home in Whiteville, Columbus County, North Carolina on 26 May 2016 without the knowledge or consent of Mr. McClain, Premier or Cannon.

286. Mr. Brawley testified that his meeting with Mr. Cartret lasted approximately 2 hours.

287. Based on their discussions prior to 26 May 2016 and their lengthy meeting of 26 May 2016, Brawley, Cartret and North State/AAI formed an agreement to take unlawful and improper damaging actions against Premier and Cannon that included, *inter alia*, (1) Mr. Brawley providing Cartret and North State/AAI – direct competitors of Cannon and Premier - with trade secrets and other sensitive and proprietary confidential information about Premier; (2) sharing Cannon's confidential contracts and confidential contracted rates with its bail bondsmen; (3) communicating, orally and/or in tangible mediums, directly and/or indirectly through the internet and a website operated by Mr. Ronald Pierce (hereinafter, "Mr. Pierce") and known as "NCADVOCATE.NET" and possibly others; (4) communicating orally and/or in tangible mediums, to third parties, including without limitation the DOI, defamatory statements about Mr. McClain, Premier and Cannon in an effort to cause uncertainty with Premier's and Cannon's bail bondsmen, and to destroy Premier's/Cannon's and Mr. McClain's business, operations, reputation, and interactions with the DOI; and/or, (5) taking additional actions and engaging in additional unfair, deceptive and unscrupulous conduct in a joint effort to devalue and destroy the business and value of Premier/Cannon and Mr. McClain so as to either compel and/or force a sale by Mr. McClain of all of his interest in Premier/Cannon to Mr. Brawley or other third-party purchaser, such as Mr. Cartret, or to cause Premier/Cannon to go out of business.

288. In either of the scenarios in Paragraph 287 above, the net effect would be North State/AAI and Cartret having a monopoly in the State as the State's only remaining captive bail surety enterprise and compelling Premier's/Cannon's bail bondsmen to seek surety from North State/AAI or go to other surety companies outside of the State.

54

289.    For the period of 14 May 2016 through 10 July 2017, Mr. Cartret made 110 complaints to the DOI's Agent Services Division (hereinafter, collectively, "Cartret Complaints").

290.    This amount of the Cartret Complaints by Mr. Cartret does *not* include any of the other complaints Mr. Cartret made with the DOI's Bail Bond Regulatory Division, the Captive Insurance Companies Division, the Financial Analysis and Regulatory Division, or the Criminal Investigations Division.  A summary listing of all of the 110 Cartret Complaints made by Mr. Cartret is attached hereto as Exhibit 11.

291.    Of the 110 Cartret Complaints made by Mr. Cartret to the DOI's Agent Services Division, approximately 99 of them were against Mr. McClain, Premier's/Cannon's interests and/or Premier's/Cannon's bail bondsmen agents.

292.    Mr. Cartret also complained to the Secretary of State and other agencies.

293.    According to Mr. Brawley's own testimony from his 24 February 2020 deposition, Mr. and Mrs. Cartret accompanied Mr. Brawley to falsely complain to agents with the Federal Bureau of Investigation (hereinafter, "FBI") in Charlotte, North Carolina and they were all accompanied by Attorney McCloskey – who was now serving as counsel to Mr. Brawley, Mr. Cartret and the NCBAA.

294.    Almost all of the 99 Cannon-focused Cartret Complaints by Mr. Cartret came only *after* Mr. Cartret's 26 May 2016 meeting with Mr. Brawley at Mr. Cartret's home.

295.    The Cartret Complaints were false when made and remain false and malicious to this very day.

296.    *As if the foregoing were not egregious enough, Mr. Brawley testified that he and North State's/AAI's principal – Mr. Cartret – had formed an insurance business together, which*

55

*was known and referred to as WFYI, LLC, a North Carolina limited liability company* (hereinafter, "WFYI").

297.    As can be seen from an online search of the North Carolina Secretary of State's website, WFYI was incorporated in the State on 2 May 2017.[28]

298.    Even though WFYI's Articles of Incorporation were not filed with the North Carolina Secretary of State's Office until 2 May 2017, they had been signed and dated about two weeks earlier on 19 April 2017.

299.    The Articles of Organization for WFYI recite that its principal office was 739 Washington Street, Whiteville, North Carolina 28472 – which is and has always been during all times pertinent to this action the home address of Mr. Cartret.

300.    As noted above, the Brawley Deposition was conducted on 24 February 2020.  A little more than two months after this date on which the Brawley Deposition was conducted with Attorney McCloskey representing and appearing for Mr. Brawley (while also representing Mr. Cartret), WFYI filed a Resignation of Registered Agent with the North Carolina Secretary of State's Office specifying that the notice of resignation was being sent to Mr. Cartret's wife, Annamaria Cartret, at the Cartrets' home address of 739 Washington Street, Whiteville, North Carolina 28472.

301.    Upon learning of Mr. Brawley's wrongful actions in conspiring with Mr. Cartret and North State/AAI and working to the detriment and damage of Mr. McClain and Premier/Cannon, Mr. McClain filed an emergency lawsuit August 2016 against Mr. Brawley in

---

[28]    Pursuant to M.D.N.C. Local Rule 7.1(c), WFYI's incorporation documentation, which is publicly available on the North Carolina Secretary of State's website, is not being attached as an exhibit but it is available for production in its entirety.

Wilson County, North Carolina. In this action, Mr. McClain sought and obtained emergency injunctive relief against Mr. Brawley, and this action bears Wilson County file number 16-CVS-1208 to protect his interests, particularly and especially including his interests in Premier and Cannon.

302. On 30 August 2016, Mr. McClain obtained an *Ex Parte* Temporary Restraining Order entered by The Honorable Milton F. Fitch, Jr. against Mr. Brawley in the First Action (hereinafter, "Fitch Order").[29]

303. On 30 August 2016, Mr. McClain sent an email to Defendants Trendel and the DOI concerning his corporate and personal dispute with Mr. Brawley and the First Action that Mr. McClain was forced to file against Mr. Brawley in order to protect his interests, particularly including his interests in Premier and Cannon (hereinafter, "Notice Email").

304. Mr. McClain's Notice Email to Defendants Trendel and the DOI attached the Fitch Order entered in the First Action against Mr. Brawley. A true and correct copy of Mr. McClain's Notice Email that also attached the Fitch Order is attached hereto as <u>Exhibit 12</u>.

305. Defendants knew of Mr. Brawley's unscrupulous conduct with Mr. Cartret – *especially* Defendant Trendel given his attendance (along with other personnel from the DOJ) - at a hearing on 8 September 2016 in Wilson County in file no. 16-CVS-1208 before The Honorable Quentin T. Sumner.

306. At this 8 September 2016 hearing, Judge Sumner entered an injunction against Mr. Brawley, as had been earlier ordered by Judge Fitch with his Temporary Restraining Order against Mr. Brawley. The effect of the rulings by Judges Fitch and Sumner were to enjoin Mr.

---

[29] Pursuant to M.D.N.C. Local Rule 7.1(c), the Fitch Order is not being attached as an exhibit but it is available for production in its entirety.

Brawley from having any meaningful involvement of any kind on behalf of Premier and Cannon.[30]

307. However, after Defendants' unlawful and unconstitutional seizure of Mr. McClain's Cannon business on 28 September 2017, in the Defendants' Seizure allegations, the Defendants incredulously claimed and accused Mr. McClain of improperly leaving Mr. Brawley's signature off a DOI filing as some sort of additional "proof" the Defendants needed to take the actions they took against Mr. McClain and his business.

308. And, the Defendants did this all the while knowing that Mr. Brawley was ordered to have no legal authority as an officer of Premier/Cannon.

309. In sum, Mr. McClain's Notice Email and the Fitch Order as well as the Order by Judge Sumner clearly explained to the Defendants in the instant action all of the improper conduct that had been undertaken by Mr. Brawley to the substantial detriment of Mr. McClain and their Premier and Cannon companies.

310. Mr. Brawley's improper conduct included numerous forgeries of Mr. McClain's signature on Premier and Cannon bank documentation, as well as Mr. Brawley's unscrupulous and improper actions with direct competitors of Premier and Cannon, *to wit*: Mr. Cartret, Mr. Loftin, and North State and AAI, all of which Mr. McClain timely notified and made Defendants aware.

311. The Fitch Order in the First Action enjoined and restrained Mr. Brawley from acting or serving as an Officer or Manager in Premier and Cannon and further ordered, *inter alia*,

---

[30]    Pursuant to M.D.N.C. Local Rule 7.1(c), this 8 September 2016 hearing transcript and excerpts therefrom are not being attached as exhibits but the transcript is available for production in its entirety.

Case 1:20-cv-00695-CCE-LPA   Document 1   Filed 07/30/20   Page 58 of 273

that Mr. Brawley was prohibited from "having any legal authority to act on behalf of [Cannon] in any manner whatsoever."

312.     After the First Action had been filed by Mr. McClain in Wilson County and the entry of the Judge Fitch Order, the venue of the action was transferred to Guilford County and assigned file number 17-CVS-7708.

313.     Not surprisingly, as a result of the foregoing and the false allegations of Mr. Cartret and Mr. Brawley, the Defendants aided the North Carolina Secretary of State in ultimately bringing fabricated, malicious, and fictitious charges against Mr. McClain in or about February of 2018 – about 5 months after having unlawfully seized his Cannon business and irreparably damaged his constitutional rights, property and interests in said Cannon business.

314.     The Defendants also aided the North Carolina Secretary of State in ultimately bringing the same fabricated, malicious, and fictitious criminal charges against Ms. Thompson.

315.     The above-referenced criminal charges of Mr. McClain are collectively referred to herein as "Criminal Charges."

316.     As of the filing of this action, the Criminal Charges are still pending against Mr. McClain.

317.     As of the filing of this action, Ms. Thompson's charges are also still pending.

*****

H.     Mr. McClain's May 2017 Lawsuit Against Mr. Cartret, Mr. Brawley, AAI and North State, et al.

318.     By action filed on or about 27 March 2017 in Wake County Civil Superior Court File No. 17-CVS-3831 – approximately six (6) months *before* the Defendants' seizure of Cannon on 28 September 2017 - Mr. McClain filed suit against Messrs. Cartret, Brawley, and Pierce, as

well as against Mr. Cartret's North State and AAI chiefly for defamation, breach of fiduciary duties, tortious interference, and civil conspiracy (hereinafter, collectively, "Tort Action").[31]

319.    In addition to Mr. McClain, the other Plaintiffs in the Tort Action were Premier, Cannon, Ms. Thompson, Mr. Valentine, and the Bail Academy.

320.    Again, Mr. McClain's Tort Action was commenced six (6) months *prior to* the Defendants' seizure on 28 September 2017 of Mr. McClain's Cannon business.

321.    Mr. McClain's Tort Action was still pending as of the Defendants' seizure of Mr. McClain's Cannon business on 28 September 2017.

322.    At all times during the pendency of the Tort Action, Mr. Brawley was represented by the aforementioned Attorney McCloskey – the same attorney representing the NCBAA and Mr. Cartret as explained above.

323.    As can be seen from a cursory review of Mr. McClain's Tort Action, the allegations and evidence set forth therein established, *inter alia*, the conspiracy of Mr. Brawley (25% owner in Premier and, thus, Cannon) with Premier's and Cannon's chief competitors – AAI, North State and Mr. Cartret – to the substantial detriment and injury to Mr. McClain and his Cannon company.

324.    The Tort Action further established the patently offensive and defamatory posts made by Mr. Cartret against Mr. McClain and his Cannon business.

325.    Unbeknownst to Mr. McClain at the time, and as mentioned above, Mr. Brawley and Mr. Cartret formed their own insurance business together – WFYI, LLC - while taking their improper actions against Mr. McClain and the other plaintiffs as summarized in the Tort Action.

---

[31]    Pursuant to M.D.N.C. Local Rule 7.1(c), Mr. McClain's Verified Complaint and Exhibits A-I in the Tort Action are not being attached as exhibits but they are available for production in their entirety.

Case 1:20-cv-00695-CCE-LPA   Document 1   Filed 07/30/20   Page 60 of 273

326.   Following the Defendants' seizure of Mr. McClain's Cannon business on 28 September 2017, the Defendants ultimately supposedly reviewed the Tort Action on behalf of Cannon as Cannon's purported "rehabilitator."

327.   By letter dated 7 May 2018, Defendants, through Defendant Trendel, sent Mr. McClain's undersigned counsel a letter notifying him that the DOI would represent Cannon through attorneys with the State's DOJ and that Mr. McClain's counsel's "services as counsel for Cannon in this [Tort Action] are hereby terminated."

328.   Defendant Trendel then stated the obvious in his letter that "[t]his notice of termination of your representation of Cannon in this [Tort Action] does not terminate your representation of any other party in this action."  A true copy of Defendant Trendel's letter is attached hereto as Exhibit 13.

329.   Upon information and belief, Defendant Trendel's letter of 7 May 2018 to Mr. McClain's undersigned counsel had the knowledge, support and/or acknowledgement of all of the other Defendants in this action.

330.   On receipt of Defendant Trendel's 7 May 2018 letter, Mr. McClain's undersigned counsel conducted a conference call on or about 22 May 2018 regarding the Tort Action with Defendants Johnson, Freeman, Stanford, and others (there were other unidentified persons on the DOI's and DOJ's side of the call) to discuss the Tort Action and the reasons – substantial reasons – for why the DOI and DOJ should continue pursuit of the Tort Action against, *inter alia*, Mr. Brawley, Mr. Cartret, AAI and North State.

331.   Mr. McClain's Tort Action was still pending as of the aforementioned 7 May 2018 letter from Defendant Trendel to Mr. McClain's undersigned counsel, and as of the aforementioned 22 May 2018 conference call.

61

332.    On 9 August 2018, Defendants notified Mr. McClain's undersigned counsel that they would *not* continue pursuing the Tort Action on behalf of Cannon.

333.    Defendants made and communicated their decision of 9 August 2018 to abandon Cannon's pursuit of the Tort Action, despite (1) the pleas of Mr. McClain – a 75% owner in Cannon and Premier not to do so; (2) the supporting reasons and pleas of Mr. McClain's counsel not to do so; and, (3) the clear and troubling conflicts of competing interests the Defendants possessed in making such a decision.  A true and complete copy of the email thread between Mr. McClain's undersigned counsel and Defendants spanning 17 July 2018 and 8 and 9 August 2018 is attached hereto as Exhibit 14.[32]

334.    But, yet, Defendants contend they were supposedly "rehabilitating" Cannon at the time of this decision.

335.    Ultimately, on or about 12 September 2018, Defendants Causey, DOI, Johnson, Freeman, and Stanford filed Stipulations of Dismissal, without prejudice, purportedly on behalf of Cannon as to all of the Defendants in the case *sub judice* in the Tort Action.

336.    Notably, Attorney McCloskey signed the Stipulation of Dismissal on behalf of Mr. McClain's only other Cannon business owner – Mr. Brawley.[33]

337.    But, yet, Defendants contend they were supposedly "rehabilitating" Cannon at the time of this decision.

338.    As a result of the Stipulations of Dismissal, Defendants severed and destroyed all

---

[32]    The copy of this email thread has been modified to eliminate the "blue" highlighting referenced by Mr. McClain's undersigned counsel and was replaced with bold font so as to ensure the blue highlighting did not obscure the words in the email thread.

[33]    Pursuant to M.D.N.C. Local Rule 7.1(c), the Stipulations of Dismissals by Defendants and Attorney McCloskey are not being attached as exhibits but they are available for production in their entirety.

Case 1:20-cv-00695-CCE-LPA   Document 1   Filed 07/30/20   Page 62 of 273

potential for a possible recovery on behalf of Mr. McClain's Cannon business unless they re-filed an action for Cannon within one (1) year of the Stipulations or within the remaining statutes of limitation, whichever is longer.

339.    Defendants' decision to dismiss Cannon's involvement in the Tort Action and the claims of Cannon in the Tort Action immensely benefitted Mr. Cartret and Mr. Brawley, while, at the same time, inflicting tremendous harm and damage to Mr. McClain and his Premier/Cannon business.

340.    But, yet, Defendants contend they were supposedly "rehabilitating" Cannon at the time of this decision.

341.    Mr. McClain had expended and incurred tens of thousands of dollars pursuing the Tort Action which had caused some financial stress on himself and his Cannon business.

342.    All of said fees had been incurred by Mr. McClain and his Cannon business were as a direct and proximate result of Mr. Cartret's and Mr. Brawley's damaging actions towards Mr. McClain and his Cannon business and the Defendants all knew this, or certainly should have known this, at the time they filed and pursued their malicious seizure of Cannon on 28 September 2017.

343.    As of this action, Defendants did not re-file any action for Cannon within one (1) year of the Stipulations of Dismissal.

344.    But, yet, Defendants contend they were supposedly "rehabilitating" Cannon at the time of this decision.

345.    In similar fashion to Defendants' Stipulations of Dismissal of the Tort Action, Mr. McClain and the other plaintiffs in the Tort Action filed a dismissal, without prejudice, in the Tort Action on or about 11 March 2019 as to all of the defendants except Mr. Pierce and his

63

Piedmont Disaster Services, LLC.

346.    However, unlike the Defendants in the instant action, Mr. McClain and the other plaintiffs from the original Tort Action, filed anew their Verified Complaint for tort and other claims against not only Messrs. Cartret, Brawley, AAI and North State, but also the insurance company – WFYI, LLC (hereinafter, collectively, "New Tort Action").

347.    WFYI, LLC was incorporated and created by Mr. Cartret and Mr. Brawley during the time that (1) Mr. Brawley and Mr. Cartret were conspiring together to damage and injure Mr. McClain and his *and Brawley's* Cannon business; (2) Mr. Cartret, enabled from his conversations with Mr. Brawley, was filing approximately 100 complaints with the Defendants in this action against Mr. McClain and his Cannon interests and agents that Mr. Cartret and the Defendants knew to be false; (3) the Defendants in this action were harassing and abusing their authority and the laws of the State and United States of America to destroy Mr. McClain and his rights, liberties and interests; and, (4) the Tort Action was pending and being pursued at substantial costs in attorneys' fees and expenses to Mr. McClain.

348.    At all times pertinent herein, the Defendants knew Mr. Cartret's malicious and abusive motivations; knew that Mr. Cartret and Mr. Brawley were conspiring together to inflict and cause damage to Mr. McClain and Cannon; and, knew that they had regulatory authority over both of them, particularly Mr. Cartret, AAI and North State, and Defendants intentionally, arbitrarily, and abusively chose not to stop them and not to take regulatory action against them.

349.    Mr. McClain's and the other plaintiffs' New Tort Action was filed in New Hanover County Civil Superior Court bearing file number 20-CVS-925.[34]

---

[34]    Pursuant to M.D.N.C. Local Rule 7.1(c), Mr. McClain's New Tort Action and its exhibits A-I are not being attached as exhibits but they are available for production in their entirety.

350.    The New Tort Action is pending as of the filing of this action against the Defendants named herein.

351.    One of the purported reasons or excuses used by Defendants to justify their unjustifiable, deplorable and unlawful seizure of Mr. McClain's Cannon business was that Cannon had expended a lot of money in attorneys' fees and costs in litigation from, *inter alia*, the original Tort Action.

352.    The attorneys' fees and costs incurred by Cannon in connection with the Tort Action and other lawsuits were all as a direct result of Mr. Brawley's and Mr. Cartret's malicious and abusive actions to the detriment of Mr. McClain and Cannon, which the Defendants named herein only further exacerbated and enabled by pursuing, inter alia, the unlawful, unwarranted and unconstitutional seizure of Cannon on 28 September 2017 and by dismissing Cannon's claims in the Tort Action.

353.    But, yet, Defendants contend they were supposedly "rehabilitating" Cannon at the time of this decision.

*****

VII.    PERTINENT HISTORY – FROM THE SEIZURE OF CANNON
            ON 28 SEPTEMBER 2017 TO THE PRESENT

A.    The Cannon Conditions Imposed by Defendants; and, the Status of
        Cannon when Unlawfully Seized by Defendants on 28 September 2017

354.    At the time of the DOI's authorization and approval of Premier and Cannon to provide surety services in or about December of 2014, the DOI had the opportunity to (1) review and inspect all of the corporate governance documents and agreements of Premier and Cannon, (2) to require any changes, and (3) to dictate or impose additional requirements or conditions – other than the aforementioned Cannon Conditions - in order for Premier and Cannon to provide

65

their surety services.

355.     Shortly after the DOI's authorization and approval of Premier and Cannon to provide surety services in or about November of 2014, Premier and Cannon moved to the Business Premises.

356.     Shortly after the DOI's authorization and approval of Premier and Cannon to provide surety services in or about November of 2014, the DOI knew or certainly should have known that there were several other business enterprises located at the Business Premises in addition to that of Premier and Cannon including, without limitation, AABB.

357.     In fact, the DOI had imposed the aforementioned very specific Cannon Conditions on Premier and Cannon that had to be first established prior to Premier and Cannon providing surety services and/or had to be followed or established during the term of the operations of Premier and Cannon.

358.     Defendants' Cannon Conditions did not specify or require Mr. McClain's Cannon business to implement any specific bookkeeping software or methods.

359.     Defendants' Cannon Conditions did not prohibit Mr. McClain's Cannon business from using QuickBooks software.

360.     Defendants' Cannon Conditions did not prohibit Mr. McClain's Cannon business from engaging in documented cash transactions.

361.     Defendants restricted Mr. McClain from taking any salary or issuing any distributions from his Cannon business, while at the same time, allowing Mr. Cartret to do so with AAI/North State *even though AAI/North State were in a far worse and compromised financial condition than Cannon ever was*.

362.     Defendants' Cannon Conditions did not prohibit Mr. McClain's Cannon business

66

from negotiating and entering into differing contract rates for bail bondsmen writing bonds with Cannon as the surety.

363. Defendants' Cannon Conditions did not prohibit Mr. McClain's Cannon and Premier businesses from being located in the same building as bail bonding companies (such as AABB and Piedmont).

364. The 1.25 million cash reserves and depository requirements imposed by Defendants on Cannon were vastly outweighed by the maximum bond exposure of Cannon if all bonds for which Cannon was surety were to be forfeited and reduced to judgment on the same day, as is the case with all surety companies.

365. Stated differently, on the day of 28 September 2017 when Cannon was unlawfully seized by Defendants, the "book" liability of all bonds for which Cannon was the surety in the State was approximately 79 million dollars – which is an amount vastly greater than the 1.25 million reserves required by Defendants. This is so because the "book" liability of all bonds does *not* mean that is the sum of *unpaid* bond forfeitures of Cannon – as Defendants well know but, yet, intentionally misrepresented to the State Court in support of its unlawful seizure of Cannon.

366. Indeed, when Cannon and Premier were approved by Defendants, Mr. McClain's own business projections expected to be the surety on approximately 137 million dollars as of around September 2017. In actuality, Cannon and Premier had written about 130 million dollars in bond "book" liability just before the Defendants' seizure on 28 September 2017.

367. In the immediate months leading up to Defendants' seizure of Cannon, Mr. McClain's Cannon business had exonerated and removed from its liability approximately 50 million dollars in book liability down to the 79-million-dollar figure in "book" liability by 28

September 2017 – the date the Defendants seized Cannon.

368. The importance of the foregoing is three-fold – *first*, the Defendants approved of Cannon and Premier acting as surety on a book of liability that was projected to be around 137 million dollars by 2017; *second*, the projected book liability approved by Defendants of 137 million dollars vastly outweighed the requirement of Cannon having 1.25 million dollars in reserves with the DOI; and, *third*, if anything, Cannon was in *better* financial condition on the date of 28 September 2017 when it was improperly seized by Defendants by only having 79 million dollars in outstanding, potential bond liability versus what the Defendants had approved for Cannon of approximately 137 million dollars.

369. At all times prior to the DOI's seizure on 28 September 2017 and at all times since, Mr. McClain was and remains a 75% percent member-owner in Premier (and, thus, a 75% indirect owner in interest to Cannon).

370. As of the DOI's seizure of Mr. McClain's Cannon business on 28 September 2017, Mr. McClain was the Manager and President of Premier and the Manager and President of Cannon.

\*\*\*\*\*

B.    The Bond of Mickey Dale Snow; and, the Timing of Defendants' Seizure
       of Mr. McClain's Cannon Business

371. In or about November 2015, a man named Mickey Dale Snow (hereinafter, "Mr. Snow"), was indicted in Rockingham County, North Carolina and was incarcerated in the Rockingham County jail with a 25-million-dollar secured judicial appearance bond and required GPS monitoring by the Sheriff's Department via an ankle monitor.

372. Mr. McClain and Cannon applied, in writing, to the Defendants to be approved to write Mr. Snow's bond and serve as the surety on his bond. In doing so, Mr. McClain noted to the Defendants that Mr. Snow was willing to (i) pay a 1-million-dollar cash premium to Cannon; (ii) post 20 million dollars in cash collateral with Cannon; (iii) pledge at least 5 million dollars in real property collateral secured by deeds of trust; and, (iv) wear a second GPS monitoring bracelet on his other leg to be monitored by the bail bondsman in addition to the monitoring efforts of the Rockingham County Sheriff's Department (collectively, hereinafter, "Snow Bond Proposal").

373. The net effect of the Snow Bond Proposal would be that Mr. McClain's Cannon business would be 100% secured from any risk on posting Mr. Snow's bond, which 100% protected the DOI, the State, and the Courts if Mr. Snow violated his pretrial release conditions and his bond were to become forfeited and reduced to a judgment.

374. *What should also not be lost on this Court is that the 1 million premium Cannon would have received would have easily put Cannon over any alleged remaining shortage on the 1.25 million dollars required under the Defendants' aforementioned Cannon Conditions.*

375. Despite the foregoing and the parameters of the Snow Bond Proposal, the Defendants inexplicably refused to approve of Mr. McClain's request that his Cannon business write Mr. Snow's bond.

376. As a result, the Florida surety company, Bankers, ended up writing Mr. Snow's bond and collecting the premium that was denied to Cannon by the Defendants.

377. After approximately two years of being under his 25-million-dollar bond, Mr. Snow's bond was reduced from 25 million to 15 million dollars.

378. As a result of the reduction in his bond, Bankers returned 5 million dollars to Mr. Snow and canceled Mr. Snow's pledge of real property assets such that Bankers retained all 15 million dollars in cash as 100% collateral from Mr. Snow fully securing Bankers from any risk on Mr. Snow's bond.

379. Notably, as ongoing protection for Bankers serving as the surety on Mr. Snow's bond, he continued to have to wear two GPS ankle monitors – with one monitored by Rockingham County and the other monitored by the bondsman.

380. Ultimately, on the afternoon of Monday, 25 September 2017 – *two* days before the Defendants filed their Petition against Mr. McClain's Cannon business and *three* days before the Defendants' actual seizure of Mr. McClain's Cannon business, the State in Mr. Snow's case filed and pursued a motion to revoke his bond based on its contention that Mr. Snow had violated his pre-trial release conditions.

381. On that afternoon of Monday, 25 September 2017, law enforcement for Rockingham County took Mr. Snow into custody and as of that date, Mr. Snow was placed in jail to await a hearing on the State's motion to revoke his bond.

382. At this time, Mr. Snow and Mr. McClain (on behalf of Cannon) had reached an agreement that if any other bond was set for Mr. Snow that Cannon would write his new bond. Mr. Snow had suffered tremendously during his pretrial detention largely due to his age and health. Mr. Snow did not want to have any delay in securing his release, should his bond be adjusted or another bond required.

383. The agreement reached between Mr. Snow and Mr. McClain (on behalf of Cannon) was that Mr. Snow would post full cash collateral for the new bond, which would eliminate the requirement for prior approval from the Defendants because Cannon would have

no risk of monetary loss, and Mr. Snow would pay Cannon 15% of the new bond amount as the fee or premium for writing the new bond.

384.    Thus, for example, if a defendant such as Mr. Snow is found to be in violation of his pre-trial release conditions, the bond amount is often doubled by the Court, which means that Mr. Snow would have guaranteed Cannon 30 million dollars in collateral and approximately 4.5 million dollars in premium.

385.    Defendant Trendel had been made aware of Mr. McClain's agreement with Mr. Snow and the very real potential for an extraordinarily large infusion of cash – likely millions of dollars - into Cannon's accounts.

386.    Even if Mr. Snow's bond had been kept at 15 million dollars, Mr. Snow would have posted 15 million dollars in cash collateral with Cannon and would have paid Cannon the premium sum of approximately 2.25 million dollars.

387.    A fully collateralized bond such as Mr. Snow's posed absolutely no risk for the insurance company or the State.  Simply stated, this was a once in a lifetime opportunity -- one that would have catapulted Cannon or any surety company that wrote the bond -- to the top of the industry and would have gone a long way towards cementing its financial success.

388.    As of the date of 25 September 2017, Mr. Snow and Mr. McClain had become friends, having common acquaintances, and developing a close relationship through the course of Mr. Snow's pretrial release.

389.    As of the date of 25 September 2017, Mr. Snow knew that Mr. McClain was a principal in Cannon and that Cannon was a competitor of Bankers.

390.    The following day after Mr. Snow's arrest, on Tuesday, 26 September 2017, Mr. Valentine was contacted about Mr. Snow's arrest by Vice-President of Bankers, Pamela Galbraith.

391.    During their conversation on 26 September 2017, Ms. Galbraith asked Mr. Valentine how Bankers could make more money off of Mr. Snow's new arrest.

392.    Mr. Valentine told Ms. Galbraith that short of a proper and lawful surrendering of Mr. Snow - which would be a very suspicious, counter-intuitive, and risky business decision given that the bond was fully collateralized - or an increase in Mr. Snow's bond amount, it would not be possible for Bankers to make more money off of Mr. Snow.

393.    During this same conversation, Mr. Valentine told Ms. Galbraith that Mr. McClain and Cannon had an agreement with Mr. Snow to write any new bond on him if the State's motion to revoke his bond were granted.

394.    The following day, Wednesday, 27 September 2017 at approximately 1:51 p.m. Eastern Standard Time, and unbeknownst to Mr. McClain and his Premier/Cannon businesses at the time, the Defendants in the instant action filed the DOI's "Confidential (Under N.C. Gen. Stat. 58-30-70) Verified Petition for an Order of Rehabilitation, a Seizure Order, an Order Appointing Receiver, and Injunctive Relief" in the Civil Superior Court Division of Wake County bearing file number 17-CVS-11692, a true copy of which is attached as Exhibit 15 (hereinafter, "Petition").

395.    On Thursday, 28 September 2017 (hereinafter, "Seizure Date") at approximately 10:00 a.m. – just two days following Mr. Valentine's aforementioned conversation with Ms. Galbraith of Bankers - personnel for Defendant DOI, some of whom possessed firearms, as well as individual Defendants Trendel , Cable, Bryant, Sumner and other members of the DOI burst

72

into the offices of Premier and Cannon, unannounced, and seized virtually everything tangible in or about the premises of Premier's and Cannon's Business Premises, even numerous matters and things having nothing to do with or belonging to Premier or Cannon (hereinafter, collectively "Seizure").

396.    The next day following Cannon's Seizure, Friday, 29 September 2017, Bankers did the unthinkable and unexplainable:  it filed a pre-breach surrender on Mr. Snow's bond.

397.    In doing so, Mr. Snow's bond was terminated – a no-risk, fully collateralized, once-in-a-lifetime bond -- thereby leaving Mr. Snow in jail with no bond.

398.    And, with Cannon out of the way due to the Defendants' Seizure the day before, Bankers was able to position itself as the only surety company to re-write Mr. Snow's bond and collect another fee, which could be easily as much as 2.25 million dollars if the bond remained at 15 million and up to 4.5 million dollars if Mr. Snow's bond were doubled.

399.    At the time Bankers filed its pre-breach surrender of Mr. Snow, all 15 million dollars had been posted by Mr. Snow with Bankers as 100% collateral, and Mr. Snow was approximately 77 years old, in failing health, and incarcerated in jail awaiting a hearing on the State's motion to revoke bond.

400.    Bankers did not inform Mr. Snow they had surrendered his bond.

401.    Based upon what was said to Mr. Valentine and upon information and belief, Bankers wanted to re-write the bond for Mr. Snow and collect another large premium.  Mr. Snow was in jail, no longer under any bond, and Cannon, the company he had contracted with to write his bond, had been seized by the Defendants the previous day.

<div align="center">*****</div>

C.    Defendants' Petition to Seize and "Rehabilitate" Cannon

402.    Defendants Johnson and Stanford signed the Petition as counsel for Defendants Causey and the DOI.

403.    Defendant Trendel signed – under oath – the Verification to the Defendants' Petition against Mr. McClain's Cannon business.

404.    In his Verification to the Petition, Defendant Trendel swore under oath that, as Deputy Commissioner for the DOI, he had "read" the Petition and that "the contents of same [were] true and correct of his own knowledge, except as to those matters and things therein set forth upon information and belief , and as to those, he verily believes it *[sic]* to be true."

405.    Upon filing the Petition and unbeknownst to Mr. McClain at the time of the Seizure on the Seizure Date, one or more of the Defendants approached The Honorable Carl Fox for an *ex parte* emergency seizure order as to Cannon and obtained said *ex parte* order.

406.    Presumably, in order to obtain the *ex parte* emergency seizure order, the Defendants communicated and used the same false narrative and false information about Cannon as set forth in summary fashion in Section II.B. above.

407.    Again, at the time of the DOI's Seizure of Cannon on the Seizure Date, Cannon was entirely, 100% owned by Premier.

408.    Stated differently, at the time of the DOI's Seizure of Cannon on the Seizure Date, Premier was the sole owner and "parent" company of Cannon.

409.    As of the DOI's Seizure of Cannon on the Seizure Date, Premier and Cannon were privately owned businesses and companies solely owned by Mr. McClain (75%) and Mr. Brawley (25%), authorized by the DOI to serve collectively as a special purpose captive under the State's surety laws in the bail bonding industry from the Business Premises.

74

410.    On the Seizure Date, Premier was not seized by the DOI.

411.    Premier has never been seized by the DOI.

412.    However, from the Seizure of Cannon on the Seizure Date until mid-2019, the Defendants had wrongfully and unlawfully "frozen" Premier from accessing its bank accounts and funds therein, despite (1) the DOI's own seizure filings related to only Cannon; and, (2) despite multiple, repeated requests by Mr. McClain and his legal counsel to remove the "freeze" on Premier's accounts and release Premier's funds.

413.    Ultimately, finally, the Defendants removed the freeze on Premier's bank account(s) on or about 17 May 2019 – approximately 1 ½ years *after* Defendants' improper Seizure of Cannon on the Seizure Date.

414.    As of the DOI's Seizure of Cannon on the Seizure Date, Premier and Cannon were not only afforded the full protections of the authorization by the DOI to operate and provide their Surety Services pursuant to the Cannon Conditions, they were also entitled to and guaranteed the full protections of the North Carolina Constitution, the United States Constitution, and the North Carolina General Statutes governing, *inter alia*, the Defendants, as well as special purpose captive surety companies such as Premier and Cannon.

415.    As of the DOI's Seizure on the Seizure Date, Mr. McClain's Premier and Cannon (through Premier as its parent company) had over 200 bail agents throughout the State writing bonds for which Premier and Cannon served as the surety.

416.    On the Seizure Date, Defendants rounded up Cannon's employees into a conference room and began summarily taking assets and other personal property items from the entire Business Premises, including personal effects and property that did not belong to Cannon.

75

417.    After numerous requests from Mr. McClain and a Court order, some – but not all
- personal property that did *not* belong to Cannon but was wrongfully seized by one or more of
the Defendants was finally returned to Mr. McClain and other rightful owners.

418.    As of this filing, and despite Mr. McClain's requests to the Defendants, the
Defendants continue to wrongfully and unlawfully possess his property without any reason or
explanation by the Defendants.

419.    As of this filing, and despite Mr. McClain's requests to the Defendants, the
Defendants have also lost and/or destroyed property items belonging to Mr. McClain, and, on
information and belief, some property items have been stolen by one or more of the Defendants.

420.    On the Seizure Date, the DOI and its personnel, after ransacking and pillaging
Cannon's Business Premises, left the building sealed, posted, and locked with new locks they
installed on the Business Premises even though neither Premier nor any other businesses located
at the Business Premises were the subject of the Seizure.

421.    What occurred to Cannon on the Seizure Date at the hands of the Defendants, and
the tremendous damage that was intentionally, recklessly, maliciously and willfully inflicted on
Mr. McClain in blatant violation of his Constitutionally-protected and guaranteed rights,
liberties, and property was not the result of a failing company being shut down to protect the
public, as falsely portrayed by the Defendants.

422.    Rather, the Defendants' actions to shut down Cannon were those undertaken and
pursued against successful companies (Premier and Cannon) and their 75% owner, Mr. McClain,
to exact revenge and retribution and to payback political favors to Mr. McClain's competitors,
detractors and financial political contributors of Commissioner Mike Causey and his DOI, as
admitted by Defendant Causey himself.  See, the Affidavit of Alwanda Williams Beane dated 20

76

April 2020 (and its Exhibits A-C)[35] and the Affidavit of Billy Todd Reavis dated 9 July 2019, both of which are each attached hereto as Exhibits 16 and 17, respectively.

423.    Among other things, Ms. Beane states in her Affidavit –

(i).    She has been a North Carolina bail agent for 35 years;

(ii).    She has been family friends with Defendant Causey and his family for over 35 years;

(iii).    She supported Defendant Causey's campaign in 2016 by placing political signs and attending some of Defendant Causey's political rallies but made no financial contributions;

(iv).    She knew of and had observed the close relationship between the NCBAA and the DOI when Defendant Causey's predecessor, Wayne Goodwin, was the DOI's Commissioner;

(v).    She knew of NCBAA's continued resentment of and opposition to Mr. McClain stemming from the past litigation involving the defeat of the Session Law;

(vi).    She knew – from Defendant Causey – that upon being elected as Commissioner of the DOI, Defendant Causey formed a committee that consisted of NCBAA members (including the aforementioned Mr. Bradshaw, Mr. Cartret, Ms. Seiler, and Mr. Cozart) as well as NCBAA's legal counsel, the aforementioned Attorney McCloskey.  Meanwhile, and very conspicuously, Mr. McClain, the bail instructor having more contact with numbers of bondsmen in

---

[35]    Certain portions of Ms. Beane's Affidavit and Exhibits have been redacted to protect her private, personal information and to also protect against the disclosure of confidential business terms and provisions.

the State than any other person, was not included with nor invited to be on this committee.;

(vii).    She knew that up to and including January of 2017, Defendant Causey had zero bail bonding experience;

(viii).   She was contacted by Defendant Causey in April 2017 (approximately 5 months *before* Defendants' Seizure of Mr. McClain's Cannon business) during which Defendant Causey told her to stop writing bonds with Cannon and that Cannon "was not in good standing and had unpaid bond forfeitures";

(ix).    During the same April 2017 telephone call, Defendant Causey told her that the NCBAA wanted Cannon shut down and they gave him a lot of money, so he was eventually going to have to do what they asked; and,

(x).    That at her request, Defendant Causey met with her and Todd Reavis in person in November 2017 (about two months *after* Defendants' Seizure of Cannon), during which Defendant Causey told her and Mr. Reavis "he was forced to shut down Cannon" and that he was told to do so by "Senator Phillip Berger and former Senator Tom Apodaca."

*Id*.

424.    In his attached Affidavit, Mr. Reavis corroborates Ms. Beane's account of the meeting with Defendant Causey from November 2017 and that Defendant Causey stated, "he was forced, by Phil Berger and Tom Apodaca to take action against and investigate Cannon Surety for their *[sic]* solvency."  See, Exhibit 17.

425.    As noted above, Defendants' Cannon Conditions included that Cannon have the sum of an on-hand, cash reserve amount deposited with the DOI in the total amount of 1.25

million dollars under the captive laws of the State including the DOI's aforementioned 2003 Memorandum.

426.    Upon information and belief, Mr. Brawley, Mr. Cartret, and Mr. Pierce actively and passively interfered with crucial relationships such as accountants and captive managers, and Defendants were notified and advised by Mr. McClain of the negative impacts of their actions.

427.    However, the Defendants, who do have regulatory authority, refused to intervene and mitigate the effect of damage being done to Mr. McClain's Cannon business by, among others, Mr. Cartret and Mr. Brawley, which had a direct effect on Cannon's revenue and the accumulation of reserves.

428.    Despite McClain's pleas to the DOI to regulate and stop Mr. Cartret and Mr. Brawley in their defamatory and other damaging actions, the opposite occurred whereby Defendants actually aided Cannon's competitors by conspiring to cripple and otherwise discriminate against Mr. McClain and his Cannon business.

429.    The Defendants had issued waivers of the 1 million reserve portion of the required 1.25 million to several other companies on a case-by-case basis. Additionally, Mr. McClain would later learn the Defendants had actually negotiated with Cannon's competitor – AAI - to allow it for several more years to try to meet and satisfy its significant shortfall. This was yet another blatant arbitrary difference withheld from the Court by, *inter alia*, Defendants Johnson, Stanford and Freeman.

430.    On the Seizure Date of Cannon, Cannon had the approximate sum of <u>$987,000.00</u> leaving a *perceived* "shortfall" of cash reserves of approximately $263,000.00.

431.    However, in addition to the $987,000.00 sum that Cannon possessed in reserves, Mr. McClain's Cannon business also had the sum of approximately <u>$410,000.00</u> in

approximately 80 BUF bank accounts of Cannon's bail agents, *the funds of which were under Cannon's control for loss protection in the event of bond forfeiture judgments that had to be paid*.

432. As noted earlier in this Complaint in Section VI.C., a BUF – or "build up fund" – account in Mr. McClain's Bail Surety Example is meant to serve as restricted funds that help offset any bond forfeitures that Cannon would have to pay for a bail agent on his or her bonds. Thus, in reality, between the sum of $987,000.00 on deposit with the DOI plus the sum of $410,000.00 under Cannon's control in the BUF accounts, Cannon had monetary reserves of $1,397,000.00 - $147,000 more than the required 1.25 million dollars.

433. Notwithstanding the foregoing, had Defendants approved either of or both of Mr. McClain's and Cannon's requested approvals to serve as surety on Mr. Snow's fully collateralized, risk-free multi-million-dollar bonds, Cannon would have possessed far in excess of any required cash reserves by the Defendants.

434. Defendants knew the foregoing facts about Mr. McClain's Cannon business and the satisfaction of the reserves required by Defendants.

435. Moreover, and as unquestionably proven in the Obusek Documents, Mr. Cartret's AAI/North State business was nowhere close to having the reserves of $1,250,000.00 required by the Defendants at any time whatsoever; nor were AAI/North State anywhere close to Cannon's cash reserve amounts on deposit with the DOI. Indeed, if Cannon's BUF account sum of $410,000.00 is not included, Cannon possessed the cash reserve sum of $987,000.00 on deposit with the DOI at the time of Cannon's Seizure compared to AAI/North State only possessing approximately $563,423.00 – *an amount that was $423,577.00 less than Cannon*.

436.    Yet, despite the foregoing, the DOI did not pursue nor has it ever tried to pursue, seize and shut down AAI at any time whatsoever.

437.    The DOI's monetary reserve requirements of Cannon and Premier, as well as AAI/North State, are mandated under N.C. Gen. Stat. § 58-10, which is known and referred to as the Captive Insurance Act.

438.    Under the Captive Insurance Act, a minimum of $250,000.00 is required for a captive surety in the State.  Additionally, for many years and with few exceptions, the DOI has required bail surety companies operating in the State to have an additional $1 million in reserves. The $250,000 and $1,000,000 amounts are collectively referred to hereinafter as, "Cash Reserve Requirements."

439.    The DOI's Cash Reserve Requirements are meant to establish minimum standards of liquidity and solvency, and to try to also ensure payment of any forfeited bonds that are reduced to judgment against the surety (in this case, for example, a surety such as Cannon and Premier, or AAI and North State) for payment into the Courts.

440.    This is because in the case of a bond forfeiture in the State, the Court enters judgment on the bond liability against only (1) the criminal defendant and, (2) the surety on the bond.

441.    Stated differently, the Court looks only to the criminal defendant and/or the surety on the forfeited bond for payment of the bond liability – not the bail bondsman that wrote the bond.

442.    In the event the surety does not pay a bond judgment, the surety is prohibited, by operation of law, from serving as a surety in that county on any other bonds until such time as the bond judgment is paid.

81

443. As previously noted above, Cannon had nearly 1 million of the Cash Reserve Requirements (and would have easily surpassed and satisfied the DOI's Cash Reserve Requirements had the DOI authorized Mr. McClain and his Cannon business to write either of Mr. Snow's bonds and/or had the DOI not unlawfully seized and taken Cannon on the Seizure Date). And, if Cannon's BUF accounts amount of approximately $410,000.00 were considered, Cannon met and exceeded the Cash Reserve Requirements.

444. Up to and including the Defendants' Seizure on the Seizure Date of Mr. McClain's Cannon business, there had never been any amount of funds drawn down or used in any fashion to pay any debt whatsoever of Mr. McClain's Cannon business specifically including bond forfeiture judgments from Cannon's funds in the DOI-controlled US Bank account.

445. In stark contrast however, and directly contrary to Defendants' representations to the State Court, AAI's reserves were far from the required Cash Reserve Requirements. Additionally, in the time period that has passed since Cannon's Seizure, AAI's sum of cash reserves has been very nearly exhausted during AAI's voluntary "run off" and winding down agreement with the DOI as evidenced by DOI having to issue payment checks from AAI's reserves to pay AAI's unpaid bond forfeiture judgment liabilities. True, exemplary and non-exhaustive copies of documents and checks reflecting the DOI's payments for AAI from AAI's reserves, as well as excerpts from Mr. Cartret's deposition testimony on behalf of AAI in another lawsuit wherein he denied this occurring, are collectively attached as Exhibit 18.

446. Despite this, the Defendants never sought to rehabilitate or seize Mr. Cartret's AAI. In fact, it appears that instead of Mr. Cartret's AAI company being regulated by Defendants, Mr. Cartret has been dictating and controlling the Defendants to not only the substantial detriment and injury of Mr. McClain and his Cannon business but also to the

substantial detriment, injury and risk to the very public that Defendants are supposed to be serving and protecting.

447.    In contrast, again, Mr. McClain and his Cannon business never asked the DOI to tap its cash reserves, nor was there ever a need of the DOI to do so – until only after the Defendants' Seizure on the Seizure Date when the Defendants had control of Cannon and have since intentionally, financially ruined Cannon to the tune of over 2-million-dollars in unpaid bond forfeiture judgments that have all been entered after Defendants' Seizure on the Seizure Date under the absurd guise and color of law of "rehabilitation."

448.    At the time of the DOI's Seizure of Cannon on the Seizure Date, neither Cannon nor its parent company, Premier, owed any bond forfeitures and bond judgment liabilities. Stated differently, Cannon and Premier owed no bond judgments to any of the State's 100 counties on the Seizure Date.

449.    At the time of the DOI's Seizure of Cannon on the Seizure Date, neither Cannon nor its parent company, Premier, had been prohibited from acting as a surety on any bonds in any of the State's 100 counties.

*****

D.    The Individual Defendants' Experience – or Really, Lack Thereof – in
       Bail Bond and Bail Surety Services and Businesses

450.    In the election of November 2016, Defendant Causey won election as the Commissioner for the DOI.

451.    In January 2017, Defendant Causey was sworn into office as the new Commissioner of the DOI.

452.    Prior to being sworn in as the new Commissioner for the DOI, Defendant Causey had zero experience in the bail bonding industry and surety services in the State.

453.    Upon information and belief, Defendants Sumner, Cable, and Obusek had zero experience in the bail bonding industry.

454.    Upon information and belief, more than 10 experienced mid-level and upper level existing DOI personnel were fired or separated in their employment by Defendant Causey.

455.    In fact, after his election and swearing into office, and in addition to Defendant Causey, most, if not all, of DOI's and DOJ's personnel, including the other Defendants named herein, had little or no experience in regulating surety companies such as Cannon and Premier, including the standard operations and business practice of bail surety companies.

456.    Prior to being sworn in as the new Commissioner for the DOI, Defendant Causey had zero experience in the business fields that comprise Premier's and Cannon's surety services.

457.    Defendant Causey ran as the Republican Party nominee against the Democrat incumbent DOI Commissioner, Wayne Goodwin.

458.    At all times pertinent to this action, including leading up to the November 2016 election and still existing to the present day, Phillip Berger, Sr. (Republican) was and remains the North Carolina Senate Majority Leader.

459.    Senator Berger's son is The Honorable Phillip Berger, Jr., a Judge for the North Carolina Court of Appeals.

460.    Prior to becoming an appellate judge at the State's Court of Appeals, Judge Berger was an instructor for the aforementioned NCBAA.

461. Based on all of the foregoing, Defendant Johnson's statements in open Court to Judge Shirley, as summarized in Section II.B. above, were all completely false when made by Defendant Johnson and he knew them to be false when they were made.

462. Defendant Johnson's false statements were made with the full knowledge and support of each and every one of the other Defendants and done at the behest of Defendant Causey.

463. At best, Defendant Johnson's false statements to Judge Shirley were made with willful and wanton, reckless disregard for the truth.

464. At worst, and even more alarming, Defendant Johnson's statements reflect a criminal conspiracy by the Defendants to help and promote a private surety company – AAI – at the unlawful expense and sacrifice of another – Mr. McClain's Cannon business.

465. Defendants Johnson, Stanford, and Freeman, all employed by the State Attorney General's Office, have participated in various hearings, depositions, and document filings on behalf of the DOI. As officers of the Court, these particular Defendants have ethical, moral, and professional duties of honesty, competency, candor and truthfulness to the Courts and the general public – including Mr. McClain.

466. Further, as employees representing the State's DOJ and Attorney General, Defendants Johnson, Stanford, and Freeman should possess an inherent pursuit of justice and refrain from participating, intentionally or recklessly, in conduct that violates the Constitutions of the State and United States of America and Mr. McClain's rights, liberties, freedoms guaranteed and protected thereunder.

467. Upon information and belief, Defendants conspired to bury Mr. McClain in legal costs and protracted legal proceedings, both civil and criminal, to prevent him from successfully

protecting himself and his Cannon business and Mr. McClain reasonably believes there are other persons within the DOI and DOJ who have and/or are acting in similar unlawful and unconstitutional fashion with Mr. McClain, as reflected in the Plaintiff's caption to this action.

468.    At another point in the 12 October 2017 hearing before Judge Shirley in State Court on Defendants' Petition, Defendant Johnson told Judge Shirley that supervision was not appropriate with Cannon because Cannon was a "train wreck."  This statement was completely false when made by Defendant Johnson and he knew it to be false when it was made. Plaintiff's Exhibit 1 (Excerpts from the 10-12-2017 Seizure Petition Hearing T. p 80) attached to this Verified Complaint.

469.    At yet another point in the same 12 October 2017 hearing, Defendant Johnson told Judge Shirley that Cannon was operating a "Ponzi scheme."  This statement was completely false when made by Defendant Johnson and he knew it to be false when it was made.  See, Plaintiff's Exhibit 1 (Excerpts from the 10-12-2017 Seizure Petition Hearing T. pp 82-83) attached to this Verified Complaint.

470.    Not only were Defendant Johnson's "train wreck" and "Ponzi scheme" comments to Judge Shirley completely false, they were inflammatory and of a scandalous nature and prejudicial to Mr. McClain.  See, Plaintiff's Exhibit 1 (Excerpts from the 10-12-2017 Seizure Petition Hearing T. pp 80, 82-83) attached to this Verified Complaint.

471.    At best, all of Defendant Johnson's foregoing statements in the State Court were made with willful, wanton, and reckless disregard for the truth.

472.    All of Defendant Johnson's foregoing false statements were made with the approval of the remaining Defendants when all of said Defendants knew or clearly should have known they were false and/or in reckless and malicious disregard for the truth.

473.    On 13 October 2017, approximately two weeks after the DOI's Seizure of Cannon on the Seizure Date, a hearing on multiple motions in the First Action came on for hearing before The Honorable John O. Craig, III (hereinafter, "10-13-2017 Hearing").

474.    The motions before Judge Craig at the 10-13-2017 Hearing included the DOI's motions to quash several subpoenas issued by Premier and Cannon, and the Motion to Show Cause filed by Mr. McClain (for Premier and Cannon) against Mr. Brawley for violating Judge Allen's Preliminary Injunction Order (hereinafter, "10-13-2017 Transcript").[36]

475.    At the 10-13-2017 Hearing, the DOI was represented by attorney and Defendant in the instant action, Daniel S. Johnson.  Furthermore, the persons in attendance at the 10-13-2017 Hearing included certain of the Defendants in this action, notably and importantly, Defendants Causey and Trendel.

476.    Mr. Brawley was present at the 10-13-2017 Hearing and was represented by Attorney McCloskey (and, as noted previously above, Attorney McCloskey was general legal counsel to NCBAA and has been representing Mr. Cartret at all times pertinent to this action as well).

477.    Also in attendance at the 10-13-2017 Hearing were Mr. Cartret and the aforementioned Mr. Pierce.  Mr. Pierce was later sanctioned that day for not complying with a valid subpoena in the production on documents.

478.    At the 10-13-2017 hearing, Messrs. Pierce, Cartret, Brawley, and several DOI officials testified.

479.    Judge Craig, after having heard all of the testimony and evidence during the 10-

---

[36]     Pursuant to M.D.N.C. Local Rule 7.1(c), the 13 October 2017 hearing transcripts and excerpts therefrom are not being attached as exhibits but the entire transcript is available for production in its entirety.

13-2017 Hearing, found, *inter alia* –

    (i).    "The witnesses Pierce, Cartret, and Brawley, in the Court's view, were often not credible" (T p. 169);

    (ii).    "But in a cumulative way the – the answers of these - - of these men [referring to Messrs. Cartret, Brawley and Pierce] were just not credible in many aspects that the Court considers to be important and things that should be easily remembered" (T p. 171); and,

    (iii).    "The Court concludes . . . beyond a reasonable doubt that Mr. Brawley is the person who provided this – this confidential and sensitive information [about Premier and Cannon] in violation of [Judge Allen's] order" (T p. 173).

480.    Judge Craig then sentenced Mr. Brawley to fifteen (15) days in jail for contempt of court.[37]

481.    Following the 10-13-2017 Hearing, the First Action was then transferred to Wake County.

<p style="text-align:center">*****</p>

## VIII.   PERTINENT *NON-EXHAUSTIVE* SUMMARY OF DEFENDANTS' ABUSIVE AND BAD FAITH ACTS AND OMISSIONS

482.    Defendants' statement, through Defendant Johnson, in State Court proceedings that Cannon owed 79 million dollars was false when made, has always been false prior to the Defendants' Seizure, and was a deliberately prejudicial and misleading statement to the Court to the substantial detriment and harm of Mr. McClain and his Cannon business.

483.    Defendants' statement, through Defendant Johnson, in State Court proceedings that Cannon had unpaid bond forfeiture judgments was false when made, has always been false prior to the Seizure, and was a deliberately prejudicial and misleading statement to the Court to the substantial detriment and harm of Mr. McClain and his Cannon business.

---

[37]    Pursuant to M.D.N.C. Local Rule 7.1(c), Judge Craig's Contempt Order against Mr. Brawley is not being attached as an exhibit but it is available for production in its entirety.

484.     Defendants' statement, through Defendant Johnson, in State Court proceedings that Cannon was a "Ponzi scheme" was false when made, has always been false prior to the Seizure, and was a deliberately prejudicial and misleading statement to the Court to the substantial detriment and harm of Mr. McClain and his Cannon business.

485.     Defendants' statement, through Defendant Johnson, in State Court proceedings that Cannon was a "train wreck" was false when made, has always been false prior to the Seizure, and was a deliberately prejudicial and misleading statement to the Court to the substantial detriment and harm of Mr. McClain and his Cannon business.

486.     Defendants' statement, through Defendant Johnson, in State Court proceedings that Cannon was not being treated differently than other sureties such as AAI and North River or 1st Atlantic was false when made, has always been false, and was a deliberately prejudicial and misleading statement to the Court to the substantial detriment and harm of Mr. McClain and his Cannon business.

487.     Defendants' Verified Petition stating that it was being done to "rehabilitate" Mr. McClain's Cannon business was false when made and continues to be false.  Defendants' Petition is nothing more than Defendants' unlawfully disguised liquidation of Mr. McClain's Cannon business.

488.     Defendants never provided Mr. McClain any notice of any shortcomings or deficiencies, despite the requirement to do so under applicable North Carolina law, from its annual audit reports and reviews for 2016 and 2017 prior to shutting down Cannon on the Seizure Date, nor at any time ever since.

489.     Defendants' statements and Petition's allegations – for the first time ever - that Mr. McClain's Cannon business inappropriately used a "primitive" bookkeeping system, was

false when made, has always been false, and was a deliberately prejudicial and misleading statement to the Court to the substantial detriment and harm of Mr. McClain and his Cannon business.

490. Defendants' statements and Petition's allegations that Mr. McClain's Cannon business was not sufficiently solvent and was not compliant with the DOI's required reserves was false when made, has always been false, and was a deliberately prejudicial and misleading statement to the Court to the substantial detriment and harm of Mr. McClain and his Cannon business. Even assuming *arguendo* any such deficiency existed as of the Seizure of Cannon on the Seizure Date, it was *only* due to Defendants' deliberate and premeditated refusal to authorize Cannon to write either of the bonds on Mr. Snow that would have easily enabled Cannon to exceed all reserve requirements, real or imagined.

491. Defendants' statements and Petition's allegations that Mr. McClain's Cannon business had to be seized to protect the public was false when made, has always been false, and was a deliberately prejudicial and misleading statement to the Court to the substantial detriment and harm of Mr. McClain and his Cannon business.

492. Defendants' decision to dismiss Cannon's participation in the Tort Action against Mr. Cartret, AAI and North State, was done during a time that Mr. Cartret, AAI and North State were actively receiving favorable regulatory treatment by Defendants starkly different than that which Mr. McClain and his Cannon business were receiving despite the fact that Cannon was in far better financial condition than AAI and North State.

493. Defendants' decision to dismiss Cannon's participation in the Tort Action against Mr. Cartret, AAI and North State, overtly favored Mr. Cartret, AAI and North State over Mr. McClain and Cannon and was made inexplicably in direct conflict with Cannon's best interests –

which Defendants were and/or are supposedly advocating – and made by persons, the Defendants, when they could not possibly do so objectively and without the appearance of impropriety and/or a real conflict of interest in light of their actions in connection with the Petition and Seizure.

494.    Defendant Causey and all other Defendants have waived all sovereign, qualified and public official immunities that may apply to this action, as demonstrated and alleged in this Complaint.

*****

IX.    CAUSES OF ACTION

FIRST CAUSE OF ACTION
(Violations of 42 U.S.C. § 1983 – Equal Protection; and, Due Process)

495.    Mr. McClain restates and realleges all of the foregoing allegations as if fully set forth herein.

496.    The Defendants, acting in concert, and aiding and abetting one another, subjected Mr. McClain to their acts, omissions and conduct under color of State law, and violated clearly established law of which any reasonable official at the DOI and DOJ would have known, that deprived Mr. McClain of his rights, privileged, immunities, property, and liberties guaranteed to him by the Fourth and Fourteenth Amendments of the United States Constitution and laws of the United States.

497.    The Defendants, acting in concert, and aiding and abetting one another, subjected Mr. McClain to their acts, omissions and conduct under color of State law that were

discriminatory in that they were arbitrary and capricious when compared to, *inter alia*, Defendants' treatment of AAI, North State, North River, and 1st Atlantic.

498. It is apparent that Defendants' actions against Mr. McClain had no rational basis and were not rationally related to a legitimate government objective.

499. By acting under color of state law to deprive Mr. McClain of his life, liberty, rights, and property guaranteed by the Constitution and laws of the United States, Defendants have violated and continue to violate 42 U.S.C. § 1983.

500. Mr. McClain was denied equal protection under the Fourteenth Amendment to the United States Constitution by the Defendants' acts, omissions and conduct under color of State law.

501. Mr. McClain was denied due process of law under the Fourteenth Amendment to the United States Constitution by the Defendants' acts, omissions and conduct under color of State law.

502. Defendants' conduct shocks the conscience given their concerted and premeditated abuse of power – from Defendant Causey all the way down to each and every other Defendant named (and to be named) herein – by using their power as an instrument of oppression to make good on political and personal favors to competitors and adversaries of Mr. McClain.

503. As a direct and proximate result of Defendants' deliberate, reckless, deliberately indifferent, abusive, and/or bad faith acts and omissions, Mr. McClain is entitled to prospective declaratory and injunctive relief to address Defendants' continued violations of his life, liberty, rights, and property.

504.    As a direct and proximate result of Defendants' deliberate, reckless, deliberately indifferent, abusive, and/or bad faith acts and omissions Mr. McClain is entitled to compensatory and punitive damages from Defendants, jointly and severally, for his economic losses, emotional trauma, loss of liberty and property, and irreparable harm to his reputation and goodwill.

### SECOND CAUSE OF ACTION
(Violations of 42 U.S.C. §§ 1983, 1985(2) – Conspiracy
And, Obstruction of Justice)

505.    Mr. McClain restates and realleges all of the foregoing allegations as if fully set forth herein.

506.    Under color of State law, Defendants conspired and entered into express and/or implied agreements, understandings, or meetings of the minds among themselves to deprive Mr. McClain of his constitutional life, liberty, and property rights with his Cannon business.

507.    The Defendants willfully participated in these illegal objectives by the various means summarized herein, which included (without limitation) making intentionally false statements about Mr. McClain's Cannon business, fabricating false allegations about Mr. McClain's Cannon business, and making calculated and premeditated, discriminatory decisions to shut down Mr. McClain's Cannon business in an effort to exact favorable treatment for his competitors and to exact political payback for Mr. McClain's detractors.

508.    The Defendants willfully participated in these illegal objectives by the various means summarized herein, which included (without limitation) making intentionally false statements about Mr. McClain's Cannon business, fabricating false allegations about Mr. McClain's Cannon business, for the purpose of hiding the truth about Cannon, impeding the fair pursuit of justice and truth about Cannon, hindering and otherwise obstructing the fact that there

93

was no basis and never has been any basis for Defendants' unconstitutional Seizure of Cannon and the deprivation and taking of Mr. McClain's life, liberty, and property rights with his Cannon business.

509. Defendants' deliberate, reckless, deliberately indifferent, abusive, and/or bad faith acts and omissions evidenced a callous disregard for Mr. McClain's constitutional life, liberty and property rights.

510. Defendants' acts and omissions were motivated by legal and political retribution on Mr. McClain and paybacks to Mr. McClain's detractors and competitors.

511. As a direct and proximate result of Defendants' deliberate, reckless, deliberately indifferent, abusive, and/or bad faith acts and omissions, Mr. McClain is entitled to prospective declaratory and injunctive relief to address Defendants' continued violations of his life, liberty, rights, and property.

512. As a direct and proximate result of Defendants' deliberate, reckless, deliberately indifferent, abusive, and/or bad faith acts and omissions Mr. McClain is entitled to compensatory and punitive damages from Defendants, jointly and severally, for his economic losses, emotional trauma, loss of liberty and property, and irreparable harm to his reputation and goodwill.

<u>THIRD CAUSE OF ACTION</u>
(Violations of 42 U.S.C. § 1986 – Conspiracy
And, Neglect to Prevent – Defendants Johnson, Stanford, and Freeman)

513. Mr. McClain restates and realleges all of the foregoing allegations as if fully set forth herein.

514. Defendants Johnson, Stanford and Freeman had prior knowledge of the wrongs conspired to be committed against Mr. McClain and his Cannon business by Defendant DOI

(through the other DOI Defendants named and to be named herein), Defendant Causey, and the other DOI Defendants named and to be named herein.

515. Defendants Johnson, Stanford and Freeman had the power to prevent or aid in preventing the commission of the wrongs conspired to be committed against Mr. McClain and his Cannon business by Defendant DOI (through the other DOI Defendants named and to be named herein), Defendant Causey, and the other DOI Defendants named and to be named herein, and which by reasonable diligence could have been prevented, but they neglected and/or refused to exercise such power.

516. As a direct and proximate result of the neglect and/or refusal of Defendants Johnson, Stanford and Freeman to prevent or to aid in preventing the commission of the wrongs conspired to be committed by Defendant DOI (through the other DOI Defendants named and to be named herein), Defendant Causey, and the other DOI Defendants named and to be named herein, Mr. McClain suffered injuries and damages as alleged herein.

517. Defendants Johnson's, Stanford's and Freeman's actions evidenced a reckless and callous disregard for, and deliberate indifference to, Mr. McClain's constitutional rights.

518. As a direct and foreseeable consequence of this conspiracy, Mr. McClain was deprived of his rights under the United States Constitution.

519. As a direct and foreseeable consequence of these deprivations, Mr. McClain has suffered economic loss, emotional trauma, loss of liberty and property, loss of privacy, and irreparable harm to his reputation and goodwill.

520. Mr. McClain is entitled to compensatory and punitive damages from Defendants Johnson, Stanford and Freeman, jointly and severally, for his economic losses, emotional trauma, loss of liberty and property, loss of privacy, and irreparable harm to his reputation and goodwill.

<u>FOURTH CAUSE OF ACTION</u>
(Intentional Infliction of Emotional Distress and Conspiracy)

521.    Mr. McClain restates and realleges all of the foregoing allegations as if fully set forth herein.

522.    Under color of State law, Defendants conspired and entered into express and/or implied agreements, understandings, or meetings of the minds among themselves to deprive Mr. McClain of his constitutional life, liberty, and property rights with his Cannon business.

523.    The Defendants willfully participated in these illegal objectives by the various means summarized herein, which included (without limitation) making intentionally false statements about Mr. McClain's Cannon business, fabricating false allegations about Mr. McClain's Cannon business, and making calculated and premeditated, discriminatory decisions to shut down Mr. McClain's Cannon business in an effort to exact favorable treatment for his competitors and to exact political payback for Mr. McClain's detractors.

524.    The Defendants willfully participated in these illegal objectives by the various means summarized herein, which included (without limitation) making intentionally false statements about Mr. McClain's Cannon business, fabricating false allegations about Mr. McClain's Cannon business, for the purpose of hiding the truth about Cannon, impeding the fair pursuit of justice and truth about Cannon, hindering and otherwise obstructing the fact that there was no basis and never has been any basis for Defendants' unconstitutional Seizure of Cannon and the deprivation and taking of Mr. McClain's life, liberty, and property rights with his Cannon business.

525. The Defendants repeatedly made false, insulting, offensive, and inflammatory statements and/or took offensive actions against Mr. McClain calculated to shame, humiliate, and produce public condemnation of Mr. McClain.

526. In combination with the conduct outlined in this Complaint, Defendants' actions, statements, and omissions evidence a pattern of extreme and outrageous behavior pursued with the intent to cause Mr. McClain to suffer severe emotional distress.

527. Defendants' conduct had the direct and foreseeable consequence of falsely marking Mr. McClain as a thug, someone who is immoral and unethical, an incompetent businessman, an incompetent bail bondsman and/or bail instructor, a fraud, a criminal, an incompetent surety principal, and the like before the entire public of the State of North Carolina and beyond.

528. Defendants' conduct and actions will continue to have deleterious effects on Mr. McClain forever.

529. As a result of Defendants' intentional and outrageous conduct, Mr. McClain has suffered and will continue to suffer from emotional and mental conditions generally recognized and diagnosed by trained professionals.

530. As a direct and foreseeable consequence of those conditions, Mr. McClain has suffered and continues to suffer, disabling emotional, mental and physical harm for which Mr. McClain is entitled to compensatory and punitive damages from Defendants.

## FIFTH CAUSE OF ACTION
### (Negligent Infliction of Emotional Distress)

531.    Mr. McClain restates and realleges all of the foregoing allegations as if fully set forth herein.

532.    Under color of State law, Defendants entered into express and/or implied agreements, understandings, or meetings of the minds among themselves that wrongfully deprived Mr. McClain of his constitutional life, liberty, and property rights with his Cannon business.

533.    The Defendants were negligent in engaging in their acts and omissions and conduct by the various means summarized herein from which it was reasonably foreseeable that Mr. McClain would suffer emotional and psychological harm.

534.    As a direct and foreseeable consequence of Defendants' conduct, acts and/or omissions, Mr. McClain has suffered and continues to suffer from diagnosable emotional and mental conditions causing disabling emotional, mental and physical harm for which Mr. McClain is entitled to compensatory and punitive damages from Defendants.

## SIXTH CAUSE OF ACTION
### (Negligence by Defendants)

535.    Mr. McClain restates and realleges all of the foregoing allegations as if fully set forth herein.

536.    At all times from Cannon's approval until up through and including the dates that are currently unknown to Mr. McClain but which are well known to Defendants during which Defendants allegedly began reviewing Cannon's business and operations, the DOI (through the

Defendants named herein and to be named) and all of the Defendants owed Mr. McClain and his Cannon business a duty to use care with respect to their acts, conduct, omissions and statements concerning their alleged regulatory and supervisory efforts.

537.   At the time of the events described herein, Defendants knew or should have known that their acts, omissions, statements and conduct were unwarranted, false, and inflammatory as to Mr. McClain and his Cannon business, and likely to cause Mr. McClain harm.

538.   In committing the aforementioned acts, omissions, statements and conduct, Defendants negligently breached said duty to use care, which directly and proximately caused injuries and damages to Mr. McClain as alleged herein.

SEVENTH CAUSE OF ACTION
(Tortious Interference with Existing Relationships)

539.   Mr. McClain restates and realleges all of the foregoing allegations as if fully set forth herein.

540.   Defendants, through their actions as outlined herein, have interfered with Mr. McClain's and Cannon's existing business relationships with bail bondsmen, other bail surety companies, Court personnel (including judges, magistrates, and detention personnel) throughout every county in the State, without any proper basis for having done so.

541.   For instance, and without limitation, upon unlawfully seizing Mr. McClain's Cannon business, Defendants began to immediately notify all of Cannon's bail agents to (i) purportedly terminate their ability to write bonds for which Cannon would be surety; and, (ii) to immediately transfer over to other surety companies any bonds they wish to write.

99

542.    Mr. McClain has suffered harm and damages as a direct and proximate result of the foregoing and other matters by Defendants as set forth and alleged herein.

## EIGHTH CAUSE OF ACTION
### (Tortious Interference with Prospective Economic Advantage)

543.    Mr. McClain restates and realleges all of the foregoing allegations as if fully set forth herein.

544.    Defendants inexplicably denied Mr. McClain's Cannon business the ability to write Mr. Snow's original 25 million dollar, fully secured bond.

545.    Defendants then undertook and conspired to undertake their illegal and unconstitutional Seizure of Mr. McClain's Cannon business to deprive him and Cannon – through the timed Seizure of Cannon when the Defendants knew that Mr. McClain was seeking to write it -of the ability to write Mr. Snow's new bond of 15 million.

546.    Defendants have deprived Mr. McClain and his Cannon business the ability to continue serving as the surety on bonds written by Cannon's agents ever since the Seizure.

547.    Defendants' actions were politically and personally motivated and corrupt.

548.    Mr. McClain has suffered harm and damages as a direct and proximate result of the foregoing and other matters by Defendants as set forth and alleged herein.

*****

## JURY DEMAND

Mr. McClain hereby requests a trial by jury on all claims so triable.

*****

<u>PRAYER FOR RELIEF</u>

WHEREFORE, to redress the injuries proximately and directly caused by Defendants' abusive acts, omissions, and conduct as alleged in all of the foregoing allegations, Mr. McClain hereby respectfully requests the following relief:

1.      In order to prevent and protect against the substantial risk of irreparable harm and injury to Mr. McClain as well as to other persons in the State of North Carolina, including bail bondsmen and owners of surety companies, and as a result of the abuse of power by the Defendant DOI (through the actions of all of the individual Defendants named herein and to be named) and the other Defendants, Mr. McClain prays this Court issue an Order and Permanent Injunction that (i) appoints an independent monitor ("Monitor") to be determined by the Court, who shall oversee certain activities of the DOI and DOJ officials charged with representing the DOI for a period of years deemed sufficient by the Court, who shall report to the Court on intervals determined by the Court, regarding Defendants' compliance or non-compliance with the terms of the Permanent Injunction; (ii) authorizes the Monitor to establish, review, and enforce all policies applicable to the management of the DOI; (iii) provides the Monitor with the authority to hire, fire, and promote all DOI officials; (iv) establishes an independent citizen DOI Review Committee, composed of members selected by the Court, which shall review and hear publicly complaints of misconduct by members of the public against DOI officials and make recommendations to the Monitor as to discipline or innocence; and, (v) issues such other and further relief and power to the Monitor so as to ensure that what has happened to Mr. McClain and his Cannon business at the abusive acts, omissions, and conduct of the Defendants never

101

happens to any private person and private business regulated by the DOI in the bail and surety industries in the State of North Carolina ever again;

2.     An award to Mr. McClain of compensatory damages as permitted or provided by law;

3.     An award to Mr. McClain of punitive damages as permitted or provided by law;

4.     An award of Mr. McClain's attorneys' fees, costs and expenses as permitted or provided by law;

5.     An award taxing the costs of this action against Defendants;

6.     To conduct a jury trial on all issues so triable; and

7.     Whatever additional relief the Court may deem proper.

This the 30th day of July 2020.

LAW OFFICES OF G. GRADY RICHARDSON, JR., P.C.

/s/ G. Grady Richardson, Jr.
G. GRADY RICHARDSON, JR.
NCSB #25508
*Attorneys for Plaintiffs*
1908 Eastwood Road, Suite 224
LUMINA STATION
Wilmington, North Carolina 28403
Telephone:    910-509-7166
Facsimile:    910-509-7167
Email:    grady@ggrlawoffice.com

DALLAS R. MCCLAIN

V.

JOHN MICHAEL "MIKE" CAUSEY, ET AL.

## PLAINTIFF'S EXHIBIT 1

```
 1   STATE OF NORTH CAROLINA      IN THE GENERAL COURT OF JUSTICE
                                      SUPERIOR COURT DIVISION
 2   WAKE COUNTY                      FILE NO: 17 CVS 11692

 3   ----------------------------------

 4   MIKE CAUSEY, COMMISSIONER
     OF INSURANCE OF NORTH CAROLINA,
 5
           Petitioner,
 6   vs.

 7   CANNON SURETY, LLC, A NORTH
     CAROLINA LIMITED LIABILITY COMPANY,
 8
           Respondent.
 9   ----------------------------------

10

11

12          BEFORE THE HONORABLE A. GRAHAM SHIRLEY, II

13               WAKE COUNTY, NORTH CAROLINA

14                   OCTOBER 12, 2017

15

16

17             TRANSCRIPTION OF PROCEEDINGS

18        TRANSCRIBED FROM AN OPEN-MICROPHONE RECORDING

19

20

21

22

23

24

25
```

Case 1:20-cv-00695-CCE-LPA   Document 1   Filed 07/30/20   Page 104 of 273

```
 1    APPEARANCES:

 2    ATTORNEYS FOR PETITIONER:

 3    Daniel S. Johnson, Special Deputy Attorney General
      N.C Department of Justice
 4    P.O. Box 629
      Raleigh, NC 27602-0629
 5

 6    ATTORNEY FOR RESPONDENT:

 7    Mark L. Bibbs, Attorney at Law
      Bibbs Law Group
 8    410 N. Boylan Ave
      Raleigh NC, 27603
 9

10    Respondent Representative: Dallas R. McClain, President

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

Case 1:20-cv-00695-CCE-LPA   Document 1   Filed 07/30/20   Page 105 of 273

```
 1    they use this weak accounting system based
 2    only on the checking accounting system that
 3    the CPA who gave an affidavit and whose
 4    allegations from the affidavit are in the
 5    verified complaint.  It's uncontradicted that
 6    the books and records of Cannon do not meet
 7    the standards required under Chapter 58 for
 8    an insurance company and do not meet the
 9    standards in the captive insurance law for a
10    company.
11        So I don't want to beat dead horses.
12    Mr. Bibbs has the advantage of being able to
13    talk about Agent Associates and its
14    supervision because he was representing that
15    client before.  He is now representing this
16    client.  But we don't have that privilege to
17    tell you, Your Honor, the confidential status
18    of the deposits of Agent Associates.
19    Certainly, we'd be glad to, if I was
20    instructed to do so by Your Honor.  But we're
21    trying to keep the confidentiality
22    confidential.
23        THE COURT:  Are they being treated
24    differently?
25        MR. JOHNSON:  They are not.
```

Case 1:20-cv-00695-CCE-LPA   Document 1   Filed 07/30/20   Page 106 of 273

```
 1        THE COURT:   What about the being treated
 2   differently than all the other sureties who
 3   have been prohibited from writing bonds in
 4   various counties?
 5        MR. JOHNSON:   No one is in the same
 6   condition as Cannon.   They are a one-off.
 7   They don't file reports.   They don't have
 8   record.   They have 79 million outstanding.
 9   There is no one that's the same as Cannon.
10   He tries to say that Agent Associates will be
11   the same as Cannon.   He cannot say truthfully
12   anything about those other things that -- he
13   can't say that AAI is doing those wrong that
14   Cannon is doing.
15        The people being prohibited, they're not
16   writing, Your Honor, and -- well, for
17   example, I think, American Reliable, they're
18   prohibited in all the counties, they're not
19   writing.   But I will say to Your Honor, I'll
20   suggest to my client that they look into any
21   of the people that Mr. McClain's affidavit of
22   the -- let's see.   I think -- was it the
23   ninth?   Yeah, his affidavit from this Monday
24   points out that there are people who are
25   prohibited.   I will talk to my client about
```

Case 1:20-cv-00695-CCE-LPA   Document 1   Filed 07/30/20   Page 107 of 273

```
 1   company.  So, Your Honor, the supervision is
 2   not appropriate for a train wreck called
 3   Cannon.
 4        THE COURT:  So are you saying
 5   rehabilitation can't be -- this company can't
 6   be rehabilitated?
 7        MR. JOHNSON:  No, rehabilitation is to
 8   rehabilitate the company.
 9        THE COURT:  Okay.
10        MR. JOHNSON:  Can't be supervised.
11   Merely supervising, keeping that management
12   in place.  So rehabilitation is to get it
13   right, and one of the first things that the
14   DOI has done to get it right is quit writing
15   bonds, quit adding up new liabilities.  Stop.
16        MR. BIBBS:  Your Honor, if I may, if
17   that's what happens, if that is, in fact,
18   what DOI's plan is, this company will be
19   bankrupt before the end of the year because
20   there is no revenue coming in.  If they're
21   not writing bonds you're not getting premiums
22   s.  If you're not getting premium, you don't
23   have revenue to pay any of your bills.  You
24   don't have any agreement.
25        MR. JOHNSON:  Your Honor.
```

Case 1:20-cv-00695-CCE-LPA   Document 1   Filed 07/30/20   Page 108 of 273

```
1   these bonds --
2·        THE COURT:  Are there indemnity
3   agreements with these bail bondsmen such that
4   if the rehabilitator is forced to pay out of
5   the assets, it can go against the bail
6   bondsman?
7        MR. JOHNSON:  We hope so, Your Honor.
8   We're not sure about that amount of
9   paperwork, if there is a contract with every
10  one.  However, they have an incentive because
11  they're disqualified from writing bonds in
12  the entire state if they have an unpaid
13  judgment.
14       So, Your Honor, you know, if they're
15  facing an unpaid judgment, they're facing
16  being out of business.
17       THE COURT:  Well, how can Department of
18  Insurance accomplish what it wants by still
19  protecting the equity of Cannon?
20       MR. JOHNSON:  They're going to bring in
21  sufficient assets.  The plan is to bring in
22  sufficient assets in litigation, or the
23  payment by the bail agents to get these
24  liabilities handled and not add to these
25  liabilities by writing a bunch of new bonds
```

Case 1:20-cv-00695-CCE-LPA   Document 1   Filed 07/30/20   Page 109 of 273

1    and not engaging in essentially a Ponzi
2    scheme where a new payment of premium is
3    funding some other forfeitures.
4         THE COURT:  What is meant by this
5    litigation?  What is owed?
6         MR. JOHNSON:  What's owed?  Well, Your
7    Honor, the records of the company -- what's
8    owed is certainly -- as of June 30 by the
9    company's own submission -- $79 million.
10        THE COURT:  No.  What -- the money that
11   the Department of Insurance is chasing to
12   bring in, what do you believe is owed and
13   what's are the debts for?
14        MR. JOHNSON:  Some of it is going to be
15   bail agents under some contracts and there
16   may be -- and where the client is looking
17   into the books and records, Your Honor, and
18   it may be that some third-party has deprived
19   the company of the money.  It may be that
20   officers have deprived the money of the
21   company to keep its books level.  That's not
22   known.  It's to be looked into, Your Honor.
23   I'm sorry, I don't have a great answer for
24   you yet.  And the purpose of a seizure order
25   is to give the Department of Insurance time

Case 1:20-cv-00695-CCE-LPA   Document 1   Filed 07/30/20   Page 110 of 273

*DALLAS R. MCCLAIN*

*V.*

*JOHN MICHAEL "MIKE" CAUSEY, ET AL.*

**PLAINTIFF'S EXHIBIT 2**

NORTH CAROLINA

WAKE COUNTY

IN THE GENERAL COURT OF JUSTICE
SUPERIOR COURT DIVISION
17 CVS 11692

MIKE CAUSEY,
COMMISSIONER OF INSURANCE
OF NORTH CAROLINA,

        Petitioner,

        v.

CANNON SURETY, LLC,
A North Carolina Limited Liability
Company,

        Respondent.

)
)
)
)
)
)
) Co
)
)
)
)
)
)
)
)

REHABILITATOR'S
QUARTLY REPORT

NOW COMES the Commissioner of Insurance of North Carolina and Rehabilitator of Cannon Surety, LLC (Rehabilitator), and hereby makes this report pursuant to North Carolina General Statute § 58-30-80(b) and the Order of this Court dated January 2, 2018, which requires the Rehabilitator to make a quarterly report to the Court including a statement of receipts and disbursements to date and a statement of financial position (balance sheet). Attached hereto and incorporated herein by reference as Exhibit A is the quarterly report of activity of the Rehabilitator as of May 15, 2020, a statement of financial position as of March 31, 2020, and a statement of receipts and disbursements of Cannon Surety, LLC, for the period from September 27, 2017, the date of the execution of the Seizure Order, through March 31, 2020, as prepared by the Special Deputy Insurance Commissioner on behalf of the Rehabilitator.

This the 27th day of May, 2020.

JOSH STEIN
ATTORNEY GENERAL
Attorney for Petitioner,

*Heather H. Freeman*

Heather H. Freeman
Assistant Attorney General
N. C. State Bar No. 28272
N. C. Department of Justice
P. O. Box 629
Raleigh, NC 27602-0629
(919) 716-6610
hfreeman@ncdoj.gov

## CERTIFICATE OF SERVICE

I, the undersigned attorney, do certify that a copy of the foregoing pleading or paper was served as follows:

Honorable A. Graham Shirley, II
Wake County Superior Court
Post Office Box 351
Raleigh, NC 27602-0351

Dallas R. McClain
P.O. Box 7961
Greensboro, NC 27417

Steven A. McCloskey
240 Natalie Drive
Winston-Salem, NC 27104-2457

in the following manner:

(xx) by United States mail, first class postage prepaid, as provided by Rule 5(b) of the North Carolina Rules of Civil Procedure, or

( ) by facsimile transmission to the facsimile number set out above, as provided by Rule 5 of the North Carolina Rules of Civil Procedure.

This the 27th day of May, 2020.

JOSH STEIN
ATTORNEY GENERAL

By: _Heather H Freeman_

Heather H. Freeman
Assistant Attorney General
N. C. State Bar No. 28272
N. C. Department of Justice
P. O. Box 629
Raleigh, NC 27602-0629
(919) 716-6610
hfreeman@ncdoj.gov

CANNON SURETY, LLC

NORTH CAROLINA COMMISSIONER OF INSURANCE AS REHABILITATOR

QUARTERLY REPORT OF ACTIVITY OF REHABILITATOR

AS OF MAY 15, 2020,

A STATEMENT OF FINANCIAL POSITION

AS OF MARCH 31, 2020

AND

A STATEMENT OF RECEIPTS AND DISBURSEMENTS

FOR THE PERIOD FROM SEPTEMBER 27, 2017

THROUGH MARCH 31, 2020

# INTRODUCTION

## BACKGROUND

Cannon Surety, LLC (hereinafter, "Cannon") was licensed by the North Carolina Department of Insurance (hereinafter, the "NCDOI") on December 22, 2014, as a special purpose captive insurance company under Part 9 of Article 10 of Chapter 58 of the North Carolina General Statutes. On September 27, 2017, the Wake County Superior Court (hereinafter, the "Court") issued a Seizure Order against Cannon. On January 2, 2018, the Court entered an Order of Rehabilitation against Cannon and appointed the Commissioner of Insurance for the State of North Carolina as Rehabilitator (hereinafter, the "Rehabilitator"). On January 31, 2020, the court issued an Order Amending Order of Rehabilitation changing Rehabilitator's reporting requirements to the Court from monthly to quarterly.

## PURPOSE OF THIS REPORT

The purpose of this report is to provide a quarterly update to the Court, as required by the Order of Rehabilitation, on the work that the Rehabilitator and his staff have carried out since the issuance of the Seizure Order on September 27, 2017, to set out the present situation of Cannon, and to provide a statement of financial position (balance sheet) as of March 31, 2020, and a statement of receipts and disbursements for the period from September 27, 2017 through March 31, 2020.

## LIMITATIONS

This report is based only on the knowledge that the Rehabilitator and his staff have gained from the work performed since the issuance of the Seizure Order. Facts may exist that the Rehabilitator is unaware of that may have a material effect on the information provided in this report. The Rehabilitator will update the information in future quarterly reports as additional facts are discovered.

# SUMMARY

## GREENSBORO OFFICE

### Cannon Personal Property

- Financial statements previously filed with the NCDOI do not contain any assets titled as personal property, however numerous items of personal property were located at Cannon's office. While reviewing records of Cannon, receipts for various items of personal property were found.
- On February 6, 2018, the Rehabilitator filed a motion to sell property seeking permission from the Court to sell through public auction the property located in the offices of Cannon.
- On February 28, 2018, all personal property located in Cannon's office was moved and placed into storage. On May 15, 2018, the Rehabilitator received a bill for $5,500 from the company that moved and stored the contents of Cannon's office.
- The motion to sell property was heard on March 21, 2018. Affidavits of Dallas McClain and Lanier McClain, disputing ownership of certain items, were submitted to the Court. The Court granted the Rehabilitator's motion to sell all property not in dispute. The Order was issued on April 18, 2018. As directed by the Court, the parties negotiated a resolution regarding the ownership of disputed property and a Joint Report of Agreement on Rehabilitator's Motion to Sell Property was filed on May 18, 2018. The Rehabilitator worked with a licensed auctioneer to sell the property not in dispute. The auction was held on May 25, 2018, in High Point, North Carolina. All items, other than electronics, were either sold or disposed of on that date. Proceeds from the sale were applied to the moving and storage bill. The net proceeds from the sale were $192 after deducting advertising expenses and the auctioneer's commission of $211. Disposal fees for items not sold during the auction was $250.

### Lease

- On March 1, 2018, the Rehabilitator notified the landlord via e-mail that the office has been vacated.
- On April 4, 2018, counsel for the Rehabilitator sent a demand letter to All American Bail Bonds LLC ("AABB") for payment of rent due to Cannon. By letter dated May 2, 2018, Jeremy Valentine, on behalf of AABB, responded that AABB could not afford to pay Cannon for rent and had vacated the premises prior to the seizure. On December 14, 2018, the Rehabilitator, on behalf of Cannon, filed a complaint against AABB. The complaint seeks reimbursement from AABB for monthly lease payments made by Cannon for AABB under the Office Rental Agreement entered into between Cannon and AABB.

## BAIL BOND NOTICES OF FORFEITURE

Following the entry and execution of the Seizure Order, the Rehabilitator utilized the information from the database used by Cannon for the inventory of bond powers. As of October 1, 2017, the Rehabilitator began receiving Bond Forfeiture Notices for Cannon from Clerks of Court

throughout North Carolina. The Rehabilitator created a database (hereinafter "Forfeitures Database") which combined information from the bond powers inventory, information provided from the Administrative Offices of the Court (hereinafter "AOC"), forfeitures received, and bond powers written through the date of the Seizure Order and submitted by bail agents to the Rehabilitator.

The Forfeitures Database tracks pertinent information from notices of forfeiture received and/or bond powers sent to the Rehabilitator and is utilized to prevent forfeitures from going to final judgment. Each day notices are entered. Email notifications are generated that night and sent to the bail agent notifying the bail agent of notice(s) received and instructing the bail agent to act to set aside forfeitures in accordance with the procedures set forth in N.C. Gen. Stat. §15A-544.5, and to provide notification to the Rehabilitator that action has been taken.

The Forfeitures Database sends out a second notification from the NCDOI's General Counsel 75 days before the date the judgment will become final reminding the bail agent that action needs to be taken to prevent the forfeiture(s) from going to final judgment and from actions being taken against the agent's license if a final judgment does occur. If necessary, additional follow-up is taken 50 days before the date of final judgment by the NCDOI's General Counsel.

In total, the Rehabilitator has received 2,132 notices of forfeiture, with a total face value amount of $16,308,382. Of these outstanding bonds, the NCDOI has confirmed, through April 30, 2020, that 1,910 cases have been disposed of with a total face value of $14,166,111 (1,334 cases have been set aside by the courts, 161 cases have been satisfied by payment by the bail agent, and 415 cases have been otherwise discharged by the courts). There is one motion filed representing a total face amount of $2,000. There are currently 15 active forfeitures with a total face value of $311,300. There are 207 active judgments, with a total face value of $1,830,971.

In addition to communicating with bail agents regarding specific cases, NCDOI's General Counsel has access to the VCAP database administered by AOC, and has been steadily going through and updating the database with actions that have occurred since it was established in early November 2017. Finally, NCDOI's General Counsel has been in regular contact with staff at AOC as well as with numerous school board attorneys across the state regarding outstanding bond forfeitures. Demand letters seeking payment of outstanding judgments have been sent to Cannon agents with Cannon agent agreements whose bail bondsman licenses have lapsed. NCDOI is meeting with Cannon agents with active licenses who have outstanding judgments to determine how those outstanding judgments will be paid or resolved.

## BAIL BOND JUDGMENTS

As of April 30, 2020, Cannon has 207 active judgments for a total face amount of $1,830,971. In addition, $13,785 of court costs, $273,600 of interest, and $135 of sheriff's fees have been incurred as a result of these judgments. Interest continues to accrue until the judgments are satisfied. On December 14, 2018, the Rehabilitator, on behalf of Cannon, filed suit against AABB seeking payment, pursuant to the agent agreement between Cannon and AABB, of any and all sums necessary to fully satisfy all bond forfeiture judgments existing on bonds written by AABB's sub-agents that were issued using Cannon Powers of Attorney. The Rehabilitator also intends to pursue

collection of the amounts from the bail agents and any other person who agreed to indemnify the Company from loss. Collection of amounts due is unknown and uncertain and as such, no receivable has been established.

## LAWSUITS

To the Rehabilitator's knowledge, at the time of the Seizure Order, Cannon was a plaintiff in the following lawsuits:

### Premier Judicial Consultants, LLC, et al. v. Clyde Robert Brawley, Jr., 17 CVS 13352; Wake County Superior Court

On February 23, 2018, Mr. Bibbs filed a motion to withdraw as counsel for Cannon and Premier.

On February 28, 2018, Daniel S. Johnson, Special Deputy Attorney General, M. Denise Stanford, Special Deputy Attorney General, and Heather H. Freeman, Assistant Attorney General, filed a notice of appearance as counsel of record for Cannon.

The motion to withdraw was heard on March 21, 2018, and the Court granted and signed the Order allowing Mr. Bibbs to withdraw.

On May 7, 2018, attorneys Donald Vaughn and Richard Forrester were notified that their services as counsel for Cannon in this action have been terminated.

On May 23, 2018, a Consent Case Management Order was transmitted to the Trial Court Administrator for Wake County Superior Court.

Counsel for all parties discussed the status of the litigation, a request to the Wake County Senior Resident Superior Court Judge Ridgeway for a 2.2 designation, and the potential for resolving the matter by stipulations of voluntary dismissal.

On April 3, 2019, a Stipulation of Voluntary Dismissal Without Prejudice between Cannon and Brawley was filed in Wake County Superior Court.

On July 19, 2019, the Court granted Defendant Brawley's Motion for Summary Judgment and dismissed each of PJC's claims against him with prejudice.

### Dallas McClain, et al. v. Mark Wayne Cartret, et al., 17 CVS 3831; Wake County Superior Court

On April 30, 2018, Daniel S. Johnson, Special Deputy Attorney General, M. Denise Stanford, Special Deputy Attorney General, and Heather H. Freeman, Assistant Attorney General, filed a notice of appearance as counsel of record for Cannon.

On May 7, 2018, attorney G. Grady Richardson, Jr. was notified that his services as counsel for Cannon in this action have been terminated.

This case was set for trial during the week of September 17, 2018. On August 13, 2018, Cannon filed a Motion to Continue, a Motion for Local Rule 2.2 Designation of Presiding Judge, and a Motion for Partial Summary Judgment. On August 17, 2018, Defendant Clyde Robert Brawley,

Jr. filed a Motion for Partial Summary Judgment. On September 12, 2018, Cannon and Defendants Mark Cartret, North State Holdings Group, LLC, Agents Associates Insurance, LLC, and Clyde Robert Brawley filed a Stipulation of Voluntary Dismissal Without Prejudice for all claims between those parties. On September 12, 2018, Cannon filed a Voluntary Dismissal Without Prejudice of its claims against Defendants Ronald Pierce and Piedmont Disaster Services, LLC. The case was assigned to Judge Shirley and removed from the September 17, 2018 trial calendar. On December 12, 2018, Cannon filed its Motions to Dismiss, Motion to Strike Pleading and Reply to Defendants Ronald L. Pierce's and Piedmont Disaster Services, LLC's counterclaims. On March 19, 2019, Cannon filed a Stipulation of Voluntary Dismissal Without Prejudice as to Claims Between Cannon, Pierce, and Piedmont Disaster Services, LLC.

## COLLECTIONS

On December 14, 2018, the Rehabilitator, on behalf of Cannon, filed suit against AABB seeking payment, pursuant to the agent agreement between Cannon and AABB, of any and all sums necessary to fully satisfy all bond forfeiture judgments existing on bonds written by AABB's sub-agents that were issued using Cannon Powers of Attorney. The Rehabilitator also intends to pursue collection of the amounts from the bail agents and any other person who agreed to indemnify the Company from loss. Collection of amounts due is unknown and uncertain and as such, no receivable has been established. Demand letters have been sent to a number of bail agents with Cannon agent agreements in which the bail agent agreed to indemnify Cannon from loss.

On April 4, 2018, counsel for the Rehabilitator sent a demand letter to AABB for payment of rent due to Cannon. By letter dated May 2, 2018, Jeremy Valentine, on behalf of AABB, responded that AABB could not afford to pay Cannon for rent and had vacated the premises prior to the seizure. On December 14, 2018, the Rehabilitator, on behalf of Cannon, filed a complaint against AABB seeking reimbursement from AABB for monthly lease payments made by Cannon for AABB under the Office Rental Agreement entered into between Cannon and AABB and seeking payment under the Agent Agreement between Cannon and AABB of bond forfeiture judgments on numerous bail bonds written by AABB's sub-agents using Cannon Powers of Attorney for which Cannon has now become liable. Counsel for the Rehabilitator attempted service on AABB via certified mail of the summons, complaint, and cover sheet at the known address for the registered agent on file with the NC Secretary of State ("SOS"), but was unsuccessful. Counsel subsequently forwarded the copies of the summons, complaint, and cover sheet to the SOS for service pursuant to N.C. Gen. Stat. § 55D-33, and received confirmation of receipt from the SOS on January 14, 2019. Pursuant to N.C. Gen. Stat. § 55D-33 service on AABB is effective on that date. An affidavit of service was filed in Wake County notifying the Court of the effective service. Copies of documents were sent to the registered agent of AABB, Jeremy Valentine, at his Floyd, VA address. AABB had 30 days from January 14, 2019, to answer or otherwise respond. Jeremy Valentine submitted a letter dated February 2, 2019, with a document attached, and requested that it be made part of the court file. On May 21, 2019, the Rehabilitator, on behalf of Cannon, filed a Motion to Strike the letter filed by Jeremy Valentine from the file and a Motion for Entry of Default. On June 12, 2019, Cannon requested a Court Order designating Judge A. Graham Shirley, II, to preside over all future matters of this case pursuant to Local Rule 2.2. On August 15, 2019, Judge A. Graham Shirley, II was designated to preside over all court proceedings in this action. On

October 10, 2019, the Rehabilitator gave notice that his Motion to Strike and Motion for Entry of Default will be heard on October 28, 2019. The Motion to Strike and Motion for Entry of Default was granted by Judge A. Graham Shirley on October 28, 2019.

## CONTINUATION OF BUSINESS

A final decision as to the course of action to take with Cannon has not yet been determined.

## OTHER

### Tax Returns

The Rehabilitator has engaged Batchelor, Tillery & Roberts, LLP to prepare and file tax returns for Cannon for the years 2016 through 2018. The Rehabilitator is providing information for the preparation of these returns and will make a decision on whether to prepare and file the 2019 returns or utilize the CPA firm. These returns will be filed at one time.

### Audit

It has been the practice for the Rehabilitator of other insurance company receiverships to have an audit performed by an outside certified public accountant, the cost of which is borne by the company upon whom the audit was performed. With Cannon, there is limited cash with which to perform an audit and to pay other administrative expenses expected to be incurred. It is the intent of the Rehabilitator to not have an independent audit performed unless otherwise instructed by the Court.

### Disbursements

Since the execution of the Seizure Order, through March 31, 2020, the Rehabilitator has paid funds for various expenses including banking fees, totaling $35,890. This amount was paid to the North Carolina Department of Revenue for interest due for 2015 premium tax of $616, premium tax for 2016 of $22,218 and interest due for 2016 premium tax of $657. The Rehabilitator negotiated with the North Carolina Department of Revenue to have the penalties for 2015 and 2016 waived in the amount of $18,752. The Rehabilitator paid $5,750 to City Transfer and Storage for expenses associated with the removal and storage of the contents of Cannon's office prior to the auction of these items. The Rehabilitator paid $3,386 for the cost of the QuickBooks software used by the Rehabilitator. The Rehabilitator paid $800 to the North Carolina Secretary of State for the 2017, 2018, 2019 and 2020 annual report filings. The Rehabilitator paid $509 to US Bank and $414 to Capital Bank for fees related to administering the deposits. The Rehabilitator paid $157 to the North Carolina Court of Appeals for services rendered during hearings. The Rehabilitator paid $325 to Gina Macchio for transcript services rendered during hearings. The Rehabilitator paid $4 to the Multnomah County Recorder and paid $11 to the County Recorder in California for lien documents. The Rehabilitator paid $1,040 to his staff as reimbursement for mileage, shipping and packing supplies related to administering the rehabilitation.

### Confession of Judgment

On February 2, 2018, the Rehabilitator became aware of a purported confession of judgment that was executed on December 15, 2017, by Dallas McClain on behalf of Cannon for the benefit of

Mark Bibbs in the amount of $227,850.50 plus interest at the legal rate of eight percent (8%). On February 6, 2018, the Rehabilitator filed motions to strike purported confession of judgment against Cannon. On March 21, 2018, the Court heard the motion filed by the Commissioner of Insurance on February 6, 2018, to strike the Confession of Judgment against Cannon Surety, LLC filed with the Clerk of Superior Court of Wake County in Case No. 17 CVS 15505 on December 18, 2017. The Court declared the Confession of Judgment to be null and void and the Court ordered it stricken from the records of the Clerk of Superior Court of Wake County.

**Motion to Intervene and Motion for Attorney Fees**

On March 15, 2018, Mark Bibbs filed a Motion to Intervene in this Rehabilitation action and a Verified Motion for Payment of Attorney Fees to recover attorney fees from his former client, Cannon, in the amount of $499,588.20. Both the Motion to Intervene and the Verified Motion for Payment of Attorney Fees were denied. The Verified Motion for Payment of Attorney Fees was denied on March 21, 2018, without prejudice to the right of Proposed Intervenor Bibbs to make a motion for payment of disputed attorney fees that complies with State Bar rules regarding the Fee Dispute Resolution Program. The Order was issued April 18, 2018.

**Appeal by Bibbs to Court of Appeals**

On April 20, 2018, Mark Bibbs filed a Notice of Appeal with the Wake County Superior Court and a Petition for Writ of Supersedeas and Motion for Stay with the North Carolina Court of Appeals, appealing the Court's Order striking the confession of judgment against Cannon in 17 CVS 11692 and 17 CVS 15505. The Petition for Writ of Supersedeas and Motion for Stay were denied by the Court of Appeals.

On May 14, 2018, Mark Bibbs filed a Motion for Extension of Time with the North Carolina Court of Appeals in order to contract with a court reporter/transcriptionist to produce the transcript of the court proceedings held on March 21, 2018. By Order dated May 14, 2018, the Court of Appeals granted the Motion allowing Mr. Bibbs an extension until May 31, 2018, to contract for the transcription of the proceedings. On May 30, 2018, Mr. Bibbs contracted for production of the transcript. By letter dated July 16, 2018, counsel for the Rehabilitator was contacted by an attorney representing Mr. Bibbs in connection with the recovery of Mr. Bibbs' attorney fees from Cannon. On July 31, 2018, counsel for the Rehabilitator requested additional information from Mr. Bibbs' attorney regarding the disputed attorney fees. On September 2, 2018, Mr. Bibbs filed a Motion for Extension of Time to Serve Proposed Record on Appeal with the North Carolina Court of Appeals. On September 4, 2018, the North Carolina Court of Appeals entered an Order dismissing without prejudice Mr. Bibb's Motion for Extension of Time to Serve Proposed Record on Appeal to refile with a showing that an initial thirty day extension to serve the proposed record on appeal has been obtained from the trial court. On September 4, 2018, Mr. Bibbs filed a Motion for Extension of Time to Serve the Record on Appeal with the Wake County Superior Court. The Court entered an Order for Extension of Time to Serve Proposed Record on Appeal on October 10, 2018. On October 16, 2018, Mr. Bibbs filed a second Motion for Extension of Time to Serve Proposed Record on Appeal with the North Carolina Court of Appeals. On October 17, 2018, the Court of Appeals entered an Order granting an extension to serve the proposed record on appeal through November 5, 2018. Mr. Bibb's served his proposed Record on Appeal on November 5, 2018. On December 5, 2018, the Commissioner served his Objections and Amendments to the

proposed Record on Appeal in both File numbers 17 CVS 11692 and 17 CVS 15505. A Motion for Extension of Time filed by Mr. Bibbs on December 28, 2018 was dismissed by the Court. On December 31, 2018, Mr. Bibbs filed a second Motion for Extension of Time. The Court of Appeals allowed Mr. Bibb's second Motion for Extension of Time and ordered that the settled Record on Appeal be filed on or before January 7, 2019. The Record on Appeal was filed on January 7, 2019, and docketed on January 10, 2019. On January 31, 2019, the Court of Appeals entered an Order granting Mr. Bibbs' Motion for Extension of Time to File Appellant's Brief and ordered that the brief shall be filed on or before March 8, 2019. Mr. Bibbs filed his brief on March 8, 2019. On March 29, 2019, the Rehabilitator filed a Motion for Extension of Time to file its brief up to and including May 8, 2019. On April 1, 2019, the Court of Appeals granted the Rehabilitator's Motion for Extension of Time. On May 8, 2019, the Rehabilitator filed Appellee's Brief. On May 28, 2019, Mr. Bibbs filed a Motion for Extension of Time to file a reply brief. On May 30, 2019, the Court of Appeals denied the motion. On July 23, 2019, the Court of Appeals issued a court calendar setting the appeal to be heard without oral arguments on Thursday, August 22, 2019. On January 7, 2020, the Court of Appeals issued an opinion affirming the trial court's order striking the confession of judgement.

**Amended Order of Rehabilitation**
On January 30, 2018, the Rehabilitator filed a motion to clarify and amend the Order of Rehabilitation; Order Appointing Receiver; Order Granting Injunctive Relief entered on January 2, 2018. The motion was heard on March 21, 2018, and the Court agreed to amend the Order of Rehabilitation; Order Appointing Receiver; Order Granting Injunctive Relief. The Court enjoined and prohibited the Rehabilitator from making payment for final forfeiture judgments from the funds on deposit in Cannon's name at US Bank until further order from the Court.

## INTRODUCTION TO CANNON SURETY, LLC

### FINANCIAL STATEMENTS

### AS OF MARCH 31, 2020

Introduction and Basis of Presentation: Cannon Surety, LLC (Company) is a North Carolina domiciled captive insurance company that was placed into rehabilitation by the Wake County Superior Court on January 2, 2018. The Company is under the control of the Commissioner of Insurance of the State of North Carolina, who is the Rehabilitator of the Company. It is the Rehabilitator's responsibility to take possession of the assets of the insurer and to administer them under the general supervision of the Court.

The accompanying statement of financial position reflects general ledger balances of the Company as of March 31, 2020, adjusted to reflect circumstances currently known to the Rehabilitator. Amounts may be further adjusted prospectively as deemed appropriate based on the Rehabilitator's continued investigation. Financial statements were not regularly prepared by the Company so the amounts reflected on the statement of financial position represent the Rehabilitator's best estimate, as explained in the accompanying notes, of the Company's assets and liabilities as of March 31, 2020. The accompanying statement of receipts and disbursements presents all actual cash receipts and disbursements for the period from September 27, 2017, the date of the execution of the Seizure Order, through March 31, 2020.

### CANNON SURETY, LLC, IN REHABILITATION
### NORTH CAROLINA COMMISSIONER OF INSURANCE AS RECEIVER
### Statement of Financial Position
### As of March 31, 2020

**Assets**

| | | | |
|---|---|---|---:|
| Cash and Cash Equivalents | (Note A) | $ | 50,562 |
| Cash and Cash Equivalents - Restricted | (Note A) | | 991,900 |
| Accounts Receivable | (Note B) | | 49,050 |
| Other Restricted Assets: | (Note C) | | |
| Build Up Fund | | | 110,349 |
| Collateral Account | | | 4,110 |
| **Total Assets** | | **$** | **1,205,971** |

**Liabilities**

| | | | |
|---|---|---|---:|
| Reserve for Loss and Loss Adjustment Expenses | (Note D) | $ | 200,000 |
| Payable to Clerks of Court | (Note E) | | 2,096,285 |
| Expense Payable | (Note F) | | 559,613 |
| Other Liabilities | (Note G) | | 114,459 |
| **Total Liabilities** | | | **2,970,357** |

| | | | |
|---|---|---|---:|
| **Surplus** | (Note H) | | |
| Excess of Liabilities Over Assets (Unrestricted and Restricted ) | | **$** | **(1,764,386)** |
| Deficiency of Assets (Unrestricted) Over Liabilities (Excluding Other Liabilities) | | **$** | **(2,756,286)** |

The financial statements should be read together with the notes to the financial statements which are an integral part of this statement.

## CANNON SURETY, LLC, IN REHABILITATION
### NORTH CAROLINA COMMISSIONER OF INSURANCE AS RECEIVER
### Statement of Receipts and Disbursements

|  |  | For the Quarter Ended March 31, 2020 | Cumulative For the Period September 27, 2017- March 31, 2020 |
|---|---|---|---|
| **OPERATING ACTIVITIES** |  |  |  |
| **Receipts** |  |  |  |
| Premium Receipts | (Note I) | 0 | 23,661 |
| Sale of Fixed Assets |  |  | 192 |
| Recovery of Bad Debt |  | 0 | 0 |
| Clerk of Court Recovery |  | 0 | 0 |
| Tax Recovered |  | 0 | 0 |
| Miscellaneous Receipts |  | 0 | 132 |
| Total Receipts |  | 0 | 23,985 |
| **Disbursements** |  |  |  |
| Policy Related Disbursements |  |  |  |
| Loss and Loss Adjustment Expenses |  | 0 | 0 |
| Court Costs |  | 0 | 0 |
| Interest Expense on Judgements |  | 0 | 0 |
| Total Policy Related Disbursements |  | 0 | 0 |
| General Expenses and Other | (Note J) |  |  |
| Personnel Expenses |  | 0 | 0 |
| Rent and Occupancy |  | 0 | 0 |
| Accounting Fees |  | 0 | 0 |
| Actuarial Fees |  | 0 | 0 |
| Legal Fees |  | 0 | 0 |
| Consulting Fees |  | 0 | 0 |
| Software |  | 0 | 3,386 |
| Office Expenses |  | 0 | 261 |
| Furniture, EDP & Equipment Expense |  | 0 | 0 |
| Travel |  | 0 | 752 |
| Claims and Underwriting Admin Fees |  | 0 | 0 |
| Court Costs |  | 0 | 157 |
| Moving & Storage |  | 0 | 5,750 |

The financial statements should be read together with the notes to the financial statements which are an integral part of this statement.

| | | |
|---|---:|---:|
| Bank Fees | 0 | 483 |
| Custody Fees | 38 | 434 |
| Taxes, Licenses and Fees | 200 | 24,296 |
| Miscellaneous Expense | 0 | 369 |
| | 238 | 35,888 |
| Total Operating Disbursements | 238 | 35,888 |
| | | |
| **Net Cash Provided by Operating Activities** | (238) | (11,903) |
| | | |
| **INVESTING ACTIVITIES** | | |
| Net (Purchases) Sales of Invested Assets | 0 | 0 |
| Net Investment Income | 2,720 | 41,458 |
| **Net Cash Provided by Investing Activities** | 2,720 | 41,458 |
| | | |
| **OTHER** | | |
| Misc Receipts | 0 | 0 |
| Change in Deposit | 0 | 0 |
| Escheat Liability | 0 | 0 |
| **Net Cash Provided by Other** | 0 | 0 |
| | | |
| **Net Increase/(Decrease) in Cash and Cash Equivalents** | 2,482 | 29,555 |
| **Cash and Cash Equivalents at Beginning of Period** | 1,039,980 | 1,012,907 |
| **Cash and Cash Equivalents at End of Period** | $ 1,042,462 | 1,042,462 |

The financial statements should be read together with the notes to the financial statements which are an integral part of this statement.

## NOTES TO FINANCIAL STATEMENTS

Note A:    All Cash and Cash Equivalents are comprised of the checking accounts originally established by the Company and now under the control of the Rehabilitator.

All Cash and Cash Equivalents – Restricted are comprised of cash and cash equivalents with a maturity of less than 1 year and are carried at cost which approximates market value. This amount is currently on deposit with the North Carolina Department of Insurance ("Department"). These funds were required to be placed on deposit with the Department as part of the terms of licensure, and can only be used for the payment of bail bond judgments.

Note B:    The components of Accounts Receivable are as follows:

| | |
|---|---|
| Premiums due from Agents | 25,110 |
| Receivable from AABB for Rent | 23,940 |
| Total | $ 49,050 |

The receivable from AABB for rent consists of $23,940 paid by the Company for the period October 2016 through September 2017. The receivable was adjusted to reduce the amount previously recorded as accrued, but unpaid totaling $11,970 for the period October 2017 through February 2018 as AABB was unable to occupy the premises after seizure. The offset was an increase in rent expense due (see Note F).

Note C:    Other Restricted assets are comprised of cash and cash equivalents with a maturity of less than 1 year and are carried at cost which approximates market value.   The Build Up Fund ("BUF") represents 22 individual accounts under the control of the Company to be used to indemnify the Company for losses and any other agreed-upon costs related to a bail bond executed by a bail bond agent.  There is a corresponding liability account offsetting the asset (see Note G).  The Collateral Account represents funds placed on deposit to secure specific bail bonds. There is a corresponding liability account as the funds may be returned upon resolution of the case for which the collateral was taken (see Note G).  During the three-month period ending March 31, 2020, $1,500 in payments were made from BUF accounts for satisfaction of specific bail bonds and related court costs.  During this same time period, BUF funds totaling $30 were returned to agents upon verification of no outstanding forfeitures or judgments.

Note D:    Reserves for Loss and Loss Adjustment Expenses represents an estimate of potential amounts for bonds which may go to judgment.  This amount was not derived from an actuarial analysis. The Company failed to obtain a Statement of Actuarial Opinion for the year-ended December 31, 2016, as required by N.C. Gen. Stat. §58-10-415(e). The Rehabilitator has estimated this amount based on the major risks to the Company which are late reporting and payment on a bail bond that does not have adequate collateralization and underlying BUF or other protection.  The Rehabilitator has observed, since the date of the Seizure Order, all the above risks.

## NOTES TO FINANCIAL STATEMENTS

Note E:    Payable to Clerks of Court represent bond forfeitures which a final judgment has been entered by the courts and for which the Company is liable for payment. As of March 31, 2020, the amount reported includes $1,821,971 of the total face amount of the bonds, $13,620 of court costs, $260,559 of interest, and $135 of sheriff's fees. Interest continues to accrue until the judgments are satisfied. The Rehabilitator intends to pursue collection of the amounts from the bail agents and any other person who agreed to indemnify the Company from loss. Collection of amounts due is unknown and uncertain and as such, no receivable has been established.

Note F:    The components of Expenses Payable are as follows:

| | |
|---|---|
| Legal Fees | $235,594 |
| Accrued Interest on Certificate of Contribution | 208,488 |
| Payroll Taxes Withheld and Unpaid | 47,560 |
| Rent | 43,776 |
| 2017 Accrued NC Premium Tax | 17,209 |
| Accrued Payroll & Payroll Taxes | 3,366 |
| NC Industrial Commission-Penalty Payable | 3,620 |
| Total | $559,613 |

Accrued interest on the Certificate of Contribution is an approximate amount.

The liability for rent has not yet been determined since the Company occupied the office space but the lease was in the name of AABB. The amount is included to be conservative. A receivable has been set up for the amount due from AABB and was increased by adjustment as noted in Note B.

The amount recorded as a liability for legal fees includes an amount payable in the amount of $227,850 to attorney Mark Bibbs. This amount is based on an e-mail that was provided to the Rehabilitator by Bibbs on December 20, 2017. On March 15, 2018, Bibbs filed a Motion to Intervene in this Rehabilitation action and a Verified Motion for Payment of Attorney Fees to recover attorney fees from his former client, Cannon, in the amount of $499,588.20. The actual amount due Bibbs is unknown at this time.

Note G:    The components of Other Liabilities are as follows:

| | |
|---|---|
| Build Up Funds | $110,349 |
| Collateral Held | 4,110 |
| Total | $114,459 |

## NOTES TO FINANCIAL STATEMENTS

**Note H:**     On December 16, 2015, the Company entered into a Certificate of Contribution ("Certificate") with a related party in the amount of $700,000. According to the terms of the Certificate, the obligation evidenced by the Certificate is not a liability or claim against the Company except to the extent the principal sum is due in whole or in part in accordance with certain provisions of the Certificate. As of September 30, 2019, the principal amount is not due and as such, is classified as a part of surplus instead of a liability. As of March 31, 2020, the principal balance of the Certificate is $630,419.

**Note I:**     The amount of Premium Receipts represents funds received from bail agents following the date of the Seizure Order. During January 2018, the Rehabilitator discovered that $183 had been deposited by the Company into its operating account and recorded as premium income rather than being deposited into a BUF account and held as collateral.

**Note J:**     During the quarter, the Rehabilitator paid:

- $200 to the NC secretary of State for the 2020 annual report filing; and
- $37.50 to US Bank for custody fees.

**NORTH CAROLINA**

**WAKE COUNTY**

### VERIFICATION

JEFFREY A. TRENDEL, being first duly sworn, deposes and says that he is a Deputy Commissioner of Insurance for the North Carolina Department of Insurance and appointed as Special Deputy Insurance Commissioner of Cannon Surety, LLC by the Commissioner of Insurance and Rehabilitator, that he has read the foregoing monthly report of activity of Rehabilitator as of May 15, 2020, the Statement of Financial Position as of March 31, 2020, and the Statement of Receipts and Disbursements for the period ending March 31, 2020, and for the period from September 27, 2017, the date of the Seizure Order, through March 31, 2020, and that the contents of same are true and correct to the best of his knowledge and belief.

This the 26th day of May 2020.

Deputy Commissioner of Insurance and
Special Deputy Insurance Commissioner for
Cannon Surety, LLC.

NORTH CAROLINA

WAKE COUNTY

Sworn to and subscribed before me this

the 26th day of May 2020.

(Official Seal)

Christine M. Williams
Notary Public

My Commission Expires: 1/20/2021

DALLAS R. MCCLAIN

V.

JOHN MICHAEL "MIKE" CAUSEY, ET AL.

**PLAINTIFF'S EXHIBIT 3**

**NORTH CAROLINA**

**WAKE COUNTY**

Agent Associates Insurance, LLC ("AAI") and the North Carolina Department of Insurance ("DOI") stipulate and agree as follows:

1) AAI will agree that the maximum amount it can expose itself to on any one risk will be set at $550,000. AAI shall be allowed to expose itself to a risk in excess of $550,000 if it is protected in excess of that amount by one of the forms of security listed in N.C. Gen. Stat. §§ 58-3-110(a)(1) or (a)(3).

2) DOI will release all real and personal property that has been pledged by AAI or its officers. AAI will draw up any required documents to accomplish this release.

3) AAI agrees to deposit cash in the amount of $ 686.577 to complete the $1,250,000 deposit stipulated in the captive licensing letter (which amount includes the $250,000 paid-in capital and surplus pursuant to N.C. Gen. Stat. § 58-10-370(5) and the additional deposit of $1,000,000 required by N.C. Gen. Stat. § 58-10-425(a)). This cash deposit will be made no later than October 31, 2017.

4) AAI will convert to a traditional surety insurance company by December 31, 2020 or stop writing bonds on that date and enter runoff. Per N.C. Gen. Stat. §§ 58-5-55 and 58-7-75(4), the requirements to become a traditional surety insurance company include a deposit of $1,000,000 of initial paid-in capital with the Commissioner and $1,500,000 of initial paid-in surplus. In addition, a traditional surety insurance company must maintain $1,000,000 in capital and $250,000 in surplus thereafter. The additional $1,000,000 in paid-in capital shall be on deposit with the Commissioner by January 1, 2021.

5) AAI and Mark Cartret hereby withdraw all currently pending public records requests.

6) AAI will voluntarily dismiss the OAH proceeding 16 INS 3102 with prejudice on or before September 21, 2017.

7) AAI agrees to sign this agreement no later than September 21, 2017. AAI agrees that the terms agreed to in this document will be further documented in a more formal agreement entered into between AAI and DOI.

This 21st day of September, 2017

Agent Associates Insurance. LLC

By: _____

Mark W. Cartret. Chairman and CEO

1

- 4887 -

Mark W. Cartret, In his Individual Capacity

NORTH CAROLINA DEPARTMENT OF INSURANCE

By _Jacqueline Obusek_

Jacqueline Obusek

2

1) AAI will agree that the maximum amount it can expose itself to on any one risk ~~without reinsurance or collateral~~ will be set at $550,000. ~~In cases where collateral is taken, the Department will accept collateral as described under Article 71, which is the same process every other insurer utilizes.~~ AAI shall be allowed to expose itself to a risk in excess of $550,000 if it is protected in excess of that amount by one of the forms of security listed in G.S. §58-3-110(a)(1), (2), (3), (4) or (5).

2) DOI will agree to release all real property that has been pledged~~, to include all funds remaining in the custodial account of Roland Loftin, Jr.~~

3) AAI will agree to $1 million deposit as stipulated in the captive licensing letter.

4) AAI will agree to convert to a traditional insurance company within ~~5~~ 3 years or enter runoff. ~~On this point, AAI notes that when captive bail bond insurers in SC were similarly converted to traditional insurers, they were given 5 years to complete the conversion.~~

5) AAI will agree to increases in its deposit throughout the ~~5~~ 3-year period. Milestones will be set collaboratively by the DOI and AAI.

6) AAI, Mark Cartret and Roland Loftin agree to withdraw all currently pending public records requests.

7) AAI, Mark Cartret and Roland Loftin will dismiss OAH matter with prejudice. ~~DOI will dismiss the pending administrative matter against Roland Loftin, Jr. with prejudice.~~

8) Once terms are agreed to, AAI agrees that they will be documented and an agreement entered into between AAI and the DOI.

9) ~~The DOI will approve North State Holding Group, LLC as an MGA.~~

10) ~~In order to work with AAI to retain capital and to help in transitioning into a traditional insurer, the DOI will grant AAI an exemption from the 2017 year-end audit and actuarial certification requirement as allowed for under N.C. Gen. Stat. §58-10-415(c) and waive the certification of loss reserves and loss expense reserves requirement under N.C. Gen. Stat. §58-10-415(d)(5).~~


NOTE: An exemption from the audit and statement of actuarial opinion is only allowed for captives writing $1.2 million or less in premium. AAI does not fit into this category.

Case 1:20-cv-00695-CCE-LPA   Document 1   Filed 07/30/20   Page 134 of 273

1) AAI will agree that the maximum amount it can expose itself to on any one risk will be set at $550,000. AAI shall be allowed to expose itself to a risk in excess of $550,000 if it is protected in excess of that amount by one of the forms of security listed in G.S. §58-3-110(a)(1), (2), (3), (4) or (5). (accepted NCDOI 03/30/2017 proposal)

2) DOI will agree to release all real property that has been pledged. (accepted NCDOI 03/30/2017 proposal)

3) AAI will agree to $1 million deposit as stipulated in the captive licensing letter. (accepted NCDOI 03/30/2017 proposal)

4) AAI will agree to convert to a traditional insurance company within 5 3 4 years or enter runoff. (changed 3 to 4 years)

5) AAI will agree to increases in its deposit throughout the 5 3 4 year period. Milestones will be set collaboratively by the DOI and AAI. (changed 3 to 4 years)

6) AAI, Mark Cartret and Roland Loftin agree to withdraw all currently pending public records requests. (no change)

7) AAI, Mark Cartret and Roland Loftin will dismiss OAH matter with prejudice. (accepted NCDOI 03/30/2017 proposal)

8) Once terms are agreed to, AAI agrees that they will be documented and an agreement entered into between AAI and the DOI.

NOTE: The caveat to the foregoing is that AAI is requesting that the time periods set forth in Items 4 and 5 will be tolled until there is a resolution of the recent litigation filed by Cannon Surety and its principals against AAI, North State Holdings, Mr. Cartret and others. According to AAI, if not resolved at an early stage, this litigation will be costly and time consuming to AAI. In our role as the regulator of Cannon Surety, AAI sees the NCDOI as an integral part of this litigation, either for purposes of discovery or as a part of settlement negotiations between the parties to find a path forward to avoid litigation.

Case 1:20-cv-00695-CCE-LPA   Document 1   Filed 07/30/20   Page 135 of 273

**Comments:**

1. Time frame of lawsuit is unknown. We cannot agree to something that has an indefinite time period. This is contrary to what we wanted to accomplish.

2. Suspending Cannon's license and putting them in supervision may put an end to lawsuit since the source of funds may be interrupted.

3. No additional deposit is a concern since no additional deposits have been made in a while and AAI is considerably short of where they are supposed to be.

4. Our original goal was to have these entities transition to a traditional company within just a couple of years. Allowing this to go on indefinitely is against our original goal.

5. Are we ok with moving forward with the evidentiary hearing on "disparate treatment" regarding the NCDOI's authority to set AAI's capital and surplus requirements?

6. What will we do if we cannot reach an agreement?

7. An option is to go to 4 years with no tolling or 3 ½ years.

8. We need to bring this matter to a close.

9. Another option is to ask AAI if they have a counterproposal that does not involve tolling the time periods set in 4 and 5 since we are not comfortable agreeing to an unknown time period.

- 4897 -

DALLAS R. MCCLAIN

V.

JOHN MICHAEL "MIKE" CAUSEY, ET AL.

## PLAINTIFF'S EXHIBIT 4



**NEWS: CJ EXCLUSIVES**

# Lawmakers Wrangle Over Training For Bail Agents

*Law granting monopoly for training leads to legal tussle*

Dan Way                                              January 7, 2013
in CJ Exclusives                                            12:00AM

Two of the General Assembly's most powerful Republican lawmakers and the
Democratic state insurance commissioner are among those ensnared in a legal
struggle between private and nonprofit bail bondsmen organizations providing
instructional courses for bail agents.

The Rockford-Cohen Group, parent organization of the for-profit North
Carolina Bail Academy, is competing with the nonprofit North Carolina Bail
Agents Association to provide classes that bondsmen must pass to receive and
maintain mandatory state certification.

Rockford-Cohen alleges Insurance Commissioner Wayne Goodwin assisted in
the creation of an unlawful monopoly for the nonprofit N.C. Bail Agents
Association. The association conducts state-required pre-licensure and
continuing education courses for bondsmen.

Lynette Thompson, one of three Rockford-Cohen partners, believes state Rep.
Tim Moore, R-Cleveland, and state Sen. Tom Apodaca, R-Henderson, worked
behind the scenes to facilitate the legislation that granted exclusive instruction

rights to the N.C. Bail Agents Association.

Moore and Apodaca are chairmen of the rules committees in their respective chambers. As such, they wield enormous power to steer bills through the committee assignment and hearing process.

Senate Bill 738, authorizing the monopoly, was rushed through General Assembly in the waning days of the 2012 legislative session. Letters of complaint seeking investigations into the involvement of Moore and Goodwin were sent to the state Attorney General's Office, Thompson said. A decision has not been reached on whether to file a similar complaint against Apodaca.

## Unconstitutional help?

Tim Mathis, a course instructor for the N.C. Bail Academy, said the attorney general's office has refused to investigate Goodwin for what he and a group of bail bondsmen allege was unconstitutional help in creating a monopoly. The AG's response letter said it represents Goodwin in an appeal of a civil suit filed by Rockford-Cohen, so it cannot open a criminal investigation.

Mathis said he may lodge a complaint against Goodwin with the U.S. attorney's office.

Thompson said for a year Goodwin cast a blind eye to the bail agents association conducting classes without proper state authorization, and then refused to revoke its operations as required by the state administrative code even after she filed a complaint with him.

Moore, an attorney, performed legal work defending the bail agents association against the Rockford-Cohen complaint, which was a precursor to passing the legislation granting the bail agents association a monopoly.

In addition, Thompson said, she filed a complaint with the State Bar against the association's attorney/lobbyist Mark Black, alleging he knowingly provided false testimony to the House Insurance Committee. He testified the association

was the state's sole provider of the course instruction.

Black said he simply misspoke at the committee hearing, at which Rose Williams, legislative counsel for the Insurance Department, spoke in favor of approving SB 738 without revealing Rockford-Cohen was offering competing classes.

"I think we should take another look at [S.B. 738]," said state Rep. Winkie Wilkins, D-Person. He filed an affidavit in state Superior Court saying the matter was not presented in the House Insurance Committee in a "forthright manner," and he planned to take it up when the legislature returns in January.

Moore and Apodaca deny any wrongdoing. They said they recused themselves from voting on the bill to grant monopoly status to the bail agents association. Requests for an interview with Goodwin were denied.

The association has funneled campaign donations to all three over the years — $19,000 to Apodaca from 2004-10, and $2,100 to Goodwin and $2,000 to Moore from 2010-12.

Apodaca, who owns a bail bonding company run by his son, is a founder and past president of the N.C. Bail Agents Association. His 2012 statement of economic interest on file with the State Ethics Commission shows he owns stock valued at more than $10,000 in Accredited Surety and Casualty. Ten of the 17 members on the N.C. Bail Agents Association's board of directors work for Accredited.

Thompson won the first round in the legal skirmish, in which both sides claim they are best suited to deliver the course instruction and accuse their competitors of questionable business practices.

## Law blocked

Case 1:20-cv-00695-CCE-LPA Document 1 Filed 07/30/20 Page 140 of 273

Wake County Superior Court Judge Donald Stephens blocked the Oct. 1 implementation of S.B. 738, signed into law July 12 by then-Gov. Bev Perdue. In siding with Rockford-Cohen, Stephens wrote:

"This court cannot find any factual, logical or reasonable basis that [the law] serves any other purpose other than to eliminate all current and future competition for the benefit of a private corporation or association in violation of the North Carolina Constitution."

"Obviously I was quite pleased" the judge ruled the legislation "was illegal and unconstitutional, and that's what we thought from the start," Thompson said.

"This is just a temporary injunction. That didn't block it completely. [Stephens] just stopped it until he hears the rest of the evidence," said Phil Burr, president of the N.C. Bail Agents Association.

"We're going to aggressively push for it just like the Department of Insurance" to keep the law intact, Burr said.

Burr's son, state Rep. Justin Burr, R-Stanly, a bail bondsman who has received $12,000 in campaign donations from the Bail Agents Association from 2006-10, also recused himself from a vote on the bill. Attempts to contact Justin Burr for comment were not successful.

## Rushed process alleged

Thompson contends the rushed legislative process was fraught with oddities and deception to get favorable votes for her competition.

"When it came time for anything to happen at the legislature, I had to simply recuse myself from any of the hearings and any of the votes" because he had represented the bail agents association against Rockford-Cohen's complaint to the Insurance Department, Moore said.

"It would have actually been improper for me to ... get involved in the process and intervening, and taking any official action one way or the other," Moore said.

"I recuse myself on any vote dealing with the bonding agency, bonding laws," and did so on S.B. 738, Apodaca said. While he was aware of Rockford-Cohen's competing organization, "The rules are very specific. When [a legislator] recuses himself from voting, he does not discuss any part" of the legislation.

"I don't know how or where it came from," he said of the bail bondsmen bill. "I honestly don't remember having any conversation with [Insurance Department officials] about it," Apodaca said repeatedly in an interview.

Yet a string of e-mails from the Insurance Department shows in the months leading up to the bill's passage, Apodaca was subject of and party to high-level discussions with the department about the Rockford Cohen/Bail Agents Association dispute and whether legislation was advisable to settle it.

In an Oct. 27, 2011, email from Rose Williams, to Angela Ford, the Insurance Department's senior deputy commissioner, Williams said she saw Apodaca at the General Assembly that morning and he told her "he is angry and upset" about "outsourcing" the bail bondsmen continuing education courses to a vendor other than the N.C. Bail Agents Association.

On Oct. 31, 2011, Apodaca sent Williams an email asking, "Is this true?", and attached to it an email sent to him by Julie Henderson, a board member of the bail agents association. Henderson complained to Apodaca that Goodwin told association lobbyist Reggie Holley that Rockford-Cohen's complaint file "has been marked confidential."

## Quick email response

Three minutes after receiving that email, Williams forwarded it to Goodwin, asking him what it was about. "Angela and I spoke to Sen. Apodaca on the phone about this last week," she wrote.

Case 1:20-cv-00695-CCE-LPA   Document 1   Filed 07/30/20   Page 142 of 273

On Nov. 1, 2011, Goodwin sent an email marked "high importance" to Williams and other Insurance Department managers seeking "the status of Sen. Apodaca on this matter? (I know you've had conversations following up on his inquiries.) Will we see legislation from the Senator or Rep. Burr on this subject … ?"

Williams replied: "I did not get a sense from Sen. Apodaca that he is going to file legislation. He did say he wished he had known this sooner and he would have filed legislation. Have not spoken with Burr."

In a Dec. 12, 2011, email to Etta Maynard, deputy commissioner of the Insurance Department's Agent Services Division, Ford wrote that bail agents association officials "want to be the sole provider and nothing else. This will probably end up being fixed by them through a statutory fix to name NCBAA as the only provider … this has been brewing for some time."

Despite those emails, Insurance Department spokeswoman Kerry Hall insisted, "Neither Commissioner Goodwin nor NCDOI legislative staff communicated with Sen. Apodaca or Rep. Burr" about steering legislation through the process that would block competition to the bail agents association.

"While the Department of Insurance expressed support of the bill due to having limited resources to oversee multiple providers of continuing education, neither the commissioner nor his staff aggressively promoted the bill," department spokeswoman Kerry Hall said.

Thompson is troubled that Rockford-Cohen had no advance notice that S.B. 738, which would put her out of business, was to be introduced.

State Rep. Jerry Dockham, R-Davidson, chairman of the House Insurance Committee, said notice of the hearing was posted two hours beforehand. He faulted Rockford-Cohen's lack of awareness about the bill on it having an ineffective lobbyist. As a small business, Rockford-Cohen does not have a lobbyist, Thompson said.

Jane Pinsky, director of the N.C. Coalition for Lobbying & Government Reform at Common Cause, said this situation is a poster child for legislative reform.

"We've proposed for a long time that a bill has to be available to the public for 24 hours before it gets committee consideration, and that the public should have a copy of the bill before it goes forward," she said.

## Last-minute gutting

S.B. 738, sponsored by Sen. Thom Goolsby, R-New Hanover, passed the Senate in 2011 and was sent to the House, which held it over until 2012. It was styled "Liability Insurance Required for ABC Permits" until the House Insurance Committee held a hearing on the bill June 27. The original language was gutted and replaced with the bail bondsmen training language.

The Senate approved the bill June 28 by concurrence, which means it skipped the normal committee hearing process in that chamber and went directly to a floor vote.

Apodaca said it is not unusual to gut bills and insert substitute language.

"We probably gutted 50 different bills, 20 to 50," in the last session, Apodaca said. And pushing the bill through to approval by concurrence in the Senate without a committee hearing is "standard procedure" late in the session, he said.

Even so, none of the principals can say what lawmaker was behind the last-minute change in bill language.

Neither Goolsby nor members of his staff returned multiple phone calls seeking comment. Despite their duties as rules chairmen, Apodaca and Moore said they did not know which lawmaker pushed the bill.

Dockham said, "I don't remember exactly" which member of the legislature was behind the push to gut and reword the bill.

Case 1:20-cv-00695-CCE-LPA　Document 1　Filed 07/30/20　Page 144 of 273

"I don't feel like there were any shenanigans going on," he said.

*Dan E. Way (@danway_carolina) is an associate editor of* Carolina Journal.

categories: **Business and Regulations**, **State Government**

tags: **bail agents**, **rockford-cohen**, **way**

DALLAS R. MCCLAIN

V.

JOHN MICHAEL "MIKE" CAUSEY, ET AL.

**PLAINTIFF'S EXHIBIT 5**

January 27, 2015

Roland Loftin, Jr.
rloftin78@yahoo.com

RE: Allegations of misconduct affecting your license – Enforcement Case # 26542

Dear Mr. Loftin:

The Department of Insurance has information that appears to justify the suspension or revocation of your bail bondsman's licenses and your qualifications as an instructor. The information indicates that you have violated one or more of the conditions enumerated under North Carolina General Statutes and Administrative Rules. Each condition is set forth below along with a summary of the information we have pertaining to it:

1. **N.C.G.S. § 58-71-80(a)(5):** *"Fraudulent or dishonest practices in the conduct of business under the license."* The Department (DOI) received information that you submitted falsified monthly reports that excluded bonds written for defendants Demetrius Archie, Morris Wilder and many others. Our investigation revealed that these bonds were not reported accurately and that multiple errors on your monthly reports from March 2011 to August 2014 were found. These errors are too numerous to list individually, but include 16 late reports, 7 deficient reports, missing seals on 36 different reports and errors on all reports reviewed. To better illustrate these inconsistencies we have attached an Excel spreadsheet that includes 5 tabs at the bottom that lists the errors for every month for each of the years in question along with this notice. We have also attached a word document that shows the comparison between the July, August and September 2011 monthly reports and lists the unreported seals and multiple errors.

2. **N.C.G.S. § 58-71-80(a)(7):** *"Failure to comply with or violation of the provisions of this Article or of any order, subpoena, rule or regulation of the Commissioner or person with similar regulatory authority in another jurisdiction."* As a result of the multiple violations that appear to exist in your monthly reports the Department may consider you in violation of this statute.

3. **N.C.G.S. § 58-71-80(a)(8):** *"When in the judgment of the Commissioner, the licensee has in the conduct of the licensee's affairs under the license, demonstrated incompetency, financial irresponsibility, or untrustworthiness; or that the licensee is no longer in good faith carrying on the bail bond business."* In the conference held on October 2, 2014 DOI requested that you provide a full accounting of all professional seals issued to you on the list that we provided. This was to be in the form of an excel spread sheet which we provided you with a template. The due date was November 6, 2014. After an extension was granted we received the first Final Report from you on December 2, 2014 and it was incomplete. DOI requested that you correct the spread sheet and resubmit the spread sheet by December 9, 2014. After approving another extension DOI received your most recent Final Report received on January 15, 2015 that was also deficient. Notably, it did not include 1,352 seals that were issued to you, 388 seals were listed more than once and 995 seals on the report were issued to Aundrey Loftin or other professional bondsmen. Additionally, DOI has received Writs of Execution for Paul D'Antonio Best for $500; Elliott Mitchell Pittman for $2,000; Latanya Ivy Sewell for $2,000; and Johnny Sharp for $500 that were not reported on your monthly reports or the first Final Report. Lastly, DOI has received a Writ of Execution for Mack Arthur Williams that was not reported on the May 2014 monthly report or the first Final Report. If the allegations listed are true, the Department may consider you to be demonstrating incompetence, financial irresponsibility, untrustworthiness and no longer carrying on the bail bonding business in good faith.

Case 1:20-cv-00695-CCE-LPA   Document 1   Filed 07/30/20   Page 147 of 273


Roland Loftin, Jr.
January 27, 2015
Page 2

4.    **N.C.G.S. § 58-71-145:** *"Each professional bondsman acting as surety on bail bonds in this State shall maintain a deposit of securities with and satisfactory to the Commissioner of a fair market value of at least one-eighth the amount of all bonds or undertakings written in this State on which he is absolutely or conditionally liable as of the first day of the current month. The amount of this deposit must be reconciled with the bondsman's liabilities as of the first day of the month on or before the fifteenth day of said month and the value of said deposit shall in no event be less than fifteen thousand dollars ($15,000)."* Your monthly reports were late on the following months: April 2011; April and November 2012; January, March, May, June, August and November 2013; January, July, August, September, October, November and December 2014. Your July 2011, August 2011, April 2012, May 2012 and January 2013 reports were deficient for the one-eighth requirement. DOI has not yet determined the full amount of your deficiencies because the data provided in your Final Report is grossly inaccurate and incomplete. You appear to be in violation of this statute.

5.    **N.C.G.S. § 58-71-165:** *"(a) Each professional bail bondsman shall file with the Commissioner a written report in a form prescribed by the Commissioner regarding all bail bonds on which the bondsman is liable as of the first day of each month showing (i) each individual bonded, (ii) the date the bond was given, (iii) the principal sum of the bond, (iv) the State or local official to whom given, and (v) the fee charged for the bonding service in each instance. . . (c) The reports required by subsection (a) of this section shall be filed on or before the fifteenth day of each month. (d) Any person who knowingly and willfully falsifies a report required by this section is guilty of a Class I felony."* The Department received information that you submitted falsified monthly reports that excluded bonds written for defendants Demetrius Archie, Morris Wilder, Paul D'Antonio Best, Elliott Mitchell Pittman, Latanya Ivy Sewell, Johnny Sharp, Mack Arthur Williams and many others. Our investigation revealed that these bonds were not reported accurately and that multiple errors on your monthly reports from March 2011 to June 2014 were found. These errors are too numerous to list individually, but include 16 late reports, 7 deficient reports, missing seals on 36 different reports and errors on all reports reviewed. Your monthly reports were late on the following months: April 2011; April and November 2012; January, March, May, June, August and November 2013; January, July, August, September, October, November and December 2014. Your July 2011, August 2011, April 2012, May 2012 and January 2013 reports were deficient for the one-eighth requirement. You appear to be in violation of this statute. Your May 2012 and July 2013 reports were deficient for the one fourth rule. DOI has not yet determined the full extent of the errors in your monthly reports because the data provided in your Final Report is grossly inaccurate and incomplete. It appears that you have violated this statute.

6.    **N.C.G.S. § 58-71-168:** *"All records related to executing bail bonds, including bail bond registers, monthly reports, receipts, collateral security agreements, and memoranda of agreements, shall be kept separate from records of any other business and must be maintained for not less than three years after the final entry has been made."* In your statement faxed to the Department on June 23, 2014 you indicated that you did not have any of the records for the 4 bonds that were written on Demetrius Archie and the 6 bonds written on Morris Wilder because your former employees purposely took files from your office. Additionally, your statement that was provided with your Final Report on January 15, 2014 stated that "Many of the files have been corrected; however some of the files simply could not be located." Since you did not provide bail bond registers, receipts, collateral security agreements,  memorandums of agreement, case numbers and dispositions of cases when requested by the Department you appear to be in violation of this statute.

Case 1:20-cv-00695-CCE-LPA   Document 1   Filed 07/30/20   Page 148 of 273


Roland Loftin, Jr.
January 27, 2015
Page 3

7. **11 NCAC 13 .0506:** *"Each professional bail bondsman shall keep at his place of business a bail bond register which shall be a numerically ordered listing of each certification seal used by the professional bail bondsman or his duly appointed runner. The bail bond register shall contain the certification seal number, the name of the principal for whom the bond was signed, the county in which the bond was signed, the amount of the bond, the amount of the fee charged by the professional bail bondsman or his duly appointed runner and the number of the receipt given for amount of the fee charged by the bail bondsman. The bail bond register shall be kept up to date daily by the professional bondsman."* The Final Reports that you submitted twice are evidence that you are not compliant with this Administrative Rule. Additionally, your statement that was provided with your Final Report on January 15, 2014 stated that "Many of the files have been corrected; however some of the files simply could not be located."

8. **N.C.G.S. § 58-71-80(1):** *"For any cause sufficient to deny, suspend, or revoke the license under any other provision of this Article".* The allegations above indicate that you appear to be in violation of insurance law N.C.G.S. §58-71-145, N.C.G.S. §58-71-165, N.C.G.S. §58-71-168, and 11 NCAC 13.0506.

The Department desires to discuss these allegations with you on **Monday, February 9, 2014 at 2:00 pm** in the Dobbs Building, Room 3238 located at 430 North Salisbury Street, Raleigh, NC 27603. **At the conference we will discuss your Professional Bail Bondsman and Surety Bail Bondsman licenses as well as your qualification as an instructor.** If you fail to appear at this conference, the Department will institute formal proceedings under Article 3A of Chapter 150B of the General Statutes to determine if the allegations are true and what response is appropriate for the Department.

If these allegations are shown to be true, the Department may suspend or revoke your license after the conclusion of the formal hearing. (In cases where your alleged actions threaten the public with immediate or substantial harm, the Department has the authority to summarily suspend or revoke your license, after which summary action you would be afforded a hearing under 150B.)

If you have any questions please call me at (919) 807-6812.

Sincerely,

Steve Bryant, ALMI, ACS, AIAA
Call Center Supervisor
Agent Services Division

Cc: Attorney Mark Bibbs
Attorney Mike Klinkosum

Enclosures

Case 1:20-cv-00695-CCE-LPA   Document 1   Filed 07/30/20   Page 149 of 273

# Roland Loftin-26542-comparison between July, August and September, 2011 reports

## Missing bonds from 7/11 and/or 8/11 report:

1. 1085264  Latasha Mercer 1000
2. 1085274 Jasmyne Kent 500
3. 1085718  Darrick Davis 2000
4. 1085758  Kenneth Joyner 2500
5. 1130287  Maria Flowers 1000
6. 1130291 Melissa Connie 2000
7. 1130358 Tracy Manning 1000
8. 1154205 Staresha Anderson 500
9. 1154225 Luther Artis 500
10. 1154258 Vincent Dodson 4000
11. 1154457 James Sullivan 2000
12. 1154471 Christopher Church 16000
13. 1154510 Ralphiezes Davis 1000
14. 1154587 JT Briggs 500
15. 1154600 Rahim Cox 500
16. 1171223 Demetrius Archie 3000 (missing from 8/11 report)
17. 1171224 Demetrius Archie 10000 (missing from 8/11 report)
18. 1171848 Jim Barbie 500
19. 1171897 Davis Artis 500
20. 1192529  Alex Contrevas 500
21. 1192530 Alex Contrevas 500
22. 1192532 Tamera Harris 2500
23. 1192534 Dedrick Payton 5000

24. 1192578 Benjamin Worsley 500

25. 1192792 Christopher Ruffin 4000 (missing from 7/11 report also)

26. 1192822 Varquana Daniel 500

27. 1192841 Maurice Graham 1000 (not on 7/11 report also)

28. 1192846 Damien Franklin 500 (not on 7/11 report also)

29. 1192847 Damien Franklin 1000 (not on 7/11 report also)

30. 1192848 Keyshan King 3000 (not on 7/11 report also)

31. 1192849 Jermarro King 500 (not on 7/11 report also)

32. 1192850 Calvin Harris 500 (not on 7/11 report also)

33. 1192851 Dennis Pope 500 (not on 7/11 report also)

34. 1192852 Tyrell Jones 1500 (not on 7/11 report also)

35. 1192853 Thomasina Joyner 3500/Jermarro King 1000 (not on 7/11 report also-two defendants on same seal)

36. 1192854 Beverly Campbell 500/Jermarro King 500 (not on 7/11 report also-two defendants on same seal)

37. 1192855 Darryl Barnes 2000 (not on 7/11 report also)

38. 1192857 Alberto Jaimes 1000 (not on 7/11 report also)

39. 1192858 Meshelle Barnes 1500 (not on 7/11 report also)

40. 1192863 Christopher Sanders 500 (not on 7/11 report also)

41. 1192864 Christopher Sanders 1000 (not on 7/11 report also)

42. 1192866 Kendall Daniels 1000 (not on 7/11 report also)

43. 1192872 Darrian Williams 1000 (not on 7/11 report also)

44. 1192874 Martin Murray 5000 (not on 7/11 report also)

45. 1192875 Martin Murray 10000 (not on 7/11 report also)

46. 1192876 Martin Murray 5000 (not on 7/11 report also)

47. 1192882 James Finch 500 (not on 7/11 report also)

48. 1192885 Coalter Jeffreys 5000 (not on 7/11 report also)

49. 1192886 David Edwards 2500 (not on 7/11 report also)

50. 1192887 Chelsea Newsome 500 (not on 7/11 report also)

51. 1192889 Demonte Hill 1500 (not on 7/11 report also)

52. 1192890 Demonte Hill 4000 (not on 7/11 report also)

53. 1192891 Trevor Parker 2400 (not on 7/11 report also)

54. 1192894 Richard Lee 8000 (not on 7/11 report also)

55. 1192897 Michael Yelverton 2500 (not on 7/11 report also)

56. 1192898 Michael Yelverton 1000 (not on 7/11 report also)

57. 1192899 Michael Yelverton 1500 (not on 7/11 report also)

58. 1192900 Michael Yelverton 5000 (not on 7/11 report also)

59. 1192901 Michael Yelverton 1000 (not on 7/11 report also)

60. 1192902 Michael Yelverton 500 (not on 7/11 report also)

61. 1192903 Marquis Epps 1200 (not on 7/11 report also)

62. 1192906 Dennis Archer 500 (not on 7/11 report also)

63. 1192928 Virginia Medina 500 (not on 7/11 report also)

64. 1192954 Arlo Wright 500 (not on 7/11 report also)

65. 1192976 Jermy Archer 500 (not on 7/11 report also)


65 missing bonds totaling approximately $166100 missing from August report

40 missing bonds totaling approximately $120600 missing from July report

**Roland Loftin-26542-comparison between July, August and September, 2011 reports**

**Inconsistencies:**

1. 1130272 Tracy Lweis 1500 (shows on all-spelling differences, Lweis-Lynch-Lweis)

2. 1154342 Shaeem McLauren 2500 (shows on all, spelling differences, McLauren-McLaurin-McLauren)

3. 1154456 Terrance Mackey 1500 (shows on all, spelling differences, Mackey-Madry-Mackey)

4. 1154527 Maria Rodriquez 500 (shows on all, differences in name, Rodriquez-Rogers-Rodriquez)

5. 1154557 Miquail Crumbley 1000; Tammy Matthews 500 (two defendants on same seal)

6. 1154557 Tammy Matthews 500 (shows on all, differences in name, Matthews-Mayo-Matthews)

7. 1154577 Ricky Langston 500 (shows on all; differences in name, Langston-Latham-Langston)

8. 1154579 Jamal Hocutt 2500 (on July and Aug; differences in name, Hocutt-Holden)

9. 1154583 Ronnie Highsmith 1000 (differences in name, Highsmith-Holden-Highsmith)

10. 1154586 Tristan Sullivan 750 (differences in name, Sullivan-Sutton-Sullivan)

11. 1154599 Ronika Martinez 1000 (differences in name, Martinez-Massey-Martinez)

12. 1171659 Anthony Horton 7500 (differences in name, Horton-House-Horton)

13. 1171699 Tommy Love 600 (differences in name, Love-Lucas-Love)

14. 1171712 Emanuel Tabron 1000 (differences in name, Tabron-Tate-Tabron)

15. 1171728 Demetrius McMillian 2000 (3 differences in name, McMillian-McNair-MaMillian)

16. 1171734 Granger Johnson 3000 (differences in name, Johnson-Jolly-Johnson)

17. 1171786 Timothy Rouse 500 (differences in name, Rouse-Ruffin-Rouse)

18. 1171849 Leslie Wade 500 (differences in name, Wade-Waggoner-Wade)

19. 1171896 Pattie Gear 2500 (duplicate entries on 8/11 report with different dates 3/29/11 and 4/6/11)

20. 1171938 Shea Langley 500 (differences in name, Langley-Langsford-Langley)

21. 1173053 Daniel Pittman 1000 (differences in name, Pittman-Pope-Pittman)

22. 1173054 Antton Sharpe 1000 (differences in name, Sharpe-Shepard-Sharpe)

23. 1173058 Donyall Smallwood 500  (difference in name, Smallwood-Smith-Smallwood)

24. 1173062 Rashad Sutton 3000 (difference in name, Sutton, Sweat-Ellis, Sutton)

25. 1173066 Shay Jones 500; Gregory Rierra/Riggins 500 (two defendants on same seal)

26. 1173066 Gregory Rierra 500 (differences in name, Rierra-Riggins-Rierra)

27. 1173103 Michael Lancaster 1000 (difference in name, Lancaster-Landry-Lancaster)

28. 1173156 Christopher Silver 500 (difference in name, Silver-Simms-Silver)

29. 1173178 Derrick Howell 600 (difference in name, Howell-Hudgins-Howell)

30. 1173180 Rogerq Mullen 1000 (difference in name, Mullen-Murphy-Mullen)

31. 1173182 Timothy Lucas 500  (difference in name, Lucas-Lweis-Lucas)

32. 1173205 Melvin Manning 1000  (difference in name, Manning-Martinez-Manning)

33. 1173206 Eddie Hawkins 500 (difference in name, Hawkins-Heath-Hawkins)

34. 1173207 Tonya Sherrod 500  (difference in name, Sherrod-Silver-Sherrod)

35. 1173208 Donnell Hill 500 (difference in name, Hill-Hilliard-Hill)

36. 1173232 Antonio Moody 500 (duplicate seal #, two different dates on 9/11 report)

37. 1193238 Darren Thomas 500 (duplicate entry for same seal # entered on 7/11 and 8/11 reports)

38. 1173242 Brandon Ruffin 500 (difference in name, Ruffin-Ruggero-Ruffin)

39. 1173245 Darren Thomas 500 (duplicate seal # on 7/11 and 8/11 reports)

40. 1191932 Tedeshi Swinson 500  (difference in name, Swinson-Tabron-Swinson)

41. 1192533 Delante Garner  500 (difference in first name, Delante 8/11-Eric 9/11)

42. 1192545 Jamikal Gaylord 1000 (difference in first name, Jamikal 8/11-Jamika 9/11)

43. 1192575 Eric Dunn 5000 (difference in first name, Eric 8/11-Lummie 9/11)

44. 1192577 Lummie Jones  3000 (difference in first name, Lummie 8/11-Rashon 9/11)

45. 1192660 Corey Smith 2000 (difference in name, Smith-Speight-Smith)

46. 1192740 Joseph Pender 500 (difference in name, Pender-Peterkin-Pender)

47. 1192741 Stacy Kent 500  (difference in name, Kent-King-Kent)

48. 1192742  Archie Tyson 500  (difference in name, Tyson-Tyson-Tyson)

49. 1192744 Calvin Harris 7500 (difference in name, Harris-Harrison-Harris)

50. 1192749 Candace Robinson 500 (difference in name, Robinson-Rodgers-Robinson)

51. 1192753 Malcolm Martin 300 (difference in first and last names, Malcolm Martin-Martin Mangum-Malcolm Malcolm)

52. 1192755 Latasha Mercer  300  (difference in names, Mercer, Merritt-Wilson, Mercer)

53. 1192757 Samuel Horne 500 (difference in names, Horne-Horton-Horne)

54. 1192796 Chaketa Brewington 500 (difference in names, Brewington 8/11-Brenington 9/11)

55. 1192805 Jatoria Griger 1000 (difference in names, Griger 8/11- Grige 9/11)

56. 1192821  Varanana Daniels 500 (differences in first and last names, Varanana Daniels 8/11-Varquana Daniel 9/11)

57. 1192827 Frances Taylor 500  (differences in first names, Heather Taylor 8/11- Frances Taylor 9/11)

58. 1192830 William McKeever 1000 (8/11 Johnston Co., 9/11 Jones Co.)

59. 1192831 Darrian Bizzell 5000 (differences in first names and counties, Darrian 8/11 Wilson-Frances 9/11; Pitt)

60. 1192834 Thomasine Joyner 500 (differences in first names, Thomasina Joyner 8/11- Thomasine Joyner 9/11)

61. 1192839 Thomasine Joyner 1000 (differences in first names, Thomasine Joyner 8/11-Thomasina Joyner 9/11)

62. 1192860 Heather McDowell  500  (differences in first names and counties, Heather 8/11, Wilson-Chamaine 9/11, Edgecombe)

63. 1192867 Kevin Heath 7500 (differences in counties, 8/11, Wilson-9/11, Greene)

64. 1192877 Charmine Chase 500 (differences in first names, dates and counties, 8/11 shows Charmine 7/13/11 Wilson Co; 9/11 shows Glenn 7/30/11 Greene Co).

65. 1192879 Glen Sumrell 5000 (differences in first names, dates and counties, 8/11 shows Ricky Bryon 8/2/11 Wilson Co; 9/11 shows Doris Bryant 8/4/11 Greene Co)

66. 1192880 Ricky Bryon  1000 (differences in first and last names, dates and counties, 8/11 shows Glen 7/30/11 Wilson Co; 9/11 shows Ricky 8/2/11 Greene Co)

67. 1192881  Alex Contreioas  500  (differences in names and counties; 8/11 shows Contreioas, Wilson Co-9/11 shows Contrevas, Greene Co)

68. 1192893 David Edwards 500 (two defendants on same seal # on 9/11 report, (Pamela Ward 1000))

69. 1192905 Otis Jackson 2000 (two defendants on same seal # on 8/11 report (Otis Jaimes 750))

70. 1192908 Stevie Ward 1500 (difference in names, Ward-Wardett-Ward)

71. 1192908 Stevie Ward 1500 (duplicate entries on 9/11 report)

72. 1192926 Corey Patrick 2500 (differences in name, Patrick-Payne-Patrick)

73. 1192927 Shaquille Williams 2500 (differences in name, Williams-Wilson-Williams)

74. 1192929 Ryan Lewis 5000 (difference in name, Lewis-Liles-Lewis)

75. 1192929 Ryan Lewis 5000 (duplicate entries on 9/11 report)

76. 1192930 Albert Raynor 500 (two bonds on same seal #; difference in name and date on duplicate; 9/11 report shows 5/21/11 for Adam Raynor)

77. 1192931 Demon Townsend 500 (difference in name, Townsend-Traylor-Townsend)

78. 1192932 Larnetta Jones/Joyner 1000 (differences in name, Jones-Joyner-Jones)

79. 1192938 Doris Battle 2000 (difference in dates, 8/11 shows 5/18/11; 9/11 shows 5/22/11)

80. 1192939 Antonio Moody 5000 (differences in name, Moody-Moore-Moody)

81. 1192939 Albert Raynor 500 (duplicate entry for same seal # entered on all 3 reports)

82. 1192958 Alberto Jaimes 2000 (differences in name, Jaimes-Jenkins-Jaimes)

83. 1173258 Alberto Jaimes 1000 (Alberto Jaimes appears in 7/11 and 8/11 reports using same seal #)

84. 1192428 James McNeil 1000 (duplicate entry for same seal # entered on 9/11 report)

85. 1192429 James McNeil 500 (duplicate entry for same seal # entered on 9/11 report)

86. 1192445 Calvin Horne 2500; Albert Jones 1000 (two bonds on same seal #)

87. 1192531 Alex Contrevas 500 (duplicate entry for same seal # entered on 9/11 report)

88. 1192541 Maurice Graham 1000; Rashon Watson 500 (two bonds on same seal #; name difference between 8/11 and 9/11 reports (Rashon-Marquis))

89. 1192789 Christopher Ruffin 1000; Clarence Terry 1000 (two bonds on same seal # for 8/11 and 9/11 reports)

90. 1192795 Audriana Chaney 500; Christopher Ruffin 4000 (two bonds on same seal # on 8/11 report)

91. 1192803 Marquis Epps 1200; Tre Watson 500 (two bonds on same seal # on 8/11 report)

92. 1192817 John Jones 300; Dwight Shaw 500 (two bonds on same seal # on 8/11 and 9/11 reports)

93. 1192975 John Ellis 500 (duplicate entry for same seal # entered on 9/11 report with different date of 5/26/13)

94. 1192995 Marques Mangum 500 (differences in name, Mangum-Mann-Mangum)

| Defendant | County | Case Number | Date of Bond | Total Bond Required | Amt. of This Bond | Premium Promised | Premium Received | Receipt # & date | Bondsman | Prof/Sur | Seal or Power | Reports Correct | Disposition Date: FSA=forfeiture Set aside, Dismissed, Sec surrendered DP=deferred prosecution | Notes |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| M. Wilder | Wilson | 10CR006601 | 3/19/2012 | $500 | $500 | $50 | $50 | | A. Edwards R. Loftin | P | 1233243 | no | F=5/29/12, D=7/9/12 | not reported on 4/12-5/12-6/12 |
| M. Wilder | Wilson | 12CR051161 | 3/19/2012 | $2,500 | $2,500 | $250 | $250 | | A. Edwards R. Loftin | P | 1233252 | no | OFA, trial date scheduled for 8/4/14 | not reported on 4/12 thru 6/14 |
| M. Wilder | Wilson | 12CR051165 | 3/19/2012 | $1,000 | $1,000 | $100 | $100 | | A. Edwards R. Loftin | P | 1233244 | no | D=11/9/12 | not reported on 3/12-4/12-5/12-6/12-7/12-8/12-9/12-10/12. |
| M. Wilder | Wilson | 11CR000790 | 3/19/2012 | $500 | $500 | $50 | $50 | | A. Edwards R. Loftin | P | 1233253 | no | D=7/9/12 | not reported on 4/12-5/12-6/12 |
| D. Archie | Wilson | 11CR050894 | 3/2/2011 | | $4,000 | $400 | $300 | | R. Loftin | P | 1171723 | no | D=3/29/12 | Power was incorrectly entered as 1171223 on reports from 3/11 to 10/11. Not reported on 8/11, 11/11, 12/11, 1/12, 2/12. |
| D. Archie | Wilson | (11CR 050587) | 3/3/2011 (3/2/11) | | $10,000 ($4,000) | $1,000 ($400) | [$300] | | R. Loftin | P | 1171224 (1171724) | no | (D=3/29/12) | 9/11 & 10/11 reports show bond amount $1k. Not reported on 8/11-3/12 (from ABPR). |
| D. Archie | Wilson | 11CR054776 | 10/25/2011 | | $1,000 | $100 | $100 | | R. Loftin | P | 1217797 | no | FSA=12/19/11 D=8/1/12 | not reported on 4/12-7/12. |
| D. Archie | Wilson | 11CR054776 | 12/16/2011 | | $2,000 | $200 | $200 | | R. Loftin | S | 360009666-3 | | FSA=12/19/11, 8/2/12 | Bond Total? |
| D. Archie | Wilson | 11CRS055705 | 12/16/2011 | | $4,000 | $400 | $400 | | R. Loftin | S | 360009667-6 | | FSA=8/2/12 | Bond Total? |
| D. Archie | Wilson | 11CRS055705 | 11/6/2012 | | $30,000 | $1,500 | $1,500 | | R. Loftin | P | 1271612 | no | FSA=4/3/13, D=4/29/13 | Not reported on 3/13. |
| D. Archie | Wilson | 11CR003970 | 11/6/2012 | | $1,000 | $100 | $100 | | A. Loftin | P | 1271611 | | FSA=1/2/13 D=5/7/13 | Bond Total? |

| | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| D. Archie | Wilson | 11CR004207 | 11/6/2012 | | $500 | $50 | $50 | | A.Loftin | P | 1271610 | | FSA 4/4/13 | Bond Total? |
| D. Archie | Wilson | 11CR050432 | 2/2/2011 | | $2,000 | $200 | $200 | | A.Loftin | P | 1154383 | | FSA 10/24/11 D=10/25/11 | Bond Total? |
| TOTALS | | | | | $49,000 | $3,400 | $3,300 | | | | | | | |

| 2011 Report Month | Concerns | Liabilities | Costodial Security | Highest liability for one individual |
|---|---|---|---|---|
| March | Demetrius Archie seal #1171223 listed incorrectly should be 1171723 (11CR 050894) and amount should be $4k not $3k as reported-Demetrius Archer seal #1171224 listed incorrectly should be 1171724 (11CR 050587), amount should be $4k, wrong date reported for this bond. | $674,000 | $100,010 | $20,000 McCrary |
| April | Demetrius Archie seal #1171223 listed incorrectly should be 1171723 (11CR 050894) and amount should be $4k not $3k as reported-Demetrius Archer seal #1171224 listed incorrectly should be 1171724 (11CR 050587), amount should be $4k, wrong date reported for this bond. Report late. | $685,200 | $100,010 | $23,500 Chadwick |
| May | Demetrius Archie seal #1171223 listed incorrectly should be 1171723 (11CR 050894) and amount should be $4k not $3k as reported-Demetrius Archer seal #1171224 listed incorrectly should be 1171724 (11CR 050587), amount should be $4k, wrong date reported for this bond-grand total does not match total for liabilities | $680,100 | $100,000 | $23,500 Chadwick |
| June | Demetrius Archie seal #1171223 listed incorrectly should be 1171723 (11CR 050894) and amount should be $4k not $3k as reported-Demetrius Archer seal #1171224 listed incorrectly should be 1171724 (11CR 050587), amount should be $4k, wrong date reported for this bond. | $683,600 | $100,010 | $23,500 Chadwick |
| July | Demetrius Archie seal #1171223 listed incorrectly should be 1171723 (11CR 050894) and amount should be $4k not $3k as reported-Demetrius Archer seal #1171224 listed incorrectly should be 1171724 (11CR 050587), amount should be $4k, wrong date reported for this bond-40 other bonds missing from report-deficient 1/8th | $683,600 | $100,010 | $23,500 Chadwick |
| August | Demetrius Archie seal #1171723 and #1171224 not reported. 65 other bonds missing from report. | $295,650 | $100,010 | $20,000 McDuffie |
| September | Demetrius Archie seal #1171223 listed incorrectly should be 1171723 (11CR 050894) and amount should be $4k not $3k as reported-Demetrius Archer seal #1171224 listed incorrectly should be 1171724 (11CR 050587), amount should be $4k (the amount changed from $10k to $1k) | $692,600 | $100,010 | $25,000 Mercer |
| October | Demetrius Archie seal #1171223 listed incorrectly should be 1171723 (11CR 050894) and amount should be $4k not $3k as reported-Demetrius Archer seal #1171224 listed incorrectly should be 1171724 (11CR 050587), amount should be $4k, wrong date reported for this bond. | $770,900 | $100,010 | $25,000 Mercer |
| November | Demetrius Archie seal #1171223 (1171723) and seal #1171224 (1171724) missing from report. | $707,550 | $100,010 | $25,000 Mercer |
| December | Demetrius Archie seal #1171223 (1171723) and seal #1171224 (1171724) missing from report. | $744,400 | $100,010 | $20,000 Murray |

| 2012 Report Month | Concerns | Liabilities | Costodial Securities | Highest liability for one individual |
|---|---|---|---|---|
| January | Demetrius Archie seal #1171223 (1171723) and seal #1171224 (1171724) missing from report | $777,350 | $100,010 | $15,500 Hendricks |
| February | Demetrius Archie seal #1171223 (1171723) and seal #1171224 (1171724) missing from report | $758,000 | $100,010 | $19,000 Pender |
| March | Morris Wilder seal # 1233244 not reported - seal # 1233252 should be $2,500. | $728,950 | $100,010 | $25,000 Hyman |
| April | 3 April reports submitted on 5/15 (blank report), 6/15 and 6/20 (via fax). Demetrius Archie seal #1217797 not reported - Morris Wilder seal #s 1233243, 1233244, 1233252 and 133253 not reported. Security on deposit reported incorrectly, should have been $100,010, deposit made on 6/8, which makes BB deficient 1/8 th rule. This is 6/15 report. Late report. | $979,300 | $125,000 | $20,000 Wilson |
| April | Report submitted again on 6/20/12 liabilities decreased $229k from first complete April report. Demetrius Archie seal #1217797 not reported - Morris Wilder seal #s 1233243, 1233244, 1233252 and 133253 not reported. Security on deposit reported incorrectly, should have been $100,010, deposit made on 6/8. Late report. | $750,300 | $125,000 | $20,000 Wilson |
| May | 3 May reports submitted 5/30, 6/6 and 6/7 (via fax). Morris Wilder seal #s 1233243, 1233244, 1233252 and 133253 not reported. Liabilities reported are $765,950, but when added correctly on Excel spreadsheet they total $1,417,350 which makes BB deficient 1/8 th rule. Liabilities increased $659,050 from previous month then dropped $430,050 on 6/7 report. 6/6 report was deficient on 1/4 rule, to correct, BB deposited $25k into his account and decreased his liabilities as noted above. This is 5/30 report | $765,950 | $100,010 | $28,000 Wilson |
| May | May report submitted again on 6/6/12. Morris Wilder seal #s 1233243, 1233244, 1233252 and 133253 not reported. Liabilities reported are $1,409,350 which makes BB deficient for 1/8 rule. Changed the total amount of outstanding liability for any one individual (Wilson) from $28k to $20k, removed seal #s 1233141 and 1233142. | $1,409,350 | $100,010 | $20,000 Wilson |

| | | | | |
|---|---|---|---|---|
| | Report submitted again on 6/7/12 via fax. Demetrius Archie seal #1217797 and Morris Wilder seal #s 1233243, 1233244, 1233252 and 133253 not reported. Security deposit on the first of June were $100,010 and his liabililites were reported as $979,300 which makes BB deficient for 1/8 rule. Liabilities dropped $430,050 from 6/6 report. | | | |
| May | | $979,300 | $125,010 | $20,000 Wilson |
| June | Demetrius Archie seal #1217797 not reported - Morris Wilder seal #s 1233243, 1233244, 1233252 and 133253 not reported | $887,300 | $125,010 | $20,000 Wilson |
| July | Demetrius Archie seal #1217797 not reported - Morris Wilder seal #s 1233244, and 133252 not reported. | $891,000 | $125,010 | $20,000 Barnes |
| August | Morris Wilder seal #s 1233244 and 133252 not reported. | $845,000 | $125,010 | $30,000 Hendricks |
| September | Morris Wilder seal #s 1233244 and 133252 not reported. Liabilities dropped $445,300 from last report. | $399,700 | $125,010 | $31,000 Hendricks |
| October | Morris Wilder seal #s 1233244 and 133252 not reported. Liabilities increased $531,500 from last report. | $931,200 | $125,000 | $31,000 Hendricks |
| November | Morris Wilder seal # 133252 not reported. Late report. | $931,950 | $125,010 | $31,000 Hendricks |
| December | Morris Wilder seal # 133252 not reported. | $863,350 | $125,010 | $30,000 Archie |

| 2013 Report Month | Concerns | Liabilities | Costodial Securities | Highest liability for one individual |
|---|---|---|---|---|
| January | Morris Wilder seal # 1233252 not reported. Report is deficient 1/8 rule before adding missing seal #. File corrupted and would not open, Ernie sent email to BB 2/20/13 about issues with faxed Jan report missing pages and liabilities differing. Copy of faxed report not attached to SBS. | $1,040,000 | $125,010 | $31,250 Archie |
| January | Morris Wilder seal # 1233252 not reported. Demetrious Archie liability was reduced from $31,250 to $30,000 from first Jan report. Late report. Liabilities dropped $176,650. | $863,350 | $125,010 | $30,000 Archie |
| February | Morris Wilder seal # 1233252 not reported. | $816,350 | $125,010 | $30,000 Archie |
| March | Morris Wilder seal # 1233252, Demetrious Archie seal #1271612 not reported. Report was late. | $708,500 | $125,010 | $30,000 Travis |
| April | Morris Wilder seal # 1233252 not reported. | $595,350 | $125,010 | $30,000 Horne |
| May | Morris Wilder seal # 1233252 not reported. Report late. | $574,250 | $125,010 | $30,000 Barnes |
| June | Morris Wilder seal # 1233252 not reported. Report late. | $692,350 | $125,010 | $30,000 Barnes |
| July | Morris Wilder seal # 1233252 not reported. Report late. Report is deficient 1/4 rule, total liability for Cory Farmer $45k, only reported aggrigate as $35k. Ernie sent letter 8/27/13. | $831,350 | $125,010 | $30,000 Farmer |
| August | Morris Wilder seal # 1233252 not reported. Report late. | $535,850 | $125,010 | $25,000 Jones |
| September | Morris Wilder seal # 1233252 not reported. | $517,050 | $125,010 | $30,000 Pilkington |
| October | Morris Wilder seal # 1233252 not reported. | $473,050 | $125,010 | $30,000 Pilkington |
| November | Morris Wilder seal # 1233252 not reported. Report late and not sorted. | $451,800 | $125,010 | $30,000 Pilkington |
| December | Morris Wilder seal # 1233252 not reported. Report not sorted. | $305,300 | $125,010 | $30,000 Pilkington |

| 2014 Report Month | Concerns | Liabilities | Costodial Securities | Highest liability for one individual |
|---|---|---|---|---|
| January | Morris Wilder seal # 1233252 not reported. Report late. | $307,300 | $125,010 | $30,000 Pilkington |
| February | Morris Wilder seal # 1233252 not reported. Liabilities increased $368,850. | $676,150 | $125,010 | $30,000 Pilkington |
| March | Morris Wilder seal # 1233252 not reported. | $655,050 | $125,010 | $30,000 Pilkington |
| April | Morris Wilder seal # 1233252 not reported. | $498,450 | $125,000 | $30,000 Pilkington |
| May | Morris Wilder seal # 1233252 not reported. Liabilities should be $493,500, report not sorted. | $456,500 | $125,000 | $30,000 Pilkington |
| June | Morris Wilder seal # 1233252 not reported. Seal # missing for Jemel Ward. Liability should be $511,500. | $466,000 | $125,000 | $30,000 Pilkington |

*DALLAS R. MCCLAIN*

*V.*

*JOHN MICHAEL "MIKE" CAUSEY, ET AL.*

## PLAINTIFF'S EXHIBIT 6



**North Carolina**
**DEPARTMENT OF INSURANCE**          Wayne Goodwin | Commissioner of Insurance

**ALTERNATIVE MARKETS**

December 22, 2014                                        *VIA ELECTRONIC MAIL*

Cannon Surety, LLC
Mr. Clyde Robert Brawley
961 N. Main Street
Mooresville, North Carolina 29115

Re:    Cannon Surety, LLC
        Licensed Effective December 22, 2014

Dear Mr. Brawley,

**Congratulations!** The North Carolina Department of Insurance ("Department") has licensed Cannon Surety, LLC ("Cannon") as a North Carolina domestic special purpose captive insurance company. Cannon's license is effective December 22, 2014, granting fidelity and surety authority as defined by North Carolina General Statute ("GS") 58-7-15(16). This authority is limited to the writing of surety bail bond business, specifically judicial appearance bonds written by or on behalf of the members of Cannon's parent, Premier Judicial Consultants, LLC.

This license is issued subject to the following conditions:
- *Prior to commencing business*, Cannon must execute a written captive manager agreement with Atlas Insurance Management, LLC ("Atlas") that is acceptable to the Department, which demonstrates the parties have agreed to an arrangement whereby Cannon has adequate management and oversight of all functions of Cannon and adequate procedures and internal controls are in place. A copy of this agreement will be provided to the Department by Cannon.
- Cannon will maintain, at all times, a minimum capital and surplus of $250,000 unless the Department determines that another minimum level of capital and surplus is required.
- Cannon must maintain deposits with the Commissioner that total $1.25 million. $250,000 of this deposit is required to support Cannon's minimum capital and surplus requirement. $1 million of this deposit is required in order for Cannon to write surety bail bond business.
  - Cannon has decided to address the deposit requirements by obtaining a $700,000 letter of credit ("LOC") in a form substantially the same as the Department's LOC template. The original $700,000 LOC will be provided to the Department by January 6, 2014.
  - For the remainder of the deposit requirement that is not met by the LOC, the Department will allow Cannon two years to fulfill its total required deposit of $1.25 million by meeting benchmarks *acceptable to the Department*. By January 6, 2014,

Case 1:20-cv-00695-CCE-LPA   Document 1   Filed 07/30/20   Page 166 of 273

> Cannon must provide the Department with a written plan, including benchmarks, to fulfill the $1.25 million deposit requirement.

- Prior approval from the Department will be obtained before Cannon writes fidelity and surety business other than judicial appearance bonds or any other type of insurance business.
- Cannon will not expose itself to any one risk greater than $500,000. However, on a case-by-case basis, if Cannon believes it is prudent to issue a bond with exposure greater than $500,000, Cannon may provide the Department with a written request to issue that bond. The written request should explain why the exposure to that risk profile is appropriate in light of the financial position of the captive. The Department will reevaluate this exposure limit no less frequently than quarterly, following receipt and review of the quarterly bond exposure distribution report.
- In the format as directed by the Department, Cannon will provide a projected quarterly bond exposure distribution report for 2015 by January 21, 2014, and on a quarterly basis, an actual bond exposure distribution report will be submitted 30 days following each quarter-end.
- Cannon will maintain all investments in cash and cash equivalents prior to the Department reviewing and approving a formal investment policy.
- Cannon will provide the Department with an amended Operating Agreement by January 6, 2014, containing provisions acceptable to the Department.
- Cannon will provide the Department with an executed copy of all of its *material* agency contracts with the direct or indirect owners of Cannon within 5 days of execution of those contracts. All agency contracts must be reduced to written agreements.

Welcome

On behalf of Commissioner Wayne Goodwin, we welcome you as a licensed captive insurance company to the state of North Carolina and extend to you best wishes for success. If you have any questions or whenever we can be of service to you, please call upon us. You may contact me at (919) 807-6165 or via email at Debbie.walker@ncdoi.gov.

Sincerely,

Debra M. Walker

Debra M. Walker
Director of Captive Insurance

cc:    Clyde Brawley, Cannon Surety, LLC
       Ray Martinez, Senior Deputy Commissioner
       Jeff Trendel, Deputy Commissioner



## LICENSE

**NUMBER: 112346**
**Initial Effective Date: December 22, 2014**

## Cannon Surety, LLC

### a Captive Insurance Company Domiciled in North Carolina

Cannon Surety, LLC has complied with the necessary requirements pursuant to Chapter 58 of the North Carolina General Statutes to transact, subject to all provisions of the laws of this State, the following kinds of insurance, as defined in N.C.G.S. 58-7-15:

16 - Fidelity & Surety Insurance

This license shall continue in force and in effect, subject to applicable provisions of the insurance laws of this State.

Wayne Goodwin

Wayne Goodwin
Commissioner of Insurance

DALLAS R. MCCLAIN

V.

JOHN MICHAEL "MIKE" CAUSEY, ET AL.

**PLAINTIFF'S EXHIBIT 7**

## NORTH CAROLINA DEPARTMENT OF INSURANCE

Raleigh, North Carolina

TO: Agent Associates Insurance, LLC
615 Oberlin Road, Suite 104
Raleigh, NC 27605

### COMMISSIONER'S SUMMARY ORDER

It appearing to the Commissioner of Insurance for the State of
North Carolina (Commissioner) that Agent Associates Insurance, LLC
("AAI") is subject to immediate administrative supervision pursuant to
the provisions of N.C. Gen. Stat. § 58-30-60 et seq. by the
Commissioner because the Commissioner has reasonable cause to believe
that AAI is in such condition as to render the continuation of its
business hazardous to the public or to holders of its policies or
certificates of insurance. This opinion is based on the following
findings of fact:

(1) AAI's December 31, 2014, Annual Report reports capital and
surplus of $468,928. When adjusted for $222,500 of pledged
assets not owned by AAI; reported capital and surplus is
$246,428, $3,572 below AAI's required minimum capital and
surplus of $250,000;

(2) AAI has not filed an acceptable plan with the Commissioner
to place an additional $1 million on deposit with the
Commissioner in accordance with the stipulations placed on
AAI at the time of licensing;

(3) AAI is providing coverage for bonds written by an
unaffiliated person, which is in violation of AAI's

approved plan of operation;

(4)  AAI did not execute contract addendums for Cheri Collins and Larry Powell reflecting their underwriting authority had been lowered to $250,000;

(5)  AAI did not follow its written procedures and practices for issuing bonds in excess of $500,000;

(6)  AAI did not maintain formal documentation of Board of Director resolutions regarding the approval of bonds in excess of $500,000, officer appointments, identification of company personnel authorized to contact the Department and bond agent underwriting authority;

(7)  AAI did not notify the Commissioner of AAI's ownership change;

(8)  AAI did not maintain proper segregation of duties over the collection of premium payments, bank deposits, cash disbursements, record keeping and bank reconciliations;

(9)  AAI issued a judicial bond in a civil action without the prior authority to do so; AAI authority is limited to the writing of judicial appearance bonds (surety bail bonds); and

(10) AAI did not maintain proper documentation supporting cash disbursements.


It is THEREFORE ORDERED by the Commissioner that AAI, effective June 11, 2015, be placed under the Commissioner's supervision pursuant to the provisions of N.C. Gen. Stat. §58-30-60(c) et seq. and that the

Commissioner be vested with all authority to effect and apply the provisions of said statute.

IT IS FURTHER ORDERED that, during the period of supervision, AAI shall not do any of the following acts without the prior written approval of the Commissioner or his appointed representative for supervision:

(1) Dispose of, convey, or encumber any of its assets or its business in force;

(2) Withdraw from any of its bank accounts (this condition shall be reevaluated once the supervisor has an opportunity to determine appropriate thresholds for the different types of withdrawals made by AAI);

(3) Lend any of its funds;

(4) Invest any of its funds;

(5) Transfer any of its property;

(6) Incur any debt, obligation or liability outside the normal course of business;

(7) Merge or consolidate with another company;

(8) Pay salaries or benefits to officers or directors or make any other payments considered preferential; or

(9) Make any other change in its operations that the Commissioner considers to be material.

The Commissioner's requirements to abate the determination as set forth in this Order are as follows:

(1) Immediately increase capital and surplus to at least $250,000;

(2)   Submit within 30 days of the date of this Order an acceptable plan to place an additional $1 million in cash or other highly liquid assets on deposit with the Commissioner in accordance with the stipulations placed on AAI at the time of licensing;

(3)   Within 180 days of the date of this Order make substantial progress in meeting the additional $1 million deposit requirement in accordance with a plan acceptable to the Commissioner;

(4)   Submit an investment policy;

(5)   Submit an updated operating agreement;

(6)   Comply with the requirement that bonds only be written by the members of AAI or affiliated parties;

(7)   Secure signed contract addendums from Larry Powell and Cheri Collins (if appropriate) that state that their underwriting authority has been lowered to $250,000;

(8)   Resolve any and all outstanding disputes/issues with Larry Powell;

(9)   Provide updated five-year financial projections;

(10)  Comply with underwriting procedures including the issuance of bonds within established authority;

(11)  Provide documentation detailing internal controls for the segregation of duties over the collection of premium payments, bank deposits, cash disbursements, record keeping and bank reconciliations; and

(12)  Provide documentation of Board of Directors resolutions and

meeting minutes reflecting proper corporate governance.

IT IS FURTHER ORDERED that Jeffrey A. Trendel, Deputy Commissioner for the North Carolina Department of Insurance, is appointed as supervisor of AAI to carry out the provisions of this Order and Susan B. Coble, Chief Regulatory Specialist for the North Carolina Department of Insurance, is appointed as assistant supervisor of AAI to act in the absence of the supervisor. The supervisor or his representatives shall conduct an examination of AAI's operations and financial condition as the supervisor deems appropriate. The administrative supervision of AAI shall continue for a period of 180 days. In the event of AAI's failure to comply within 180 days, the Commissioner may institute proceedings under Article 30 of Chapter 58 of the North Carolina General Statutes to have a rehabilitator or liquidator appointed, or extend the period of supervision.

Issued under my hand and seal this 11th day of June, 2015.



Wayne Goodwin

Commissioner of Insurance

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that I served a copy of the foregoing Commissioner's Summary Order, dated June 11, 2015, by hand-delivery on June 11, 2015 on:

> Agent Associates Insurance, LLC
> 615 Oberlin Road, Suite 104
> Raleigh, N.C. 27605

by handing a copy of the Commissioner's Summary Order to Mark W. Cartret, Registered Agent for Agent Associates, while Mr. Cartret was in the Dobbs Building, 430 N. Salisbury Street, Raleigh, N.C. 27603, and

I FURTHER CERTIFY that I have this day served a copy of the foregoing Commissioner's Summary Order, dated June 11, 2015, by mailing a copy of the same via U.S. certified mail, return receipt requested, in a postage prepaid envelope properly addressed as follows, on June 12, 2015, to:

> Agent Associates Insurance, LLC
> c/o Mark W. Cartret, Its Registered Agent
> 615 Oberlin Road, Suite 104
> Raleigh, N.C. 27605

This the 12ᵗʰ day of June, 2015.

David W. Boone
Special Deputy Attorney General
N.C. State Bar Number 8648
N. C. Department of Justice
P.O. Box 629
Raleigh, NC 27602-0629
(919) 716-6610

DALLAS R. MCCLAIN

V.

JOHN MICHAEL "MIKE" CAUSEY, ET AL.

## PLAINTIFF'S EXHIBIT 8

1st ATLANTIC SURETY - Counties Prohibited as of Dec 9, 2018

| County | Bond Amt | Prohibited | Due now |
|---|---|---|---|
| Burke 17CRS000485 | 10,000 | 10/18/2018 | 10,178.97 |
| Burke 17CRS0001695 | 20,000 | 10/18/2018 | 20,292.95 |
| Cherokee 17CR051510 | 2,500 | 7/25/2018 | 2,610.48 |
| Cherokee 17CR051612 | 15,000 | 7/25/2018 | 15,337.88 |
| Cherokee 17CR051189 | 10,000 | 9/13/2018 | 90.53 |
| Haywood 18CR051594 | 75,000 | 11/19/2018 | 75,383.77 |
| Lee 17CR701131 | 2,000 | 11/5/2018 | 2,066.32 |
| Moore 17CR052837 | 25,000 | 10/8/2018 | 25,404.73 |
| Onslow 17CRS052577 | 10,000 | 9/28/2018 | 10,212.81 |
| Onslow 17CRS052578 | 10,000 | 9/28/2018 | 10,212.81 |
| Onslow 17CRS052579 | 25,000 | 9/28/2018 | 25,449.52 |
| Onslow 17CRS052580 | 25,000 | 9/28/2018 | 25,449.52 |
| **12 in 6 counties** | **229,500** | | **222,690.29** |

NORTH RIVER SURETY - Counties Prohibited as of Dec 9, 2018

| County | Bond Amt | Prohibited | Due Now |
|---|---|---|---|
| Catawba 03CRS009377 | 10,000 | 5/30/2009 | 10,873.97 |
| Catawba 08CR005296 | 500 | 10/12/2018 | 886.19 |
| Catawba 09CR051729 | 1,500 | 10/26/2009 | 2,596.47 |
| Catawba 09CR051730 | 3,000 | 10/26/2009 | 5,142.93 |
| Durham 14CR058635 | 5,000 | 4/19/2015 | 6,511.44 |
| Durham 14CR051559 | 5,000 | 5/14/2015 | 3,270.07 |
| Durham 14CR060736 | 2,500 | 5/14/2015 | 6,485.14 |
| Durham 15CR051110 | 2,500 | 10/19/2015 | 3,193.49 |
| Vance 11CR051871 | 5,000 | 9/16/2012 | 6,846.92 |
| Vance 11CR703518 | 600 | 11/16/2017 | 706.02 |
| Wake 14CR226850 | 2,000 | 5/9/2015 | 2,628.37 |
| Wake 13CRS222823 | 1,000 | 6/15/2015 | 1,334.01 |
| Wake 14CR202161 | 500 | 6/21/2015 | 701.00 |
| Wake 14CR219586 | 1,000 | 7/24/2015 | 1,325.47 |
| Wake 14CR229908 | 500 | 7/24/2015 | 690.23 |
| Wake 14CR227250 | 5,000 | 8/9/2015 | 6,388.70 |
| Wake 14CR713426 | 1,000 | 8/21/2015 | 1,319.33 |
| Wake 15CR200992 | 1,000 | 8/24/2015 | 1,318.67 |
| Wake 14CR732306 | 1,000 | 9/19/2015 | 1,312.53 |
| Wake 14CR229429 | 1,000 | 10/9/2015 | 1,308.59 |
| Wake 14CR716089 | 1,000 | 10/19/2015 | 1,306.40 |
| Wake 13CR006455 | 1,500 | 11/6/2015 | 1,926.18 |
| Wake 13CR213751 | 3,000 | 11/19/2015 | 3,788.81 |
| Wake 14CRS209456 | 1,500 | 12/5/2015 | 1,915.99 |
| Wake 14CR223254 | 5,000 | 12/6/2015 | 6,184.86 |
| Wake 14CR230130 | 10,000 | 1/4/2016 | 12,402.40 |

| | | | |
|---|---|---|---|
| Wake 12CR225738 | 1,000 | 1/25/2016 | 1,285.14 |
| Wake 14CR229261 | 10,000 | 1/28/2016 | 12,349.79 |
| Wake 12CR212327 | 25,000 | 1/31/2016 | 24,627.05 |
| Wake 14CR203591 | 1,000 | 7/14/2016 | 1,283.60 |
| Wake 14CR203592 | 6,000 | 7/14/20216 | 7,426.62 |
| Wake 14CRS227868 | 500 | 2/18/2016 | 677.33 |
| Wake 14CR227891 | 1,000 | 7/17/2016 | 1,246.78 |
| Wake 13CRS201853 | 5,000 | 10/29/2016 | 5,898.84 |
| **33 in 4 counties** | **121,100** | | **147,159.33** |

AMERICAN SURETY - Counties Prohibited as of Dec 9, 2018

| County | Bond Amt | Prohibited | Due Now |
|---|---|---|---|
| Forsyth 15CR052166 | 3,000 | 5/16/2016 | 3,569.68 |
| Meck 14CR250177 | 5,000 | 8/23/2015 | 6,300.82 |
| Meck 16CRS201995 | 5,000 | 3/25/2017 | 5,737.74 |
| **3 in 2 counties** | **13,000** | | **15,608.24** |

*DALLAS R. MCCLAIN*

*V.*

*JOHN MICHAEL "MIKE" CAUSEY, ET AL.*

**PLAINTIFF'S EXHIBIT 9**

7-8-2016

From: **Lynette Thompson** <lyne.thompson@gmail.com>
Date: Fri, Jul 8, 2016, 2:57 AM
Subject: Timeline and notes
To: <ke.xu@ncdoi.gov>

Ms. Xu,

Attached is the timeline we discussed earlier, as well as a few notes recapping our discussion. Hopefully, this will help explain what has transpired regarding Cannon's ownership.

I included my phone number in the attachment. Please feel free to call me if you need clarification or have additional questions.

Dallas told me you're going on vacation next week. Lucky you! I hope your vacation is wonderful and safe.

Lyne Thompson

Ms. Xu,

Here is the timetable we discussed earlier today. In addition, I am forwarding you the email DOI sent to Cannon agents separately.

Events regarding Cannon Surety's ownership evolved as follows:

**09/09/14** First email I received from Brawley, discussing insurance for all potential partners in Cannon

**10/30/14** Application was sent to DOI, naming McClain and Brawley as owners. In his bio, included with the application, Brawley stated that his ownership in Cannon was 25%.

**11/13/14** DOI confirmed ownership percentages via email – McClain 75%, Brawley 25%. Brawley agreed.

**11/23/14** Brawley's attorney made loan guarantee part of operating agreement, Brawley insisted that we all sign to guarantee loan. Carl Valentine and I signed to guarantee loan but refused to initial ownership percentages. Brawley said his attorney had assured him that not initialing was all that was necessary to insure that he and McClain were the only owners. This operating agreement did not take effect until December 1, 2014.

**11/24/14** Out of an abundance of caution, and despite Brawley's assurances that we were only guarantors on the loan, Valentine and I signed documents to transfer any and all ownership that the operating agreement may have bestowed upon us back to McClain. This was done for the following reasons:

(1) We didn't trust that the absence of our initials was sufficient to insure that we didn't have ownership in Cannon,

(2) Application sent to DOI had Brawley's and McClain's name only and did not list us as members. In addition, ownership percentages had been confirmed 11/23/14.

(3) Valentine owns 16.6% of Cattlemen's Surety and neither that operating agreement nor Cannon's allows an owner to own any interest in another surety. Valentine and I never owned interest in Cannon – not even for a day – possibly because ownership percentages were not initialed on the operating agreement, but, most significantly, because we transferred ownership 11/14/14 and the Operating Agreement did not take effect until December 1, 2014. Approximately a week after this occurred, I gave my attorney a copy of the document that transferred my ownership to McClain. He will confirm this, if necessary.

**12/3/14** DOI emailed question regarding ownership percentage. McClain's reply: 75% McClain / 25% Brawley. Brawley's response email: "Looks good to me."


Other notes:

There is an abundance of proof that Robert Brawley is collaborating with Cannon's competitor, Mark Cartret, owner of AAI Surety, to cause financial damage to Cannon and irreparable harm to the reputations of Cannon and Dallas McClain.

After the formation of Cannon, Brawley told Mr. McClain and me that he was contacted by Mark Cartret, ostensibly to congratulate him on Cannon's opening. This is when their relationship started. Since then, they have together and separately mounted malicious campaigns against McClain and Cannon, evidently designed to convince DOI to award full ownership of Cannon to Brawley. Brawley has stated to at least one Cannon agent that DOI will turn over full ownership of Cannon to him by year's end. Brawley stated that Mr. Cartret has offered to manage Cannon for him when this happens. (The agent has agreed to sign an affidavit stating this.) It is important to note that no one (including Brawley) has ever disputed

Brawley's ownership of 25%. When he started with the company, he had 25%, and his ownership has consistently remained 25%.

For his part, Cartret has sent over 125 pages of complaints to DOI regarding McClain and Valentine, claiming that Valentine was, and is, an owner of Cannon. Suddenly, Brawley is agreeing with him, despite previously confirming ownership percentages with DOI at least 3 times.

Cartret's most recent complaint included a spreadsheet of 200 names, mostly Cannon agents, whom he once again said had a business relationship with Valentine. This complaint resulted in DOI sending letters to the majority of Cannon agents with the heading "ALLEGATIONS OF BUSINESS ASSOCIATION WITH UNLICENSED, DISQUALIFIED INDIVIDUAL", which, as you can imagine, had the effect Brawley and Cartret wanted. Even though most of these agents had never even heard Valentine's name, an email from DOI containing allegations that could result in the loss of the agent's license understandably causes overwhelming concern and alarm. The complaint caused the agents to question the integrity and reputations of Cannon and Mr. McClain.

Mark Cartret's campaign to discredit Cannon and link Carl Valentine with Cannon is obvious subterfuge. He is trying to deflect attention from the fact that Carl Valentine remains his and Roland Loftin's partner in AAI, thereby avoiding a lawsuit from Valentine and the discovery by DOI that Carl Valentine is still his partner and that Cartret willfully lied about AAI's ownership on his surety company application. In fact, at the time of the application, not only was Mr. Valentine a partner, but so were Dallas McClain and I.

Additionally, Brawley has leaked Cannon Surety's confidential documents to Ron Pierce, an individual currently suing DOI and Commissioner Goodwin. He and Cartret have used Ron Pierce's website, www.NCAdvocate.net to disseminate more untrue information about Cannon, McClain and Carl Valentine. Mr. Pierce confirmed with me that Mark Cartret and Robert Brawley had contacted him on numerous occasions, encouraging him to write negative articles against Cannon, McClain and Valentine. Mr. Cartret has even written articles for him. Mr. Pierce also confirmed that almost every comment posted under each article came from Mark Cartret's IP address in Whiteville, NC, including the one that stated that a Cannon employee was selling drugs to Ray Martinez.

Brawley has called Cannon agents on numerous occasions. In these phone calls, he discussed other agents' rates, which is a severe breach of confidentiality and destroys agents' confidence in Cannon's and Mr. McClain. He also encouraged those agents to complain to DOI about Cannon. Even worse, he encouraged them to lie about McClain and suggested specific ways to slander him. These agents have agreed to give affidavits regarding his actions.

This is not meant to be an exhaustive list of the actions perpetrated by Mark Cartret and Robert Brawley, just some of the more egregious ones.

If you have any questions, please contact me anytime at 919.612.1260.

Thank you,

Lyne Thompson

DALLAS R. MCCLAIN

V.

JOHN MICHAEL "MIKE" CAUSEY, ET AL.

**PLAINTIFF'S EXHIBIT 10**

*8-5-2016*

## Fw: Ownership of Premier

From: duhkingfish (duhkingfish@yahoo.com)

To:     lyne.thompson@gmail.com

Date: Tuesday, April 21, 2020, 11:19 PM EDT

----- Forwarded Message -----
**From:** duhkingfish <duhkingfish@yahoo.com>
**To:** "Jeff.Trendel@ncdoi.gov" <Jeff.Trendel@ncdoi.gov>
**Cc:** "Ray.Martinez@ncdoi.gov" <Ray.Martinez@ncdoi.gov>
**Sent:** Friday, August 5, 2016, 07:01:45 AM EDT
**Subject:** Re: Ownership of Premier

Good morning sir,

Attached please find a revised Plan of Operation, and a revised draft operating agreement per your request.

Regards,
Dallas

---

**From:** "Trendel, Jeff" <Jeff.Trendel@ncdoi.gov>
**To:** duhkingfish <duhkingfish@yahoo.com> .
**Cc:** "Martinez, Ray" <Ray.Martinez@ncdoi.gov>
**Sent:** Tuesday, August 2, 2016 1:27 PM
**Subject:** RE: Ownership of Premier

Mr. McClain -

As requested in my e-mail dated July 22, 2016, I would also like a revised draft business plan for Cannon Surety, LLC, and a revised draft operating agreement for Judicial Consultants, LLC.

**From:** duhkingfish [mailto:duhkingfish@yahoo.com]
**Sent:** Monday, August 01, 2016 5:11 AM
**To:** Trendel, Jeff
**Subject:** Ownership of Premier

Mr. Trendel,

I recently sent you an email stating that Lyne Thompson has offered to purchase a portion of my membership in Premier Judicial. After a discussion with my attorney, I believe it will be in the best interest of Premier Judicial, LLC, Cannon Surety, LLC and all involved if I return Ms. Thompson's original 25% share to her. This does not preclude her purchasing a portion of my membership at a later time. As you know, Mr. Brawley has recently been maintaining that he was unaware of the ownership transfer, and while I disagree with him, I prefer to move forward and acquiesce to Mr. Brawley's claim that Ms. Thompson is and has always been a 25% member of Cannon Surety. In short, if he says she is a partner, then she is a partner. I no longer wish to dispute the issue.

As for Carl Valentine, Premier Judicial's operating agreement, written by Mr. Brawley's attorney, prevents Mr. Valentine from being a member of Premier Judicial. Mr. Valentine is a 16.33% owner of Agents Associates Insurance (AAI) and Section 1.6 of Premier's operating agreement states:

**1.6     Other Activities of Members. No Member may engage in or possess an interest in other business ventures of any nature, if similar to or competitive with the activities of the Company.**

Since December 1, 2014, the effective date of the operating agreement, Mr. Valentine has not been in a position to be a member of Premier without violating Premier's operating agreement. If Mr. Brawley agrees to alter the operating agreement to allow a member to hold interest in a competing business, and the Department determines that Mr. Valentine's association with Premier and Cannon will be legal, I have no issue with returning his share as well.

I do want the Department to understand that it was never my intention to misrepresent the ownership of Premier Judicial. I sincerely believed then, and still believe, that my ownership percentage was 75% and Mr. Brawley's was 25%, as I have indicated several times. At the time of the application, It was my understanding from discussions with Mr. Brawley and his subsequent emails confirming the percentages, that he agreed with this division of ownership, as well. In any case, Mr. Brawley's 25% ownership has never changed nor been in dispute. Whether my ownership is 25% or 75%, Mr. Brawley's ownership Interest has always been and remains 25%.

Regardless, in the spirit of cooperation and in order to bring closure to this issue, I am hereby concurring with Mr. Brawley's assertion that Ms. Thompson is a 25% owner, and, if the Department has no objections, I hereby formally acknowledging Lynette Thompson as a 25% owner/member of Premier Judicial, LLC, effective immediately.

I have already forwarded you Ms. Thompson's biography. If any further information is needed from Ms. Thompson or me, we will be happy to comply. If you wish to contact Ms. Thompson, her email address is Lyne.Thompson@gmail.com and her cell phone number is 919-612-1260.

As I've said before, Ms. Thompson's experience and expertise will be an asset to Cannon.

Warm Regards,

Dallas McClain


 rev Operating agreement .pdf
703.2kB

 Plan of Operation rev.docx
14.2kB

## Letter

From:  Trendel, Jeff (jeff.trendel@ncdoi.gov)

To:     duhkingfish@yahoo.com; crobertb@abts.net

Cc:     Ray.Martinez@ncdoi.gov

Date:  Tuesday, August 9, 2016, 09:58 AM EDT


Please see the attached letter. A hard copy will go out in the mail today.


**Jeff Trendel**


 08092016 LTR CANNON Premier Ownership.pdf
30.2kB

Case 1:20-cv-00695-CCE-LPA  Document 1  Filed 07/30/20  Page 186 of 273



# North Carolina
## DEPARTMENT OF INSURANCE

Wayne Goodwin | Commissioner of Insurance

### ALTERNATIVE MARKETS

August 9, 2016

Mr. Dallas McClain, President
Mr. C. Robert Brawley, Jr., Secretary
Cannon Surety, LLC
2303 West Meadowview Road
Suite 200 Box 3
Greensboro, NC 27407

SENT VIA U.S. MAIL AND ELECTRONIC MAIL

Dear Mr. McClain and Mr. Brawley:

After further review of the documentation submitted by Cannon Surety, LLC, the North Carolina Department of Insurance ("Department") does not object to Mr. McClain transferring 25% of his ownership in Premier Judicial Consultants, LLC ("Premier") to Ms. Lyne Thompson.

Please forward to the Department a signed copy of Premier's amended operating agreement after execution.

Sincerely,

Jeffrey A. Trendel
Deputy Commissioner


cc: Raymond Martinez, Senior Deputy Commissioner



1203 Mail Service Center | Raleigh, NC 27603 | tel: 919.807.6140  fax: 919.733.2206 | www.ncdoi.com
An Equal Opportunity/Affirmative Action Employer


8-5-2016

----- Forwarded Message -----
**From:** duhkingfish <duhkingfish@yahoo.com>
**To:** Jeff Trendel <jeff.trendel@ncdoi.gov>
**Cc:** Ray Martinez <ray.martinez@ncdoi.gov>; David Boone <dboone@ncdoj.gov>; John Mansfield <johnmansfieldlaw@gmail.com>
**Sent:** Friday, August 5, 2016 7:29 AM
**Subject:** Fw: Fw: Fwd: Cannon Surety, LLC

All,


I will of course be happy to comply with the Department's request; however, at this point I am not quite sure it would be in Cannon's best interest to use AIG as a captive manager. I believe they are AAI's captive manager and my first thought is that I would be uncomfortable with the possible conflict of interest, as well as the possible sharing of proprietary and confidential information.

Additionally, I am all for keeping folks in the loop, but as evidenced and highlighted yellow below, at least Mr. Brawley has been cc'ing the CEO of Cannon's competition, Mark Cartret. That I am extremely disturbed by.

Please consider this my public records request for emails sent by Mr. Brawley to NCDOI including the Captive Unit personnel, ASD, Agile Enterprise, and involved AG personnel. I would limit the request to within the last six months. Thank you very much.

Regards,


Dallas McClain



On Thu, Aug 4, 2016 at 1:33 PM, duhkingfish <duhkingfish@yahoo.com> wrote:


----- Forwarded Message -----
**From:** John Mansfield <johnmansfieldlaw@gmail.com>
**To:** jeff.trendel@ncdoi.gov; "Boone, David" <dboone@ncdoj.gov>
**Cc:** duhkingfish <duhkingfish@yahoo.com>
**Sent:** Thursday, August 4, 2016 1:30 PM
**Subject:** Fwd: Cannon Surety, LLC

Deputy Commissioner Trendel,

Mr. Brawley and I are in receipt of your correspondence of today's date.

We appreciate the Department's position, but as you can see from the forwarded email below, my client is no longer in a position of confidence to allow Mr. McClain to make unilateral decisions on behalf of Cannon. Therefore, we are not inclined to blindly

2

Case 1:20-cv-00695-CCE-LPA   Document 1   Filed 07/30/20   Page 188 of 273

accept whomever Mr. McClain proposes to be the Department, to be Captive Manager of Cannon.

As you can also see, Mr. Brawley proposes AIG or Atlas, if the Department and Mr. McClain are not reasonably opposed.

Mr. McClain, and Deputy Commissioner Trendel, please let me know if there is any reason why AIG or Atlas is not acceptable for this engagement.

Thank you in advance for your professional courtesy, and for your attention to the above. Do not hesitate to contact me if you have questions or concerns.

Sincerely,


John D. Mansfield, Esq.
of Counsel, Polanco Law, P.C.
2840 Plaza Place, Suite 260
Raleigh, NC 27612
(919) 294-8032

---------- Forwarded message ----------
From: <crobertb@abts.net>
Date: Thu, Aug 4, 2016 at 12:47 PM
Subject: Re: Cannon Surety, LLC
To: John Mansfield <johnmansfieldlaw@gmail.com>
Cc: Mark Cartret <markcartret@gmail.com>


I want on record as requesting AIG or Atlas as captive managers for Cannon Surety and I total oppose a close friend of Dallas's ,, Gene Davis as captive manager . Dallas has already stated that his friend would do whatever Dallas asked and what Dallas wants has already been shown to be damaging to Cannon Surety.

-----Original Message-----
From: "Trendel, Jeff"
Sent: Aug 4, 2016 11:48 AM
To: "duhkingfish@yahoo.com" , "crobertb@abts.net"
Cc: "Martinez, Ray"
Subject: Cannon Surety, LLC

Mr. Brawley and Mr. McClain –

Please see the attached letter.


Jeffrey Trendel
Deputy Commissioner, Alternative Markets Division
North Carolina Department of Insurance
Tel: 919-807-6148
Fax: 919-733-2206


"Together We Can"

3

*DALLAS R. MCCLAIN*

*V.*

*JOHN MICHAEL "MIKE" CAUSEY, ET AL.*

**PLAINTIFF'S EXHIBIT 11**

| Tracking Id | Respondent | Consumer/Complainant | Date Opened | Investigator | Communication Specialist Assigned | Completed |
|---|---|---|---|---|---|---|
| 53384 | Carl B Valentine | Mark Cartret | 7/10/2017 | Nicole Williams | Demetrius | DH |
| 49175 | Robert H Mathis | Mark Wayne Cartret | 11/18/2016 | Thomas F. West | Demetrius | DH |
| 49174 | Charles T Mathis | Mark Wayne Cartret | 11/18/2016 | Thomas F. West | Demetrius | DH |
| 47348 | Melissa A Jones | Mark Wayne Cartret | 8/16/2016 | Thomas F. West | Demetrius | DH |
| 47239 | Carl B Valentine | Mark Wayne Cartret | 8/10/2016 | Thomas F. West | Demetrius | DH |
| 46539 | Chamira Yea Zelaya | Mark Wayne Cartret | 7/12/2016 | Thomas F. West | Demetrius | DH |
| 46538 | Eddie L McCoy | Mark Wayne Cartret | 7/12/2016 | Thomas F. West | Demetrius | DH |
| 46535 | Clarence Ray Fuller | Mark Wayne Cartret | 7/12/2016 | Thomas F. West | Demetrius | DH |
| 46359 | Dallas R McClain | James Richards | 7/1/2016 | Angela Hatchell | Demetrius | DH |
|  | NC Bail Academy | Mark Wayne Cartret |  |  |  | DH |
| 46007 | Perla Jessenia Lopez | Mark Wayne Cartret | 6/15/2016 | Thomas F. West | Demetrius | DH |
| 45798 | Michelle Leigh Livingston | Mark Wayne Cartret | 6/9/2016 | Thomas F. West | Demetrius | DH |
| 45797 | Steve Kim | Mark Wayne Cartret | 6/9/2016 | Thomas F. West | Demetrius | DH |
| 45796 | Delma M Kendrick | Mark Wayne Cartret | 6/9/2016 | Thomas F. West | Demetrius | DH |
| 45795 | Bryan Kelley | Mark Wayne Cartret | 6/9/2016 | Thomas F. West | Demetrius | DH |
| 45794 | LKISHA PRETTY | Mark Wayne Cartret | 6/9/2016 | Thomas F. West | Demetrius | DH |
| 45793 | Margaret Darlene Phillips | Mark Wayne Cartret | 6/9/2016 | Thomas F. West | Demetrius | DH |
| 45792 | Hollis Edward Kearns | Mark Wayne Cartret | 6/9/2016 | Thomas F. West | Demetrius | DH |
| 45791 | Robert Palmer | Mark Wayne Cartret | 6/9/2016 | Thomas F. West | Demetrius | DH |
| 45790 | Kimberley Dawn Pacheco | Mark Wayne Cartret | 6/9/2016 | Thomas F. West | Demetrius | DH |
| 45789 | Edward Brant Caudle | Mark Wayne Cartret | 6/9/2016 | Thomas F. West | Demetrius | DH |
| 45788 | Iris Villegas Lopez | Mark Wayne Cartret | 6/9/2016 | Thomas F. West | Demetrius | DH |
| 45787 | KaReem Vaughn | Mark Wayne Cartret | 6/9/2016 | Thomas F. West | Demetrius | DH |
| 45785 | BRIAN WAYNE CARSWELL | Mark Wayne Cartret | 6/9/2016 | Thomas F. West | Demetrius | DH |
| 45784 | mindy vanHorn | Mark Wayne Cartret | 6/9/2016 | Thomas F. West | Elizabeth | EP |
| 45783 | ADRIAN murphy | Mark Wayne Cartret | 6/9/2016 | Thomas F. West | Elizabeth | EP |
| 45782 | Richard Ingram Capps | Mark Wayne Cartret | 6/9/2016 | Thomas F. West | Elizabeth | EP |
| 45781 | Gudiel Toledo | Mark Wayne Cartret | 6/9/2016 | Thomas F. West | Elizabeth | EP |
| 45780 | Bobby Woods | Mark Wayne Cartret | 6/9/2016 | Thomas F. West | Elizabeth | EP |
| 45779 | Sylvia Denise Cameron | Mark Wayne Cartret | 6/9/2016 | Thomas F. West | Elizabeth | EP |
| 45778 | Carol Lynn Thompson | Mark Wayne Cartret | 6/9/2016 | Thomas F. West | Elizabeth | EP |

| | | | | | | |
|---|---|---|---|---|---|---|
| 45777 | Daniel M Weatherington | Mark Wayne Cartret | 6/9/2016 | Thomas F. West | Elizabeth | EP |
| 45776 | Charles Keith Tatum | Mark Wayne Cartret | 6/9/2016 | Thomas F. West | Elizabeth | EP |
| 45775 | Juan Ramon Camacho | Mark Wayne Cartret | 6/9/2016 | Thomas F. West | Elizabeth | EP |
| 45774 | MELINDA WALCER | Mark Wayne Cartret | 6/9/2016 | Thomas F. West | Elizabeth | EP |
| 45773 | Deborah Vanzuylen Tatem | Mark Wayne Cartret | 6/9/2016 | Thomas F. West | Elizabeth | EP |
| 45772 | James Keith Morris | Mark Wayne Cartret | 6/9/2016 | Thomas F. West | Elizabeth | EP |
| 45771 | Ira B Spivey | Mark Wayne Cartret | 6/9/2016 | Thomas F. West | Elizabeth | EP |
| 45770 | Joshua Erick Morphies | Mark Wayne Cartret | 6/9/2016 | Thomas F. West | Elizabeth | EP |
| 45769 | Darain L Vines | Mark Wayne Cartret | 6/9/2016 | Thomas F. West | Elizabeth | EP |
| 45768 | Shaun Kenta Blackwell | Mark Wayne Cartret | 6/9/2016 | Thomas F. West | Elizabeth | EP |
| 45767 | Kimberly Thompson McSwain | Mark Wayne Cartret | 6/9/2016 | Thomas F. West | Elizabeth | EP |
| 45766 | Montana Snow | Mark Wayne Cartret | 6/9/2016 | Thomas F. West | Elizabeth | EP |
| 45765 | Mikhel Ja'Rondee McNair | Mark Wayne Cartret | 6/9/2016 | Thomas F. West | Elizabeth | EP |
| 45764 | Jonette M Caldwell | Mark Wayne Cartret | 6/9/2016 | Thomas F. West | Marlo | MH |
| 45763 | William Andrew Hillman | Mark Wayne Cartret | 6/9/2016 | Thomas F. West | Marlo | MH |
| 45762 | sandy simmons | Mark Wayne Cartret | 6/9/2016 | Thomas F. West | Marlo | MH |
| 45761 | Melissa A Jones | Mark Wayne Cartret | 6/9/2016 | Thomas F. West | Marlo | MH |
| 45760 | Logan Dale Burton | Mark Wayne Cartret | 6/9/2016 | Thomas F. West | Marlo | MH |
| 45759 | James Donald Henderson | Mark Wayne Cartret | 6/9/2016. | Thomas F. West | Marlo | MH |
| 45758 | Anthony Rashaud Mckoy | Mark Wayne Cartret | 6/9/2016 | Thomas F. West | Marlo | MH |
| 45757 | Benjamin Eugene Morgan | Mark Wayne Cartret | 6/9/2016 | Thomas F. West | Marlo | MH |
| 45756 | Ritchie V Hinkle | Mark Wayne Cartret | 6/9/2016 | Thomas F. West | Marlo | MH |
| 45755 | Misty C McDonald | Mark Wayne Cartret | 6/9/2016 | Thomas F. West | Marlo | MH |
| 45754 | Danna M Seabron | Mark Wayne Cartret | 6/9/2016 | Thomas F. West | Marlo | MH |
| 45753 | Susanna Layaou Spearman | Mark Wayne Cartret | 6/9/2016 | Thomas F. West | Marlo | MH |
| 45752 | Dallas R McClain | Mark Wayne Cartret | 6/9/2016 | Thomas F. West | Marlo | MH |
| 45751 | Quade Austin Mathis | Mark Wayne Cartret | 6/9/2016 | Thomas F. West | Marlo | MH |
| 45749 | Jeffrey Alan Martin | Mark Wayne Cartret | 6/9/2016 | Thomas F. West | Marlo | MH |
| 45748 | Robertino Moses Lopez | Mark Wayne Cartret | 6/9/2016 | Thomas F. West | Dawne | DP |
| 45747 | Rodney Sawyers | Mark Wayne Cartret + | 6/9/2016 | Thomas F. West | Dawne | DP |
| 45746 | Lee Austin Burns | Mark Wayne Cartret | 6/9/2016 | Thomas F. West | Dawne | DP |
| 45745 | James Richards | Mark Wayne Cartret | 6/9/2016 | Thomas F. West | Dawne | DP |

| 45744 | Michael Kirk Schon | Mark Wayne Cartret | 6/9/2016 | Thomas F. West | Dawne | DP |
|---|---|---|---|---|---|---|
| 45743 | James E Himes | Mark Wayne Cartret | 6/9/2016 | Thomas F. West | Dawne | DP |
| 45740 | Cathy Queen Rodman | Mark Wayne Cartret | 6/9/2016 | Thomas F. West | Dawne | DP |
| 45739 | Robert Orion Davis | Mark Wayne Cartret | 6/9/2016 | Thomas F. West | Dawne | DP |
| 45737 | Timothy Edward Bullins | Mark Wayne Cartret | 6/9/2016 | Thomas F. West | Dawne | DP |
| 45736 | Adrian Bernard Dais | Mark Wayne Cartret | 6/9/2016 | Thomas F. West | Dawne | DP |
| 45735 | Travis Lovell Crawford | Mark Wayne Cartret | 6/9/2016 | Thomas F. West | Dawne | DP |
| 45734 | Alice Anne Roberts | Mark Wayne Cartret | 6/9/2016 | Thomas F. West | Dawne | DP |
| 45733 | Derrick L Cox | Mark Wayne Cartret | 6/9/2016 | Thomas F. West | Dawne | DP |
| 45732 | Shannon Concepcion | Mark Wayne Cartret | 6/9/2016 | Thomas F. West | Dawne | DP |
| 45731 | James Jackson Cline | Mark Wayne Cartret | 6/9/2016 | Thomas F. West | Dawne | DP |
| 45730 | Robert David Clement | Mark Wayne Cartret | 6/9/2016 | Thomas F. West | Quinetta | QL |
| 45729 | Timothy Wayne Cheek | Mark Wayne Cartret | 6/9/2016 | Thomas F. West | Quinetta | QL |
| 45728 | Rochelle Monique Hearns | Mark Wayne Cartret | 6/8/2016 | Thomas F. West | Quinetta | QL |
| 45727 | Jacob Thomas Harris | Mark Wayne Cartret | 6/8/2016 | Thomas F. West | Quinetta | QL |
| 45726 | Courtney Allison Griffith | Mark Wayne Cartret | 6/8/2016 | Thomas F. West | Quinetta | QL |
| 45725 | Bobby Jamal Griffin | Mark Wayne Cartret | 6/8/2016 | Thomas F. West | Quinetta | QL |
| 45724 | MALISSA GOODMAN | Mark Wayne Cartret | 6/8/2016 | Thomas F. West | Quinetta | QL |
| 45723 | Daniel Gibby | Mark Wayne Cartret | 6/8/2016 | Thomas F. West | Quinetta | QL |
| 45722 | GEOFFREY EDWARD GADSDEN | Mark Wayne Cartret | 6/8/2016 | Thomas F. West | Quinetta | QL |
| 45721 | Zulie L Foxe | Mark Wayne Cartret | 6/8/2016 | Thomas F West | Quinetta | QL |
| 45720 | Rafael Antonio Ortiz Fonseca | Mark Wayne Cartret | 6/8/2016 | Thomas F. West | Quinetta | QL |
| 45719 | Meredith C Ferrier | Mark Wayne Cartret | 6/8/2016 | Thomas F. West | Quinetta | QL |
| 45718 | Brittany Eileen Gaither | Mark Wayne Cartret | 6/8/2016 | Thomas F. West | Quinetta | QL |
| 45717 | Rigoberto Faz | Mark Wayne Cartret | 6/8/2016 | Thomas F. West | Quinetta | QL by DP |
| 45716 | Russell Fair | Mark Wayne Cartret | 6/8/2016 | Thomas F. West | Quinetta | QL |
| 45715 | Christel L Reno | Mark Wayne Cartret | 6/8/2016 | Thomas F. West | AC | AC |
| 45714 | LAWRENE S EVANS | Mark Wayne Cartret | 6/8/2016 | Thomas F. West | AC | AC |
| 45713 | Levi David Eplin | Mark Wayne Cartret | 6/8/2016 | Thomas F. West | AC | AC |
| 45712 | Janet G Ramirez | Mark Wayne Cartret | 6/8/2016 | Thomas F. West | AC | AC |
| 45711 | Donna Ann DeLand | Mark Wayne Cartret | 6/8/2016 | Thomas F. West | AC | AC |
| 45710 | Remus Lamar Brown | Mark Wayne Cartret | 6/8/2016 | Thomas F. West | AC | AC |

| | | | | | | |
|---|---|---|---|---|---|---|
| 45709 | Shamel J Brailsford | Mark Wayne Cartret | 6/8/2016 | Thomas F. West | AC | AC |
| 45708 | Angel Richards | Mark Wayne Cartret | 6/8/2016 | Thomas F. West | AC | AC |
| 45707 | christopher john bowman | Mark Wayne Cartret | 6/8/2016 | Thomas F. West | AC | AC |
| 45706 | James Robert Bishop | Mark Wayne Cartret | 6/8/2016 | Thomas F. West | AC | AC |
| 45705 | Lequita Buchanan Belle | Mark Wayne Cartret | 6/8/2016 | Thomas F. West | AC | AC |
| 45704 | Rickie Donovan Baker | Mark Wayne Cartret | 6/8/2016 | Thomas F. West | AC | AC |
| 45703 | Nikesha Sherrelle Anderson | Mark Wayne Cartret | 6/8/2016 | Thomas F. West | AC | AC |
| 42611 | Carl B Valentine | Mark Wayne Cartret | 12/8/2015 | Thomas F. West | AC | AC |
| 42504 | Carl B Valentine | Mark Wayne Cartret | 12/2/2015 | Thomas F. West | AC | AC |
| 42385 | Cannon Surety, LLC in Rehabilitation | Mark Wayne Cartret | 11/23/2015 | Thomas F. West | Tom | TFW |
| | Dallas R McClain | | | | | TFW |
| 38950 | | Agent Associates Insurance, LLC | 6/1/2015 | Thomas F. West | Tom | TFW |
| 38624 | Jerome J Baggett | Agent Associates Insurance, LLC | 5/14/2015 | Thomas F. West | Tom | TFW |
| | Larry Averon Powell | Mark Wayne Cartret | | | | TFW |
| | Shawn David Sullivan | | | | | TFW |

*DALLAS R. MCCLAIN*

*V.*

*JOHN MICHAEL "MIKE" CAUSEY, ET AL.*

## <u>PLAINTIFF'S EXHIBIT 12</u>

| | |
|---|---|
| **From:** | duhkingfish <duhkingfish@yahoo.com> |
| **Sent:** | Wednesday, April 22, 2020 1:26 PM |
| **To:** | Grady Richardson |
| **Subject:** | Fw: Restraining Order |
| **Attachments:** | scanTRO.pdf |

----- Forwarded Message -----
**From:** duhkingfish <duhkingfish@yahoo.com>
**To:** "jeff.trendel@ncdoi.gov" <jeff.trendel@ncdoi.gov>; "ray.martinez@ncdoi.gov" <ray.martinez@ncdoi.gov>; "debbie.walker@ncdoi.gov" <debbie.walker@ncdoi.gov>
**Sent:** Tuesday, August 30, 2016, 11:17:11 PM EDT
**Subject:** Restraining Order

Jeff,

My Friday update is a bit early, and I had genuinely hoped I wouldn't be writing this. I had hoped for a better resolution before this action. For too long I and others, including even yourselves have put up with innuendo, baseless allegations, and undue pressure. Believe me when I tell you it has been very tense here and we are trying to catch up on our normal work due to all that has been going on.

I want to say that unequivocally neither myself or anyone I know has been talking out of school about our audit as has been alleged. Lots of things are being thrown out as fact, rumor, and gossip. I would welcome any inquiry from any of you folks directly if you have any question about any comment someone said I made. Secondly, the Department is to be commended on the audit team for their professionalism, neutrality, courtesy, and conduct. I never witnessed any untoward comment, negative attitude or improper behavior aimed at me or Mr. Brawley. Even as he demanded and ranted from time to time, they maintained their composure and graciousness.

I have been able to absorb the negativity and personal attacks until now, when our agents are being harassed, Cannon's reputation is being harmed, and the livelihoods, morale, and survival of our Cannon family is being threatened. The company has and is thriving, and has great potential to make us all proud. While I don't understand all of Mr. Brawley's behavior and motives, I still have to take action.

I have attached a scanned Judge's restraining order regarding Brawley and Cannon. When I get the entire lawsuit scanned tomorrow I will forward that to you as well, that spells out more of what has been going on. For now, you should be aware that late this afternoon a Senior Resident Superior Court Judge issued the attached order. You can read it, but basically it removes Mr. Brawley from any authority--legal and otherwise with respect to Cannon. He is barred from the premises, from talking to agents, any decision making and legal authority whatsoever, any banking, etc. There will be a hearing later, and an ongoing lawsuit with Cannon as the plaintiff against him.

I'm afraid I have to ask for expediency on the public records asked for earlier to prepare for this hearing. There is a letter to the Commissioner, and emails from Brawley to the Department from January to date.

As for notice of this, Mr. Brawley I suspect will be served tomorrow by the sheriff and FedEx. I kept the recipients just you and Ray and Debbie, but you do what you need to do. Tomorrow I will notify the bank where the forgeries took place as they will have to comply with part of the order. Criminal charges have not been filed as of yet.

I apologize for you folks having to have been in the middle, and maybe this will set things a little straighter and less awkward.

Kind regards,
Dallas

1

NORTH CAROLINA                                    IN THE GENERAL COURT OF JUSTICE
                                    FILED        SUPERIOR COURT DIVISION
                                                 FILE NO. 16 CVS  1208

WILSON COUNTY                      2016 AUG 30  P  4: 36

CANNON SURETY, LLC,          WILSON COU, C.S.C.
A NORTH CAROLINA LIMITED              )
LIABILITY COMPANY                     )
                                      )
          Plaintiff,                  )
                                      )          *EX PARTE*
                                      )     TEMPORARY RESTRAINING
                                      )              ORDER
                                      )
VS.                                   )
                                      )
                                      )
CLYDE ROBERT BRAWLEY, JR.,            )
                                      )
          Defendant.                  )

---

          THIS CAUSE COMING ON TO BE HEARD before the undersigned Superior Court
Judge, upon Plaintiffs' Motion for an *Ex Parte* Temporary Restraining Order; and the Court having
considered the Plaintiff's complaint and attached exhibits, the arguments of counsel, the Court now
makes the following findings of fact and conclusions of law:

### FINDINGS OF FACT

          1.      That the Court has personal jurisdiction over the Defendant in this matter.

          2.      Plaintiff, Cannon Surety, LLC has demonstrated a reasonable likelihood of success on
the merits of its claims against the Defendant, Clyde Robert Brawley.

          3.      It appears that the Defendant, Clyde Robert Brawley, has engaged in a course of
conduct that would deprive Plaintiff, Cannon Surety, LLC of its property rights outside the
permissible bounds of the Constitution of the State of North Carolina, and the North Carolina
General Statutes.

          4.      Absent the interim, preliminary relief set forth herein, Plaintiff, Cannon Surety, LLC,
will be harmed in an irreparable manner as to its property rights.

1

5.      Entry of this Order is appropriate under the unique facts and circumstances of this case.

6.      Any injury to the Defendant, Clyde Robert Brawley, caused by entry of this Order is substantially and convincingly outweighed by the harm which Plaintiff, Cannon Surety, would suffer if the relief requested were denied.

7.      It is in the public interest for this Court to take swift, appropriate, and carefully tailored action to protect the citizens of the State of North Carolina from the apparent unfair and very secretive treatment of businesses in the state of North Carolina. Entry of this Order is in the public interest.

8.      The relief granted in this Order is reasonably tailored and narrowly proscribed to provide appropriate interim relief.

9.      The relief requested is reasonable and appropriate and authorized under Section 39-23.7 (a) (3) of the North Carolina General Statutes.

## CONCLUSIONS OF LAW

1.      That the Court has personal jurisdiction over the Defendant in this matter.

2.      Plaintiff, Cannon Surety, LLC has demonstrated a reasonable likelihood of success on the merits of its claims against the Defendant, Clyde Robert Brawley.

3.      It appears that the Defendant, Clyde Robert Brawley, has engaged in a course of conduct that would deprive Plaintiff, Cannon Surety, LLC, of its property rights outside the permissible bounds of the Constitution of the State of North Carolina, and the North Carolina General Statutes.

4.      Absent the interim, preliminary relief set forth herein, Plaintiff, Cannon Surety, LLC will be harmed in an irreparable manner as to its property rights.

5.      Entry of this Order is appropriate under the unique facts and circumstances of this case.

6.      Any injury to the Defendant, Clyde Robert Brawley, caused by entry of this Order is substantially and convincingly outweighed by the harm which Plaintiff, Cannon Surety, LLC would suffer if the relief requested were denied.

7.      It is in the public interest for this Court to take swift, appropriate, and carefully tailored action to protect the businesses in the State of North Carolina from the apparent unfair and very secretive treatment of citizens of the state of North Carolina. Entry of this Order is in the public

2

interest.

   8.     The relief granted in this Order is reasonably tailored and narrowly proscribed to provide appropriate interim relief.

   9.     The relief requested is reasonable and appropriate and authorized under Section 39-23.7 (a) (3) of the North Carolina General Statutes.


   THEREFORE, based upon the Foregoing Findings of Fact and Conclusions of Law, the Plaintiff's complaint, the record in this case and for other good cause shown, the Court hereby ORDERS that:

   1.     Pending further Orders of this Court, and subject to the other terms of this Order, the Defendant, Clyde Robert Brawley, is hereby prohibited from having any legal authority to act on behalf of Plaintiff, Cannon Surety, LLC in any manner whatsoever; Defendant, Clyde Robert Brawley, is hereby prohibited from doing or engaging in any of the following, pending a hearing on a Preliminary Injunction in this matter: (1) Legally binding Cannon Surety, LLC to any contract, agreement or thing of value whatsoever; (2) Write, sign or deposit checks on behalf of Cannon Surety, LLC; (3) Real estate transactions on behalf of Cannon Surety, LLC; (4) Personal property transactions of Cannon Surety, LLC; (5) Stock, bond, share and commodity transactions on behalf of Cannon Surety, LLC; (6) Banking transactions on behalf of Cannon Surety, LLC; (7) Safe deposits on behalf of Cannon Surety, LLC; (8) Business operating transactions on behalf of Cannon Surety, LLC; and (9) Insurance transactions on behalf of Cannon Surety, LLC; Nothing in this Order shall be construed as to prohibit the Defendant from receiving financial benefits as a result of his Twenty-Five Percent (25%) ownership share in Cannon Surety, LLC. Pending further Orders of this Court, the Defendant shall retain his Twenty-Five Percent (25%) economic interest in Cannon Surety, LLC; The Defendant Clyde Robert Brawley, pending further Orders of this Court, and prior to a hearing on a Preliminary Injunction, shall not come on or about the premises of any Cannon Surety, LLC office or location; shall not have any contact with any Cannon Surety, LLC bail agents; Any and all banking institutions where the Plaintiff Cannon Surety, LLC has any bank account or deposits, shall separate any and all accounts of any other individual or corporate entity, including but not limited to the Defendant Brawley.

   2.     IT IS HEREBY FURTHER ORDERED, pending further Orders of this Court and prior to a hearing on a Preliminary Injunction, that: (1) Funds shall only be expended by the President, members and other officers and/or employees of Cannon Surety, LLC to pay ordinary and bona fide business expenses of Cannon Surety, LLC; and (2) The President and other officers and/or employees of Cannon Surety, LLC are hereby Ordered not to borrow any additional funds on behalf of Cannon Surety, LLC, purchase or encumber any real or personal property on behalf of Cannon Surety, LLC, take any actions that would dissolve Cannon Surety, LLC, pending a full hearing on a Preliminary

3

Injunction.

3.      IT IS ALSO HEREBY FURTHER ORDERED, pending further Orders of this Court
and prior to a hearing on a Preliminary Injunction, that: (1) All members and economic
interest holders of Cannon Surety, LLC, including the Defendant, are allowed to be paid
their normal financial distributions as allowed by any prior company Agreements; and (2)
The President, members and other officers and/or employees of Cannon Surety, LLC, are
authorized to make and carry out legal and financial decisions to promote the corporate
welfare of Cannon Surety, LLC, in their sole determination. *THIS ORDER IS GRANTED EX PARTE
WITHOUT NOTICE TO THE DEFENDANT, BECAUSE TO DO SO WOULD FOREWARN THE DEFENDANT AND
ALLOW THE DEFENDANT TO HARM THE PLAINTIFF OF ITS PROPERTY RIGHTS, WHICH IS IRREPARABLE.*

4.      This Order shall be served along with the pleadings, in accordance with Rule 4 of the
North Carolina Rules of Civil Procedure.

SO ORDERED this the *30* day of August, 2016.


                                    _____
                                    The Honorable Milton F. Fitch, Jr.
                                    Senior Resident Superior Court Judge Presiding


*THIS MATTER SHALL BE SET ON FOR PLAINTIFF'S
MOTION FOR PRELIMINARY INJUNCTION, BEFORE
THE JUDGE ASSIGNED TO HOLD COURT IN THIS
COUNTY ON THURSDAY, SEPTEMBER 8, 2016 AT
10:00 A.M., IN SUPERIOR COURT OF WILSON COUNTY.
PURSUANT TO RULE 65(c) OF THE N.C. RULES OF CIVIL
PROCEDURE, THE PLAINTIFF SHALL POST A BOND IN
THE AMOUNT OF $ 500.00  BEFORE THIS ORDER
SHALL TAKE EFFECT.*

*DATE: AUGUST 30, 2016*                   _____
*TIME: 4:46 P.M.*                         *THE HONORABLE MILTON F. FITCH, JR.*
                                          *SENIOR RESIDENT SUPERIOR COURT JUDGE*

*DALLAS R. MCCLAIN*

*V.*

*JOHN MICHAEL "MIKE" CAUSEY, ET AL.*

## PLAINTIFF'S EXHIBIT 13



May 7, 2018

G. Grady Richardson, Jr.
1213 Culbreth Drive
Wilmington, NC 28405

RE:   Dallas McClain, *et al* v. Mark Wayne Cartret, *et al*:
        Wake County 17 CVS 003831

Dear Mr. Richardson:

As you are aware, an "Order of Rehabilitation; Order Appointing Receiver; Order Granting
Injunctive Relief" was entered on January 2, 2018, appointing the North Carolina Commissioner
of Insurance as Rehabilitator for Cannon Surety, LLC. The Commissioner has reviewed the
above matter, in which Cannon Surety, LLC ("Cannon") is a named party, and determined that
attorneys within the North Carolina Attorney General's Office will represent Cannon going
forward. This letter serves as notice that your services as counsel for Cannon in this case are
hereby terminated. This notice of the termination of your representation of Cannon in this action
does not terminate your representation of any other party in this action.

Sincerely,

Jeffrey A. Trendel
Special Deputy Commissioner
Cannon Surety, LLC in Rehabilitation

DALLAS R. MCCLAIN

V.

JOHN MICHAEL "MIKE" CAUSEY, ET AL.

## PLAINTIFF'S EXHIBIT 14

## Grady Richardson

**To:**                Email:
**Subject:**          FW: Phone conference about Cannon Surety

**From:** Stanford, Denise <DStanford@ncdoj.gov>
**Sent:** Thursday, August 9, 2018 11:06 AM
**To:** Grady Richardson <grady@ggrlawoffice.com>
**Cc:** Johnson, Daniel <DJOHNSON@ncdoj.gov>; Freeman, Heather <Hfreeman@ncdoj.gov>
**Subject:** RE: Phone conference about Cannon Surety

We have reviewed your email below with our client and we do not agree with your contentions. The Rehabilitator has the authority to continue to prosecute or to abandon the prosecution of claims pursuant to G.S. 58-30-85(a)(12).

**From:** Grady Richardson [mailto:grady@ggrlawoffice.com]
**Sent:** Wednesday, August 08, 2018 3:47 PM
**To:** Stanford, Denise; john.hoomani@ncdoi.gov
**Cc:** Johnson, Daniel; Freeman, Heather
**Subject:** RE: Phone conference about Cannon Surety

Thank you for your email, Denise.

However, I have not received the Department's responsive feedback, including any documentation it believes is supportive of its feedback, to the balance of my email highlighted in blue below. I have received no answers or input or anything from the Department to said issues and concerns noted in my email. Please let me hear from the Department as to those items.

Sincerely,

Grady

**From:** Stanford, Denise <DStanford@ncdoj.gov>
**Sent:** Tuesday, July 17, 2018 2:39 PM
**To:** Grady Richardson <grady@ggrlawoffice.com>
**Cc:** Johnson, Daniel <DJOHNSON@ncdoj.gov>; Freeman, Heather <Hfreeman@ncdoj.gov>
**Subject:** RE: Phone conference about Cannon Surety

After further internal discussions, we found we have no questions for you.

Thank you.



M. Denise Stanford
Special Deputy Attorney General
Insurance Section
Phone: (919) 716-6610
Email: dstanford@ncdoj.gov
Street Address: 114 W. Edenton St., Raleigh, NC 27603
Mailing Address: P.O. Box 629, Raleigh, NC 27602-0629
Website: WWW.NCDOJ.GOV

1

Please note messages to or from this address may be public records.

**From:** Grady Richardson [mailto:grady@ggrlawoffice.com]
**Sent:** Tuesday, July 17, 2018 9:55 AM
**To:** Stanford, Denise; Johnson, Daniel; Freeman, Heather; 'Hoomani, A. John'; 'Trendel, Jeff'
**Cc:** 'Jennifer Carpenter'; susan@ggrlawoffice.com
**Subject:** RE: Phone conference about Cannon Surety

Dear John, Dan, Denise, Heather, Jeff (and anyone else I am forgetting that participated in our conference call on 22 May 2018):

Good morning. I hope you are all doing well.

During our conference call on May 22nd, there were several questions posed primarily by Dan about certain operational/financial aspects of Cannon Surety. I requested that you send me the list of questions to which you sought answers/information and I would report back to you. I have not received your questions as of this email. Please let me know the status of this aspect.

Also during our conference call, I noted my strong disagreement with any suggestion that the lawsuit was not worth pursuing on behalf of Cannon. I noted several reasons why, one of which included the significant likelihood that any judgment against Mr. Brawley would be collectible. Mr. Brawley's actions and conduct against the best interests of Cannon and in breach of his clear fiduciary duties to Cannon not only can be easily established, they are egregious and accompanied by serious aggravating factors so as to give rise to Chapter 75 treble damages and/or punitive damages.

Of particular concern and importance to me, and as I made clear during our conference call, was the clear conflict of interest of the DOI making any decision to decline pursuing Cannon's claims in this lawsuit. It is important to understand why. The "why" is the fact that the Cannon lawsuit has substantial claims against North State Holding Group, LLC formerly known as "Judicial Associates, LLC" ("North State"), Agent Associates Insurance, LLC formerly known as "Cattlemen's Surety, LLC" ("AAI"), and Mark W. Cartret.

AAI – just like Cannon – is a captive and is regulated and supervised by the DOI. The Complaint alleges substantial claims against AAI, North State and Mr. Cartret. Mr. Cartret is and has always been during the times pertinent to Cannon's lawsuit, a principal owner, officer, and manager in AAI and North State.

Without limitation, here are a few problems with the DOI self-evaluating whether to pursue Cannon's lawsuit against North State, AAI and Mr. Cartret:

1:      If the DOI abandons Cannon's lawsuit against North State, AAI and Mr. Cartret, it is in effect helping North State, AAI and Mr. Cartret – who are competitors of Cannon.

2:      As alleged in the Complaint, Cannon was damaged by the actions of North State, AAI and Mr. Cartret and the allegations are that their actions were in violation of the DOI's standards, statutes, and rules governing captives. The Complaint seeks to redress this damage and, if successful, would assist the DOI in allegedly "rehabilitating" Cannon's viability (NOTE: for the record, Cannon disputes the entirety of the DOI's seizure and rehabilitation action).

3:      Notwithstanding the merits of the first two points above, if the DOI is successful in pursuing Cannon's claims against AAI and North State and obtains a judgment against these entities, such a judgment could weaken and/or defeat the remaining viability, if any, of North State and AAI, which could theoretically, potentially harm the public.

Case 1:20-cv-00695-CCE-LPA   Document 1   Filed 07/30/20   Page 205 of 273

As to the points above, how can DOI objectively and impartially decide whether to pursue Cannon's action and claims against, *inter alia*, North State, AAI and/or Mr. Cartret?

In closing, during our conference call and in a prior hearing in the rehabilitation action by the DOI, there was an assertion made that Cannon had not informed DOI of the removal of Mr. Brawley from the Board/officer/manager position with Cannon as a ground to supposedly support the DOI's seizure actions. That assertion is inaccurate, at best. Please see the email highlighted in yellow and the attached Order that were sent by Mr. McClain on August 30, 2016 to Jeff Trendel, Ray Martinez, and Debbie Walker notifying the DOI of the removal of Mr. Brawley until further Orders of the Court, if ever. This Order has never been terminated or extinguished. At the return hearing, at least two DOI deputy commissioners were in the courtroom when the TRO was made into a preliminary injunction continuing Mr. Brawley's removal.

I look forward to hearing from you regarding the matters contained herein.

Sincerely,

Grady

LAW OFFICES OF G. GRADY RICHARDSON, JR., P.C.
Attorney and Counselor at Law
N.C.S.B. 25508

WE'VE MOVED: Our new address is as follows:

1908 Eastwood Road
Lumina Station, Unit #224
Wilmington, NC 28403

Our telephone, facsimile and email address information will all remain the same.
Telephone: 910.509.7166
Facsimile: 910.509.7167
Mobile:    910.471.3377
Email:     grady@ggrlawoffice.com

----- Forwarded Message -----
**From:** duhkingfish <duhkingfish@yahoo.com>
**To:** Jeff Trendel <jeff.trendel@ncdoi.gov>; Ray Martinez <ray.martinez@ncdoi.gov>; Debbie Walker <debbie.walker@ncdoi.gov>
**Sent:** Tuesday, August 30, 2016 11:17 PM
**Subject:** Restraining Order

Jeff,

My Friday update is a bit early, and I had genuinely hoped I wouldn't be writing this. I had hoped for a better resolution before this action. For too long I and others, including even yourselves have put up with innuendo, baseless allegations, and undue pressure. Believe me when I tell you it has been very tense here and we are trying to catch up on our normal work due to all that has been going on.

I want to say that unequivocally neither myself or anyone I know has been talking out of school about our audit as has been alleged. Lots of things are being thrown out as fact, rumor, and gossip. I would welcome any inquiry from any of

3

you folks directly if you have any question about any comment someone said I made. Secondly, the Department is to be commended on the audit team for their professionalism, neutrality, courtesy, and conduct. I never witnessed any untoward comment, negative attitude or improper behavior aimed at me or Mr. Brawley. Even as he demanded and ranted from time to time, they maintained their composure and graciousness.

I have been able to absorb the negativity and personal attacks until now, when our agents are being harassed, Cannon's reputation is being harmed, and the livelihoods, morale, and survival of our Cannon family is being threatened. The company has and is thriving, and has great potential to make us all proud. While I don't understand all of Mr. Brawley's behavior and motives, I still have to take action.

I have attached a scanned Judge's restraining order regarding Brawley and Cannon. When I get the entire lawsuit scanned tomorrow I will forward that to you as well, that spells out more of what has been going on. For now, you should be aware that late this afternoon a Senior Resident Superior Court Judge issued the attached order. You can read it, but basically it removes Mr. Brawley from any authority--legal and otherwise with respect to Cannon. He is barred from the premises, from talking to agents, any decision making and legal authority whatsoever, any banking, etc. There will be a hearing later, and an ongoing lawsuit with Cannon as the plaintiff against him.

I'm afraid I have to ask for expediency on the public records asked for earlier to prepare for this hearing. There is a letter to the Commissioner, and emails from Brawley to the Department from January to date.

As for notice of this, Mr. Brawley I suspect will be served tomorrow by the sheriff and FedEx. I kept the recipients just you and Ray and Debbie, but you do what you need to do. Tomorrow I will notify the bank where the forgeries took place as they will have to comply with part of the order. Criminal charges have not been filed as of yet.

I apologize for you folks having to have been in the middle, and maybe this will set things a little straighter and less awkward.

Kind regards,
Dallas

4

DALLAS R. MCCLAIN

V.

JOHN MICHAEL "MIKE" CAUSEY, ET AL.

## PLAINTIFF'S EXHIBIT 15

STATE OF NORTH CAROLINA ~~FILED~~     IN THE GENERAL COURT OF JUSTICE
                                      SUPERIOR COURT DIVISION
**WAKE COUNTY**                       **FILE NO.**
                    2017 SEP 27 P 1: 51

MIKE CAUSEY,
**COMMISSIONER OF INSURANCE**     WAKE CO. C.S.C.
OF NORTH CAROLINA,
                                  BY

Petitioner,                       )     **VERIFIED PETITION FOR AN ORDER**
                                  )     **OF REHABILITATION, A SEIZURE**
v.                                )     **ORDER, AN ORDER APPOINTING**
                                  )     **RECEIVER, AND INJUNCTIVE**
CANNON SURETY, LLC,               )     **RELIEF**
A North Carolina Limited Liability )
Company,                          )     **(CONFIDENTIAL UNDER**
                                  )     **N.C.GEN. STAT. § 58-30-70)**
Respondent.                       )
_____)

     **NOW COMES** Mike Causey, the Commissioner of Insurance of the State of North

Carolina (hereinafter "Commissioner," "Department," or "NCDOI"), and hereby petitions for an

Order of Rehabilitation against Cannon Surety, LLC (hereinafter "Respondent"), entry of a

Seizure Order, an Order appointing him as receiver of Respondent, and for injunctive relief.

     In support thereof, Petitioner shows unto the Court that:

     1.    Petitioner is the Commissioner of Insurance of the State of North Carolina and

initiates this action in his official capacity pursuant to N.C. Gen. Stat. §§ 58-10-475, 58-30-15,

58-30-20, 58-30-22, 58-30-25, 58-30-65, 58-30-70, 58-30-71, 58-30-75, 58-30-80, and Article

38 of Chapter 1 of the North Carolina General Statutes.

## STATUTORY BACKGROUND

2.     The North Carolina Captive Insurance Act ("Act") is found in Part 9 of Article 10 of Chapter 58 of the North Carolina General Statutes, and is codified as N.C. Gen. Stat. §§ 58-10-335 through 58-10-655.

3.     Pursuant to N.C. Gen. Stat. § 58-10-345, no captive insurance company shall transact any insurance business in this State unless it obtains a license from NCDOI authorizing it to do insurance business in this State.

4.     Pursuant to N.C. Gen. Stat. § 58-10-345, in order to receive a license to issue policies of insurance as a captive insurance company in this State, an applicant business entity shall file, among other information, its plan of operation, evidence that the liquidity of the captive insurance company is sufficient relative to the risks to be insured, evidence of the overall soundness of its plan of operation, and evidence of the adequacy of the loss prevention programs of its insureds.

5.     Pursuant to N.C. Gen. Stat. § 58-10-345(a)(10), a duly-licensed special purpose captive insurance company may provide insurance or reinsurance or both for risks as approved by the Commissioner.

6.     Pursuant to N.C. Gen. Stat. § 58-10-345(c)(6), in order to receive a license to issue policies of insurance as a captive insurance company in this State, the paid in capital amount required by N. C. Gen. Stat. § 58-10-370, in a form acceptable to the Commissioner, shall be paid into the applicant business entity.

7.     Pursuant to N.C. Gen. Stat. § 58-10-345(c)(7), in order to receive a license to issue policies of insurance as a captive insurance company in this State, an applicant business

2

entity shall submit to the Commissioner for approval a description of the coverages, deductibles, coverage limits, and rates, together with such additional information as the Commissioner may require.

8.     Pursuant to N.C. Gen. Stat. § 58-10-360, before licensing, the applicant business entity shall report in writing to the Commissioner the name and address of any captive manager designated to manage the captive insurance company. The Commissioner must approve the captive manager.

9.     Pursuant to N.C. Gen. Stat. § 58-10-370(a)(6), in order to be issued a license, a special purpose captive insurance company must possess and maintain unimpaired paid-in capital and surplus of not less than $250,000.00 or such other amount determined by the Commissioner. In addition to this capital and surplus requirement, pursuant to N.C. Gen. Stat. § 58-10-425, the Commissioner may require a captive insurance company to maintain a deposit with the Commissioner in a form and amount as the Commissioner may specify.

10.    On December 8, 2003, NCDOI issued a memorandum to all surety companies engaged in the bail bond business in North Carolina. The purpose of the memorandum was to address concerns regarding unpaid surety bail bond judgments in the State. Pursuant to this memorandum, NCDOI established a new requirement for all surety bail bond companies in the State. Beginning on January 14, 2004, surety bail bond companies in North Carolina were required to deposit with NCDOI an additional $1,000,000.00.

11.    Pursuant to N.C. Gen. Stat § 58-10-385, every captive insurance company shall report to the Commissioner within 30 days after any change in its executive officers or directors, including in its report a biographical affidavit for each new officer or direct.

3

12.     Pursuant to N.C. Gen. Stat § 58-10-395, any material change in a captive insurance company's plan of operation that was filed with the Commissioner at the time of initial application and any subsequent amendment of the plan requires prior approval from the Commissioner.

13.     Pursuant to N.C. Gen. Stat. § 58-10-400, no person shall act in or from this State as a managing general agent, producer, or reinsurance intermediary for captive business without the authorization of the Commissioner.

14.     Pursuant to N.C. Gen. Stat § 58-10-405, prior to March 15 of each year, each captive insurance company shall submit to the Commissioner a report of its financial condition on the preceding December 31, verified by oath of two of its executive officers. Each captive insurance company shall report using generally accepted accounting principles, unless the Commissioner requires, approves, or accepts the use of another comprehensive basis of accounting.

15.     Pursuant to N.C. Gen. Stat. § 58-10-415, all captive insurance companies shall have an annual audit performed by an independent certified public accountant and shall file such audited financial report with NCDOI on or before June 30 for the prior calendar year. The annual audited financial report is to consist of financial statements, notes to financial statements and related required auditor communications.

16.     Pursuant to N.C. Gen. Stat. § 58-10-415, every captive insurance company, unless otherwise exempted by the Commissioner, shall annually submit with the annual audited financial report the opinion of an appointed actuary entitled, "Statement of Actuarial Opinion," evaluating the captive insurance company's loss reserves and loss expense reserves.

4

17.     Pursuant to N.C. Gen. Stat. § 58-10-420(a), a captive insurance company, shall within 60 days, if not already disclosed at the time of application, report to the Commissioner in writing, the name and address of the independent certified public accountant retained to conduct the annual audit set forth in N.C. Gen. Stat. § 58-10-415.

18.     Pursuant to N.C. Gen. Stat. § 58-10-420(b), a captive insurance company shall require its independent certified public accountant to immediately notify in writing an officer and all members of the board of directors or other governing body of the captive insurance company of any determination by the independent certified public accountant that the captive insurance company has materially misstated its financial condition in its report to the Commissioner required by N.C. Gen. Stat. §58-10-405. A captive insurance company receiving a notification pursuant to N.C. Gen. Stat. § 58-10-420(b), shall forward a copy of the notification to the Commissioner within five business days after receipt of the notification and shall provide the independent certified public accountant with proof that the notification was forwarded to the Commissioner. If the independent certified public accountant fails to receive the proof within the five-day period required by the Act, the independent certified public accountant shall within the next five business days submit a copy of the notification to the Commissioner.

19.     Pursuant to N.C. Gen. Stat § 58-10-430(a), whenever the Commissioner determines it to be prudent, the Commissioner shall audit a captive insurance company's affairs to ascertain its financial condition, its ability to fulfill its obligations, and whether it has complied with the Act.

20.     Pursuant to N.C. Gen. Stat. § 58-10-450(b), no captive insurance company is permitted to join or contribute financially to any guaranty or insolvency fund in this State, nor

shall any such captive insurance company, or any insured or affiliate thereof, receive any benefit from any such guaranty or insolvency fund for claims arising out of the operations of such captive insurance company.

21. Pursuant to N.C. Gen. Stat. § 58-10-455, a captive insurance company is taxed in accordance with Article 8B of Chapter 105 of the North Carolina General Statutes (N.C. Gen. Stat. §§ 105-228.3 through 105-228.10). Under N.C. Gen. Stat. § 105-228.4A, a tax is levied on the premium revenues of captive insurance companies doing business in this State. Such captive insurance companies must file with the Secretary of Revenue a full and accurate report of the premiums contracted for or collected on policies or contracts of insurance written by the company during the preceding calendar year. The report is due on or before March 15. The taxes imposed by that statute are due to the Secretary of Revenue with the report.

22. Pursuant to N.C. Gen. Stat. § 58-10-650, the following provisions of Chapter 58 of the North Carolina General Statutes are applicable to all captive insurance companies: N.C. Gen. Stat. § 58-2-185, N.C. Gen. Stat. § 58-2-190, N.C. Gen. Stat. § 58-2-200, and N.C. Gen. Stat. § 58-7-50. These statutes require captive insurance companies to make and keep a full and correct record of the business done by them, showing the number, date, term, amount insured, premiums, and the persons to whom issued, of every policy or certificate or renewal. The information that must be maintained specifically includes financial records; corporate records; reinsurance documents; all accounting transactions; claim files; and payment of claims, in accordance with such methods and systems as are customary or suitable as to the kind or kinds of insurance transacted. The information from these records must be furnished to the Commissioner on demand, and the original books of records shall be open to the inspection of

6

the Commissioner when demanded. Any person who shall refuse, on demand, to exhibit the books, accounts, or papers, as above provided, or who shall knowingly or willfully make any false statement in regard to the same, shall be subject to suspension or revocation of his license under Articles 1 through 64 of Chapter 58 of the North Carolina General Statutes; and shall be deemed guilty of a Class 1 misdemeanor. In addition, any person who, without the prior approval of the Commissioner, removes or attempts to remove such records or assets or part therefore or who conceals or attempts to conceal such records from the Commissioner shall be deemed guilty of a Class I felony.

## BACKGROUND OF RESPONDENT'S BUSINESS

23.     Respondent is a North Carolina limited liability company existing under the laws of the State with its principal place of business located at 2303 W Meadowview Road, Suite 200 Box # 3, in Greensboro, Guilford County, North Carolina.

24.     All American Bail Bonds, LLC ("AABB") is a North Carolina limited liability company existing under the laws of the State with its principal place of business located at 2303 W. Meadowview Road, Suite 200B Box #11, in Greensboro, Guilford County, North Carolina.

25.     Piedmont Bail Services, LLC ("PBS") is a North Carolina limited liability company existing under the laws of the State with its principal place of business located at 2303 W. Meadowview Road, Suite 200B Box #11, in Greensboro, Guilford County, North Carolina.

26.     Upon information and belief, Respondent, AABB and PBS are all operated out of the same location.

27.     Respondent applied to NCDOI for licensure as a captive insurance company on November 1, 2014 and made representations to NCDOI in its application and accompanying

7

documents that were relied upon by NCDOI in making its decision to issue a captive insurance company license to Respondent.

28.     Respondent was licensed by the NCDOI on December 22, 2014 as a special purpose captive insurance company under the Act.

29.     Respondent, as a captive insurance company, is subject to the regulatory authority of NCDOI as set forth in the Act.

30.     Respondent was licensed by NCDOI to transact Fidelity & Surety Insurance as a captive insurance company. Such license was further limited to the writing of surety bail bond business, specifically judicial appearance bonds (hereinafter "Surety Bail Bonds") written by or on behalf of the members of Respondent's parent, Premier Judicial Consultants, LLC (hereinafter "Premier").

31.     Respondent's exposure on any single one risk was limited by its Licensure Letter to no more than $500,000.00 without prior approval from NCDOI.

32.     Pursuant to his authority in N.C. Gen. Stat. § 58-10-425(a), the Commissioner required as a condition of licensure in the Licensure Letter, Respondent to place a $1,000,000.00 deposit with the Commissioner. This deposit was in addition to the initial $250,000.00 minimum paid in capital and surplus requirement required by N.C. Gen. Stat. § 58-10-370(a)(6). Respondent requested and NCDOI approved a deposit installment plan with monetary benchmarks in order for Respondent to meet these capital and deposit obligations under the Act.

33.     According to the deposit installment plan approved by NCDOI, Respondent was to have at least $1,250,000.00 on deposit (the $250,000.00 capital and surplus requirement plus the addition $1,000,000.00 deposit) with NCDOI by January 1, 2017.

8

34.     Respondent issues its Surety Bail Bonds through licensed surety bail bondsmen or bail agents (hereinafter "Bail Agents") who are appointed by Respondent. In accordance with the Respondent's licensure letter dated December 22, 2014, (hereinafter "Licensure Letter") the licensed and appointed Bail Agents who write bonds on behalf of Respondent are required to be members of Premier.

35.     Upon information and belief, the Bail Agents appointed by Respondent are supposed to sign an agreement ("Retailer Agreement") in which they agree to certain terms and conditions, including the maximum authority for which they are allowed to write bonds, the amount of premium owed to Respondent on bonds written on behalf of Respondent, and the amount of premium required to be deposited in a build-up fund (hereinafter "BUF"), which is a reserve account set up to pay Surety Bail Bond forfeiture judgments and court or recovery costs.

36.     The appointed Bail Agents for Respondent are provided with powers of attorney from Respondent that authorize them to write Surety Bail Bonds on behalf of Respondent in varying dollar denominations in order to obtain pretrial release of the defendants charged with a crime.

37.     Pursuant to N.C. Gen. Stat. § 58-71-140(d), the Bail Agents writing a Surety Bail Bond must file with the clerk of court having jurisdiction over the defendant an affidavit on a form furnished by the Administrative Office of the Courts, Form AOC-CR-201. The affidavit includes the amount of the premium promised and the due date. If the Bail Agent has received a premium, the affidavit is to include the amount of premium received. If the Bail Agent is given collateral security, the affidavit is to include the name of the person from whom it is received along with the nature and value of the collateral received.

9

38.     In exchange for obtaining the pre-trial release from jail for a person charged with a crime, Bail Agents appointed by Respondent receive a non-refundable (with few exceptions) premium of up to 15% of the face amount of the Surety Bail Bond. See N.C. Gen. Stat. § 58-71-95.

39.     In exchange for a Bail Agent's appointment and authorization to write Surety Bail Bonds on behalf of Respondent, the appointed Bail Agent owes a premium to Respondent based on the face value of each Surety Bail Bond written on behalf of Respondent in an amount set by contract between the appointed Bail Agent and Respondent.

40.     According to the Plan of Operation submitted by Respondent with its application, its Bail Agents are obligated to pay between one and two percent of the face value of each Surety Bail Bond to Respondent as a premium.

41.     Each appointed Bail Agent is also required by contract to deposit a percentage of the appointed Bail Agent's premium on each Surety Bail Bond to Respondent to establish Build Up Fund (BUF) account on deposit with Respondent. The BUF account is a reserve account that is meant to be available to cover the Bail Agent's potential liabilities incurred as a result of forfeitures of bonds written by the Bail Agent.

42.     The Retailer agreement further provides that the Bail Agent is required to maintain at its principal office location a full, complete and accurate permanent record and account of all bond business transaction written. Further, all such records are required to be open for inspection at all times by Respondent.

43.     Pursuant to N.C. Gen. Stat. § 15A-544.3, if a defendant who was released on

10

bond, fails on any occasion to appear before the court as required, a forfeiture is entered against the defendant as well as against each surety on the bond.

44.     Pursuant to N.C. Gen. Stat. § 15A-544.6, in the absence of a motion to set aside the forfeiture, the forfeiture becomes a final judgment 150 days after the notice of forfeiture is given to the defendant and the surety. When a final judgment of forfeiture is entered, the surety, along with the defendant, is bound to pay the State of North Carolina the amount of the bond.

45.     Pursuant to N.C. Gen. Stat. § 15A-544.7, after a final judgment is docketed by the clerk of superior court where the bond was written, no surety named in the judgment may become a surety on a bond in the county in which the judgment is docketed until the judgment is satisfied in full.

46.     Pursuant to the Licensure Letter, Respondent is required to provide bond exposure reports on a quarterly basis, in the format as directed by NCDOI. Each such bond exposure report is required to be submitted thirty (30) days following the end of each quarter.

## STATUTORY GROUNDS FOR REHABILITATION

47.     Pursuant to N.C. Gen. Stat. § 58-10-475, the terms and conditions set forth in Article 30 of Chapter 58 of the North Carolina General Statutes relating to supervision, rehabilitation and liquidation apply to licensed captive insurance companies, including Respondent.

48.     Pursuant to N.C. Gen. Stat. § 58-30-75, the Commissioner may petition the Court for an order authorizing him to rehabilitate a domestic insurer or an alien insurer domiciled in this State on any one or more of the grounds set out in that statute, including the following:

11

a.   The insurer is in such condition that the further transaction of business would be hazardous financially to its policyholders, creditors, or the public.

b.   There is reasonable cause to believe that there has been embezzlement from the insurer, wrongful sequestration or diversion of the insurer's assets, forgery or fraud affecting the insurer, or other illegal conduct in, by, or with respect to the insurer that if established would endanger assets in an amount threatening the solvency of the insurer.

c.   After demand by the Commissioner the insurer has failed to promptly make available for examination any of its own property, books, accounts, documents, or other records; those of any subsidiary or related company within the control of the insurer; or those of any person having executive authority in the insurer insofar as they pertain to the insurer.

d.   Within the previous four years the insurer has willfully violated its charter or articles of incorporation, its bylaws, Articles 1 through 67 of this Chapter, or any valid order of the Commissioner under G.S. 58-30-60.

e.   The insurer has failed to pay within 60 days after due any obligation to any state or any subdivision thereof or any judgment entered in any state, if the court in which such judgment was entered has jurisdiction over such subject matter; except that such nonpayment is not a ground until 60 days after any good faith effort by the insurer to contest the obligation has been terminated, whether it is before the Commissioner or in the courts, or the insurer has systematically attempted to compromise or renegotiate previously agreed settlements with its creditors on the ground that it is financially unable to pay its obligations in full.

f.   The insurer has failed to file its annual report or any other financial report required by statute within the time allowed by law and, after written demand by the Commissioner, has failed to immediately give an adequate explanation.

49.   Further, pursuant to N.C. Gen. Stat. § 58-30-60, in determining whether the continued operation of any licensed insurer is hazardous to its policyholders, creditors, or the general public in accordance with N.C. Gen. Stat. § 58-30-75(1), the Commissioner may consider any or all of the standards set out in that statute. Those standards include:

12

a.   Adverse findings reported in financial condition and market conduct examination reports, audit reports, and actuarial opinions, reports, or summaries;

b.   Whether the insurer has made adequate provision, according to presently accepted actuarial standards of practice, for the anticipated cash flows required by the contractual obligations and related expenses of the insurer, when considered in light of the assets held by the insurer with respect to such reserves and related actuarial items, including, but not limited to, the investment earnings on such assets, and the considerations anticipated to be received and retained under such policies and contracts;

c.   Whether the management of an insurer, including officers, directors, or any other person who directly or indirectly controls the operation of the insurer, fails to possess and demonstrate the competence, fitness, or reputation considered by the Commissioner to be necessary to serve the insurer in that position;

d.   Whether the management of an insurer has failed to respond to the Commissioner's inquiries about the condition of the insurer or has furnished false and misleading information in response to an inquiry by the Commissioner;

e.   Whether the management of an insurer has filed any false or misleading sworn financial statement, has released a false or misleading financial statement to a lending institution or to the general public, or has made a false or misleading entry or omitted an entry of material amount in the insurer's books;

f.   Whether the insurer has experienced or will experience in the foreseeable future cash flow or liquidity problems; or

g.   Any other finding determined by the Commissioner to be hazardous to the insurer's policyholders, creditors, or general public.

13

Case 1:20-cv-00695-CCE-LPA   Document 1   Filed 07/30/20   Page 221 of 273

## FACTS JUSTIFYING REHABILITATION

### *Examination Findings Raise Serious Questions About Respondent's Financial Viability*

50. Pursuant to N.C. Gen. Stat § 58-10-405, prior to March 15 of each year, each captive insurance company shall submit to the Department a report of its financial condition on the preceding December 31, verified by oath of two of its executive officers. Each captive insurance company shall report using generally accepted accounting principles.

51. Pursuant to N.C. Gen. Stat. § 58-10-415, all captive insurance companies shall have an annual audit of its report of financial condition performed by an independent certified public accountant in accordance with generally accepted auditing standards and shall file the audited financial report with the Department on or before June 30 each year for the prior calendar year.

52. In accordance with N.C. Gen. Stat. § 58-10-430, NCDOI conducted financial examinations of Respondent covering the period of January 1, 2016 through December 31, 2016 and the period of January 1, 2017 through June 23, 2017 (hereinafter "Examinations").

53. Financial examinations performed by the Department are similar to audits performed for publicly-traded companies in that they include systematic inspection, testing and verification of an insurance company's accounting records.

54. The North Carolina General Statutes require captive insurance companies to make and keep a full and correct record of the business done by them, showing the number, date, term, amount insured, premiums, and the persons to whom issued, of every policy or certificate or renewal. The information that must be maintained specifically includes financial records; corporate records; reinsurance documents; all accounting transactions; claim files; and payment

14

of claims, in accordance with such methods and systems as are customary or suitable as to the kind or kinds of insurance transacted. The information from these records must be furnished to the Commissioner on demand, and the original books of records shall be open to the inspection of the Commissioner when demanded. *See* N.C. Gen. Stat. § 58-10-650 incorporating the provisions of N.C. Gen. Stat. § 58-2-185, N.C. Gen. Stat. § 58-2-190, N.C. Gen. Stat. § 58-2-200, and N.C. Gen. Stat. § 58-7-50.

55.     The examinations revealed that Respondent uses a primitive cash-based accounting system consisting of using the bank statements for its operating account to track deposited funds and withdrawn funds. Deposited funds are deemed by Respondent to be revenue and withdrawn funds are deemed by Respondent to be expenses. Respondent uses an accounting software program called "QuickBooks" but the information uploaded to that software is merely the information from the bank statements.

56.     A major defect in this "accounting system" based on Respondent's bank statements is that cash receipts that do not pass through that checking account will not appear in the "accounting system". Likewise, cash disbursements that do not pass through that checking account will not appear in the "accounting system".

57.     Accounting records for premium revenue receivable are not maintained by Respondent and accounts payable accounting records are not maintained by Respondent. As a result, Respondent cannot report an accurate and true statement of all its assets and liabilities as required in its Annual Report.

58.     Bank statements for Respondent's operating account for the entire 12 months of 2016 and the first three months of 2017 were obtained and reviewed.

15

59.    Withdrawals from Respondent's operating account were made by check or by debit card ATM withdrawals or by debit card purchases. Multiple debit card users have access to this bank account. Checks may be written by one company officer on this account for any amount without any requirement for a co-signer signature.

60.    Respondent did not maintain receipts or other supporting documents for debit card withdrawals from its operating checking account. Thus, the examiners could not determine the justification for each debit card withdrawal and could not determine the reasonableness or legitimacy of Respondent's expenses paid by debit card. Respondent's accounting records were thus incomplete.

61.    Respondent did not maintain receipts or complete supporting documents for each check written. Thus, the examiners could not determine the justification for all checks written and could not determine the reasonableness or legitimacy of all of the company's expenses paid by check. The company's accounting records were thus incomplete.

62.    Based on a review of the bank statements for the first three months of 2017, the company had one overdraft in each of those first three months of 2017. Thus, the Company failed to monitor cash flow needs on daily basis to avoid insufficient funds, checks and overdraft fees.

63.    In its Annual Report to the Department for the year 2016, a negative balance was reported for cash on hand. Thus, Respondent did not maintain adequate cash to meet its needs.

64.    In the audit of Respondent's 2015 financial statements by its CPA firm, Rives &

16

Associates, LLP, the auditors reported that they could not confirm the accuracy of the company's financial statements and issued an audit disclaimer regarding Respondent's financial condition as reported by company management. The auditor's disclaimer raises severe concerns about Respondent's financial condition.

65.    Rives reported in the Respondent's 2015 annual audited financial report that it encountered various difficulties performing the audit including:

        a.    Bank reconciliations were not performed throughout the course of the year to be audited;

        b.    Requested documentation was not readily available or made available to Rives in a timely manner;

        c.    Premiums were not recorded properly; and

        d.    Management failed to provide sufficient appropriate audit evidence for significant transactions.

66.    Respondent has not made or kept a full and correct record of the business done by it as required by law.

67.    Respondent does not have the backing of reinsurance or a guaranty association to assist it to meet its obligations.

68.    Respondent has not demonstrated that it has sufficient assets to meet its liabilities. Respondent is in such condition that further transaction of business would be hazardous financially to its policy holders, creditors, or the public.

### *Respondent Has Significant Exposure on Bonds*

69.    A condition of Respondent's licensure, as set out in its Licensure Letter from the

17

Department was that Respondent must submit on a quarterly basis a report demonstrating the number of bonds issued by exposure amounts.

70.     On July 31, 2017, Respondent submitted its Bond Exposure Report for the 2nd Quarter of 2017 – ending June 30, 2017. At that time, the total number of bonds outstanding at the end of the period was 12,027, and the total exposure on those bonds was $79,538,431.08.

71.     Given that the potential exposure for bail bonds issued by Respondent was $79,538,431.08 at the end of June 2017, and given Respondent's financial condition as set forth above, the Respondent's continued operation is hazardous to its policyholders, creditors, or the general public, which is grounds for rehabilitation in accordance with N.C. Gen. Stat. § 58-30-75(1).

### Bond Forfeiture Judgments not paid within 60 days of entry

72.     On or about July 7, 2016, power number 6002585 was issued on a bond written on behalf of Respondent for Defendant Dave Denzel Dunston in Granville County District Court, File Number 16 CR 744, in the amount of $10,000.00. The defendant failed to appear as required by the court, and a bond forfeiture notice was issued against the defendant and Respondent on October 24, 2016 in accordance with N.C. Gen. Stat. § 15A-544.4.

73.     In accordance with N.C. Gen. Stat. § 15A-544.6, the forfeiture would have become a final judgment of forfeiture on or about March 24, 2017 (150 days after the notice of forfeiture is given to the defendant and the surety) and execution would have been issued based on that judgment under N.C. Gen. Stat. §15A-544.7. However, on motion of Respondent, the Granville County District Court entered a Consent Order to Stay Execution on March 23, 2017, staying the execution on that final judgment until April 23, 2017.

18

74.    On April 24, 2017, Respondent entered into a Consent Order with the Granville County Board of Education in which Respondent was ordered to pay the forfeited bond by making two (2) payments of $5,000.00 each on April 24, 2017 and May 24, 2017.

75.    In accordance with the April 24, 2017 Consent Order, the forfeiture became a final judgment of forfeiture on April 24, 2017. The final judgment of forfeiture was not satisfied until July 20, 2017, 87 days after the entry of the final judgment of forfeiture.

76.    Respondent's failure to pay within 60 days after due a judgment entered in this state is grounds for rehabilitation in accordance with N.C. Gen. Stat. § 58-30-75(10).

77.    On or about November 21, 2016, power number 8001455 was issued on a bond written on behalf of Respondent for Defendant Adria Ninoska Rincon in Cabarrus County Superior Court, File Number 16 CRS 055010, in the amount of $50,000.00. The defendant failed to appear as required by the court, and a bond forfeiture notice was issued against the defendant and Respondent on February 22, 2017 in accordance with N.C. Gen. Stat. § 15A-544.4.

78.    In accordance with N.C. Gen. Stat. § 15A-544.6, the forfeiture would have become a final judgment of forfeiture on or about July 22, 2017 (150 days after the notice of forfeiture is given to the defendant and the surety). However, on July 21, 2017, Respondent entered into a Consent Order with the Cabarrus County School Board in which Respondent was ordered to make payments of $5,000.00 per month for ten (10) consecutive months beginning on October 1, 2017 until the full amount of $50,000.00 was satisfied. Thus this judgment will not be paid in full until the year 2018 is one half over.

79.    Respondent's failure to pay within 60 days after due a judgment entered in this

19

state is grounds for rehabilitation in accordance with N.C. Gen. Stat. § 58-30-75(10).

80.     Respondent's inability during the year 2017 to make good on its obligation to the State on two bonds – a $10,000 bond and a $50,000 bond – which are mere fractions of its bond liabilities of more than $79,000,000 without entering into installment payment plans is evidence that Respondent has failed to make adequate provision, according to presently accepted actuarial standards of practice, for the anticipated cash flows required by its contractual obligations and related expenses, and that it will experience in the foreseeable future cash flow or liquidity problems. *See* N.C. Gen. Stat. §§ 58-30-60(b)(4) and (b)(15).

81.     Further, the foregoing demonstrates that Respondent's management fails to possess and demonstrate the competence, fitness, or reputation considered by the Commissioner to be necessary to serve the insurer in that position. *See* N.C. Gen. Stat. § 58-30-60(b)(11).

82.     The foregoing demonstrates that Respondent's continued operation is hazardous to its policyholders, creditors, or the general public, which is grounds for rehabilitation in accordance with N.C. Gen. Stat. § 58-30-75(1).

### *Failure to Timely File Required Reports*

83.     Respondent filed its 2015 annual audit on September 30, 2016, ninety-two days after the June 30, 2016 due date.

84.     Respondent filed its 2015 statement of actuarial opinion on September 30, 2016, ninety-two days after the June 30, 2016 due date.

85.     Respondent failed to file its 2016 annual audited financial report due on June 30, 2017.

86.     Respondent has not filed its 2016 statement of actuarial opinion. Thus the

20

Department has not been given information sufficient to determine whether respondent's reserves for claims are adequate to meet its obligations.

87.     The foregoing demonstrates that Respondent has failed to timely file its annual report or any other financial report required by statute within the time allowed by law, which is grounds for rehabilitation in accordance with N.C. Gen. Stat. § 58-30-75(11).

### Providing Purported Commissions and Offsets to AABB

88.     The Examination showed that Respondent allowed AABB to offset premium revenue with purported advance premium credits and commission credits despite the fact that there were no supporting documents to justify the credits taken by AABB and to substantiate the reasonableness of the practice.

89.     The Examiners found that the total premium payments made by AABB to Respondent were merely $1,025 after applying commission credits of $69,358 and other credits of $5,685 for the 3rd and 4th quarters of 2016, and the 1st quarter of 2017. For the same period, Respondent authorized AABB Bail Agents to execute Surety Bail Bonds with exposure totaling $16,402,966.

90.     The Examination showed that contrary to the premium payable to Respondent of from one to two percent of the face amount of the Surety Bail Bonds stated in the Plan of Operation, the actual agent agreement between Respondent and AABB set the premium payable to Respondent at 0.5% of the face value of the Surety Bail Bond. It is further noted that the 0.5% of premium rate is lower than all other Bail Agents who contracted with Respondent.

91.     The Examination showed that Respondent allowed AABB to offset premium

21

revenue with purported advance premium credits and commission credits despite the fact that there were no supporting documents to justify the credits taken by AABB and to substantiate the reasonableness of the practice.

92.    The foregoing constitutes a willful violation of Respondent's plan of operation and the licensure letter issued by the Commissioner, which is grounds for rehabilitation in accordance with N.C. Gen. Stat. § 58-30-75(9).

### *Failure to Have $1 Million Deposit*

93.    Pursuant to N.C. Gen. Stat. § 58-10-370(a)(6), in order to be issued a license, a special purpose captive insurance company must possess and maintain unimpaired paid-in capital and surplus of not less than two hundred fifty thousand dollars ($250,000) or such other amount determined by the Commissioner.

94.    In addition to this capital and surplus requirement, pursuant to N.C. Gen. Stat. § 58-10-425, the Commissioner may require a captive insurance company to maintain a deposit with the Commissioner in a form and amount as the Commissioner may specify.

95.    Pursuant to his authority in N.C. Gen. Stat. § 58-10-425(a), the Commissioner required, as a condition of licensure in the Licensure Letter, Respondent to place a one million-dollar ($1,000,000.00) deposit with the Commissioner. This deposit was in addition to the initial two hundred and fifty thousand dollars ($250,000) minimum capital and surplus requirement, and included a deposit installment plan with monetary benchmarks to be prepared by Respondent and approved by the Commissioner.

96.    According to the deposit installment plan approved by the Department,

22

Respondent was to have at least $1,250,000.00 on deposit (the $250,000.00 capital and surplus requirement plus the addition $1,000,000.00 deposit) with the Department by January 1, 2017.

97.     Respondent filed its Annual Report for fiscal year ending December 31, 2016 with the Department on March 15, 2017. According to the 2016 Annual Report, Respondent only had $984,576.00 on deposit with the Department – which is $265,424.00 (or 21%) less than the required amount.

98.     Respondent failed to comply with its deposit installment plan dated November 19, 2015, which required an additional deposit of one million dollars ($1,000,000) in addition to the two hundred and fifty thousand dollars ($250,000) of paid-in capital. The NCDOI approved a deposit installment plan but Respondent failed to make deposits during the months of November and December 2016, and failed to make the balloon payment due in December 2016. As of this date, Respondent's total capital and deposit is $986,559, instead of the required amount of $1,250,000.

99.     The foregoing constitutes a willful violation of Respondent's plan of operation and the licensure letter issued by the Commissioner, which is grounds for rehabilitation in accordance with N.C. Gen. Stat. § 58-30-75(9).

### Failure to Report Changes in Executive Officers

100.    Pursuant to N.C. Gen. Stat § 58-10-385, every captive insurance company shall report to the Commissioner within 30 days after any change in its executive officers or directors.

101.    Respondent applied to NCDOI for licensure on November 1, 2014. In the application, only two individuals are listed as officers, directors, managers or members of the corporate entity – Clyde Robert Brawley and Dallas Ray McClain.

23

102.    On August 21, 2015, in its first annual report following formation filed with the N.C. Secretary of State's Office, Respondent's 2015 Limited Liability Company Annual Report listed only two officers in Section C, entitled Company Officials – Mr. McClain is listed as President and Mr. Brawley is listed as Secretary.

103.    On December 14, 2016, Respondent filed with the N.C. Secretary of State's Office, its 2016 Limited Liability Company Annual Report. In this report, Respondent only listed one officer in Section C – Mr. McClain is listed as President. Mr. Brawley is no longer listed as Secretary.

104.    The listing of officers on the 2016 Annual Report indicate that Mr. Brawley is no longer an officer of Respondent corporation. As a result, Respondent was required to report the change in officers to NCDOI within 30 days, in accordance with N.C. Gen. Stat. § 58-10-385(a).

105.    Respondent failed to report the change in officers to the Department.

106.    The foregoing constitutes a willful violation of Chapter 58, Article 10 of the N.C. General Statutes, which is grounds for rehabilitation in accordance with N.C. Gen. Stat. § 58-30-75(9).

107.    Based upon the foregoing, the appointment of the Commissioner as the Rehabilitator of Respondent is necessary to protect its policyholders, its creditors, and the public.

### GROUNDS FOR SEIZURE ORDER

108.    Pursuant to N.C. Gen. Stat. § 58-30-65(a), the Court may issue a Seizure Order if the Commissioner has demonstrated that:

> a.    Grounds exists that justify a judicial order for a formal delinquency proceeding against an insurer under Chapter 58, Article 30 of the N.C. General Statutes; and

24

b.　　The interests of policyholders, creditors, or the public will be engaged by delay.

　　109.　The foregoing constitutes grounds to justify a judicial order for a formal delinquency proceeding against Respondent.

　　110.　Further, based upon the demonstrated history of Respondent failing to provide the Commissioner or even its own auditor with necessary documentation, the interests of policyholders, creditors, or the public will be endangered by the delay.

　　111.　Petitioner has reason to fear disposal or concealment of assets and destruction of records by Respondent if Respondent is notified of this proceeding before entry of a seizure order.

　　112.　The foregoing constitutes grounds for the entry of an immediate Seizure Order under N.C. Gen. Stat. § 58-30-65.

　　113.　Upon the entry of a Seizure Order or an Order of Rehabilitation, it is in the public interest that the Court enter an injunction pursuant to N.C. Gen. Stat. § 58-30-20, and Article 38 of Chapter 1 of the North Carolina General Statutes, which order should prohibit:

　　　　a.　　the disposition, waste, or impairment of the property of Respondent;

　　　　b.　　the destruction of records, no matter the form or location of such records;

　　　　c.　　the unauthorized transaction of further business on behalf of Respondent;

　　　　d.　　interference with the Rehabilitator or with a proceeding under Article 30 of Chapter 58 of the North Carolina General Statutes;

　　　　e.　　waste of the Respondent's assets;

　　　　f.　　dissipation or transfer of Respondent's bank accounts;

　　　　g.　　the institution or further prosecution of any actions or proceedings;

25

h.   the obtaining of preferences, judgments, attachments, garnishments, or liens against Respondent, its assets or its policyholders;

i.   the levying of execution against Respondent, its assets, or its policyholders;

j.   the withholding from the Rehabilitator of books, accounts, documents, or other records relating to the business of Respondent.

114.   The Commissioner and his deputies shall be responsible on their official bonds for the faithful performance of the duties and obligations of the Rehabilitator in this action.

WHEREFORE, Petitioner prays the Court as follows:

1.   To enter an Order of Rehabilitation appointing Mike Causey, Commissioner of Insurance of the State of North Carolina, as Rehabilitator of Respondent;

2.   To order that the Rehabilitator be vested with the title to all assets of Respondent and that the filing or recording of this Order with the Clerk of the Superior Court and the Register of Deeds of the county in which the Respondent's principal office or place of business is located; or, in the case of real estate, with the Register of Deeds of the county where the property is located, shall impart the same notice as a deed, bill of sale, or other evidence of title duly filed or recorded with that Register of Deeds, would have imparted;

3.   To authorize, empower and direct Petitioner to take possession and control of all property, stocks, bonds, securities, bank accounts, savings accounts, monies, accounts receivable, books, papers, records, data bases, printouts and computations, whether stored by microfilm, electronic, optical, magnetic or other means, whether stored in tapes, disks, or other media, and all other assets of any and all kinds and nature whatsoever belonging to Respondent, wherever located, and to conduct Respondent's business and administer Respondent's assets and affairs under the general supervision of this Court;

26

4.     To vest the Rehabilitator with such other power, authority, and duties as are provided by Article 30 of Chapter 58 of the North Carolina General Statutes;

5.     To order that pursuant to N.C. Gen. Stat. § 58-30-85, the Rehabilitator be authorized to appoint a Special Deputy Commissioner to act for the Rehabilitator in connection with the delinquency proceedings against Respondent and that said Special Deputy Commissioner be authorized to employ at the prevailing customary rates such counsel, clerks or assistants as the Rehabilitator or said Special Deputy Commissioner shall deem to be necessary, or to utilize State employees for said purposes if he has determined that the use of State employees to conduct certain aspects of the rehabilitation is the most cost effective method of administering the delinquency proceeding and that this action benefits the estate and its creditors; and to further authorize said Rehabilitator or Special Deputy Commissioner to obtain such bonds, errors and omissions type insurance, or excess liability insurance in addition to any such insurance that may be already provided for employees of the NCDOI, as a reasonably prudent person charged with the duties would deem to be appropriate; and that all expenses of taking possession of Respondent and of conducting the delinquency proceedings against Respondent shall be paid out of the funds of Respondent pursuant to N.C. Gen. Stat. § 58-30-85;

6.     To order that the Rehabilitator is authorized, empowered and directed to incur such expenses for communication and traveling expenses for himself, his agents or attorneys as may be necessary in the proper administration of his duties as Rehabilitator and also to incur such other expenses as the Rehabilitator may deem advisable or necessary in order to properly conduct and perform his duties as Rehabilitator;

27

7.      To authorize the Petitioner, as Rehabilitator, to accept new business and renewals on behalf of Respondent, in the discretion of the Rehabilitator.

8.      To authorize the Petitioner, as Rehabilitator, to notify state or federal regulators of this action;

9.      To appoint Petitioner as the Receiver of Respondent;

10.     To grant injunctive relief pursuant to N.C. Gen. Stat. § 58-30-20 to prohibit any person from interfering in any manner with the property or assets of Respondent or with said Rehabilitator in the performance of his duties, and further enjoin and restrain any person from instituting or prosecuting any suit or other action against the Rehabilitator or the Respondent's property except by the permission of this Court first had and obtained; to stay all persons, firms and corporations with notice of the Court's Order from the obtaining of preferences, judgments, attachments, garnishments, or liens against the Respondent or its assets, or the levying of execution or foreclosure against Respondent or its assets, until further order of the Court; to enjoin and restrain Respondent , its trustees, officers, directors, agents, employees, or third party administrators, and all other persons from the disposition, waste or impairment of any of Respondent's property, assets, or records; to enjoin the transaction of further business unless supervised and approved by the Rehabilitator or his agents or deputies, until further order of the Court; to order all such persons to transfer to the Rehabilitator any and all property of Respondent wheresoever situated, and enjoin and restrain Respondent, its trustees, officers, agents, servants, employees, third party administrators, directors or attorneys from doing or permitting to be done anything which may allow or suffer the obtainment of preferences,

28

judgments, attachments or other liens, or the initiation of a levy against Respondent, without permission of this Court;

      11.     To set accounting and bond requirements for the Rehabilitator;

      12.     To enter an immediate Seizure Order pursuant to N.C. Gen. Stat. § 58-30-65 that directs Petitioner to take possession and control of all the property, books, accounts, documents, and other records of Respondent, and of the premises occupied by it for the transaction of its business, and to enjoin Respondent, its officers, managers, agents, or employees from disposing of its property or transacting its business except with the written consent of the Petitioner; and

      13.     To grant such other and further relief as the Court may deem just and proper.

      This the 27 day of September, 2017.

<div style="margin-left: 40%;">

JOSH STEIN
ATTORNEY GENERAL

By: _Daniel S. Johnson_

Daniel S. Johnson
North Carolina State Bar No. 9289
Special Deputy Attorney General

By: _M. Denise Stanford_

M. Denise Stanford
North Carolina State Bar No. 17601
Special Deputy Attorney General

Insurance Section
N. C. Department of Justice
P.O. Box 629
Raleigh, N.C. 27602-0629
Telephone: (919) 716-6610

</div>

29

NORTH CAROLINA

WAKE COUNTY                                    VERIFICATION

Jeffrey A. Trendel, being first duly sworn, deposes and says that he is a Deputy Commissioner of Insurance for the North Carolina Department of Insurance; that he has read the foregoing Petition; and that the contents of same are true and correct of his own knowledge, except as to those matters and things therein set forth upon information and belief, and as to those, here verily believes it to be true.

This 27th day of September, 2017.

N.C. Department of Insurance

BY: _____

Jeffrey A. Trendel
Deputy Commissioner

Sworn to and subscribed before me
this 27th day of September, 2017.

_____

Notary Public

My Commission Expires: _December 4, 2017_

30

DALLAS R. MCCLAIN

V.

JOHN MICHAEL "MIKE" CAUSEY, ET AL.

## PLAINTIFF'S EXHIBIT 16

## AFFIDAVIT OF ALWANDA WILLIAMS BEANE

I, ALWANDA WILLIAMS BEANE, being duly sworn, deposes and says as follows:

1.    I am over 18 years of age, a citizen and resident of Randolph County, North Carolina, and reside at 788 Williams Court, Pleasant Garden, North Carolina 27313-8088 (hereinafter, "Home Address"), and competent to make this Affidavit. As of this Affidavit, I am 79 years old.

2.    I have direct, personal knowledge of the matters set forth herein and the statements contained in the Affidavit are made of my own volition. A true and correct copy of my North Carolina Drivers License is attached as Exhibit A.

3.    My husband, Allen Beane, passed away in April of 2015. Prior to his death, Allen had been a bail bondsman for approximately 51 years – since 1965. Prior to his death, Allen and I had been married for 32 years.

4.    For the entirety of our 32 years of marriage, Allen and I lived at our Home Address.

5.    Allen was one of the first 23 bail bondsmen licensed in 1965 by the Insurance Commissioner's Office in the State of North Carolina.[1, 2]

6.    When Allen and I got married, I also started in the bail bonding business and I have been a bail agent for over 35 years now. I have never been punished or reprimanded by the North

---

[1]    On 14 August 2019, I executed a document entitled, "Sworn Statement of Alwanda Beane." A true and correct copy if this prior statement I executed under oath is attached as Exhibit B. In my prior Sworn Statement, I said Allen was in the first group of **32** bail agents. The correct number is **23**, as this Affidavit recites.

[2]    This Affidavit is being given to supplement and add to my prior Sworn Statement.

Carolina Department of Insurance (hereinafter, "Department") or accused of any wrongdoing by the Department.

7.    I am the sole owner and bail agent of AAA Bonding Company. I held a runner's license from 1984-1988. In 1988, I obtained my surety bondsman license and I have maintained it continuously at all times since 1988.

8.    To my knowledge, during the entirety of his 51-year bail bonding career, Allen was never punished or reprimanded by the Department or accused of any wrongdoing by the Department. Certainly, during the course of our marriage, Allen was never punished or reprimanded by the Department or accused of any wrongdoing by the Department.

9.    Neither Allen nor I have ever contributed any money to any political campaigns of any candidates running for Commissioner of the Department. Thus, we did not and have not contributed money to the campaigns of Jim Long, Wayne Goodwin or Mike Causey.

10.    The current Commissioner of the Department is John Michael "Mike" Causey. Allen (before he passed away) and I have been family friends with Commissioner Causey and his family for over 35 years. Commissioner Causey and his family have always lived near my Home Address – only about 5 minutes away.

11.    When I first started in the bail surety bonding industry, I worked as a bail agent under Tom Apodoca and his Ranger Insurance business ("Ranger").

12.    In addition to Ranger, Mr. Apodoca contracted with several other surety businesses including Alleghany, International, and Accredited over time.

13.    As a result of Mr. Apodoca's business practices, I stopped writing bonds with him in or about the Fall of 1996.

Case 1:20-cv-00695-CCE-LPA   Document 1   Filed 07/30/20   Page 241 of 273

14.     After leaving Mr. Apodoca, I began writing bonds through Financial Casualty and Safety National Casualty. During my times with Financial Casualty and Safety National Casualty, my agent contract rate I paid on all bonds was approximately 2% plus I was required to contribute into my BUF account ("Build-Up-Fund Account").

15.     I have known Dallas McClain for approximately 10 years. I have never observed or witnessed Mr. McClain do anything remotely improper, unlawful, unscrupulous, or illegal in any way, including without limitation, in any efforts connected with the bail bond industry in the State of North Carolina. One would be hard-pressed to find any person in the State of North Carolina with more knowledge, understanding and experience in the bail bonding industry than Mr. McClain.

16.     In November 2016, after Mr. McClain had started Premier Judicial Consultants, LLC ("Premier") and its wholly owned captive subsidiary, Cannon Surety, LLC ("Cannon"), I began to write bonds exclusively with Cannon and Mr. McClain whenever possible.

17.     I wrote approximately 5 bonds with Cannon prior to Cannon being seized by the Department. The total "face" liability of all of the bonds I wrote with Cannon was probably approximately $300,000 dollars. I am very selective about the bonds I write.

18.     For all of the bonds I wrote with Cannon, my agent contract rate was approximately ▮ and I also had to pay an additional ▮ into my Cannon BUF account, for a total of approximately ▮ I would pay to Cannon. A copy of my agent contract with Cannon is attached hereto as Exhibit C.

19.     Cannon never had to pay for any bond forfeitures on any bonds I wrote through Cannon.

Case 1:20-cv-00695-CCE-LPA   Document 1   Filed 07/30/20   Page 242 of 273

20.     After Cannon was seized by the Department, I went back to writing bonds through Financial Casualty and I am paying approximately 2% on my agent contract rate with Financial Casualty.

21.     In 2016, I supported Mr. Causey's campaign against Wayne Goodwin to be elected as Commissioner of the Department. I volunteered to work the polls, put up signs for Mr. Causey, and I attended some of his campaign rallies. I never contributed any money to Mr. Causey's campaign.

22.     In Mr. Causey's prior, unsuccessful campaigns for Commissioner, neither Allen nor I supported his campaigns or his opponent's campaigns.

23.     I supported Mr. Causey's campaign in 2016 against Mr. Goodwin because I did not like Mr. Goodwin's close affiliation and allegiance to the North Carolina Bail Agents Association ("NCBAA"). The NCBAA was a very big financial contributor to Mr. Goodwin's campaign and Mr. Goodwin, while he was Commissioner of the Department, was allowing the NCBAA to, essentially, "run" and dictate to the Department that the Department do as the NCBAA wanted.

24.     I informed Mr. Causey of my complaints and concerns with Mr. Goodwin and with the NCBAA.

25.     The NCBAA resented and opposed Mr. McClain because of his and Lyne Thompson's successful legal challenge to legislation the NCBAA had passed in 2012 effectively granting itself a monopoly for providing bail bonding instruction in the State of North Carolina (hereinafter, "NCBAA Legislation").

26.     In mid-2012, the trial court struck down the NCBAA Legislation as unconstitutional and unlawful. Ultimately, the North Carolina Court of Appeals affirmed the trial court's decision and the litigation was settled in 2015.

Case 1:20-cv-00695-CCE-LPA   Document 1   Filed 07/30/20   Page 243 of 273

27.     The NCBAA Legislation had been supported and lobbied for by then-Senator, Tom Apodoca.

28.     Once Mr. Causey was elected as the Department's Commissioner in late 2016 and upon taking office in January 2017, Mr. Causey formed a committee largely comprised of NCBAA members and their legal counsel. The members on this committee – per Mr. Causey telling me this information - included NCBAA board member Phil Bradshaw, Past President Mark Cartret, Past Executive Director and NCBAA board member, Melissa Seiler, and instructor Doug Cozart, as well General Counsel for the NCBAA, Steve McCloskey.

29.     At all times prior to and leading up to taking office in January of 2017, Mr. Causey had zero bail bonding experience.

30.     In or about April of 2017, Mr. Causey called me. Prior to this call, I had not recently spoken to Mr. Causey. Our conversation lasted for about 10 minutes. During our conversation, Mr. Causey told me not to continue writing bonds with Cannon. Without any explanation or details, Mr. Causey told me that Cannon was "not in good standing and had unpaid outstanding bond forfeitures." Mr. Causey then told me that "the NCBAA wanted Cannon shut down and they gave me a lot of money, so he was eventually going to have to do what they asked."

31.     Following Mr. Causey's call, I contacted the Administrative Office of the Courts to find out if Cannon was not in good standing in any counties in the State of North Carolina. When I called, I spoke to a lady whose name I cannot remember, who confirmed for me that Cannon was not cut off in any counties and that had never been a problem for Cannon. The lady further stated, "I wish there were more sureties like Cannon." She was referring to several other surety companies with numerous judgments and writs that were still being allowed to operate.

Case 1:20-cv-00695-CCE-LPA   Document 1   Filed 07/30/20   Page 244 of 273

32. At the end of September of 2017, the Department seized Cannon. In doing so, Cannon's bail agents, which numbered approximately 200 – myself included – were stopped from writing bonds with Cannon immediately and suddenly.

33. Following Cannon's seizure, I called Mr. Causey and told him that I, Duane Long and Todd Reavis all wanted to meet in person with him about bail issues. Mr. Long is a professional bondsman in Yadkin County. Mr. Reavis is surety bondsman and a runner and his dad, Billy Reavis, is a professional bondsman.

34. Mr. Causey agreed to meet with us and in or about late November 2017, we all met at the Bojangles location on South Elm Street in Greensboro, North Carolina. This location was selected by Mr. Causey and it is convenient to where he would either go to his home coming from Raleigh, or heading from his home to head towards Raleigh.

35. Our meeting with Mr. Causey lasted for approximately 45 minutes. When we asked Mr. Causey why he shut down Cannon, Mr. Causey told us under no uncertain terms that he was forced to shut down Cannon and told to shut down Cannon by Senator Phillip Berger and former Senator Tom Apodoca. Mr. Causey reiterated he did not want to because he knew Mr. McClain and liked Mr. McClain, but legislation he wanted and/or needed would be blocked if he did not do so.

36. In or about January or February of 2018, I called Mr. Causey again. In our conversation, I told Mr. Causey that what he and the Department did to Mr. McClain and his Cannon company was illegal and corrupt. At the end of our telephone conversation, Mr. Causey told me, "Don't worry, I fixed it." Based on this comment, I thought Mr. Causey was telling me that he had put Cannon back in business, which has not happened.

Case 1:20-cv-00695-CCE-LPA   Document 1   Filed 07/30/20   Page 245 of 273

37.     During that same conversation with Mr. Causey in early 2018, I asked him about the status of Agent Associates Insurance, also known as "AAI," and why the Department had not seized AAI.  Mr. Causey said that Mr. Cartret (past president of the NCBAA and the principal owner in AAI) agreed to shut down AAI voluntarily.  Mr. Causey then stated that Mr. McClain was also asked to voluntarily shut down Cannon and refused.  I now know that statement by Mr. Causey was false because Cannon was never offered a voluntary shut down and was seized, without any notice, by Mr. Causey and the Department.

38.     I have not had any further communications with Mr. Causey since our last conversation in early 2018.

39.     The matters set forth in this Affidavit are true and correct and based on my own direct, first-hand knowledge.  I have received no money or consideration of any kind from Mr. McClain or other persons or businesses for my statements in this Affidavit or my prior Sworn Statement.  I am very upset with what has been done to Mr. McClain, his Cannon business, and Cannon's agents, including me.

Further this Affiant sayeth not.

This 20 day of April 2020.


_____
ALWANDA "WANDA" WILLIAMS BEANE

Sworn to and subscribed before me
This 20 day of April 2020.

_____
Notary Public

My commission expires: 4 | 25 | 2020



Case 1:20-cv-00695-CCE-LPA   Document 1   Filed 07/30/20   Page 246 of 273



STATE OF NORTH CAROLINA  DMV

DRIVER LICENSE    839440

ALWANDA WILLIAMS BEANE

class: C    restr: None

issued 06-17-2015    expires -2020

sex F    eyes BL    hgt GRY

birthdate 940



EXHIBIT
A

## SWORN STATEMENT OF ALWANDA BEANE

I, Alwanda Beane, being duly sworn, avers as follows:

I have been a North Carolina bail bond agent for 35 years. In 1965 my husband, Allen Beane was one of the first group of 32 bail agents to be licensed by the state of North Carolina. He remained licensed for 51 years.

I am a long-time friend of the North Carolina Insurance Commissioner, Mike Causey. I was a strong supporter of Commissioner Causey in all of his campaigns for Insurance Commissioner, including the last one, which he won.

In or around April of 2017, in a private conversation, Commissioner Causey warned me not to sign on as an agent of Cannon Surety. He stated that the NCBAA (North Carolina Bail Agents Association), especially Phillip Bradshaw and Melissa Seiler wanted Cannon shut down and they had been big contributors to his campaign. At their request, NCDOI was "looking into" Cannon and would probably have "to do something about them". I said something to the effect of: "You know Dallas McClain [the majority owner of Cannon Surety]. You're his friend, you know how honest he is! That man would never do anything illegal!" Causey replied , "Yeah, I hate it, but they gave me a lot more money than Dallas did." I warned him not to let NCBAA influence him and get him caught up in a scandal and a lawsuit, which is what NCBAA did to the former commissioner, Wayne Goodwin, to shut down another one of Mr. McClain business, NC Bail Academy which resulted in a lawsuit between McClain's company and NCBAA and the former commissioner, Wayne Goodwin. He again stated that NCBAA had given him a lot of money and he owed them and because of that he would probably have to do something about Cannon, so I shouldn't sign with them. Despite his warning, it was my opinion that Cannon was the best surety insurance company in the state, so I did sign with them.

It surprised and alarmed me that Commissioner Causey was allowing himself to be influenced by NCBAA in this way because I was aware that Causey knew what illegal lengths NCBAA had gone to in the past to shut down another business, NC Bail Academy. Dallas McClain, the majority owner of Cannon Surety, was also a co-founder of NC Bail Academy.

In prior conversations held between Commissioner Causey and me, both before and after he was elected, Commissioner Causey and I had discussed the intense hatred NCBAA board members, especially the individuals named above, have towards Mr. McClain, and , as a matter of fact, me. We had also discussed the extreme extent that NCBAA had gone to in order to get rid of their only competition, NC Bail Academy, and the apparent vendetta that NCBAA and Mark Cartret had against Mr. McClain and Lyne Thompson. Ms. Thompson is the other co-founder of the school. Commissioner Causey knew that NC Bail Academy was, and is, NCBAA's only competition. He knew that a few years ago, NCBAA got a law passed giving NCBAA a monopoly to teach bail bonding in NC. A Superior Court Judge in Raleigh ruled that the law was illegal and unconstitutional. Causey and I have talked about how NCBAA got the law passed in a very underhanded way by blatantly lying to the legislature and saying NCBAA were the

1

EXHIBIT

B

STATE LEGAL®

only school who was teaching in North Carolina and this law wouldn't put anyone out of business. Causey and I have discussed how NCBAA got Senator Tom Apodoca, a founder of NCBAA, to put pressure on the past Commissioner to shut NC Bail Academy down. I know that Commissioner Causey was also aware of the resulting 3 year-long lawsuit between Mr. McClain and Ms. Thompson and NCBAA and the Department of Insurance under the last DOI administration.

I have told Causey that it was my opinion that NCBAA stopped supporting the prior Commissioner and started supporting Causey because the prior Commissioner refused to do NCBAA's bidding after NC Bail Academy's lawsuit was filed against DOI and NCBAA. I warned Causey that he better not let them improperly influence him.

However, a few months later in September of 2017, Commissioner Causey and DOI seized Cannon Surety and shut it down, putting over 200 agents out of business.

A few months after this happened, I met with Commissioner Causey, Billy Todd Reavis and Mendy Greenwood, a DOI employee, at Bo Jangles fast food restaurant on South Elm St. in Greensboro, NC.

Ms. Greenwood was there for part of the conversation, but not all of it. During the course of the conversation, I asked the Commissioner why he had shut Cannon Surety down with no notice to any of the agents or the company officials. He stated that he was forced to shut Cannon Surety down by ex-Senator Tom Apadoca and Senator Phillip Berger. He said that he liked Dallas and didn't want to but he had to do what they said if he wanted to get any legislation passed while he was Commissioner.

From our conversation, I did not get the impression that Commissioner Causey thought that what he did when he shut Cannon down was illegal, otherwise I don't think he would have told us about it. I got the distinct impression that he considered it a necessary evil and felt guilty that he had to hurt Mr. McClain, who he considered a friend.

In a subsequent telephone conversation we had, I told Causey that what he had done to Mr. McClain and Cannon was pure corruption and that I was ashamed I had helped get him elected. I also told him that if justice was served, he would be going to prison. He said, "Don't worry, I fixed it." and walked away. I have no idea what he meant.

Further than this, Affiant sayeth not. This the /4 day of August, 2019.

ALWANDA BEANE

Sworn to and subscribed before me,
this the 14th day of August, 2019.

Notary Public          My Commission Expires: 5/8/22

LISA G FORRESTER
NOTARY PUBLIC
GUILFORD COUNTY, NC
My Commission Expires May 8, 2022

2



**CANNON SURETY**

STATE OF NORTH CAROLINA

                                                                    AGREEMENT

COUNTY OF GUILFORD

     THIS AGREEMENT is entered into this the day 28 of NOVEMBER, 2016, by and between Cannon Surety LLC, (hereinafter referred as "Company"), and ALWANDA BEANE , (hereinafter referred to as "Retailer").

<div align="center">STATEMENT OF PURPOSE</div>

     Cannon Surety LLC is engaged in the business of providing bail bonding services within the Continental United States to include, but not limited to, the State of North Carolina. Retailer is engaged in the retail business of issuing bail bonds within the State of North Carolina and desires to be appointed by Company for the writing of bail bonds and fugitive recovery within the State of North Carolina provided through the Company. Cannon Surety LLC has agreed to allow Retailer to issue bail bonds through it in accordance with the terms and provisions of this Agreement.

     NOW THEREFORE, in consideration of the mutual promises and covenants contained herein, the receipt and sufficiency of which is hereby acknowledged, the parties do agree as follows:

1. **COMPANY.** For such times as Retailer is in full compliance with the terms of this Agreement and until it is terminated, Company hereby authorizes Retailer to solicit and write bail bonds and recover fugitives under the surety through the Company according to the terms and provisions of this Agreement. Company will provide Retailer with such written authorizations, including but not limited to, powers of attorney and printed forms to be used in the issuance of such bail bonds.

2. **RETAILER.** During the term of this Agreement, Retailer agrees to engage himself in the enterprise of a Bail Bondsman within the State of North Carolina and shall solely utilize the bonding services provided by Company, albeit subject to the terms of this Agreement. Nonetheless, in the event Company declines to write any particular bond, Retailer shall be entitled to seek to write it elsewhere. Retailer shall be solely responsible for all cost and expense associated with the operation of his business except as otherwise specifically provided for in this Agreement.

In addition to the above, it is agreed that:

a. Retailer shall not have authority to execute bonds in excess of █████████ DOLLARS ████████ ) without first obtaining the prior approval of the Company. This restriction includes the writing of multiple bonds for the same person which cumulatively exceeds the above stated amount and applies regardless of the qualifying authority of the Company. Retailer shall provide reports to Company detailing all activities (specifically including the use of any powers of attorney for the issuance or voiding of bonds) taken on behalf of the Company for the prior (7) seven days or such

Initials: Company _MM_  Retailer _AB_                                  Page 1

EXHIBIT C — ALL-STATE LEGAL®



**CANNON SURETY**

other period as may be defined by the Company. Reports shall be hand delivered or mailed to Company via overnight mail (FedEx; UPS through the United States Post Office via certified mail or registered mail), return receipt required.

b. Retailer shall remit all premiums and collateral collected in relation to the issuance of bonds according to such schedule set by the Company. Retailer may have authority to keep and deposit collateral funds as set by the North Carolina Department of Insurance if Company so warrants.

c. Retailer shall timely take up and return for cancellation any bond as soon as it possibly can be cancelled/discharged and certified copies of the discharge documents signed by the Clerk of Court or other proper officer shall likewise be immediately forwarded to the Company. Retailer shall provide monthly reports to the Company detailing all bonds cancelled during the reporting period. If retailer fails to discharge his or her sub agents bonds the company may take it upon itself to discharge retailer and their sub agents' bonds and charge back to retailer $0.0 (ZERO cents) per file number discharged. This charge will be paid out of retailer's build up fund (BUF) if not paid in advance.

d. Retailer shall adjust and assist Company in resolving claims against any bail bond he has issued, including his sub-agents, in the name of or through the Company.

e. Retailer is (100%) one hundred percent responsible for the activities of his sub-agents. Any Powers of Attorney issued to Retailer by Company are Retailer's responsibility. All funds due to Company for the use of said Power of Attorney, regardless of who uses said Power of Attorney, is the responsibility of Retailer and Retailer is to make payment to Company for all premium and BUF due.

f. Retailer is (100%) one hundred percent responsible for sub-agents' forfeitures. Retailer must bring all sub-agents' forfeitures to a satisfactory conclusion within the allotted time. If any payment of forfeiture becomes due for a Retailer's sub-agent it is the Retailer's responsibility to pay said forfeiture within the allotted time without coming to Company to use any BUF.

3. **COMPANY REPRESENTATIONS AND WARRANTIES.** Company represents and warrants to Retailer, the following:

a. Company is a limited liability company duly organized, validly existing and in good standing under the laws of the State of North Carolina, has all requisite corporate power and authority to own its properties and assets and carry on its business and is in good standing in each jurisdiction in which such qualification is required.

b. Company has full authority to execute and deliver this Agreement and any other Agreement to be executed and delivered by Company in connection herewith and to carry out the transactions contemplated hereby.

Initials: Company _MN_    Retailer _AB_                    Page 2

Case 1:20-cv-00695-CCE-LPA   Document 1   Filed 07/30/20   Page 251 of 273



**CANNON SURETY**

   c. This instrument constitutes a valid and binding Agreement of the Company with Retailer in accordance with its terms.

4. **RETAILER REPRESENTATIONS AND WARRANTIES.** Retailer represents and warrants to Company, the following:

   a. Retailer is and shall remain during the term of this Agreement a duly licensed Bail Bondsman under the laws of the State of North Carolina;

   b. Retailer has not been found at fault in any disciplinary action or investigation by the State of North Carolina or any other State relating to activities performed as a Bail Bondsmen/Runner, except as disclosed and attached hereto and incorporated herein by reference;

   c. Retailer currently operates his bail bond business at the following address: GUILFORD COUNTY N.C

   d. And that all records related to the operation of such business is kept at such location. Retailer agrees to immediately notify Company in writing of any change in the location of the operation of his business or his business records;

   e. Retailer will promptly notify the Company of all entry of forfeitures on bonds;

   f. Retailer will promptly and timely see to the discharge of all bonds issued through the Company;

   g. Retailer will attend continuing education meetings to maintain a professional level of competence, and complete such mandatory continuing education requirements as may from time to time be in effect or otherwise required under this Agreement, including attendance of at least one (1) time per year at training seminars provided by or offered by the Company. The costs of all such continuing education meetings and training shall be at the expense of Retailer. Retailer must ensure that all sub-agents also attend said training at his cost.

5. **RECORDS.** Retailer shall maintain and keep at its principal office location, a full, complete and accurate permanent record and account, in such form as the Company may indicate or require, of all bond business transactions written by or omitted, through and/or at the request of Retailer, and all such records and all accounts, documents, vouchers and memoranda connected with the business shall be open at any time and all times to examination, inspection and photographic reproduction by Company and its employees, agents and assigns. In addition, Company may, at any time, require Retailer to furnish to it, in such manner or form it requires, any information concerning the bond business of Retailer and/or any sub-agent.

Retailer agrees and understands that Company provided forms including issued powers of attorney, whether such forms are blank, partially completed, or completed are and are to

*Initials: Company* ___    *Retailer* ___            *Page 3*



**CANNON SURETY**

remain the property of the Company and must be delivered forthwith to the Company upon demand. Failure to return negotiable instruments, powers of attorney or associated bond documents may result in criminal charges.

In addition to the above, Company shall have the right, at any reasonable time and without prior notice or demand, to examine such books and records for the purpose of having them audited at its expense to determine compliance with the payment of all premiums due Company; however, in the event such examination or audit discloses a deficiency in premium owed to Company, then Retailer shall pay the actual cost of such examination and audit and shall immediately pay any deficiency, plus a penalty equal to ten percent (10%) of such deficiency. Audits will also confirm that Retailer is complying with all rules and regulations of the Company, the State of North Carolina and the Bail Bond Industry. Any violation of such could result in a reduction of Retailer's contract rate or possibly termination of contract.

In the event this Agreement is terminated, the right of Company to inspect such records and conduct an audit of the same shall continue for a period of (1) year after all bonds are discharged, and all copies, files and ancillary documents being the property of the Company must be returned upon demand. Failure to return negotiable instruments, powers of attorney or associated bond documents may result in criminal charges.

6. **REPORTS.** Retailer shall deliver to the Company in such intervals or periods and is such format as the Company may require from time to time, the following information regarding his activities:

   a. Bonds issued (including risk assumed) and discharged;

   b. Premiums collected on weekly reports;

   c. Collateral received (including description, location) and released; logging all information in the collateral log book;

   d. Entry of forfeitures on bonds or their discharge;

   e. Claims paid;

   f. Copies of documents related to bond coverage issued through the Company;

   g. Any and all other information which the Company may from time to time request related to the bail bond activities of Retailer;

7. **PREMIUMS.** The Company shall charge as the premium for Bonds issued through it, █████ █████ of Bond Liability, on each bond written plus any increase in tax. Regardless of the above, the minimum charge on any bond shall be █████ DOLLARS █████ per bond. Rewrites of a cancelled or exonerated bond shall be charged to Retailer AT █████ DOLLARS ($█████

*Initials: Company* ____ *Retailer* ____                    *Page 4*



**CANNON SURETY**

No credit, as far as Company is concerned, is to be extended by Retailer and/or any sub-agent(s) for premium owed on bonds written, and any renewal thereof, and if any credit is so extended, it shall be for Retailer's own account and he/she/it shall account for and pay all amounts to Company as though said premiums were collected at the time of the writing of the bonds.

Should any powers of attorney be unaccounted for, lost, mislaid or stolen, such powers of attorney shall be considered as issued and posted for the maximum amount endorsed thereon, and Retailer shall immediately report to Company a list of such powers of attorney (report) and pay therewith the full premium amount, including contribution to Retailer's Indemnity Fund/Escrow account/Build up fund (BUF) per Paragraph 10 below, which would be due if such powers of attorney had been issued or posted for the maximum amount endorsed thereon. Should any such powers of attorney thereafter be found and returned to the Company with satisfactory evidence that the same had never been issued or posted, Company will consider refunding all amounts paid thereon by Retailer. Any refunded premium amounts may be placed in Retailer's Indemnity Fund (BUF). All powers of attorney will be used by Retailer in numerical order using the lowest number first and subsequent number. A skip in a power number on a report may result in an audit by the Company at the Retailer's expense.

All premiums collected by Retailer and/or any sub-agent(s) shall be deemed trust funds and shall not be commingled with other funds. The amounts due Company shall be turned over to it as provided for in Paragraph 2 above.

The Company shall have the right from time to time to alter and amend the above stated premium for bond services upon providing thirty (30) days written notice to Retailer.

8. **RETAILER'S COMPENSATION.** Retailer shall retain as compensation for all bail bonds issued through the Company, such amount collected above and beyond the Company's premium referenced in Paragraph 7 above. Any amounts charged by Retailer for bail bonds shall be within the limits allowed to be charged in the State of North Carolina. Company shall not be liable to Retailer for any commission, compensation, expense or other payment whatsoever.

9. **INDEMNITY.** Retailer further agrees that:

   a. Retailer does hereby indemnify Company, its guarantors, indemnitors and co-surety(ies) and hold them and each of them harmless from any and all liability, loss, cost, damages, claims, suits, attorneys fees and other expenses whatsoever, of whatever kind or nature which any of them may sustain or incur as a result of, or in connection with, the execution of any bond heretofore or hereafter written by, through and/or at the request of Retailer, and/or any other act by Retailer and/or his/her/its/their employees, sub-agents, representatives, contractors and/or sub-contractors.

   b. Retailer will indemnify Company, their guarantors, indemnitors and co-surety (ies), and hold them and each of them harmless from any and all liability, loss, cost damages,

Initials: Company _DM_   Retailer _GB_                    Page 5



**CANNON SURETY**

claims, from any and all liability, loss, cost, damages, claims, suits, attorneys fees and other expenses whatsoever, of whatever kind or nature which Company and/or any of their guarantors, indemnitors, and co-surety (ies) may sustain or incur as the result of and/or in connection with any collateral deposited in connection with any bond(s) written by, through deposited in connection with any bond(s) written by, through and/or at the request of Retailer; in making any investigation on account of any such bond(s); in defending or prosecuting any action, suit or other proceeding which may be prosecuting any action, suit or other proceeding which may be brought in connection with any such bond (s) and will indemnify Company and any of their guarantors, indemnitors and co-sureties to the full amount of all such liability, loss, costs, damages, claims, suits, attorneys fees and expenses, regardless of reinsurance that may be carried on such bond (s), it being the object and intent hereof that this Agreement shall protect Company and all sureties and/or insurance companies that may assume reinsurance on such bond(s) and, in like manner, indemnify such other guarantors, indemnitors, co-sureties and insurance companies as Company has procured or may procure to execute or join with it in executing any such bonds.

c. Notwithstanding any provision to the contrary herein, if Company and/or any of its indemnitors, guarantors and co-sureties is joined in any action or proceeding pertaining or relating to, or suffers any cost, expense, loss, or harm, or is in any way held liable or accountable for, the negligence or gross negligence acts or omissions or intentional misconduct of Retailer and/or his/her/its/their employees, sub-agents, representatives, contractors and/or sub-contractors which acts, omissions or misconduct result in personal injury and/or property damage to a third party, personal injury and/or property damage to a third party, Retailer agrees to indemnify, defend and hold harmless Company and all of its guarantors, indemnitors and co-sureties from all actions, claims, losses, costs, and expenses, including but not limited to, attorneys' fees, judgments and liabilities, in any way emanating from said acts, omissions or misconduct. It is expressly understood by Retailer that Retailer has no right of contribution or indemnity from or against Company or any of its guarantors, indemnitors or co-sureties for any losses, costs and expenses, including but not limited to attorneys' fees, judgments and liabilities, in any way emanating from said acts, omissions or misconduct.

d. An itemized statement of such expenses, sworn to by the principal officer of the Company, shall be acceptable as prima facie evidence of the fact and extent of such expenses in any and all suits or claims hereunder.

e. This Agreement shall inure to the benefit of any of the Company's guarantors, indemnitors and co-sureties, and their successors and assigns, so as to give them a right of action hereunder. Company's guarantors, indemnitors and co-sureties as referenced in this Agreement do not include Retailer, any sub-agent and/or any guarantor or indemnitors to Retailer.

Initials: Company _MM_    Retailer _QB_                    Page 6



CANNON SURETY

    f.    Retailer releases all error and waives all right to a stay of execution of appeal, and consents to liability with respect to property, whether real, personal or mixed, in which Retailer may now or hereafter have any interest, and Retailer hereby irrevocably waives the benefit and advantage of any and all valuation, stay appraisement and homestead exemption laws of any State of the United States now in force or hereafter enacted.

**10. INDEMNITY FUND/ESCROW ACCOUNT/BUILD UP FUND (BUF).** To secure Retailer's performance of his obligations under this Agreement (specifically Paragraph 9 above), Retailer has deposited or provided Company with the following as collateral as security:

    a.    $_____, certified check;

    b.    $_____, represented by a Deed of Trust constituting a first/second/third lien against the real property therein described;

    c.    $_____, represented by a Security Agreement constituting first/second/third lien against the personal property therein described;

    d.    $_____, represented by a title issued from a State Department of Motor Vehicles in which retailer will allow Company to place a lien on said property for the amount listed above.

    e.    $_____, represented by an Indemnity Agreement which will become a part of this entire Agreement.

Such funds shall be held in an interest bearing account with a financial institution of Company's choice although such account shall be opened in the name of Retailer or Retailer's sub-agents with Company as the sole signatory and entity authorized to make deposits and/or withdrawals from said account. Retailer or sub-agents may not attempt to withdraw any funds from said account at any time for any reason.

In addition to the above, Retailer, as additional security, shall submit to the Company, as escrow agent, an amount in cash or certified check equal to ██ ████ ████ of the face amount of each bond or surety written by Retailer or Retailer's sub-agents on behalf of the Company. Such funds shall be held in an interest bearing account in the name of Retailer or Retailer's sub-agents; however, such funds may only be withdrawn by Company or Surety as signatory on the account.

In the event that Retailer or Retailer's sub-agent(s) shall at any time default in any of his/her/its undertakings as set forth in this Agreement, then Company shall have the right to draw from Retailer's or Retailer's sub-agent's Indemnity Account whatever sums may be necessary to indemnify and save harmless Company from the consequences of such default. In the case of collateral in Retailer's or Retailer's sub-agent's Indemnity Account other than cash, Company shall have the right to dispose of such collateral either at public or private sale to provide cash, without requirement of notice to Retailer or Retailer's sub-agents except as may otherwise be required by law. The proceeds received from the sale shall be

Initials:  Company _MM_    Retailer _AB_                                        Page 7

Case 1:20-cv-00695-CCE-LPA   Document 1   Filed 07/30/20   Page 256 of 273



**CANNON SURETY**

credited to Retailer's or Retailer's sub-agent's indemnity Account. The sale or disposition of any such collateral shall not serve or reduce or diminish Retailer's or Retailer's sub-agent's obligations hereunder, except to the extent of actual payment received by Company in payment of Retailer's or Retailer's sub-agent obligations. For purposes of this Agreement, it shall be considered a default under Retailer's obligations under this Agreement if a bond issued by Retailer shall become the subject of an Entry of Forfeiture under G.S. 15A-544.3 (and or other applicable statute) and such Entry of Forfeiture is not dismissed or withdrawn within one hundred and twenty (120) days from the date of its filing.

In the event that Retailer's Indemnity Fund shall at any time on account of drawings there from as above provide or depreciation in any collateral or large writings or other causes, fall below such amount as Company may deem adequate in proportion to the Retailer's writings, Retailer will, within seven (7) days, make deposits in Retailer's Indemnity Fund sufficient, in the discretion of Company, to bring up Retailer's Indemnity Fund to such adequate amount and Retailer shall write no business nor incur no additional liability when Retailer's Indemnity Fund is below such amount.

In the event of the termination of this Agreement, Retailer's Indemnity Fund, or such balance as shall then be remaining, will be returned to Retailer, provided that, to the satisfaction of Company, in its sole discretion, all liability on any and all bonds written by, through and/or at the request of Retailer and/or Retailer's sub-agents shall have been fully discharged and all obligations of Retailer, hereunder, shall have fully been met.

11. **COLLATERAL.** All monies, securities or other collateral received by Retailer and/or sub-agent from or for persons bonded, or received from any other sources as collateral in connection with the bonding business, shall be received by Retailer for his/her/its own account. However, such funds, securities or other collateral as are received in connection with the bonds written by, through and/or at the request of Retailer shall be turned over by Retailer to the Company in accordance with such instructions as may be given, and upon receipt by the Company, the same shall be held for the purposes for which it was deposited. Responsibility for collateral prior to its receipt by the Company shall be that of the Retailer, including risk of loss.

12. **EXPENSES OF RETAILER.** Retailer will pay all expenses of conducting his/her/its agency including, but not limited to, all overnight mail, expressage and freight on items requested by his/her/its agency and the initiating party shall pay all telephone calls and telegrams. Company will furnish, at its discretion, printed forms necessary for issuing bail bonds through it. Company may pay in the first instance any expenses necessary for its own protection such as for entering judgments and issuing executions, but shall be reimbursed for such expenses as per Paragraphs 10 and 15 hereof.

13. **ADVERTISEMENT.** Retailer shall not insert the name of the Company or Surety or any information regarding it, in any publication, circular or newspaper advertising his services, unless prior written permission is obtained from the Company.

Initials: Company _____PM/_____ Retailer_____QB_____          Page 8

Case 1:20-cv-00695-CCE-LPA   Document 1   Filed 07/30/20   Page 257 of 273



**CANNON SURETY**

14. **RULES AND PROCEDURES.** From time to time, Company may adopt policies regarding the conduct of Retailer's business related to the issuance of bonds through the Company. Retailer agrees to abide by such policies and shall not execute bonds or recover fugitives except as is consistent with such policies and within the authority granted.

15. **FORFEITURES.** Retailer will send to Company immediate notice of any forfeitures declared on any bonds written by, through and/or at the request of Retailer and/or Retailer's sub-agent(s) and shall be financially one hundred percent (100%) responsible for the payment of any judgments on the same, and all costs and expenses associated therewith, including Company's attorneys fees. Retailer agrees that any indemnity fund held by Company or Surety will not be used for said forfeitures. The indemnity fund(s) are to indemnify Company, not Retailer or his sub-agent(s). **All forfeitures will be properly taken care of within 120 days of notice of forfeiture. The Company may choose to suspend your writing authority if forfeitures are not taken care of within 120 day time period. Company will help Retailer handle any forfeiture at the Retailers request or in the event that the retailer is in the opinion of the Company unable to take care of any forfeitures. Any expenses incurred are the sole responsibility of the Retailer.**

16. **SETTLEMENTS.** Retailer shall have no authority to consummate any settlement or compromise any claim for or against the Company or Surety on behalf of the Company or Surety without first obtaining the written consent of Company or Surety.

17. **SUB-AGENTS.** By execution of this Agreement, Retailer acknowledges and assumes full liability and responsibility for the actions of any sub-agent.

18. **SURETY BOND.** Retailer shall, if required, furnish to Company a surety bond and/or fidelity bond, in such amount (s) and form (s), with such surety company or companies, as may be approved by the Company, which bond (s) shall guarantee the fiduciary and faithful performance of the terms of this Agreement.

19. **COMPLIANCE WITH LAWS.** Retailer acknowledges that the operation of his business is regulated by the State of North Carolina and other applicable federal and local statutes, ordinances, rules and regulations. Retailer agrees that he shall, at his sole cost and expense, comply with all such laws, rules, regulations and requirements now in force, or which may hereafter be enacted, relating to or affecting his occupation as a Bail Bondsman. In addition, Retailer will not breach or sanction the breach of any applicable laws, statutory regulations, or ordinances related to the operation of his bail bonds business by his employees or agents and shall promptly notify the Company of any such violations.

20. **OWNERSHIP; CONFIDENTIALITY.**

   a. All records, accounts, accounts receivable, books, professional documents, educational materials, equipment, professional promotional materials, any other things owned by Company and made available to or used by Retailer remain the property of Company and will be returned immediately on termination of this Agreement regardless of

Initials: Company _MM_   Retailer _WB_                    Page 9

Case 1:20-cv-00695-CCE-LPA   Document 1   Filed 07/30/20   Page 258 of 273



**CANNON SURETY**

reason. This includes, but not limited to, all reports, applications, ancillary documents, powers of attorney and receipts written on all bail bonds.

b. Retailer shall treat all records (including any data or information pertaining to bonds issued or collateral obtained from a principal) as confidential and shall not disclose such information to anyone, unless otherwise permitted by law or otherwise permitted in writing by Company.

21. **ASSIGNMENT.** This Agreement is personal to Retailer and he shall not assign his/her/its rights, obligations or duties under this Agreement without Company's prior written approval, which approval may be unreasonably withheld. In the event Retailer assigns his/her/its rights, obligations or duties under this Agreement in contravention of this provision, such assignment shall be void and result in the immediate termination of this Agreement and will not relieve Retailer of any responsibility stated in this Agreement.

22. **TERMINATION.** This Agreement may be terminated by Retailer upon thirty (30) days written notice, but may be terminated by the Company at any time for cause upon providing either verbal or written notice to Retailer. Such cause shall include, but not be limited to, failure to remit premiums when due, failure to pay forfeitures when due, failure to maintain Retailer's Indemnity Fund, failure to timely report bonds, failure to immediately report bond forfeitures, or any other failure by any of the parties hereto to perform any of the obligations assumed by such party under this Agreement or for any other action deemed prejudicial to the best interests of the Company.

Notice by the Company to the Retailer of the cancellation of Retailer's power of attorney and/or termination of this Agreement shall be conclusively presumed and deemed to serve as notification that Retailer has no further authority to issue bonds through the Company and that no further actions may be taken except in regards to the orderly discharge of any outstanding bonds. Nothing in said notice shall be construed, in any manner, to alter, diminish, relieve, discharge or release the Retailer from his obligations under this Agreement. Such obligations shall continue in full force and effect until such time as all bonds have been fully discharged or as otherwise specifically provided for in this Agreement.

23. **INDEPENDENT CONTRACTOR.** Retailer is an independent contractor and not an employee, agent or servant of the Company.

24. **ARBITRATION; ATTORNEY'S FEES.**

a. In the case of disputes or disagreements concerning the terms and conditions of this Agreement which cannot be resolved between the parties, the method of settlement shall be solely through arbitration conducted under the Uniform Arbitration Act of North Carolina, and shall require only one arbitrator's decision and shall be binding upon both parties.

Initials: Company _MM_ Retailer _AB_                    Page 10



CANNON SURETY

    b.  In the event of any breach of this Agreement, the non-defaulting party shall be entitled to recover its actual attorney's fees as part of any arbitration award related to the enforcement of this Agreement.

**25. INTEREST.** Any indebtedness of Retailer owed to the Company shall bear prorated annual interest at the rate of ZERO PERCENT (0.00%), commencing upon the date such sums were due, with no further notice required.

**26. APPLICABLE LAW; VENUE.** This Agreement shall be governed and construed by the laws of the State of North Carolina. The parties hereby stipulate that Guilford County, North Carolina shall be the proper venue for any action arising out of or relating to this Agreement.

**27. ENTIRE AGREEMENT.** This Agreement constitutes the entire agreement between the parties with respect to the subject matter addressed herein and supersedes and replaces any oral or written communications and any undertakings otherwise made between the parties prior to its execution. Any amendment, change or alteration to this Agreement shall be made in writing and signed by the party sought to be bound thereby.

**28. DEFINITIONS.** Terms capitalized in this Agreement have such meaning as may be assigned to them herein and otherwise as such terms may be defined in Chapter 58, Article 71, of the General Statutes.

**29. SEVERABILITY.** It is understood and agreed by the parties hereto that if any part, term, or provision of this Agreement is held by a Court of competent jurisdiction to be illegal or in conflict with any applicable law, the validity of the remaining provisions of this Agreement shall not be affected, and the rights and obligations the parties shall be construed and enforced as if the Agreement did not contain the particular part, term or provision held to be invalid.

**30. ADDITIONAL DOCUMENTS.** Each party to this Agreement agrees to perform any other acts and execute and deliver any documents that may be reasonably necessary to carry out the provisions of this Agreement.

**31. CO-SIGNER/INDEMNITOR.** Any individual that signs this Agreement as a co-signer/indemnitor agrees to take on the same financial responsibility and liability as Retailer for all action or omission of Retailer and/or Retailer's sub-agent(s).

**32. SUMMARY AT SIGNING; ADDENDUMS.** From time to time Retailer and Company may amend or modify this agreement upon addendums to this agreement signed by both parties. Such addendums shall become binding and incorporated as part of this agreement. Any addendum shall become binding and effective as of the date of its signing. For purposes of convenience, some but not all of the terms of this agreement from the Retailer's perspective are summarized below:

**33.**

Initials: Company ___DM___    Retailer ___aB___                Page 11



**CANNON SURETY**

a) Premium rate: █████

b) BUF rate: ████

c) Reporting interval: weekly

d) Writing authority: $████████

e) Forfeiture liability: █████

f) Exonerations due: monthly

g) Rewrite fee: $███

h) Any deviance from stated terms must be by Company consent in advance

Case 1:20-cv-00695-CCE-LPA   Document 1   Filed 07/30/20   Page 261 of 273



CANNON SURETY

AGREED TO BY ALL PARTIES:

**Company/Representative:**

DAVLAS McCLAIN, PRES,

PRINT/TITLE                                   SIGNATURE

State of North Carolina; County of Guilford

On this 28th day of November, 2016, Dallas McClain did appear before me and identified himself by NCDL a valid state identification.

February 10, 2020

NOTARY PUBLIC                     My Commission Expires

**Retailer:**

Alwanda Beane                    Alwanda Beane

PRINT                                          SIGNATURE


**Cosigner / Indemnitor:**

_____          _____

PRINT                                          SIGNATURE


**Cosigner / Indemnitor:**

_____          _____

PRINT                                          SIGNATURE

State of North Carolina County of Guilford on this 28th day of November, 2016.

Alwanda Beane

did appear before me and was identified by NCDL which is a valid state/federal identification card.

February 10, 2020

NOTARY PUBLIC                     My Commission Expires

Initials: Company MM    Retailer AB                     Page 13

*DALLAS R. MCCLAIN*

*V.*

*JOHN MICHAEL "MIKE" CAUSEY, ET AL.*

## PLAINTIFF'S EXHIBIT 17

## **AFFIDAVIT**

Billy Todd Reavis, being duly sworn avers as follows:

I am a bail bondsman in primarily Davie County and the surrounding counties. I am a long time friend and acquaintance of the North Carolina Commissions of Insurance, Mike Causey. In the course of a conversation at an agreed-upon meeting in Greensboro, North Carolina, Mr. Causey stated that he had found out that for anything to be accomplished he had to "play ball" with Mr. Phil Berger and Tom Apodaca. At this meeting were Mr. Causey, Ms. Mendy Greenwood, Wanda Beane and myself. Also, Mr. Causey said he was forced, by Phil Berger and Tom Apodaca to take action against and investigate Cannon Surety for their solvency.

This the **9th** day of July, 2019.

_Billy Todd Reavis_
Billy Todd Reavis

Sworn to and subscribed before me,
This the **9** day of July, 2019.

_Notary signature_
Notary Public

My Commission Expires: **5|8|22**

LISA G FORRESTER
NOTARY PUBLIC
GUILFORD COUNTY, NC
My Commission Expires May 8, 2022

## NORTH CAROLINA DEPARTMENT OF INSURANCE
### MENDY GREENWOOD
#### REGIONAL DIRECTOR

T: 919.807.6011   C: 919.218.3626
MENDY.GREENWOOD@NCDOI.GOV

1201 MAIL SERVICE CENTER
RALEIGH NC 27699-1201

TOLL FREE: 855.408.1212
WWW.NCDOI.COM



MIKE CAUSEY · COMMISSIONER

*DALLAS R. MCCLAIN*

*V.*

*JOHN MICHAEL "MIKE" CAUSEY, ET AL.*

## <u>PLAINTIFF'S EXHIBIT 18</u>

1    A    No. Actually, actually, we don't. I

2    don't. That's sent to the Department. The only time

3    I've ever got a total on that, I would ask the

4    Department. I would ask them in writing.

5    Q    Well, how much do you believe is in that

6    account?

7    A    I wouldn't like to put a hypothetical out

8    there and guess. I don't know.

9    Q    Does the Department of Insurance, has the

10   Department ever sent you any notice that it was

11   accessing those funds for any bond forfeiture

12   judgment liability?

13   A    The Department has never sent us notice

14   that -- for judgment or liability.

15   Q    Is AAI restricted from serving as a surety

16   in North Carolina as sit here today?

17   A    No. We're in good standing.

18   Q    You're able to still act as a surety on

19   new bonds even though you're in the process of

20   runoff?

21   A    We've made the decision voluntarily not to

22   issue any new bonds, but we are a surety for

23   purposes of handling off the matters of the court,

24   the contractual obligation with the State of North

25   Carolina. Because as you know, if we would just

30(B)(6) AAI, LLC         February 26, 2020

**From:** Trendel, Jeff
**Sent:** Thursday, February 15, 2018 1:35 PM
**To:** Kilpatrick, Rick G
**Subject:** RE: AAI reimbursement

Ok.

From: Kilpatrick, Rick G
Sent: Thursday, February 15, 2018 12:02 PM
To: Trendel, Jeff <Jeff.Trendel@ncdol.gov>
Cc: Coble, Susan <Susan.Coble@ncdol.gov>
Subject: AAI reimbursement

Jeff,

You recently forwarded requests made by Mark Cartret where he requested approval to pay judgement from the operating account to be subsequently reimbursed from the deposit held by US Bank. Mark has provided me with payment amounts. I have attached the writs as well as payments.

Dominique Freeman $2099.39
Eugene Fleming    $1555.99
Eddie Farmer      $1055.66

Total             $4,711.04

Upon your review and approval, I will have Nancy instruct US Bank to have a check cut from the deposit made payable to AAI for the amount above. I will inform Nancy that the check should be sent here.
Once we receive the check, we can have Mark come here to pick up the check and sign a form she utilizes acknowledging receipt. I believe you also stated that you would want him to provide us with proof of deposit.

Rick

Case 1:20-cv-00695-CCE-LPA   Document 1   Filed 07/30/20   Page 268 of 273

On Mar 11, 2019, at 8:52 AM, Trendel, Jeff <Jeff.Trendel@ncdoi.gov> wrote:

Mark —

We will review and get back to you.

On another note, AAI's annual report is due March 15, 2019. I just wanted to remind you.

Also, we never received a request for a waiver for the annual audit/statement of actuarial opinion.

Thanks.

Jeff

Jeffrey A. Trendel, PIR
Deputy Commissioner, Financial Analysis and Receivership Division

<image001.png>
                    <image003.jpg>N.C. Department of Insurance
                    1203 Mail Service Center
                    Raleigh, NC 27699-1203
                    919.807.6148 **office**
                    919.398.4047 cell

**From:** Mark Cartret [mailto:markcartret@gmail.com]
**Sent:** Sunday, March 10, 2019 12:44 PM
**To:** Trendel, Jeff <Jeff.Trendel@ncdoi.gov>
**Cc:** annamaria@myaai.net
**Subject:** [External] Loftin Bail Bonding Execution in Wilson County

2
- 4999 -

CAUTION: External email. Do not click links or open attachments unless you verify. Send all suspicious email as an attachment to report.spam@nc.gov

Jeff,

Could we have the attached paid from the special deposit? The payoff is good until Friday 3/15.

Thank you. Mark



**NC DEPARTMENT OF INSURANCE**
MIKE CAUSEY · COMMISSIONER

MEMORANDUM

To:     Agent Associates Insurance, LLC

From:  Jeff Trendel

Re:     Reimbursement from Special Deposit

Date:  February 23, 2018

Please find check #108457017, dated February 16, 2018, in the amount of $4,711.04 which represents a partial liquidation of the special deposit of Agent Associates Insurance, LLC. This check is for the reimbursement of costs associated with paying the judgements for Dominique Freeman, Eddie Farmer and Eugene Fleming.

By signing below, you acknowledge acceptance of the check.

Accepted by: _____     Date: _____
                    Agent Associates Insurance, LLC

Case 1:20-cv-00695-CCE-LPA   Document 1   Filed 07/30/20   Page 270 of 273

THIS DOCUMENT HAS AN ARTIFICIAL WATERMARK PRINTED ON THE BACK. THE FRONT OF THE DOCUMENT HAS A MICRO-PRINT BORDER. ABSENCE OF THESE FEATURES WILL INDICATE A COPY.

 **bank.**

02/16/2018          108457017          83-38

Wealth Management & Securities Services
Questions Call 1-866-252-4360

PER NCDOI APPROVAL

PAY     FOUR THOUSAND SEVEN HUNDRED ELEVEN DOLLARS AND 04/100

Issued by: U.S. Bank National Association, Minneapolis, MN 55480          $   4,711.04

Drawer: U.S. Bank

TO THE     AGENT ASSOCIATES INSURANCE LLC
ORDER
OF

                                                    AUTHORIZED SIGNATURE

⑈ ⑈084570⑈9⑈⑈  ⑈

UB  362          000002                          108457017
IT SL STLOUIS                                    02/16/2018
2274                                             4,711.04
ITC

CHECK ISSUE

PER NCDOI APPROVAL

AGENT ASSOCIATES INS, LLC (NCDOI)

Wealth Management & Securities Services
Questions Call 1-866-252-4360

AGENT ASSOCIATES INSURANCE LLC
NORTH CAROLINA DEPARTMENT OF INS
ATTN: NANCY WISE
1203 MAIL SERVICE CENTER
RALEIGH, NC 27699-1203

| From: | Trendel, Jeff |
| Sent: | Monday, March 11, 2019 9:55 AM |
| To: | 'Mark Cartret' |
| Cc: | Susan Cobie; Rick Kilpatrick |
| Subject: | RE: [External] Loftin Bail Bonding Execution in Wilson County |

Mark –

Sorry to hear about Redacted  Hopefully, things have, or will, work out.

We did not give a blanket exemption last year. The exemption that we gave was only for the audit and actuarial opinion, and was only for the year ending 12/31/17.

Unfortunately, pursuant to G.S. 58-10-405(e), we cannot exempt AAI from both the annual report and annual audit/actuarial opinion requirements.

Since the audit costs money, I would assume you would prefer an exemption for that. If so, I will go ahead and make a recommendation regarding that requirement.


Let me know if you have any questions.

Jeff


Jeffrey A. Trendel, PIR
Deputy Commissioner, Financial Analysis and Receivership Division



N.C. Department of Insurance
1203 Mail Service Center
Raleigh, NC 27699-1203
919.807.6148 office
919.398.4047 cell


From: Mark Cartret [mailto:markcartret@gmail.com]
Sent: Monday, March 11, 2019 9:15 AM
To: Trendel, Jeff <Jeff.Trendel@ncdoi.gov>
Subject: Re: [External] Loftin Bail Bonding Execution in Wilson County

External email. Do not click links or open attachments unless you verify. Send all suspicious email as an attachment to report.spam@nc.gov


Thank you and thanks for reminding me. As you know AAI is working on the runoff and has not incurred any liability. Unfortunately in the last month we've been battling an issue with Redacted
I apologize I wrongly assumed we had a blanket exemption.

1
- 4998 -



Would you accept this as our request for an exemption?

M



# NC DEPARTMENT OF
# ★ꓵNSURANCE
### MIKE CAUSEY · COMMISSIONER

**FINANCIAL ANALYSIS AND RECEIVERSHIP**
Tel 919.807.6140  Fax 919.807.6635

MEMORANDUM

To:    Agent Associates Insurance, LLC

From:  Jeff Trendel

Re:    Reimbursement from Special Deposit

Date:  June 13, 2018

Please find check #108584111, dated June 5, 2018, in the amount of $1,555.88 which represents a partial liquidation of the special deposit of Agent Associates Insurance, LLC. This check is for the reimbursement of costs associated with paying the judgements for Alexis Gooding and Carlos Little.

By signing below, you acknowledge acceptance of the check.

Accepted by: _____          Date: 6-13-18
             Agent Associates Insurance, LLC

